**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

JODY KRISS ET AL,         )
                                  )
       Plaintiff,        )
                                  )
v.                          )
                                  )
BAYROCK GROUP LLC ET AL,    )
                                  )
       Defendants     )

**ORAL ARGUMENT WILL
BE REQUESTED**


No. 10-Civ-3959 (LGS/FAM)


### OBJECTION TO MAGISTRATE'S REPORT AND RECOMMEDATION TO STRIKE CERTAIN PARAGRAPHS FROM THE FIRST AMENDED COMPLAINT

       Plaintiffs Jody Kriss, Michael Ejekam, and, through them, the hundreds of banks, customers, and other creditor victims of the Bayrock defendants' ("Bayrock's") criminal frauds, whom they represent as derivative plaintiffs, ask this Court to review the Magistrate's Report and Recommendation to strike certain paragraphs from the first amended complaint (the "FAC").

*****

       The Recommendation should not be followed and the Court should further respond to this objection, in concert with the prior pending motion, ECF 69, for relief from the Magistrate's May 29, 2014 order, ECF 68, by itself conducting further process, including evidentiary hearing, as set forth below, or by recalling the reference and reissuing a reference to a new Magistrate to conduct the same. In brief, to restore

*****

# I. TABLE OF CONTENTS

I.   Table of Contents ............................................................................................................. i

III.   Catch-All Provisions ..................................................................................................... 1

  A.   Standard of Review ................................................................................................. 1

  B.   Plenary Review ....................................................................................................... 1

IV.   Summary: There was no violation of an order. Hence there can be no sanction. ...... 2

  A.   The punctilio of an honor the most sensitive. ......................................................... 2

  B.   Background ............................................................................................................. 5

  C.   The 2013 Order was clear. We complied, and even if not it was trivially fixable. ...... 6

  D.   The 2014 Order was equally clear (or unclear). Even though compliance was massively difficult, and utterly impossible in the time we had, we complied. ..................................... 11

V.   General Argument ........................................................................................................ 19

VI.   Miscellaneous Matters ................................................................................................ 26

  A.   Due Process Notice as to Bernstein Affidavit ....................................................... 26

  B.   Brief "Sum and Substance" Review of Our Prior Arguments ............................... 26

    1.   The Bayrock defendants' privilege log and associated "argument" and "declaration" are incompetent. ....................................................................................................... 26

  C.   Waivers .................................................................................................................. 27

    1.   Schwarz .............................................................................................................. 27

    2.   Bayrock/Subsidiary. ........................................................................................... 28

  D.   Evidence of Crime Can Not be "Converted" or "Stolen" ...................................... 29

VII.   Conclusion .................................................................................................................. 30

VIII.   Public docketing of all motions required: .................................................................. 32

IX.   Conclusion .................................................................................................................. 33

# III. CATCH-ALL PROVISIONS

## A. Standard of Review

As a preliminary matter, pursuant to F.R.C.P. 72(b), this Court must consider any objections to a magistrates Recommendation *de novo*. For the sake of brevity, plaintiffs do not copy and reargue their argument and submissions below but incorporate the prior pleadings and papers herein.

## B. Plenary Review

Notwithstanding their detailed objections below, plaintiffs object to every finding of fact made as (i) conclusory, with no record capable of review; (ii) against the weight of the evidence; and (iii) made pursuant to an inadequate evidentiary standard, as the standard herein must be "clear and convincing"; and (iv) not sufficiently set forth as being actually recommended findings rather than musings and ruminations concerning non-operative facts.

Plaintiffs further object to every conclusion of law as not supported by the evidence.

The preceding two paragraphs shall not apply to the Magistrate's recommendation that the outright striking of the FAC is unwarranted, which taken for what it is, which is a disapproval of and disinclination to recommend the imposition thereof (of course plaintiffs do not agree with the recommendation that any sanction be imposed; this paragraph simply shows their acquiescence and accord that outright striking should not be imposed.

The purpose of this paragraph is to ensure that the Court understands that we have asked it to review *de novo* the entirety of the subject matter presented without having to replicate all the exhibits and filed papers herewith.

## IV.     SUMMARY:
### THERE WAS NO VIOLATION OF AN ORDER. HENCE THERE CAN BE NO SANCTION.

**A.     The punctilio of an honor the most sensitive.**

On May 29, 2014, the Magistrate issued an order requiring us to make certain identifications. ECF 68 at 12. This is how, in sum and substance, he described all his order had required of us, writing in the January 14, 2015, Recommendation that suggested this court impose quasi-criminal sanctions for what he called our obviously fraudulent, indeed comically so failure to comply. ECF 97 at 16.

> The court required that, for each of 600 disputed allegations in their complaint which had one or more public (untainted) sources, they were to identify at least one of them.

About 100 of the allegations had one or more public (untainted) sources. Almost all of those sources were documents filed publicly in Delaware Chancery court 6 years ago by the same parties as are here. They have been public ever since. No one ever sought any form of protective order.

To the right is a picture of a binder we prepared in compliance with this order and on July 1, 2014, sent to the Magistrate and defendants. It has, listed and tabbed, every one of the 60 documents public on those dockets, and filing receipts therefor.



Below is a picture of part of the chart we were ordered to prepare and submit as well. Each line corresponds by its number to a disputed allegation, so there are 600 of them. As noted, about 100 allegations should have a notation that there is at least one or more public (untainted) sources, and at least one such source should be identified.

| 382 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 381 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 385 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| Footnote 23 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS |
| 386 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 387 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 388 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 389 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 390 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 391 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| Footnote 24 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS |

As the court can see, that's exactly what we did, and more. We identified every public source for every allegation that had one. All these allegations, for example, are based on Bayrock partnership agreements, all of which are in a binder labeled "Partnership and Subscription Agreements." Some of those agreements are also public on Delaware dockets. Every one of them is in the binder pictured, labeled "Delaware Chancery Filings," and tabbed. Every chart entry links a disputed allegation to that binder. And incidentally, virtually every such allegation is based in part on the same, two of the documents in that binder, Kriss's membership and service agreement and the Bayrock LLC agreement. So we could have listed either, too, on every entry, but it would have been redundant and of no real value.

We complied. Period. There's not a lot of wiggle room here.

Now, there's some debate whether what's in Delaware is really public. Apparently defendants believe that letting documents sit public for 6 years isn't a waiver, even as to documents they themselves filed in Delaware. We think that's ridiculous. The Magistrate has not addressed it. But if there is a doubt, if the Magistrate decides they're not really public, then **none** of the 100 allegations sourced to Delaware would be involved in the order, **as he described it**, which is confined to allegations sourced to public sources. In that case, our entire production would have to have consisted of…noth-

ing. Well that's not completely true, there were a few disputed allegations we sourced to public government records, a tax statute, and the like, but that's it. **In other words, we may not, if defendants are correct, have been required to produce much of anything.**[1]

It's also possible that by "untainted source" the Magistrate meant private, not just public, untainted sources. In that case, we could have no idea what, or who, such a source might be, but presumably one such might be our client, plaintiff Kriss. And the chart shows that we identified him, too, as a source for these disputed allegations, and far more, something on the order of 388 of them.

How did we wind up subject to a recommendation to be sanctioned at quasi-criminal levels when we obviously produced? That's a good question. Here's a better one. Look at that chart entry for ¶386. It shows (that is, it conveys):

> Allegation ¶386 in the complaint is sourced to information obtained from our client, plaintiff Kriss, which is privileged; from our own work product (almost all of it opinion work product), which is protected; and from Bayrock partnership documents (a set of about a dozen partnership, or limited liability company, agreements) and subscription documents (agreements to contribute capital in return for membership interests), many of which are public in Delaware Chancery court.

Now answer this: Given that chart, exactly how did the Magistrate come to say:

---

[1] Mention should be made here of something relevant. It should logically go later in this document, under the "Balancing of Equities" section. It's this:

This is the first page of an exhibit filed in Delaware. It's "Exhibit A" to "Arif Affidavit" in Binder 5, and is Kriss's last membership services agreement. It contains lots of financial information. Defendants have included among their claims of stolen trade secret information matters sourceable to this document. Defendants are the ones who filed it there. In public. By their local counsel, the largest firm in the state. Think that through. Defendants are claiming as trade secret and confidential information they themselves placed in the public domain in open court, and arguing that what's in Delaware isn't really public. Of course had there been any hearings on sanctions *vel non* we would have shown this to the Magistrate for his "balancing of equities" consideration. But there were no hearings.



The court is requested to keep that and far more that's about to be revealed in mind as it contemplates that Bayrock, which has admitted in its own filings to having been a criminal enterprise, is the aggrieved, sympathetic party whose "trade secrets" (aka criminal evidence) are being "misused" to bring them to justice.

The Plaintiffs were not yet done, however, and intensified their efforts to pay lip service to – but not actually comply with – my prior Orders…On or about [July 1], they also delivered to my Chambers what they identified as "Binder 5," consisting of approximately 700 pages of unindexed documents allegedly "prepared for and then submitted into prior litigation in Delaware." (Id.). It appears that a copy of Binder 5 also was furnished to Bayrock's counsel. (Id.). Mr. Oberlander represented that none of the documents in Binder 5 came from Bernstein **but he did not specify the relationship, if any, between the documents and any of the paragraphs of the FAC challenged by the Defendants.** (ECF 97 at 11-12)

Or this:

**Nevertheless, in clear defiance of the Orders, the Plaintiffs have yet to specify a source for any of the averments in the FAC that Bayrock contends are based on the purloined documents.** (ECF 97 at 12).

We have a pretty good idea. Because of the gravity of what's at stake, we'll need quite a few pages to **prove** what we just said. And in fairness we alert the court that what may at first appear to be gamesmanship is anything but, rather is **formal proof** of what went on here, which is sufficiently distressing in its implications for fair play and due process that we are taking painstaking care in our proof. Suffice it to say for now that it is a matter of honor. We let the facts speak more for themselves.

## B.     Background

Bayrock alleges that plaintiffs "improperly" obtained their privileged and confidential information from one Bernstein, a former employee who was in possession of copies of documents which contained them, kept on a hard disk he had made while working at the firm.[2] They claimed some 600 paragraphs in the complaint had been tainted and sought relief including striking the complaint. Plaintiffs confirmed that they had obtained some information from Bernstein, but they denied that they had done so "improperly" and denied that any of it was privileged or confidential.

---

[2] "Improperly" is in quotes as no one has explained by what standard, state law, or unknown federal common law, it was "improper," and by that standard what facts made it "improper." If this court were sitting in diversity,nit would be important as, if considered a substantive rule, it would have to be determined by state law. *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938). And in federal question jurisdiction, there's no way besides some "common law of sanctions" apparently written in invisible ink that it could be decided in a case like this, where plaintiff is a full managing partner of defendant, not a mere disgruntled ex-employee, without touching comity, abstention, and corporate internal affairs doctrine (rights of a partner in a partnership to use partnership information). Where quasi-criminal sanctions are implicated, due process is violated if the "rules of the game" are not ascertainable.

The Magistrate was assigned the task of resolving this as part of a general pretrial assignment. Naturally, assuming defendants had made out a *prima facie* case entitling them to relief[5], the Magistrate would have to determine (i) whether what was acquired was "protected"[4]; (ii) if so, whether the acquisition was "improper"; and (iii) if so, whether the requested sanction, or some other, was appropriate, presumably (if at all) under inherent powers, as neither §1927 nor Rule 11 would apply.

This isn't novel. There are many cases where one party, usually a plaintiff employer, complains that another, usually a plaintiff ex-employee, misappropriated documents and asks that a pleading be stricken. What is novel is that the Magistrate decided to do it backwards[5]. Rather than first considering whether any information on which the allegations are based were protected, he determined to consider before that whether such information [what was in the complaint had been acquired "improperly," and to do that he determined to first consider the sources from which the allegations had been derived.

This may be not entirely silly, to a degree. If, for example, the Magistrate considered that there were only three possible sources, (i) public; (ii) Bernstein; and (iii) anywhere else; then it might make sense to know which one (or more) of these applied to each contested allegation because then you would know that (i) the allegations with public sources sail through; (ii) the ones with Bernstein sources are subject to some kind of "Bernstein-specific" analysis; and (iii) the others get some other analysis.

C.     **The 2013 Order was clear. We complied, and even if not it was trivially fixable.**

Presumably to further that end, in the September 11, 2013, status conference, the Magistrate ordered plaintiffs to **indicate**, for each of the 600 paragraphs in the complaint, **whether** the allegation was sourced to Bernstein or to some public source known at the time it was drafted. There's no question that what was ordered was a **representation whether** each contested allegation was or wasn't clean, not at all a full trail of how the allegation was derived. This was ordered orally, at a September 11, 2013 status conference. The transcript shows the following [Emph. add.]:

---

[3] They didn't. This issue is currently sub judice in our objection to the Magistrates determination, *infra*.

[4] Or, whether there was any prejudice. Improper acquisition of information that was already known to be in the public domain would presumably not trigger any right to seek to have a pleading struck.

[5] We have raised this issue in our first objection, *sub judice*, we renew it here.

THE COURT: Mr. Oberlander needs to represent that which in the first amended complaint came from Mr. Bernstein and that which he has an independent source for...

THE COURT: And, in particular, for the paragraphs where the Bayrock defendants say the information should not be in the complaint…What I am going to require is that you **indicate** that which came from Bernstein; that, in particular, you address **whether** the paragraphs that the Bayrock defendants say came from Bernstein and are confidential, privileged or work product, **whether** those came from Bernstein; but, further, that you indicated, because I think there is no harm in this, **was there a public source also for the information**?...

MR. OBERLANDER: You're ordering me to state whether or not there is a public source for every paragraph of an 800-paragraph complaint…

THE COURT: A public source that you rely on. If 99 percent of this information came from Mr. Kriss, it's not a heavy lift…

THE COURT: **The source is Bernstein or the source is Kriss or the source is some public document…**of which you were aware at the time you were drafting it.[6]

[BAYROCK]: Addressing what came from Mr. Bernstein is important…but to address the issue of fundamentally whether or not they're privileged is not satisfied alone by saying, "Oh, that thing came from Bernstein."

As the Magistrate himself described the 2013 Order (Rec. at 5, quoting ECF 6, Tr. at 26-27):

I therefore instructed the Plaintiffs to "address **whether** the paragraphs that the Bayrock defendants say came from Bernstein and are confidential, privileged or work product" in fact came from Bernstein, by indicating whether "there [was also] a public source . . . for the information" set forth therein.

Note this is a simple proposition: for any challenged paragraph, (i) it was sourced to Bernstein or it was not; (ii) it was sourced to Kriss or it was not; (iii) it was publicly sourced or it was not; and (iv) it was sourced to someone or something else or it was not.

And here we have a problem. While it appears each allegation could take on only one of 4 values, "i," "ii," "iii," or "iv," that's true if, and only if, there's only one possible source for each allegation. This is the fundamental problem of this entire endeavor, namely that **the Magistrate's orders kept flip-flopping between ordering all sources (thus recognizing that there might be multiple sources) and ordering only one, if any.** Just look above and compare "was there a public source also" with "either the source is Bernstein or the source is Kriss or the source is some public document or fact." They are two entirely inconsistent views of the world.

---

[6] Notice this is error, as it doesn't allow for private sources other than Kriss or Bernstein.

While the Magistrate contemplated a world with four flavors of ice cream, chocolate, strawberry, and vanilla, then ordered us to tell him what flavor ice cream cone we had ordered on each of 600 occasions, if you consider a cone as having only one scoop, there's only 4 possible answers for any of the 600. But if a cone can have up to four scoops, and they don't all have to be the same flavor, there can be 255 different answers. The more possible scoops, the worse it gets.

But the one thing absolutely certain is that the order was to **state whether** for each allegation it was chocolate, vanilla, strawberry, or coffee, or some combination, **not to prove it**.

Accordingly, as we recognized that this was a simple "coloring" problem (that's what it's called in math, seriously), we committed to turn it out in two weeks, since, as the Magistrate himself said, if 99 percent of this information came from [plaintiff] Kriss, and it did, "It's not a heavy lift."

Two days later, the Magistrate issued a written version (2013 Order ¶ 2). This one said:

> Plaintiff[s] shall serve . . . an annotated version of Exhibit A to the Bayrock Defendants' [May 9 Letter, **detailing any** sources of information other than . . . Bernstein for the allegations in the referenced paragraphs of the [FAC]."

This was the first indication something wasn't right. Still, we interpreted this order to mean the same as at conference, considering all the dialogue that had taken place, and so "detailing any" sources of information must have meant "stating **whether** it was Kriss, or Bernstein, or public, or…"

And, according to the Magistrate, we were right. His own words say so, in the following from the offending Recommendation ("Rec". at 5, quoting ECF 6, Tr. at 26-27):

> I therefore instructed the Plaintiffs to "address **whether the paragraphs** that the Bayrock defendants say came from Bernstein and are confidential, privileged or work product" **in fact came from Bernstein, by indicating whether** "there [was also] a public source . . . for the information" set forth therein. (Id. at 28).

> To further memorialize this directive, I issued the 2013 Order, which required that, "[b]y September 30, 2013, the Plaintiff[s] shall serve . . . an annotated version of Exhibit A to the Bayrock Defendants' [May 9 Letter], **detailing any sources of information other than . . . Bernstein** for the allegations in the referenced paragraphs of the [FAC]." (2013 Order ¶ 2) (emphasis added).

**Indicating whether** there was a public source is not the same as detailing any sources other than Bernstein. But the Magistrate says they mean the same thing. In any event, we chose the simpler,

"whether" rather than the "detail," so made a map, yellow representing only Bernstein; orange representing Bernstein plus Kriss, then colored each paragraph and made a corresponding map on the objection chart Bayrock had submitted, producing something where one could see at a glance which allegations we represented to be public, which to be only Bernstein, etc.



Then, as the Magistrate hadn't been clear whether Kriss should have his own category, we identified the following categories of sources (multiple scoop cones) exactly as required (remember, for example, the directive to say which came from Bernstein and which also came from public sources:

YELLOW is Bernstein.                    GRAY is Bernstein and others.
GREEN is Bernstein and public records.  ORANGE is Bernstein, others, and public records
BLUE is others and public records.      NO HIGHLIGHT is others

There is no debate. This is precisely what the Magistrate ordered, combining together Kriss and all other private sources into one category (recall the Magistrate had neglected to consider there might be other private sources besides Kriss, such as witnesses). Again, remember what he said:

> I therefore instructed the Plaintiffs to "address **whether the paragraphs** that the Bayrock defendants say came from Bernstein and are confidential, privileged or work product" **in fact came from Bernstein, by indicating whether** "there [was also] a public source . . . for the information" set forth therein. (Id. at 28).

So, there **had** to be a category for allegations sourced only to Bernstein, and another category for allegations sourced to Bernstein where there was also a public source, by his own order.

Now it's possible we misunderstood, and the Magistrate didn't want merely "whether," but also "detail," or "what." And sure enough, Bayrock objected to our production within days, and we responded back within days. Had this been a discovery dispute, we would have been expected to work it out, and Bayrock could not have asked for an order to compel without that attempt.

But even though all this disagreement was sent to the Magistrate by October 10, 2013, *passim* the docket he said nothing for **seven months**. Yes, there are other cases. But we ask the court go back and look at the prior page, just glance at it. How hard should it have been for the Magistrate to glance at it and say, "Yes, that's what I wanted," or "No, I wanted detail." Ten seconds? Thirty.

We submit, and as vehemently as we can, that to blow up what would have taken less than a minute to approve or disapprove into allegations in the May 29, 2014 that we deliberately defied orders is vastly inappropriate. Apparently the Magistrate chose to combine the approval *vel non* of what we had produced with the resolution of several motions before him, which is his choice, but it does not entitle him to blow this out of proportion to the extent that our choosing to go with "whether" rather than "what" in the face of absolutely clear language from the conference transcript and where the question can be settled in a phone call instead sits festering for more than half a year and then becomes the basis for the imposition of sanctions to strike a complaint. That is *per se* abuse of discretion[7].

---

[7] As was calling the color map and chart absolutely useless, ECF 68 at 11, and then actually using it for the purpose intended. ECF 97 at 20.

**D.    The 2014 Order was equally clear (or unclear). Even though compliance was massively difficult, and utterly impossible in the time we had, we complied.**

As noted, on May 29, 2014, the Magistrate issued an order requiring us to make certain identifications. ECF 68 at 12. This is the actual decretal language:

> *The* factual source for each contested allegation is to be identified with sufficient specificity that the Court and opposing counsel can determine whether documents that arguably are privileged or work product or sealed were relied upon as *the* basis for the allegation.

But, as noted, this morphed, so that the Magistrate's interpretation of this order became, by the time he issued the offending Recommendation, in sum and substance, ECF 97 at 16-17::

> The court required that, for each of 600 disputed allegations in their complaint which had one or more public (untainted) sources, they were to identify at least one of them.

It doesn't look the same as what he said it required. It isn't. Here's how this happened, and to the extent we can reasonably infer, why.

Look at the italicized words in the actual order. *The* factual source. *The* basis. This is the same "error" the Magistrate made throughout this endeavor: As we noted, there's been a constant flip-flop between language that makes no sense unless allegations have only one source, and language that makes no sense unless they have many. And almost all the allegations have many, many sources.

This explains, assuming good faith, why the Magistrate found fault with the color map, because the concept underlying it was that an allegation can be both Bernstein and non-Bernstein, for example.

So what did "*The* factual source…is to be identified…" mean in a multi-source world?

If it was meant to require only one source, especially only if public (untainted), *infra*, it was reasonable, but would be fruitless as most allegations would be sourced with insufficient specificity.

If it was meant to require all sources, he was generating an abusively large amount of work (for which he had allowed us only two weeks, or some 80 or so working hours). Identifying every paragraph on every document behind every allegation, let alone threading them together to connect dots and explain how a 100 word allegation came from 25 different sources, which otherwise would hardly be obvious, especially as this is a complex tax case, would take thousands of hours. We know,

because that's how we wrote the complaint, and it took nearly a year. That's beside the fact that drawing this kind of roadmap is a *per se* infringement of work product protection.

On the other hand, producing every document underlying every allegation, organized by category, without the roadmap, could be done in a few hundred hours and so might be safe enough as to work product. So that's what we did. But that still gave us a 5,000 page, 9-binder, 250 document production, the equivalent of two or three litigation boxes, give or take.

So we did the responsible thing, which was to produce those 5,000 pages, but keep asking for clarification and for a privilege conference, *in camera* review, briefing, telephone conference, something to guide us, passim the docket from June through August 2014, and when each time opposing counsel refused to cooperate and the court stayed silent, eventually we realized that we would get no clarification and no privilege ruling, so notified the court that we were producing what we were, even if an over production, but **with one exception** not sending it to opposing counsel, only to the court, until we had a ruling on privilege and work product (privilege would have been implicated if we had to divulge what person gave us any of the documents, and that person was a client).

That one exception was information which supported some of the allegations and which was public (untainted). There were about 100 such allegations. One was sourced to the Internal Revenue Code (Fn.13), a few to Florida online public corporation filings (¶345) and New York State Supreme Court filings (¶342, ¶344). We noted those in chart entries corresponding by number to the allegations.

But most, 89, were sourced to public filings in prior litigation between the parties in Delaware Chancery Court, filings which we've already discussed. As we noted, we collected every one of the 60 documents filed in Delaware, many single page emails, the rest multiple-page pleadings, into a PDF folder then had that printed and bound and delivered into court and to opposing counsel, with a cover letter explaining that they were all the filings in Delaware and that they were the source for the 89 allegations. ECF 68 *et seq*. We also notified the court that we had available a PDF version, which of course is much more usable, because they were all indexed and text-searchable. ECF 68 *et seq*. And we made 89 corresponding chart entries, noting for each of the allegations, again cross-referenced by number, that at least in part they were sourced to one or more filings in Delaware, which had been

collected together in that binder (Binder 5). If we may briefly repeat ourselves, here is a sample of what the chart entries looked like:

| 382 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH |
| 381 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 385 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| Footnote 23 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS |
| 386 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 387 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 388 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 389 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 390 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| 391 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS, MANY PUBLICLY SOURCEABLE (DEL CH) |
| Footnote 24 | ATTORNEY CLIENT COMMUNICATION (KRISS), WORK PRODUCT, BAYROCK PARTNERSHIP AND SUBSCRIPTION DOCUMENTS AND RELATED EMAILS AND |

For example, the chart says (virtually):

"Allegation ¶386 in the complaint is sourced to information obtained from our client, plaintiff Kriss, which is privileged; from our own work product (almost all of it opinion work product), which is protected; and from Bayrock partnership documents (a set of about a dozen partnership, or limited liability company, agreements) and subscription documents (agreements to contribute capital in return for membership interests), many of which are public in Delaware Chancery court."

Then we submitted this chart, with, first, on June 9, 2014, the Delaware Chancery category binder with all the Delaware filings, which include some of the partnership and subscription agreements, then later, 8 more category binders, one, titled "Partnership and Subscription Agreements," with all of the documents we used in drafting these allegations, several of which are, again, public in Delaware, so are also in the Chancery binder. **We had to do this because allegations like ¶386 had multiple sources, not one, or "the" source, so a complete production required identifying the multiple sources, some of which were public, and some of which were not, and showing which**

**was which, thus 5,000 pages in 6 categories spreading across 9 binders.** And we sent the Delaware binder also to defendants, since it couldn't have privilege implications.

To be clear: every allegation that had any public (untainted) source was clearly so identified on that chart, and for the 90% of them which had a public source in Delaware we not only identified them on the chart, we produced (all) the public documents, and proof of their provenance.[8] And of course, like all the other documents in all the other categories, the documents public in Delaware were related by category to each and every one of the complaint paragraphs that at least in part relied on any of them by that chart (we'll explain why that was in boldface shortly).

Moreover, we did the same category binder production for every allegation that **didn't** have any public (untainted) source. So does this mean we complied with the actual order? Yes. Here's why:

The order had to components to consider, (1) what was supposed to be identified; and (2) with what level of specificity.

We've finished discussing the first part; clearly, for each disputed allegation (1) either every source was to be disclosed; or (2) one source was to be disclosed. Because we had been beaten up on the production of the color chart, we chose the best course to us, which was (1), every source, of course to the extent it didn't implicate privilege or work product.

But the second component, the level of specificity, appears to be a problem. Facially of course, it's impossible to know what the court and opposing counsel need to make their determination. It's a *per se* violation of due process to sanction us, or anyone, for failing to produce what a third party finds "sufficient" when there are no guidelines given. Certainly we should be entitled to an opportunity to get clarification and privilege rulings and have an opportunity to argue that what we gave was sufficient and if not an opportunity to fix it upon those rulings.

Beyond that, it's still a problem, because

*The* factual source for each contested allegation is to be identified with sufficient specificity that the Court and opposing counsel can determine whether documents that

---

[8] The binder contained, right at the front, documents produced by the Delaware Chancery online filing system showing the dates and times the other documents in the binder had been filed by uploading.

arguably are privileged or work product or sealed were relied upon as *the* basis for the allegation.

So, since we obviously complied with the order as the Magistrate wrote it (and even more so as he later, and quite differently, said he meant it (we'll address the specificity issue shortly), especially given that we had at best weeks, not months, how did we wind up the subject of a quasi-criminal sanctions recommendation for violating them? It speaks for itself, in the offending Recommendation.

You see, the need for such specificity could only be for one, or both, of two needs. First, if it ran to specifying the documents we did use, and they were not public, then inspecting them would show that there was no problem with the allegation based on them. Otherwise, if they were public, it could only be useful to be able to establish that the allegation did indeed source to them.

In other words, it runs to proof, not whether, but "prove it." Here's the problem: Again, this is not a slip and fall case, but an extremely sophisticated tax and financial fraud. One little allegation, such as "clearly there was no debt" could be based on a dozen documents which together, in the attorney's mind, enable the allegation.

And that means that if you don't produce them all, but produce only one, or even none if none are public (untainted), then you can't possibly do the proof. But if you produce them all, you have an 80-lb 5,000 page production which is useless without a roadmap which is precisely what opinion work product protects (needless to say, it is improper to order penetration of work product without a hearing on the issue, which is what we asked for, but were denied, and worse, we weren't told of the Magistrate's decision as to work product until he surprised us with it by using it as purported grounds to sanction. It's not even a matter of our good faith belief in the work product, it's that we were never told it couldn't be asserted until it was too late.

In short, what the Magistrate wanted to accomplish could not ever work. Yet that doesn't mean he was without recourse, there were other ways to skin the cat, such as starting with determining first whether the documents or information were even protected, or in camera analysis, etc. We never had a chance to argue those in a sanctions hearing to defend ourselves and protect our client.

Recall we had asked for clarifications and conferences because compliance could become a year-long, explosively complex endeavor if every paragraph of every document source had to be linked with every allegation because it's not true that there's only one source per allegation, there are dozens, and it's not possible to link them together like that in reasonable time (forgetting work product issues). Here's what the Magistrate had to say about that, ECF 97 at 16-17:

> Another alternative would, of course, be to give the Plaintiffs and their counsel yet another chance to cite specific sources, other than the Bernstein Information, for each of the contested allegations in the FAC. The Plaintiffs' counsel have previously declared, however, that they are incapable of performing this task. They cite at least two reasons why this allegedly is so. First, the Plaintiffs assert that "it's not possible to tie each allegation to a specific line or paragraph in a specific page of a specific document" because "[t]hat is not how the story was put together." (June 30 Letter at 1). They further contend that "[m]ost if not almost all of the allegations in question derive their existence from many sources, including many documents," and that any attempt to match specific allegations to particular documents "fails before it starts." (July 9 Letter at 1).

> [This objection] is not well taken. At the outset, although the FAC is 766 paragraphs long, the fact that the Plaintiffs have chosen to file a prolix complaint is scarcely a reason why they should be exempted from establishing that their allegations do not derive from a tainted source. Moreover, there is nothing extraordinary about the task that they were directed to undertake. By way of example, although Local Civil Rule 33.3(a) generally proscribes the service of contention interrogatories at the outset of a case, it is not unusual to require a party to describe the facts underlying the material allegations of a complaint at a later stage…[citations]…**While the Plaintiffs understandably might not have been able to supply every item of evidence that supported the contested assertions at this early stage, that is not what the Court required.** *Rather, the Court simply required the Plaintiffs to identify at least one untainted source for each of the contested assertions in the FAC.*

This isn't even internally consistent, as the first part suggests we were supposed to identify all the **non-Bernstein** sources, while the last said we were only requiring only one untainted source per allegation (or, obviously, none). And how do you get from this (the actual order):

> **The factual source** for each contested allegation is to be identified with sufficient specificity that the Court and opposing counsel can determine whether documents that arguably are privileged or work product or sealed were relied upon as *the* basis for the allegation.

To this (what he now says it meant:

> Rather, the Court simply required the Plaintiffs to identify **at least one untainted source** for each of the contested assertions in the FAC.

Incidentally, on page 1 of the offending Recommendtion, the Magistrate writes:

I afforded plaintiffs…one final opportunity to identify specific public sources of information for certain allegations in their First Amended Verified complaint…

Now, when you combine this with page 16-17:

[T]he Court simply required the plaintiffs to identify at least one untainted source for each of the contested assertions…

It proves our point, that the Magistrate believes that what he required, regardless what the decretal language might look like, was only one source per allegation, and then only where the source was public and untainted, in other words.

That's easy. He admitted it. He knows, at least now, that allegations can (and clearly here do) have many, many sources, some public, some not. He also knows that ordering us to produce all those sources, a fortiori ordering us to do so with full granularity (whatever that might be), as in "this came from here, and here, and from here to, and from here…" is abusive. If opposing counsel tried to do it by contention interrogatory at this stage of the case he'd be slammed. So the Magistrate backtracked. He said he never ordered that at all, just ordered "at least one" source, and only if untainted.

That's not a sustainable position. Here's why, and we're being as supportive of the Magistrate as possible, albeit to show that even then this fails all pretense to normal juridic thought, so to speak:

The Magistrate has chosen to handle the issue of the complaint by first determining what allegations can be shown to have been entirely, or sufficiently, based on information that defendants won't complain about. Initially, that means allegations that can be shown to have been entirely, or sufficiently, based on information that didn't come from Bernstein (again, this is the Magistrate's thinking, not ours, as we maintain that we had the right to take from Bernstein). So, naively – or not – for each challenged allegation he asks for "the" source, assuming that he'll get back one document, or the name of one person ["source" is never defined in any order] so he and defendants can see whether that document [this fails of course if "source" is a person] is protected.

But we repeat this doesn't work, because almost all the allegations have dozens of "sources" so this generates an 80 pound, 5,000 page production because plaintiffs, having been slammed months earlier for not producing enough, and having been refused any guidance or clarification, err on the

side of caution by producing every source for every contested allegation. This generates privilege issues, and certainly work product issues, especially if they're ordered to connect the dots by linking documents together to reveal the thinking.

So clearly was this an impossible production that the Magistrate has to admit that, well, if he really had ordered that it would look bad, it would look like a court-ordered contention interrogatory, which would be prohibited at this stage if a party did it, as it would be abusive.

So the Magistrate says, well, I never ordered any such thing. OK, I said "the source" which plaintiffs took to mean "all sources," but I can't own that, so let me see if I can get away with saying, no, I never wanted all the sources, I only wanted one, and only if it was untainted.

That's the only explanation, and it reveals more than one may realize. Here's why.

# V.    GENERAL ARGUMENT

Because the Recommendation was based on the Magistrate's conclusion that we violated a court order, but we didn't, we delivered exactly what the Magistrate ordered, and more (and even if we didn't, then his order was so vague it was impossible to know for sure what was required) the Recommendation must be rejected.

Even if there was a violation, we are not fairly charged with it, as it was excusable by impossibility, as to time and complexity both. Compliance was further frustrated by the Magistrate's refusal, despite our many requests, to clarify what he wanted and resolve the privilege issues we had raised, leaving us to guess at the answers, only to wind up apparently sanctioned for guessing conservatively to protect our clients. In other words, as a matter of law and as a matter of equity, any noncompliance was not our fault, and the Magistrate is conflating the time it took him to respond to our requests with evidence of seriousness; indeed, most of his complaints are, to be precise, trivial.[9]

But even if it was our fault, the worst that can be said is that we were negligent, and this makes the imposition of the recommended sanction legally impossible, because that would require that we have been acting in bad faith, not negligently.

---

[9] See, for example, *In re Johnson*, , 408 B.R. 115 (S.D. OH 2009), The movant sought an order directing the party answering the Rule 33 interrogatories to match up specific documents with specific paragraphs in the complaint, rather than provide a document dump. The court noted that under Rule 33(d), it is sufficient to identify documents by category and location. Here, the plaintiffs provided binders identifying the responsive documents by category. Thus, the plaintiffs provided as much as could have been required under Rule 33. And we note that Judge Maas indicated in his order that he wasn't requiring the plaintiffs to even satisfy the Rule 33 requirements, as discovery in the case has not yet even begun. Moreover, as the court noted in *Johnson*, the issue as to whether the response sufficed "is a matter that could have been – and should have been – resolved informally through the parties' good faith efforts to confer and discuss their disagreements with even a modicum of candor." 408 B.R. 115 *16.  In *Bayview Loan Servicing v. Boland*, 259 F.R.D. 516 (D. Colorado 2009), a party objected that another's Rule 33 response of thousands of pages, identified by category, was improper. The court, however, noted that CD's containing the documents were produced, with file folders therein identifying the separate files by loan number. In the case at bar, the plaintiffs offered to produce electronic versions of the binders. Binder 5, the Delaware Chancery documents, were in fact provided in electronic form. The other documents would have been provided the moment the Magistrate issued a ruling that such disclosure would not constitute a waiver of the plaintiffs' attorney-client privilege. Finally, in *In re G-I Holdings Inc.*, 18 F.R.D. 428 (D. NJ 2003), the court agreed that Bates numbering of documents is not required under Rule 33, but categorical responses suffice.

Notably, there is no finding at all that we did act in bad faith. The phrase appears nowhere in his Recommendation, nor does "willful." In fact, there are no recommended findings of any kind. FRCP 72(b) requires that the Magistrate make them. He did not. He wrote a lot, and made many factual statements, but it is impossible to tell which, if any, were meant to be operative, the basis for his recommendation, rather than merely background narrative, or dictum, or musing.

This is fatal error, because a finding, or recommended finding, of bad faith must be made upon clear and convincing evidence, not by conclusory statement[10], and here we don't even have that, we have nothing capable of review, just *ad hominem* invective, such as calling our requests for clarification "comical" and our submissions "feigned" to make it appear we were complying when we knew that we were not. In short, asserting that we defrauded the court, or tried to.

There's nothing comical about a federal judge, even if only a magistrate, adjudicating by insult, not by reason. Let's be clear here; respect for the court does not turn its officers into whipping boys, mere punching bags for the court's displeasure, deserved or not.

We're left to argue that it's error to recommend quasi-criminal sanctions where the Magistrate has not explained how he came to the conclusion, and by what evidentiary standard, that it's error to recommend that we be sanctioned because we not only defrauded the court, but in a way that's so obvious to him (but not to us) that it's laughable, apparently so laughable that he doesn't have to make a record or explain himself, apparently so obvious that a responsive production that took hundreds of hours (and we were only given eighty) to prepare and deliver and spanned 6,000 tabbed and indexed pages and required the review of thousands more was really a comically inept, obvious fraud on the court. If it was, we don't get the joke.

We deserve better. So does the judicial system. That not only sounds good, it has the added benefit of being true, because at no time anywhere, not once, does the Magistrate say what we should have produced, only that whatever it was, we didn't produce it. In *Guys and Dolls*, when Big Julie insists

---

[10] *Cadle Co. v. Moore (In re Moore)*, 2014 BL 6284, CA5, No. 13-10325, 1/9/14. "Bad faith" cannot be found unless what was done, or, not done, is utterly devoid of legal merit and has been done for an improper purpose; neither have been found here. *Sussman v. Bank of Israel*, 56 F.3d 450 (CA2 1995).

on shooting crap with his own dice which have no spots on them because they've worn off but, he assures that he "remembers where they were," it's funny. When a magistrate repeatedly issues what is supposedly the same order in constantly shifting decretal form, and his own statements of what he wanted are inconsistent, one after the other – in other words, where compliance is a moving target only he can see - we've moved from mere error to structural, a violation of due process.

Due process violations abound. Refusing to clarify or rule on ethics issues and then play "gotcha!" by eight months later saying we guessed wrong and moreover were engaged in fraud on the court ("feigning compliance"), never mind that our ethics counsel himself pleaded for telephonic or in person conference, not just us, is just the start. What about the failure to accord any hearing by which we would be given an opportunity to explain the supposed noncompliance? How do you decide bad faith – again without even explicitly, if at all, deciding it – without detailing what was supposed to have been produced and letting us defend why we didn't, if indeed we didn't, produce it?

Which brings us to the recommended sanction. Apparently the Magistrate applied a balance of equities, at least in refusing to recognize privilege (but not in time for us to then comply), and presumably in recommending the particular sanction. That's error, as we weren't allowed to argue the issue, let alone properly at a hearing, where we would have insisted that, for example, the Magistrate consider that Bayrock and co-defendant Sater paid Bernstein for a perjured or at least deceitful affidavit then knowingly introduced it into this proceeding, clear obstruction, if not subornation as well. Not only is this fraud a pervasive taint, the Magistrate's failure is inexplicable as not only was he himself apparently involved in the procurement of the affidavit years ago but also, while we have no reason to believe he knew or should have known it was fraudulent at the time, he certainly was on notice no later than a year ago, when we presented all this to him in papers a year ago, suggesting that, as a fact witness to conspiracy to commit subornation and obstruction he ought to disqualify himself. Those papers have disappeared into a black hole of sealing, but what's in them has not.

So this completes the circle, the Magistrate apparently considering, because remember there's no way to tell what was operative and what merely insult, statements in Bernstein's' affidavit without recognizing that he had on the record ample proof that it was procured to commit fraud and without

allowing us to bring that into consideration to balance the equities against Bayrock. Of course that's error; we assert, finally, that the Magistrate's failure to disqualify himself was also error.

And in closing, we note that it was also error for the Magistrate to – one more time, without being able to tell if it was, or was meant to be operative – selectively quote from the record to make it look like we gave incompetent if not fraudulently wrong advice to Bernstein. While we refer to this as error, it is hard, though we try mightily, to include within that phrase the Magistrate's misstatement, whereby a comment Mr. Oberlander made about privileged was intentionally rewritten by moving around quotation marks to make him look corrupt. We call that error. We doubt that's the best term for it.

*****

We acknowledge that Judge Sheindlin's decision in *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997), has been followed by other trial court judges, who believe they have the power to pass judgment upon pre-litigation conduct, such as the trial court judge in *Tartaglia v. Paine Webber*, 775 A.2d 786, 342 N.J. Super. 182 (2001). Yet when the appellate court considered the trial court's decision, it treated the decision, and thus Judge Sheindlin's analysis, as dross. *Tartaglia v. Paine Webber*, 794 A.2d 816, 350 N.J. Super. 142 (2002). That decision discusses the common-law rules, as best articulated by Professor Wigmore, that allegedly "stolen" evidence is not rendered inadmissible by such irrelevant fact. This point has previously been briefed, and is *sub judice*. We merely add that the Second Circuit clearly agrees, as proved by the case of *US v. Knoll*, 16 F. 3d 1313 (2d Cir. 1994) (the district court properly found stolen documents turned over to AUSA Bruce had already been searched by private parties and that a search warrant therefore was not required to read them.… There was thus no Fourth Amendment violation requiring suppression of the documents and papers taken from Knoll's office on that basis.").

There is however a larger point. To begin with, Magistrate judges cannot have inherent powers because whatever they are doing as non-Article III judges is not incident to a constitutional grant of

power, and it is the constitutional source of power, albeit instrumented by Congressional creation, which is the source of inherent power. We understand he did not purport to exercise them now, but that is only because he thought that he had no inherent sanctions power. Not so; he has no inherent power.

We must, and will, address this in reply to Bayrock's papers, which call on this Court's inherent powers to override inherent powers and so put the issue in play as to the metes and bounds of those powers. For example, as noted, what was done here that was "improper?" By what law?

This dovetails with the whole concept of bad faith and good faith. It should be clear that when an action is taken, or not, in good faith, then that is a defense to quasi-criminal sanction. Surely the court is aware that when an attorney does not comply with a court order to protect his client's privilege, so long as the attorney has raised the issue cleanly, even though he has lost, his good faith belief is a defense to contempt, and so should be a defense to quasi-criminal sanction.

Here, it is not even clear to what extent in determining the sanction he recommended the Magistrate is relying on conduct outside the four corners of the failure to comply with his order. He purports to have made no finding of wrongdoing in the acquisition of the documents, yet also speaks at length about "how Mr. Oberlander obtained the documents."

We remind the court that Mr. Oberlander has never kept secret what he did; he attempted to file the initiating complaint in this matter by motion to Judge Wood which disclosed that he had used emails and other material that opposing counsel might argue was privileged and confidential; and has freely testified to this, indeed, as the record shows, he insisted that he would not touch anything from the disk unless and until Bernstein had obtained independent counsel to confirm his right to use it or even possess it.

All this is not because Mr. Oberlander purports to be a hero. Quite the contrary. Mr. Oberlander purports to be a **lawyer**. We have exhaustively briefed his legal analysis of his client's right to

receive that information, in fact the whole disk, from Bernstein. Whether this court agrees with it or not is beside the point; so long as Mr. Oberlander acted in subjective good faith, which is completely clear by his honesty and openness, that should be an absolute defense to finding anything "wrong" in what he did. Granted there would still be an issue of exposure to documents if in fact he had done something wrong and in fact they were protected, but it would not justify sanctions.

Yet not only did the Magistrate decline to allow him to be heard in defense to establish this,the Magistrate seems to have gone out of his way to deny the existence of his good faith. How else to explain the Magistrate's statement that there was "near incontrovertible" evidence that we had done something improper – yet again, not defining what that might be.

Frankly, it's even more disturbing that the Magistrate would distort what Bernstein's affidavit stated in an attempt to make it look like Mr. Oberlander gave either incompetent or manipulative advice to Bernstein.

Bernstein's affidavit states that when Mr. Oberlander had taken from the drive the particular documents he had sought out, he explained to Bernstein that **those documents "from"** the hard drive were subject to the crime-fraud exception. Bern. Aff. at 23.

Yet the Magistrate manipulated the quotation to make it seem otherwise, then used that to imply that Judges Glasser and Buchwald had somehow ruled at all on the issue of documents from the disk and crime fraud. We regret this speaks for itself. The Magistrate wrote that Mr. Oberlander "similarly opined **that the contents of** the hard drive were not confidential 'because of the crime fraud exception, then citing to the Bernstein affidavit.

So does the Magistrate's statement that Judge Glasser had held we had "no legal rights" in the sealed documents. As to the PSR, we, like everyone else in the country, have the right to read a great deal about what it says as we won before the Supreme Court the right to reveal most of it. That eliminates the idea we had no rights in the PSR. And the record of 98-CR-1101 clearly reflects that in

and about February 25, 2012, Judge Glasser issued scheduling orders on whether or not he could permanently enjoin our dissemination of the other allegedly sealed documents. He never reached the issue but nevertheless it is flat error to say that he had ever found we had no rights in them, only that we agreed to long consensual TRO's.

# VI. MISCELLANEOUS MATTERS

## A. Due Process Notice as to Bernstein Affidavit

The Magistrate stated that as to affidavits, summary judgment analysis should apply. ECF 6 Tr. at 32. Accordingly Bernstein's affidavit is incompetent insofar as it recounts his feelings and motivations and such would, or might, be operative. Moreover, in reviewing Rule 56 issues, a court must resolve lla ambiguities and draw all reasonable inferences in favor of plaintiffs here. *Eastway Const. Corp. v. City of New York*, 762 F. 2d 243 (1985). Cases in which the underlying issue is one of motivation, intent, or some other subjective fact are particulary inappropriate for summary judgment, as are thosein which the issues turn on credibility. *Conrad v. Delta Airlines*, 494 F.2d 914, 918 (7th Cir. 1974). We object because the Magistrate is, or appears to be, quoting selectively from the affidavit to make it appear that Oberlander somehow seduced or influenced Bernstein's actions. Just as his direct affidavit testimony to such is incompetent, so must be the implication use here.

## B. Brief "Sum and Substance" Review of Our Prior Arguments

### 1. The Bayrock defendants' privilege log and associated "argument" and "declaration" are incompetent

Work product applies only to documents prepared in anticipation of litigation. Defendants claim their privilege log and Simonchyk Declaration carry the day as to work product. They do not. The privilege log says nothing anywhere about who prepared what document in what circumstances at what time in contemplation of what litigation etc. etc. etc., and so it does not allow us to challenge it (remember we have all the information in dispute so could challenge the points directly). *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473-474 (2d Cir. 1996).

Plaintiff Kriss explained in his declaration that Simonchyk is but a clerical worker at Bayrock, and cannot have any personal knowledge of any of her privilege declarations. Her conclusory self-qualification, self-serving, that"I'm an Authorized Person," without stating what one of those is and why that qualifies her to do anything here, fails as well.

Simonchyk speaks of allegations in the complaint which "appear" to be "based on" documents that were written by, or maybe just edited by, an attorney, and that they therefore are work product.

But privilege doesn't apply to the underlying facts, only to the contents of communications or the documents themselves which are the communication or work product. For example, an allegation that "Bayrock sold some stuff to an Icelandic Company" cannot be improper because it "appears" to be "based on" a document an attorney *may* have edited.

As to attorney-client communications, facts are not privileged. "Bayrock paid Sal Lauria as a broker in the Iceland deal" is not subject to privilege, vs. "I asked the lawyer whether we should pay Lauria on his contract as a broker because he was a felon and that made the contract illegal and the lawyer told me that he had decided to pay and did so based on his legal opinion the contract was still enforceable." They're not the same. *Grand Jury Witnesses*, 979 F.2d 939 (2d Cir. 1992).

### C. Waivers

#### 1. Schwarz

Mr. Schwarz has, without contravention, testified (and stated during the entirely surreptitiously, yet entirely lawfully, recorded conversation which is an exhibit to plaintiffs' motion to disqualify the Satterlee firm) that while from time to time he was general counsel or otherwise legally representing Bayrock, he always wore two hats, the second as a business executive. His state of mind is critical to the determination whether the privilege applies; he will have to testify if Bayrock wishes to maintain that communications between him and other members of Bayrock are privileged. And again, privilege would only run to, "Julius told me…," not facts learned from or told to Julius.

As to the entirety of the allegations claimed to be privileged, and for that the entirety of the allegations deemed trade secret or otherwise protectable, Bayrock waived protection when Julius Schwarz, whom we claim was acting in his capacity as an executive not an attorney, emailed the original complaint to virtually every defendant, including directly to Alex Salmon and Felix Sater. As neither Salmon nor Sater are attorneys, there can be no common-interest privilege argument. In any event, we deny that a common interest could have existed, especially as to Sater. The court will recall that Mr. Saurack complained at the hearing on September 11, 2013 that Mr. Sater should not see or be served with the FAC. Bayrock will have a hard time explaining how common their interest is.

Mr. Kriss was jointly represented, in direct privity with, Roberts & Holland at the same time as Mr. Schwarz, Mr. Sater, Mr. Arif, and Bayrock. Ober. Decl. pg. 156. As they are now adverse, Mr. Kriss waives all privilege as to all communications made in that joint representation.

### 2. Bayrock/Subsidiary.

As Plaintiffs Kriss, member of Camelback, Merrimac, Spring Street, and Whitestone, and Ejekam, member of Spring Street and Whitestone, are suing parent Bayrock Group derivatively in behalf of these companies and all four were on related matters represented jointly by both Mr. Saurack and Mr. Schwarz, see Ober. Dec.. pg. 41, Schwarz pg. 144 at 22; and Plaintiff's Motion to Disqualify Exh. C, privilege is waived as to all communications between and among them.

Alternately, Kriss and Ejekam are creditors, by virtue of the facts in the FAC, of those subsidiaries, which on information and belief are and since before this action were in insolvency triggering the "Trust Fund Doctrine," giving them the same standing to sue derivatively and waive privilege, and are creditors pursuant to New York LLC law and Delware LLC law as to their failure to receive member distributiosn.

As Mr. Saurack represented Mr. Schwarz and Bayrock Group LLC at the same time at least in 2010 on this same matter of this action, and Bayrock Group LLC is derivatively being caused to sue Mr. Schwarz, all communications between them are waived as to privilege.

*Lugosch v. Congel*, 219 F.R.D. 220 (NDNY 2003) and *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), both as, first, members as just stated above, and creditors, of those companies, and Kriss also a member and creditor of Bayrock Group LLC, as to which the insolvency allegation is made, the privilege is waived to communications made concerning or in relation to "fiduciary matters," for example, where a general partner communicates with counsel for the partnership on matters related to his fiduciary duty to the limited partners, in any action by the limited partners such communication is waived insofar as the privilege equitably belongs to the member or other beneficiary thereof.

On March 5, 2010, and March 9, 2010, Mr. Oberlander took the depositions of Schwarz and Sater. See Ober. Decl. pgs. 154 et seq. And we ask the Court note the exculpatory provision in the

Bayrock Group LLC operating agreement, in the Kriss Affidavit, §6.6 at pg. 58. Mr. Schwarz was asked repeatedly about one of the major criminal acts in Bayrock history, the embezzlement by Bayrock Group LLC of $50M from the four subsidiaries and willful failure to include that in taxable income, and emphatically not only stated under oath that he had taken actions in that transaction based on advice of counsel and also stated that counsel had told him, for example, that such actions were legal. All related communications and work product are waived.

### D.    Evidence of Crime Can Not be "Converted" or "Stolen"

Dissemination of information that reveals crime may not prohibited or sanctioned in any way, not by application of fiduciary duty to silence a trustee, not by application of agency law to stop an agent from revealing his principal's crimes, not by specific performance of confidentiality agreements, and not by stipulated court order. Information that is evidence of a massive criminal scheme is not private property. It cannot be converted, regardless of what Judge Glasser may have speculated during colloquy.[11] Anyone with duties of care, such as tipper Bernstein, is free to ignore them to reveal it; there is no duty not to reveal it (the information as to the crime, not the history of the world) even if he stole it. So when Bernstein learned what he had, evidence of a massive criminal scheme, he had no duty to the company (that is, its innocent constituents, either its owners or, if it were insolvent, its creditors) to keep it quiet, he could disclose it to stop the crime; or, possibly depending on the nature of his duty as a former employee, he did have a duty to the company to disclose it to law enforcement or to someone who could stop the crime, such as an innocent director.

Even if Bernstein stole the documents in the first place, or did anything else wrong to get them, which Bayrock does not allege and neither do we, Kriss, as a full managing member of the firm

---

[11] While we're dealing with Judge Glasser, we ask the Court note that at no time did Judge Glasser have before him the provenance of these documents or information. Anything he said was dealing only with the allegedly "sealed" court documents and in any event what he said is not an opinion, it's a rumination, as the Court can see ( Judge Glasser hypothesizes that, "Let's say Sater had the documents in his desk…"). such deceit permeates Mr. Saurack's arguments). Moreover, whether or not the "sealed" documents were on the hard drive, a fact we cannot know because we did not access them there, they were handed to Oberlander by Bernstein; Oberlander testified to that and was not contradicted. Thus Glasser had no opinion on anything that was or might have been on the hard drive.

with the plenary agency authority to bind it in the ordinary course did nothing wrong and nothing he was legally *restricted* from doing, rather everything he was legally *required* to do.

If the Court wonders, what about ethics rules, the answer is, none, at least none relevant here, when the issue is not a client's own confidential information, deal with issues of privilege. Privilege is an evidentiary matter. It is for the courts. Ethics rules deal with issues of confidentiality, of lawyers' obligations to keep client confidences. Not with rules of privilege. Most of them even say so in their preambles.

Thus as we have established that there is nothing confidential about crime (please note we are not making the argument that the lawyers need not maintain confidences about crime to protect their clients; that's not relevant here, but we note even there they do not have to if they choose to reveal ongoing or future certain crime), there is no ethical implication in what Mr. Oberlander did, other than to zealously represent his client in the discharge of his duties to the Bayrock Defendants' victims.

## VII. CONCLUSION

Magistrate Maas begins his Report and Recommendation of January 14, 2015, with the statement that, "[a]lthough this case has been pending for more than four years, astonishingly little progress has been made," and then suggests that the delay has been due to the plaintiffs. How did this happen? Quite simply, the case has been delayed, frustrated, interrupted and confused by the entirely irrelevant inquiry into how documents came into the possession of plaintiffs' counsel. Under the common law, and under New York law, how plaintiffs' counsel came into possession of any documents is of no moment whatsoever. And counsel came into possession of the documents, before the jurisdiction of the federal courts was ever invoked. Consider the emphasized portions of Wigmore's treatise:

> **Documents, chattels and testimony obtained by illegal search or removal; General principle. Does the illegal source of a piece of evidence taint it so as to exclude it, when offered by the party who has shared in the illegality?**
>
> As a general rule, our legal system does not attempt to do justice incidentally and to enforce penalties by indirect means. A judge does not attempt, in the course of a specific litigation, to investigate and punish all offenses which incidentally cross the path of that litigation. Such a practice would offend our

system of law in several ways. (1) It amounts to trying a violation of law without the proper complaint and process which are essential for its correct investigation. _(2) **Determination of incidental violations jeopardizes the primary litigation by delaying, interrupting, confusing and sometimes frustrating it.**_ (3) It does all this unnecessarily and gratuitously; the persons harmed by the supposed incidental violations have direct means of redress available and should not be allowed to attend to their complaints in this indirect and possibly tardy manner. (4) The judicial rules of evidence were never meant to be used as an indirect method of punishment. To punish the incidental violation by rendering evidence obtained thereby inadmissible in the primary litigation is to enlarge improperly the fixed penalty of the law, that of fine or imprisonment, by adding to it the forfeiture of some civil right through loss of the means of proving it.

The incidental illegality is by no means condoned. It is merely ignored in this litigation.

For these reasons, it has long been established that the admissibility of evidence is not affected by the illegality of the means through which the party has obtained the evidence.

8 *Wigmore on Evidence*, Sec. 2183 (McNaughton rev. 1961) (emphasis added).[12]

Wigmore hit the nail on the head. Were Wigmore to look at the past five years of litigation, he would see that it has been quite "frustrated" by immaterial allegations that "stolen" evidence was given by Bernstein to plaintiffs' counsel. Such immaterial arguments have been made without any challenge whatsoever of the above-stated principle of law, much less a challenge to the fact that Kriss, as an owner, that is, a member, indeed a managing member, and plenary agent of Bayrock Group LLC, had a right to the documents in Bernstein's possession. Second Circuit precedent is the same, even in criminal cases, where the Fourth Amendment is implicated. See *U.S. v. Knoll*, 16 F.2d 1313, 1319 (2d Cir. 1994) ("[T]he district court properly found the documents turned over to AUSA Bruce had already been searched by private parties and that a search warrant therefore was not required to read them. (Citation omitted). There was thus no Fourth Amendment violation requiring suppression of the documents and papers taken from Knoll's office on that basis.'

---

[12] This is the law of New York, of course. See *Mosallem v. Berenson*, 76 A.D.3d 345, 905 N.Y.S.2d 575 (1st Dep't 2010).

So the extensive delay has been caused not by the plaintiffs, but by the past four years of inquiry into the propriety of plaintiffs' counsel's use of documents obtained pre-litigation in order to prepare the complaint.

## VIII.  PUBLIC DOCKETING OF ALL MOTIONS REQUIRED:

The plaintiffs have been accused of impropriety in a publicly docketed R&R, though the public cannot see the papers upon which the R&R is based. The plaintiffs have the right to defend themselves, in public, against the public charges of impropriety, and therefore demand the immediate public docketing of all motion papers and correspondence with the magistrate, which request must be taken up forthwith pursuant to Lugosch v. Pyramid Co., 435 F.3d 110 (2d Cir. 2006) ("the district court erred not only in failing to make the specific, on-the-record findings required in order to justify its denial [of access to judicial documents] but also in failing to act expeditiously. … [¶] We take this opportunity to emphasize that the district court must make its findings quickly. Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found.") Such secrecy, as the Supreme Court noted, in  Nebraska Press Assn. v. Stuart, 427 US 539, 587 (1976), breeds distrust for the court and suspicion of the judge's competence and fairness:

> Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability. (Citation omitted); L. Brandeis, Other People's Money 62 (1933) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman").

# IX.   CONCLUSION

To the extent that any factual representations herein are not already in the record, we attest that under penalty of perjury pursuant to 28 U.S.C> §1746 they are true and correct to the best of our knowledge.

We respectfully submit this objection and pray for the relief set forward in the opening (cover) page of this document.


/s/ Frederick M. Oberlander

**THE LAW OFFICE OF FREDERICK M.OBERLANDER, P.C.**
Counsel for Plaintiffs
28 Sycamore Lane
Post Office Box 1870
Montauk, NY 11954

212.826.0357
212.202.7624

/s/ Richard E. Lerner

**THE LAW OFFICE OF FREDERICK M.OBERLANDER, P.C.**
Co-Counsel