**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NY**

| | |
|---|---|
| J. L. KRISS and MICHAEL "CHUDI" EJEKAM, directly and derivatively on behalf of BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; and BAYROCK WHITESTONE LLC; <br><br> Plaintiffs, <br> v. <br><br> BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ; FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA; ALEX SALOMON; JERRY WEINRICH; SALOMON & COMPANY PC; AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN; DUVAL & STACHENFELD LLP; BRUCE STACHENFELD; DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT; ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL; MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC: BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.; and NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.; <br><br> Defendants <br> and <br> BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC, and BAYROCK WHITESTONE LLC <br><br> Nominal Defendants (Derivative Plaintiffs) | **FIRST AMENDED** <br><br> **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**Plaintiffs** J. L. Kriss ("Kriss") and Michael "Chudi" Ejekam ("Ejekam"), through counsel, allege:

## INTRODUCTION

1.      Plaintiffs, members in and creditors of Bayrock limited liability companies, directly and derivatively seek relief from Arif, Satter, Schwarz, for violations of substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act; from Halberg, Salomon, Weinrich, Salomon & Co., Roberts & Holland, Pisem, Duval & Stachenfeld, Stachenfeld, Granin, Brown, and Dogan for violations of its conspiracy provision; and variously from all Defendants for violations of substantive, aid and abettance, and conspiracy provisions of state law.

2.      The Bayrock Organization ("Bayrock") is a New York-based group of real estate businesses claiming to have developed, owned, or operated $5,000,000,000 of projects globally.

3.      Generally, Bayrock is a hierarchy of commonly controlled, but not wholly owned, limited liability companies. Bayrock Group LLC is the top of the hierarchy, control parent of the lower-tier companies. Since 2002, Arif and Satter, joined by Schwarz in 2005, have owned most of Bayrock, have controlled Bayrock Group LLC, and through control of Bayrock Group have controlled most of the entities in the hierarchy.

4.      Bayrock does conduct legitimate real estate business, but for most of its existence it was substantially and covertly mob-owned and operated. Arif, Satter, and Schwarz operated it for years through a pattern of continuous, related crimes, including mail, wire, and bank fraud; tax evasion; money laundering; conspiracy; bribery; extortion; and embezzlement.

5.      Almost all they took from Bayrock, the $8,000,000 or more Satter took, the $4,000,000 Schwarz took, and the $15,000,000 Arif took, came from crime rather than legitimate profit.

6.      Thus, Arif, Satter, and Schwarz are not only organized businessmen, they are organized criminals, operating Bayrock through acts of racketeering as, or at least in, its normal course.

7.      Satter is an organized criminal and racketeer by career choice, with a history of felonies including convictions for violating federal racketeering law and for assault with a deadly weapon.

8.      Arif made Satter Bayrock's covert majority owner and co-control person even while Satter was awaiting sentencing on a prior federal racketeering conviction, then immediately began crimes with him, committing tax fraud and obstructing justice in that sentencing by hiding Satter's near $1,000,000 a year unreported and untaxed cash skims from Bayrock from his presentencing Probation Officer, letting Satter fake poverty to evade restitution.

9.      Arif and Schwarz are organized criminals and racketeers by definition, their participation in and facilitation of the predicate crimes making them the kind of defendants RICO was meant to capture, what the ABA RICO Task Force calls "persons who regularly commit such crimes."

10.    Regularly commit crime they did. They evaded up to $20,000,000 of their tax liabilities; conspired to evade $100,000,000 tax; and defrauded, embezzled, and extorted millions of dollars from Plaintiffs, repudiating their Bayrock membership interests, then worth over $30,000,000.

11.    Concrete example of their crime, Trump SoHo, stands 454 feet tall at Spring and Varick, where it also stands monument to spectacularly corrupt money-laundering and tax evasion:

14.    Plaintiffs thus sue for conspiracy to violate RICO attorneys and accountants who agreed to knowingly facilitate the racketeering, in doing so committing crimes: Roberts & Holland (and attorney Pisem) and Duval & Stachenfeld (and attorneys Stachenfeld, Brown, and Granin), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud and tax evasion; and Salomon (and accountants Salomon and Weinrich), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud, tax evasion, tax perjury, and tax obstruction.

15.    Indeed, tax evasion and money-laundering are the core of Bayrock's business model:

---

[1] There is no evidence Trump took any part in, or knew of, their racketeering. Any contrary inference would be unjust.

**TAX EVASION AND MONEY LAUNDERING**

16.    **Substantive Crimes**. Arif, Satter, and Schwarz, variously, in operating Bayrock did:

A.    <u>Tax Evasion</u>. Attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by Bayrock tax partners, creating a material tax deficiency of as much as, or more than, $20,000,000, in violation of 26 UC §7201.

B.    <u>Failure to Pay</u>. Fail to collect and pay over tax, in violation of 26 USC §7202.

C.    <u>Failure to Make Returns</u>. Fail to supply information and make returns, in violation of 26 USC §7203.

D.    <u>Failure to Make a Statement</u>. Fail to make a statement (W-2) as required by law, in violation of 26 USC §7204.

E.    <u>Tax Perjury</u>. Subscribe perjurious returns, and aid and assist with the preparation of documents known materially false, in violation of 26 USC §§7206(1) and 7206(2).

F.    <u>Tax Obstruction</u>. Corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the IRS, in violation of 26 USC §7212(a).

G.    <u>Money Laundering</u>. Knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from specified unlawful activity, in violation of 18 USC 1957.

H.    <u>Money Laundering</u>. Conduct and attempt to conduct financial transactions involving proceeds of specified unlawful activity, said proceeds known to be from unlawful activity

I.    with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(1)(A)(i).

II.    with the intent to evade taxation, in violation of 18 USC §1956(a)(1)(A)(ii).

III.    knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(1)(B)(i).

4

I. <u>Money Laundering</u>. Transport, transmit, and transfer funds from a place in the United States to a place outside the United States and to a place in the United States from a place outside the United States

    I. with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(2)(A).

    II. knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(2)(B)(i).

J. <u>Fraud and False Statements</u>. Make materially false statements and representations in matters within the jurisdiction of the executive branch, in violation of 18 USC §1001.

K. <u>Obstruction of Justice</u>. Corruptly endeavor to impede a U.S. court officer, making false statements and representations to a Probation Officer, in violation of 18 USC §1503.

17. **Conspiracy Crimes**. Arif, Satter, and Schwarz, together[3], with each other and others known and unknown, in operating Bayrock unlawfully, willfully, and knowingly conspired:

A. <u>*Klein* Conspiracy</u>. To defraud the IRS by impeding its lawful function in the evaluation, assessment, and collection of income taxes, in violation of 18 USC §371.

B. <u>Offense Conspiracy</u>. To commit the offenses enumerated in ¶16.A through ¶16.F and ¶16.J through §16.K, in violation nof 18 USC §371.

C. <u>Money Laundering Conspiracy</u>. To commit the offense(s) enumerated in ¶16.G through ¶16.I, in violation of 18 USC §1956(h).

18. **Private Rights of Action**. Plaintiffs' causes of action arise from these Defendants' commission of these tax, and other, crimes, at the interplay of federal racketeering law and state business organizations law and concomitant laws fiduciary, of contract, and of tort.

---

[3] While Schwarz joined Bayrock in 2005, his *Pinkerton* liability extends back to the conspiracy origins in 2002.

THE BAYROCK RICO DEFENDANTS

21.      **Tevfik Arif** is a natural person residing in New York. Arif, a native Russian, started Bayrock as a party *apparatchik* in Moscow in 1989 at the fall of communism, backed by oligarchs and money they stole from the Russian people. He came to the United States in 2000 to establish a presence for Bayrock, forming Bayrock Group LLC in 2002. Until Satter joined, Arif had sole, if nominal, direct or indirect ownership and control of Bayrock Group LLC. He has always been a member and has always participated in its operation with the title "Chairman".

22.      **Felix Satter** ("Satter") aka Felix Sater, is a natural person residing in New York, a native Russian who emigrated to the United States in the 1970s. He joined Bayrock in 2002 with an organized crime history. By 2003, Arif had given him majority ownership in, and shared control of, Bayrock. He is been a member of all five Subs and of Bayrock Group LLC and has always participated in its operation, with the title "Chief Operating Officer" or "Managing Director".

23.      **Julius Schwarz** ("Schwarz") is a natural person residing in New Jersey. Bayrock hired him as Executive V.P. and General Counsel in early 2005, and since November 2005 he has been a member of all five Subs and of Bayrock Group LLC, and has always participated in its

operation, with dual roles as an attorney and an executive managing its normal operations; he considers himself *de facto* CEO.

PLAINTIFFS

24.     **J. L. Kriss** ("Kriss") is a natural person residing in New York. He performed services for Bayrock from 2003 to 2007 and in 2008 as Director of Finance. Since no later than 2004 he has been a member of Bayrock companies and is a member of Bayrock Group LLC and all five Subs.

25.     **Michael "Chudi" Ejekam** ("Ejekam") is a natural person and United States citizen. Ejekam performed services for Bayrock from 2003 through 2006. Since 2005 Ejekam has been a member of two of the Four Subs, Bayrock Spring Street LLC and Bayrock Whitestone LLC.

ORGANIC LAW

26.     In all cases, specifically and without limitation in the cases of Bayrock Group, Bayrock Spring Street, Bayrock Camelback, Bayrock Merrimac, Bayrock Whitestone, and Bayrock Ocean Club, such default fiduciary duties apply among and between managers, officers, members, and the limited liability companies as exist under the applicable state law of their states of formation.

28.     The private organic rules in the limited liability company agreements do not eliminate, materially enhance, or materially modify those status duties and liabilities for breaches thereof.

**THEORY OF THE CASE**

30.     Plaintiffs bring this action primarily on account of Arif, Satter, and Schwarz's years of operating Bayrock companies for purposes including the continuous, related commission of criminal and civil frauds, largely but not entirely tax frauds, to wrongfully benefit themselves.

31.     **Mediating Agents**. Plaintiffs were direct and derivative <u>victims</u> of these frauds because of these Defendants' use of Bayrock companies, especially Bayrock Group LLC, as the mediating agents with which to commit them, whether or not Plaintiffs were also <u>targets</u> of the frauds.

32.     Stripped of visual complexity, Bayrock is a hierarchy of commonly controlled but not wholly owned limited liability companies taxed as partnerships. Arif, Satter, and Schwarz control the ultimate parent, Bayrock Group, and through control of Bayrock Group control all subsidiary and related lower-tier companies in the hierarchy. FIGURE 2.



FIGURE 2

33.     **Convergence**. From the standpoint of alleging injury caused by these Defendants' wrongful use of Bayrock companies as the mediating agents through which they committed these frauds in their own self-interest, the state law case and the RICO case are substantially the same:

34.     At the tax fraud core of this action, Plaintiffs have standing to sue Arif, Satter, and Schwarz, directly, derivatively, or both, depending on who suffered the injury:

> A.     <u>Under state law</u>, on account of their wrongful operation of Bayrock Group LLC for their personal benefit, in an effort to evade their own taxes, and for their fraudulent concealment of it, which causally injured Plaintiffs; and

> B.     <u>Under federal racketeering law</u>, on account of their operation of Bayrock Group LLC, in an effort to evade their own taxes, through a continuous pattern of related mail and wire fraud perpetrated against governments in an effort to defraud those governments of tax revenue and their opportunity to collect it, which causally injured Plaintiffs.

35.     There are two sovereigns. One makes illegal the betrayal of the Plaintiffs *qua* principals to whom fiduciary duties run and were breached and one makes illegal committing predicate acts the commission of which harmed the Plaintiffs and also breached those fiduciary duties.

36.     **State Law**. Without limitation, in each of Bayrock Group and the five Subs the managers and officers of owed the companies and members fiduciary duties, including duties of loyalty (including the duty to disclose) and care, and contractual duties of good faith and fair dealing.

37.     <u>Doing Wrong</u>. When Arif, Satter, and Schwarz used their control of Bayrock Group to act in their self-interest, whether by operation of Bayrock Group alone or by using Bayrock Group to operate other companies in the hierarchy, they breached their fiduciary duties of loyalty.

38.     <u>Concealing It</u>. When after wrongfully acting in their self-interest they concealed their own wrongdoing, they breached their fiduciary duties of disclosure and so also committed fraud. For example, when they used Bayrock companies to commit fraud to benefit themselves, then concealed their intent to defraud (their scienter), they breached fiduciary duties <u>and</u> committed fraud by concealment on the company and the members, because the principal is not deemed to "know" of his agent's deceit when the knowledge is concealed in the hands of that agent.

39.     <u>Doing Wrong by Committing Tax Crimes</u>. Arif, Satter, and Schwarz used their control of Bayrock companies to evade tens of millions of dollars of their personal income tax liabilities.

40.     One way they did this was to use Bayrock to skim millions of dollars of cash, giving Satter a million dollar a year unreported income and causing Bayrock Group to execute a sham "note" with him, a note Arif and Schwarz have admitted on MP3 was never meant to be repaid

41.     Another way they did this was to cause Bayrock companies to intentionally understate partnership taxable income, by at least $50,000,000 to as much as $100,000,000, causing Bayrock to prepare and file knowingly false K-1's and partnership tax returns as part of the fraud.

42.     These companies were tax partnerships, and partnerships do not pay tax, their partners pay tax on the partnerships' income, based on the distributive shares of income allocable to them.

43.    By intentionally understating Bayrock taxable income, since between them they owned the vast majority of Bayrock (most of it covertly by Satter), they captured the vast majority of the "benefit" of the understatement, and personally evaded tens of millions of dollars of tax.

44.    Thus they used Bayrock Group as the mediating agent to commit these tax crimes for their own benefit. They committed tax <u>crimes</u>, not tax mistakes. They acted with intent to evade.

45.    The causal injuries those companies and members suffered were not caused by any personal tax deficiency of Arif, Satter, or Schwarz's, but were caused by these Defendants' wrongful use of Bayrock to commit their personal tax evasion. The companies and members are thus <u>victims</u> of the tax frauds, or more precisely are victims of the companies' being hijacked to commit the tax frauds, even though they were not the primary <u>targets</u> of the tax frauds.

46.    For example, when Arif, Satter, and Schwarz caused Bayrock companies to underreport Bayrock taxable income in 2007 by $45,000,000 or more, so underreported their own distributive shares of that income by almost all that much in the aggregate in order to evade their own taxes, there was causal injury to the companies and to the members whether or not any or all of these Defendants would wake up next day to find they inherited a $200,000,000 net operating loss fortuitously wiping out their illegally unreported Bayrock income and with it any tax deficiency.

47.    Even if such fortuitous elimination of tax deficiency had eliminated criminal liability for certain substantive tax crimes, these Defendants would still be liable for Plaintiffs' injuries because the injuries are not created by the "success" of the tax crimes, but by the wrongful use, or hijacking, of Bayrock companies in the effort to commit them. The effort completes the wrong.

48.    <u>Concealing the Tax Fraud</u>. They committed tax fraud through Bayrock. Whether or not they hid the transactions they used to do it, they hid their scienter, their knowledge that what they were doing was fraud, from the company and from the members. Thus they not only breached fiduciary duty against Bayrock and its members by committing the tax fraud, they also then committed concealment fraud against Bayrock and its members by hiding the fact of their fraud.

12

49.   **Federal Law (RICO)**. The same principles apply in RICO. Importantly, Plaintiffs do not base their RICO case solely on federalization of state law breaches of fiduciary duty bootstrapped through honest services fraud, but on Arif, Satter, and Schwarz's pattern commission of predicate crimes for which RICO liability lies even if all fiduciary duties had been consensually eliminated.

50.   Those predicate acts are (i) that subset of the tax crimes, ¶16 *et seq*., which are RICO predicates, e.g. money laundering to evade taxation; and (ii) their mail and wire fraud RICO analogs. Each of those tax tax crimes shares two facts which create that RICO analog liability:

   A.   Each crime was committed with the intent to deprive the United States and other taxing authorities, by fraud, of tax revenue or the opportunity to collect it.

   B.   Each crime was committed with the jurisdictionally significant use of mail or wire communications, even if ordinary course communications.

51.   It is settled federal law that schemes to defraud governments of tax revenue or the opportunity to collect it may be prosecuted under mail and wire fraud statutes, that tax and the opportunity to collect tax are property for purposes of mail and wire fraud, and that no tax deficiency is necessary, the mail and wire fraud statutes punishing the scheme and not its success.

52.   It has been settled law in this circuit for 20 years that a scheme to defraud governments of tax or the opportunity to collect it may be prosecuted under RICO with mail and wire fraud predicates, even where the predicates, such as filing false state tax returns, were not state crimes.

53.   Thus, Arif, Satter, and Schwarz's operation of Bayrock Group LLC to commit tax fraud; plus use of mail or wire; plus pattern; would support their criminal prosecution for RICO.

54.   It is now settled law that, as to predicate crimes of mail and wire fraud, a <u>victim</u> may have causal injury and thus RICO standing even if the victim was not the <u>target</u> of the fraud.

55.   Since both the companies and Plaintiffs suffered causal injury by reason of Arif, Satter, and Schwarz's operation of Bayrock Group LLC through this pattern of predicate crime (the common law "hijacking" concept, ¶45, as expressed in RICO terminology), alleged *infra*,

Plaintiffs, directly and derivatively can privately prosecute Arif, Satter and Schwarz for violating federal racketeering law by, *inter alia*, operating Bayrock Group LLC through a years-long pattern of mail and wire fraud intended to deprive victim governments of up to $100,000,000 or more of tax, whether or not the crimes "succeeded" in creating any tax deficiency.

56.    Concealing It. In addition, these Defendants' concealments of the tax frauds and related information in the presence of duties to disclose it are related predicate crimes, as in state law.

57.    **Injury**. These Defendants proximately caused the same or similar direct and derivative injury by their violations of state law as they did by their violation of federal racketeering law.

58.    Plaintiffs' Derivative Injury. As members of Bayrock limited liability companies, Plaintiffs have the standing to sue on behalf of those companies for their causal injuries.

59.    Derivative injuries includes legal and accounting fees Bayrock victim companies spent defending audits due to the frauds, like the 2007 audit of sham "loans" to Satter, ¶127; Bayrock funds misappropriated and illegally spent on fees paid to corrupt attorneys and accountants for their facilitation of these frauds, including as applicable money spent on bribing them to breach their fiduciary duties; partnership level penalties; and nonrefundable FICA, FUTA, and sate unemployment taxes never due but paid as part of the OWNERSHIP FRAUDS, *infra*.

60.    In addition, the companies themselves suffered injury when Arif, Satter, and Schwarz caused them to make illegal distributions or other dispositions of the proceeds of these crimes.

62.    Plaintiffs' Direct Injury II. Plaintiffs' membership interests in Bayrock companies entitle them to tax distributions equal to a percentage of these companies' partnership taxable income.

63.     Payment of this distribution is mandatory, automatic, and non-discretionary. The amount is computed mechanically as a fixed, objectively determinable function of partnership income. It is computed without regard to a member's individual tax circumstances. It is positively correlated with taxable income, so the greater the partnership taxable income the greater the distribution.

64.     This tax distribution provision is like a huge pendulum. Every time it realizes partnership income on an arc to the left, it must inexorably deposit a predetermined portion of that income as a tax distribution to Plaintiffs on its next arc to the right. It cannot be reasoned with. It does not think. It does not feel. It simply is. There is no "off" switch. It is eternal. It cannot be stopped.

65.     When Arif, Satter, and Schwarz executed schemes to fraudulently understate partnership income, causing the pendulum to pick up too little income on its arc left, Plaintiffs' tax distributions were illegally diminished, the pendulum foreseeably depositing too little to Plaintiffs on its arc right. Plaintiffs' failure to receive their due distributions is direct, not derivative, harm.

67.     Such intentional failure to make distributions is oppressive conduct. The harm is direct.

68.     <u>Plaintiffs' Direct Injury III</u>. In addition to causal injury by reason of the deprivation of their tax distributions, Plaintiffs have causal injury by reason of the deprivation of their opportunity to collect it, their chose in action. Plaintiffs have been injured by these Defendants' fraudulent concealment of the information needed to determine the existence and amount of taxable income and the existence and amount of due tax distributions and their need to sue for it.

69.     As part of their tax frauds, Arif, Satter, and Schwarz not only caused Bayrock companies to file dozens of fraudulent partnership returns and K-1's, they also caused Bayrock companies to fail to file dozens more returns and K-1's, sometimes pretending companies were disregarded entities so the transactions underlying the tax frauds could be buried on the wrong returns of other companies, and they failed to distribute required K-1's to Plaintiffs and other members.

70.     Then, they illegally refused Kriss's demands for access to Bayrock tax information, though state limited liability company statutes entitle Kriss to access them on demand and the limited liability company agreements of every company allow him the right to audit its books.

71.     As a result, Plaintiffs are unable to report their distributive shares and pay any tax due, and Kriss has had to sue for this information, suing Bayrock Spring Street LLC and Bayrock Whitestone LLC, Delaware companies, in a books and records action per 6 Del. Code §18-305.

72.     Plaintiffs' legal (and related) fees in bringing that and subsequent books and records action(s), motions, or orders to obtain the wrongfully withheld tax information, and for dealing, as a partner, with partnership-level IRS examinations and partner-level defenses are direct, not derivative, §1964(c) injury, legal fees as damages.

73.     **Causation Is Direct and Proximate**. Arif, Satter, and Schwarz had statutory and contractual duties to truthfully compute and report certain numbers, and the duty to pay Plaintiffs, without intervening decision, fixed, determinable, non-discretionary percentages of those numbers. For years they have operated Bayrock Group LLC through schemes to fraudulently under-compute those numbers. Whether those numbers were to be computed by reference to Fiji's annual sugar exports or by reference to the number of sunspots each July 4th or by reference to partnership items of income and loss is irrelevant; there is but one step from fraud, the knowing under-computation of those numbers, to injury, the diminished distributions as a result.

74.     "One step from fraud to injury" satisfies the causation requirement of §1964(c), and so also satisfies the causation requirements of state law breach of fiduciary duty and fraud.

75.     **Standing**. Plaintiffs are not sovereign entities. Paradigmatically, Plaintiffs <u>privately</u> "tax" these companies by their right to receive these information reports and tax distributions, so are essentially <u>private</u> attorneys general suing Arif, Satter, and Schwarz because their frauds deprived Plaintiffs of their <u>private</u> "tax" revenue and their <u>private</u> opportunity to collect it.

76.     Plaintiffs are quintessential RICO persons who suffered quintessential RICO injury to their quintessential RICO property by reason of quintessential RICO violations. Whether New York or any sovereign entity also suffered RICO injury *qua* lost tax or the opportunity to collect it and if so has standing to sue Defendants using RICO as a tax collection device is not at issue.

77.     **Vicarious Liability**. Plaintiffs assert vicarious liability under both state law and RICO.

78.     Under state law, Plaintiffs assert liability for aiding and abetting and civil conspiracy.

79.     Under RICO, Plaintiffs assert liability against those who agreed to knowingly facilitate Arif, Satter, and Schwarz's racketeering. As such claims are made pursuant to its conspiracy, §1962(d), not substantive, §1962(c), provisions, those Defendants, though accountants and attorneys, cannot hide behind *Reves*.

THE STORY

80.     **Bayrock Becomes a Mob-Owned Business**. The story began when Satter, a mobster and ex-convict (assault with a deadly weapon) infiltrated Bayrock in 2002. At the time, Satter was awaiting sentencing on federal racketeering charges for running a securities fraud syndicate in collaboration with the New York Mafia and Russian mob that deprived its victims of $40,000,000. By 2003 Satter had attained majority Bayrock ownership and shared control with Arif. From then, at all relevant times, Bayrock was largely a mob-owned and operated business.

81.     Running a mob-owned and operated business offered Arif and Satter a lot of difficulties, number one being they were running a mob-owned and operated business. No bank would lend for any project, no money partner would join any venture, no professionals would do any work.

82.     And, Satter's sentencing for racketeering was approaching. Most of the Russian and Mafia mob co-defendants he would have testified against had pled guilty and been sentenced to incarceration and up to$40,000,000 of restitution, and Satter, who in 2003 began skimming what would become almost a million dollars a year from Bayrock, did not want to give it to his victims.

83.     **Concealing Bayrock's Owners**. Arif and Satter agreed to conceal Satter's majority ownership of the Bayrock Organization. They concealed it from Plaintiffs and others at Bayrock, including Plaintiffs. They concealed his million dollar skimmed income from his presentencing Probation Officer and the Court. They concealed it, and his million dollar skimmed income, from the IRS. They concealed it from their partners. They concealed it from their lenders. They concealed it from their buyers, filing false condominium offering documents.

86.     **Concealing From Bayrock's Owners**. Their concealment ran to more than hiding the existence and identity of Bayrock owners from others; it also encompassed concealing material information <u>from</u> Bayrock owners, to whom they had fiduciary duties of disclosure, ¶36.

91.    The first purpose was to deprive Plaintiffs and others of their multi-million dollar share. Their mens rea became apparent later, in the form of spoken admissions, which Kriss recorded.

93.    **<u>Relatedness</u>**. It is helpful to visualize the non-tax related concealment frauds and crimes in this action grouped according to:

   A.    Those which concealed Satter's majority ownership of Bayrock.

   B.    Those which concealed the identity of other, minority, owners of Bayrock.

   C.    Those which concealed information from Bayrock itself, as a matter of law (that is, where a duty of disclosure ran to a Bayrock company).

   D.    Those which concealed information from Bayrock's owners, as a matter of law (that is, where a duty of disclosure ran to one or more owners of a Bayrock company).

   E.    Those which concealed information other than ownership of Bayrock.

94.     The main scheme of tax fraud dominates.

95.     Not every concealment was of ownership.
nor every concealment of ownership for tax fraud
nor every tax fraud by concealed ownership[5]; not
every concealment of ownership involved Satter,
or only Satter. But, as the diagram shows, all the
frauds satisfy *Daidone* relatedness, all related to
the enterprise and all with the common goal of
lining the pockets of Arif, Satter, and Schwarz
with the proceeds of their racketeering, but



**FIGURE 3**

importantly, this is no allegation of one unitary scheme to defraud; rather, that there was a scheme
to defraud the IRS, and other schemes to defraud, for example, banks, and they were separate
schemes, but shared Daidone relatedness in that they were a set of non-unitary frauds, easily one
scheme committed without the other, yet existing together to enrich them by criminal acts.

96.     **The Story (cont'd)**. When Plaintiffs joined Bayrock in 2003, Arif and Satter told them
Satter had a "nominal" interest in the firm, only in subsidiaries, and while he had a prison record
for assault, he was turning his life around. Because his guilty plea to criminal RICO, proffer, and
cooperation agreement were hidden as he was aiding the prosecution of his Mafia and Russian
organized crime confederates, Arif and Satter were able to hide his history of securities fraud,
money laundering, and related crimes from Plaintiffs and others for almost five years, though

---

[5] However, every tax fraud impacted every partner. By partnership taxation, Bayrock's criminally fraudulent tax
accounting harmed all the partners, even the innocent, who received either fraudulent K-1's, or no K-1's at all as part of
the concealment of their status and identity from the IRS, and who received illegally diminished tax distributions, or no
tax distributions, as a proximate result of the illegally understated Bayrock partnership taxable income.

Schwarz, who joined in 2005, learned the truth by 2007 and used it in an attempt to extort Arif and Schwarz, *infra*.

97.     Plaintiffs agreed to join Bayrock, as did others, because Arif and Satter promised them "sweat equity", with comparatively modest, or no, regular additional cash compensation.

98.     This meant these service providers' ultimate compensation would be heavily dependent on the entrepreneurial success of Bayrock operations; this was the essence of all their bargains.

99.     Sometimes, as with Ejekam, the sweat equity was limited in scope to depend on the success of specific projects, and sometimes, as with Kriss and Schwarz, it was broadly scoped to depend on the success of almost every project in the Bayrock Organization.

100.     Sweat equity rights were encapsulated in, and conveyed to service providers by having Bayrock companies issue them, membership interests, making them members.

101.     Those service providers whose sweat equity was limited in scope received membership interests in one or more Subs. For example, referring to the EQUITY CASH FLOW diagram, Pg. 2, Ejekam, whose sweat equity was limited in scope to the Trump SoHo and Waterpointe projects, received membership interests in Bayrock Spring Street LLC and Bayrock Whitestone LLC.

104.     At least this is what was supposed to happen. It did not.

105.     What Plaintiffs did not know as they joined and worked there, and could not have known, was that, far from turning his life around, Satter, had joined with Arif, and later also with Schwarz, to run ran Bayrock as their private piggy bank, with no regard for the fiduciary and contract duties they owed Plaintiffs and others, in contempt of criminal law as well, operating Bayrock Group LLC, an evolving joint criminal enterprise, through a pattern of racketeering to line their pockets with as much as possible, especially with the proceeds of crime.

106.     They began to find out when things went well and their membership interests were worth over $32,500,000 and Arif, Satter, and Schwarz stole it from them, and millions from other minority members, as part of a conspiracy to evade $100,000,000 of tax, the crimes tainting not only Trump SoHo, ¶11, but Trump International, Trump Camelback, and Waterpointe as well.

107.     How they, conspiring with other Defendants, did this is but one of the criminal subplots in this case which make clear Plaintiffs' RICO standing and together tell the rest of the story.

THE SUBPLOTS

119.    Part of the reason was FL's willingness to conspire in the theft of Plaintiff's interests.

121.    And part of the reason was a side deal, where Arif, Satter, Schwarz, and FL agreed to perpetrate $100,000,000 of money laundering and tax evasion, benefitting Arif, Satter, and Schwarz by allowing them to evade $20,000,000 of their personal income tax liabilities immediately and in return benefitting FL by allowing it to evade $80,000,000 of tax over time.

123.    When Kriss objected to all this, Satter made him an offer he couldn't refuse: either take $500,000, keep quiet, and leave all the rest of his money behind, or make trouble and be killed.

124.    Given Satter's criminal history of kidnapping, illegal possession of assault weapons, assault with a deadly weapon, and recent threats to torture, kill, and dismember another Bayrock partner, Ernest Menes, if he didn't stop complaining that Satter was skimming from Trump Camelback, this was no idle threat. Kriss took leave from Bayrock after the extortion.

---

[6] Disguising the sale as a "loan", Arif, Satter, and Schwarz had Bayrock understate income by $42,000,000, automatically understating all partners' distributive shares of income by $42,000,000 and eliminating $20,000,000 of tax distributions. This one step, Arif, Satter and Schwarz understating partnership income to evade their own tax, as a result automatically caused understatement of other partners' income and loss of their tax distributions, a RICO injury.

126.     Schwarz encouraged the New York Times to run a story about Satter's mob ties, Exh. B, then used the negative publicity in an attempt to extort Arif and Satter into giving him Bayrock.

128.     Arif refused to submit to extortion, and Satter, who knew about extortion, proffers, and cooperation agreements, knew Schwarz would not turn anyone in because Schwarz was up to his eyeballs in tax fraud and other crime and would never get immunity, so he also refused to submit.

129.     Bayrock's audit problems tripled when iStar, $275,000,000 Trump SoHo lender, unhappy the article made them seem to be financing Mafia and Russian mobs, demanded to audit Bayrock, followed by the Sapirs, Bayrock's Trump SoHo partner, demanding a forensic fraud audit.

134.     The sham $1,600,000 "withholding" was a pretext to pay Satter's personal tax debt with misappropriated Bayrock money, so was $1,600,000 of unreported taxable income to him, and they knew it, and knew the amount was $1,000,000 low, that he owed more like $3,000,000, and knew they were evading $600,000 of interest and penalties, and the made-up $4,200,000 salary was a pretext to wipe the "loans" off the books, yet they filed the returns and schedules anyway.

THE CONSPIRATORS

139.     Arif, Satter, and Schwarz didn't commit these crimes and other wrongful acts alone. In their direct or derivative capacities Plaintiffs allege the following Defendants are liable for, variously, conspiracy to violate federal racketeering laws; civil conspiracy in the commission of or aid and abetment of Arif, Satter, and Schwarz's state law wrongs; and their own violations of substantive state law, including breaches of their own fiduciary, contract, and professional duties.

147.    Plaintiffs unwittingly became minority members in and creditors of an organized criminal enterprise operated through perjury, embezzlement, tax evasion, extortion, bribery, and fraud.

148.    They did not bargain for this. That they were induced to associate with criminality is a renouncement of the essence of their bargain, that the parties consensually bound themselves in relationships mutually understood to be governed by the rule of law, not the rule of the Mafia.

149.    Plaintiffs seek monetary and equitable relief in two overarching alternate sets of theories:

A.    **Rescissory**. Plaintiffs acquiesce to the renouncements. Regardless of label, rescission for repudiation or anticipatory breach, forced buyout for majority oppression and squeeze-out, or voidance for fraud in the inducement, and regardless of jurisprudence in law or equity, Plaintiffs seek judgment that Defendants abrogated the relationships. Plaintiffs' chiefly plead the FL Frauds were repudiations of their memberships and pray for lost profit damages in an amount determined at trial, likely in excess of $25,000,000.

B.    **Remedial**. Alternatively, Plaintiffs hold Defendants to their bargains, and seek to remedy the direct and derivative harm done them. They seek to recover the distributions they failed to receive; the imposition of constructive trusts; the voidance of distributions from all Bayrock limited liability companies and other fraudulent transfers; declaratory judgments, and judicial dissolution of every juridical entity in the Bayrock Organization.

150.    Plaintiffs in addition, seek relief in RICO:

A.    **Legal**. Pursuant to §1964(c), Plaintiffs seek treble damages for their causal injury as pled subsequently *infra*, plus attorneys' fees and costs.

B.    **Equitable**. Pursuant to §1964(a), Plaintiffs seek equitable relief, including judgments from the Court divesting each Defendant of all interests in Bayrock; ordering each Defendant to disgorge the amount by which he was unjustly enriched; and ordering the dissolution, winding up, and terminal liquidation of all Bayrock entities.

## JURISDICTION AND VENUE

151.     This Court has jurisdiction pursuant to 28 USC §1331, the action arising under the laws of the United States; and 28 USC §1367(a), all other claims not arising under the laws of the United States so related to claims in this action that they form part of the same case or controversy under Article III, including claims that involve the joinder of additional parties.

152.     Venue is proper pursuant to 28 USC §1391(b)(2), a substantial part of the events or omissions giving rise to the claims occurring within this district, and a substantial part of property the subject of the action situated within this judicial district; and 28 USC §1391(b)(3), Defendant Bayrock Group LLC found within this district and Defendants not all residing in the same state.

# RULE 23.1 STATEMENT

**PLAINTIFF KRISS ATTESTS:**

153.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Group LLC, Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFF EJEKAM ATTESTS:**

154.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFFS KRISS AND EJEKAM BOTH ATTEST:**

155.    This action is not a collusive one to confer jurisdiction the court would otherwise lack.

156.    Demand would be futile. This is stated this with the following particularity:

157.    Defendants Arif, Satter, and Schwarz control Bayrock Group LLC, and have controlled it each alone, and together in combination, since no later than 2002 in the case of Arif, 2003 in the case of Arif and Satter, and 2005 in the case of Arif, Satter, and Schwarz.

158.    During those periods, they have not only controlled it, but dominated it to the extent they are and have been the sole f persons having *de jure* or *de facto* control over it. There are no other persons in the nature of independent managers or directors who could contest or overrule them. In particular, throughout these times Defendant Arif has been the only member of Bayrock Group LLC, which is member managed, whose membership interests have voting rights.

159.    Through their control of Bayrock Group LLC they exercise both *de jure* and *de facto* control over all other Bayrock entities relevant to this action, including without limitation Spring Street and Whitestone, of which Bayrock Group LLC is the sole manager.

160.    This Complaint in general and the derivative causes of action in particular are predicated on the continued, wrongful operation of these three derivative Plaintiffs for the personal benefit of (i) Arif, Satter, and Schwarz, as to Bayrock Group LLC; and (ii) Bayrock Group LLC, Arif, Satter, and Schwarz, as to Bayrock Spring Street LLC and Bayrock Whitestone LLC.

161.    The acts complained of include not just civil wrongs but criminal acts of money laundering, tax evasion, perjury, obstruction of justice, mail fraud, wire fraud, bribery, honest services fraud, extortion, and embezzlement of a degree and nature and in respect of amounts so large that federal sentencing guidelines for a comparable criminal action would be in the decades.

162.    None of Arif, Satter, or Schwarz can be expected to adequately pursue civil action against themselves which could result in such possible subsequent criminal liability, particularly where liability would depend on their own culpable mental state (mens rea or scienter).

163.    Moreover, these acts complained of, for example the tax evasion, were acts whereby these Defendants used these derivative Plaintiffs as mediating agents to commit the crimes and related wrongs predominantly by engaging in transactions with third parties, many named as conspiracy Defendants in this action, in which they stood on both sides of the transaction, either directly, for example in the FL transactions whereby they stripped tens of millions of dollars of assets from Bayrock subsidiaries, including Spring Street and Whitestone, in order to gain access to $50,000,000 cash for the direct benefit of Bayrock Group and themselves personally, or constructively, because of conspiracy with the "other side", and so they are self-interested.

164.    Moreover, no reasonable persons controlling these entities would, in the exercise of proper business judgment, commit these crimes and related civil wrongs, let alone on such terms.

165.    Finally, Kriss has made attempts to gain access to the books and records of Spring Street and Whitestone by proper demand and has been refused, and there is no reason to believe demand for action would meet with any different result other than refusal.

**DEFENDANTS**

BAYROCK GROUP LLC AND CERTAIN SUBSIDIARIES

166.    Most of Bayrock's U.S. entities are contained in a hierarchy (the "Bayrock Hierarchy"):

A.    **Bayrock Group LLC**, is, and was at all times relevant, a duly organized and existing New York limited liability company Its principal place of business is New York.

168.  **Tevfik Arif** ("Arif") is a natural person residing in New York.

169.  **Felix Satter** ("Satter") aka Felix Sater, is a natural person residing in New York.

170.  **Julius Schwarz** ("Schwarz") is a natural person residing in New Jersey.

THE RICO CONSPIRACY DEFENDANTS

171.  **Brian Halberg** ("Halberg") is a natural person residing in New York.

172.  **Salomon & Company, PC** ("Salomon & Co.") is, and was at all times relevant, a duly organized New York professional corporation.

173.  **Alex Salomon** ("Salomon") is a natural person residing in New York.

174.  **Jerry Weinrich** ("Weinrich") is a natural person residing in New York.

175.  **Roberts & Holland, LLP** ("Roberts") is, and was at all times relevant, a duly organized New York limited liability partnership.

176.  **Elliot Pisem** ("Pisem") is a natural person residing in New York.

177.  **Duval & Stachenfeld, LLP** ("Duval") is, and was at all times relevant, a duly organized New York limited liability partnership.

178.  **Bruce Stachenfeld** ("Stachenfeld") is a natural person residing in New York.

179.  **Craig Brown** ("Brown") is a natural person residing in New York.

180.  **David Granin** ("Granin") is a natural person residing in New York.

181.  **Mel Dogan** ("Dogan") is a natural person, residing and in New York.

OTHER DEFENDANTS

182.  **Akerman Senterfitt LLP** ("Akerman") is, and was at all times mentioned herein, a duly organized Florida limited liability partnership.

183.  **Martin Domb** ("Domb") is a natural person residing in New York.

184. **Nixon Peabody, LLP** ("Nixon") is, and was at all times relevant, a duly organized New York limited liability partnership.

185. **Adam Gilbert** is a natural person residing in New York.

186. **Bayrock Group, Inc.** is, and was at all times relevant, a duly organized Delaware corporation.

187. **Michael Samuel** is a natural person residing in New York and Florida.

188. **Salvatore Lauria** is a natural person residing in Connecticut and Florida.

189. **National Union Fire Insurance Co. of Pittsburgh, PA.** is, and was at all times relevant, a duly organized Pennsylsania corporation.

190. **John Does 1-50** are "Company Entities", as defined in ¶416, their identity unknown.

191. **John Does 51-100**. Are a certain trust settled by Satter in 2008 and such other juridical entities, as defined herein, through which he has participated in Bayrock activities.

**PLAINTIFFS**

192. **J. L. Kriss** ("Kriss") is a natural person residing in New York.

193. **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen.

**NON-PARTIES OF INTEREST**

194. **Beau Woodring** is a natural person residing in Arizona.

195. **FL Group ehf** is an Icelandic investment company, since 2008 known as Stodir.

196. **Elizabeth Thieriot** is a natural person residing in California.

197. **Cayres** are a family of natural persons, investors and developers residing in New York.

198. **Maria Simonchy** is a natural person residing in New York. She has always been at all relevant times Arif's email agent, unless otherwise stated all emails addressed to her are alleged to have been received by Arif and all emails sent by her are alleged to have been sent by Arif.

## ALLEGATIONS

**THE SATTER FRAUDS I**

SATTER'S INFILTRATION INTO BAYROCK

199.    Soon after Arif formed Bayrock Group LLC in 2002 as the ultimate control parent of the Bayrock Hiearchy, Satter joined Bayrock. He had been working as a commission broker, trying to raise money for development companies; one of his few successes was a deal on a Florida project to be done jointly by New York developer Michael Samuel and a New York family, the Cayres.

200.    As a success fee for brokering that deal, called Midtown Miami, Satter was paid in kind in the form of a personal option to buy a membership interest, conveying a 5% profit interest, in one of the project limited liability companies (a Midtown Miami "Sub") for $450,000.

202.    Meanwhile, between 2000, when he had just come to the United States, and that time in 2002, Arif, using the progenitor of what was becoming Bayrock, had started several development projects and, most prominently, had acquired a large income project, Loehmann's Plaza in Brooklyn, for which he paid about $16,000,000 and would sell in a few years for $23,000,000.

PRIOR CONVICTION FOR CRIMINAL RICO

203.    When Satter infiltrated Bayrock in 2002, he was awaiting sentencing for his guilty plea for violating criminal RICO, his information, see *U.S. v. Sater* (aka "John Doe"), 10-CV-3959,

revealing his participation in the operation of an enterprise which committed securities fraud, money laundering, threats of violence in connection therewith, and mail and wire fraud,.

204.     Satter committed these crimes in connection with his founding (with several partners in crime, one of whom, Sal Lauria, he would take with him to Bayrock) and operation of a Russian and Mafia stock brokerage "pump and dump" operation variously known as "White Rock Partners" and "State Street Capital Markets", which defrauded its victims of $40,000,000[7].

205.     Although he agreed to cooperate in 1998, Exh. A, Satter was not convicted until 2009, Exh. C, well within the 10-year window of FRE 609(b), and the nature and degree of his crimes, the number of victims and the amount they were defrauded of, about $40,000,000, would qualify for the 609(b) exemption in any event.

206.     His criminal activities eventually attracted the attention of the FBI's Russian organized crime squad, largely because he and a Russian mob confederate, Gennady Klotsman, who has since returned to Russia after serving his term for these crimes, left a locker full of incriminating documents and TEC-9 assault weapons without paying the rent and it was eventually broken into by the owner. Their ensuing investigation culminated in a 1998 information against Satter,

---

[7] Satter was deposed Marcy 9, 2010 in *Bernstein v. Bayrock Group LLC*. Here is his testimony about his racketeering:

Q.     Were you ever convicted of a crime?

A.     Yes.

Q.     What was the crime you were convicted of?

A.     I was convicted of assault one.

Q.     Were you ever convicted of any other crimes?

A.     On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself nor does this business litigation have anything to do or bearing on whether I am convicted of any crimes or not. On the advice of counsel, I won't answer past what I have already answered.

Q.     You already answered you were convicted of assault?

A.     Yes.

Q.     If you have actually been convicted, the fact that you have been convicted cannot constitute any testimony against your own interests and goes to your credibility depending upon what the nature of conviction was and if it goes to a conviction related to something related to any sort of fraud, et cetera, it is relevant to your credibility as a witness in this case.

A.     Probably not a very credible witness to begin with.

resulting in his 1998 guilty ple and coioperation, and subsequent sentencing in 2009 to a $25,000 fine, no jail, no restitution, no probation on federal racketeering charges (Klotsman pled guilty and was sentenced to 71 months in jail and $40,000,000 in restitution).

207.    His frauds included disguising his ownership of White Rock and State Street, because he was statutorily disqualified, and securities frauds conducted through White Rock and State Street,, commonly referred to as "pump and dump" schemes, which ent essentially as follows. Sater and others secretly acquired large blocks of stock of publicly traded companies.To control this sock, Sater and others put shares in the brokerage accounts of foreign corporations whose activities were directed using false names "Elliot Smith" and "Paul Stewart." Sater and others then used White Rock to underwrite initial public offerings for these stocks and enlisted brokers at White Rock and other firms, including Baron and D. H. Blair, to hype the stock to retail customers. To inflate the demand, Sater and others made secret payoffs (in cash or securities) to brokers at White Rock and the other firms based on the sales they generated. As brokers generated demand for the stock, Sater and others sold the shares they secretly controlled, generating tens of millins in profits which were then laundered through various offshore and domestic accounts.

208.    The information describes these frauds besides Holly Products, and the money laundering Satter used, including shell companies and corresponding overseas bank accounts[8].

---

[8] There is remarkable similarity between method of operation of State Street and the methods of operation of Bayrock, including the frauds on partners and on the public, Satter's use or planned use of shell companies, and the use of dummy companies like Bayrock Group Inc. through which Bayrock funneled at least $1,5000,000 of unreported, untaxed income to Satter so he and Bayrock could pretend he had separated from Bayrock, his membership interests transferred into a "trust" for his wife for additional plausible deniability of his Bayrock ownership.

209.     Twenty of Satter's White Rock confederates, including members of the Bonanno, Gambino, and Colombo Mafia organized crime families, were also convicted, many on racketeering charges. Most were sentenced to prison terms and multimillion dollar restitution.

210.     This was Satter's second felony conviction; he was convicted in 1993 of first-degree assault with intent to cause serious injury with a weapon and imprisoned for 1-1/2 to 4-1/2 years.

211.     On his release from prison, Satter was perpetrating his crimes at White Rock <u>even while still on parole</u> for that assault conviction.

212.     And he ran White Rock even though he had been barred by the NASD from working in a significant capacity in the securities industry:

213.     In short, while still on parole from his previous felony conviction for assault with a deadly weapon, Satter defrauded the NASD; hid his active role in the operation of a Mafia and Russian mob securities broker/dealer racketeering enterprise through a pattern of predicate crimes including threats of violence; hid his partnership in the firm; defrauded investors; and laundered the proceeds of its illegal activities.

214.     So it is no surprise that in late 2002, while not even sentenced yet for these racketeering crimes and still cooperating with the US Attorney's Office, Satter proceeded to do the same thing right under the nose of the U.S. Probation office, commencing his next racketeering crimes while still involved with, in fact while not even yet sentenced for, his last.

215.     Satter infiltrated Bayrock in 2002, soon becoming Arif's covert majority partner, hiding his partnership in Bayrock , then proceeded to skim off and fail to report millions of dollars of taxable cash income; hide his participation in the operation and management of all aspects of Bayrock Group LLC, including through a pattern of predicate crimes including threats of violence; defrauding investors, lenders, and partners; laundering the proceeds of Bayrock's illegal activities; and defrauding and deceiving the U.S. Judiciary, obstructing justice by giving false, misleading, and incomplete information to a U.S. Probation Officer.

216.     At this time, late 2002 to early 2003, Satter still had not yet been sentenced for his State Street racketeering, and as he knew, because he had to know from instructions to him, in the interviews in preparation of his presentence investigation he would be required to disclose complete, accurate information about his income, assets, and ability to pay restitution, and he knew that his near million dollar a year income and ownership of more than half the company would subject him to significant restitution order, like his Mafia and Russian mob co-defendants.

217.     So in February 2003 Arif conspired with Satter to, and did, hide his ownership of, and income from, Bayrock, allowing Satter to skim the better part of a million dollars a year in cash, unreported and untaxed, the money sometimes wired to Satter's wife or third parties. The pretext was that these were "loans", but Arif and Satter never took that seriously, as shown *infra*.

218.     Satter obstructed justice by giving false or misleading information to a U.S. Probation Officer, in violation of 18 USC §1503. The 2004 Presentence Report for *U.S. v. Sater*, Docket

No. 98-CR-1101-01, EDNY indeed says that Sater reported no regular salary from Bayrock, and that Sater was hiding his racketeering conviction from the firm and his partners.

219.     This was also mail or wire fraud, 18 USC §1341 or 1343: He defrauded the Probation Office in order to deprive his racketeering victims of restitution by understating his ability to pay.

221.     In short, at the time he was preparing for his 2004 sentencing Satter was perpetrating a scheme which, had his sentencing not been postponed, would have had him standing before the Court, having successfully duped the Probation Officer into presenting a knowingly false sob story of hand to mouth penury for which there was no other reason other than to defraud his way out of an order of restitution of periodic income based payments (restitution was mandatory, but a schedule of payments like that to a degree discretionary) and one can be sure not mentioning he had just purchased a $1,750,000 mansion given it is not likely he could have obtained the mortgages with which to buy it if he had told the bank he had no salary or equivalent.

222.    From 2003 Arif and Satter, then from 2005 with Schwarz, arranged for and participated in Satter's skimming almost $1,000,000 per year of unreported and untaxed cash from Bayrock Group LLC. By 2007 Satter had skimmed off the following amounts, counting amounts Bayrock paid for his personal American Express bills:

| Year | Amount Skimmed | Cumulative Amount Skimmed | With Interest (Approx.) |
|------|----------------|---------------------------|-------------------------|
| 2003 | $   355,000.00 | $   355,000.00 | $   372,750 |
| 2004 | $   578,201.29 | $   933,201.29 | $ 1,017,136 |
| 2005 | $   673,160.25 | $ 1,606,361.54 | $ 1,825,668 |
| 2006 | $   654,965.20 | $ 2,261,326.74 | $ 2,695,948 |
| 2007 | $ 1,475,085.05 | $ 3,736,411.79 | $ 4,514,382 |

223.    That's almost $5,000,000 Satter "owed" by the end of 2007, or $1,000,000 a year.

226.    Arif, Satter, and Schwarz never respected the skims as "loans", for good reason: When he joined Bayrock, supposedly his only asset was his Bayrock interest. No creditor would have lent him millions as he had nothing ex Bayrock to repay it with. Nothing he would admit, anyway. His presentencing report says he admitted earning millions from securities fraud, never accounted for.

227. It's possible his "couple million dollars" of racketeering proceeds survived his conviction and sentencing and that he showed Arif he had it stashed overseas so was a good credit risk, and this knowledge reassured Arif; this cannot be known until disclosure, though it is unlikely Satter or Arif will actually testify Satter had these illegally obtained millions to support his "credit."

229. One example is Schwarz's recent deposition testimony in an unrelated case that he was aware of those constant, month after month, continuing payments of cash to Satter and that he believed they weren't "loans", but compensation[11].

---

[11] From Schwarz's March 5, 2010 deposition in *Bertnstein v. Bayrock Group LLC* (for brevity slightly redacted):

Q.    Felix Sater was given money by Bayrock group LLC in exchange for his services?  True or false?

A.    Yes.

Q.    What did Felix Sater do or promise to do in return for the money?

A.    His job was to source and obtain transactions for the company.

Q.    Was the money paid to him in consideration for his doing that or was it lent to him in consideration for his repaying [it]?

A.    I would stay it was -- I guess in my view he was paid for him in consideration of doing that.

Q.    Then it was not a loan; it was pay?

A.    I would say that is probably correct.

240.     Satter paid for that mansion from three sources, a first mortgage for $1,400,000; a second mortgage for $200,000, and the remaining $175,000 with another skim from Bayrock, that $175,000 wired directly from Bayrock to the attorney's escrow account to avoid detection.

241.     There is little doubt that in disclosure, production of Satter's mortgage application will reveal he did not tell his mortgage lenders, that he had no salary, no income, had "borrowed" the down payment, but rather gave them a very different story about his assets, liabilities, income, and occupation.

242.     And how did Satter think he could service the principal, interest, taxes, and insurance on the mortgages if the money he had got from Bayrock had really been *ad hoc* "advances", how did he think he could pay about $15,000 per month, plus monthly household expenses, a monthly nut of perhaps $20,000 after tax, for which he would need a $400,000 annual pre-tax income – unless he knew his $50,000 to $75,000 a month skim from Bayrock would go on indefinitely, which of course is the point, that these were not "loans" and that he and Arif always intended the skims to go on indefinitely, as they did.

248.     These and subsequent allegations employ the following standard conventions:

249.     **Membership Interest** means the totality of a member's interests in a limited liability company. By definition, membership interests are contain two disjoint subsets of rights, *viz*:

> A.     Governance Components of membership interests convey the right to participate in management of the company, *e.g.* by voting, consent, or access to information.
>
> B.     Financial Interest Components convey the right to distributions from the company. It may convey a capital or a profits interest, but not both, as they are mutually exclusive.
>
>> I.     Capital Interest means an interest that would give the holder a share of the proceeds if the partnership's[12,] assets were sold at fair market value and then the proceeds were distributed in a complete liquidation of the partnership. This determination generally is made at the time of receipt of the partnership interest.
>>
>> II.     Profits Interest means "[A] partnership interest other than a capital interest."

250.     These examples illustrate the important concepts used in subsequent allegations.

> Hypothetical 1. A and B form limited liability company AB, a tax partnership. Each contributes $50. The business of AB is to invest $100 in project X for some indefinite term, then liquidate and distribute the residual equity, after all liabilities, to each 50:50.

---

[12] By tradition, "partnership", "partnership interest" and "partner" are used in the federal income taxation of limited liability companies taxed as partnerships and their members, and in context refer to the appropriate equivalents of membership, membership interest, and member

Each of A and B has an identical 50% capital interest, capital not profits because if they were to liquidate instantly after formation each would receive a liquidating distribution.

Hypothetical 2. The same as Hypothetical 1, but at liquidation A will receive 100% of the distributions until she has received $50, then B will receive the next $50, thereafter each will receive 50:50 to exhaustion.

A and B each have a capital interest, but not equal. A's interest at receipt (and after) is worth more than B's because of the possibility the liquidating distribution will total less than $100, so A's return priority makes her interest worth more than B's, so A owns more than 50% of the equity; equivalently A owns more than 50% of the membership interests.

Hypothetical 3. The same as Hypthetical 1, but at liquidation A's "accreted amount" will be the future value of $50 accreted at a preference return of 8.5% annually. B's "accreted amount" will be $50. At liquidation they will share each dollar of distribution *pro rata* by accretion amount until each has received such amount, then 50:50 thereafter.

If liquidation occurs in 5 years, A's accreted amount will be $76.48. A and B will share each dollar of distribution in the ratio 76.48:50 for the first $126.48 and 50:50 thereafter. A's preference return makes her interest worth more than B's, thus A owns more than 50% of the equity.

Hypothetical 4. A, B, and C form limited liability company ABC. A and B contribute $50, C contributes his services. At liquidation A will receive 100% of all distributions until she has received the then-future value of her $50 accreted at 8.5%. B will receive 100% of the next $50. Thereafter C will receive 66.67%, and A and B each 16.67%. The business of the company will be to invest in a fixed index of U.S. value stocks for 5 years and then liquidate. There will be no interim distributions before termination.

A and B have capital interests. C, who would get nothing in an instantaneous liquidation immediately upon receipt of his interest at formation, has a compensatory profits interest.

Assuming that the stock index is well modeled by standard Black Scholes option pricing, assuming no dividend yield, a risk free rate of 5%, and 25% volatility: The net present value at formation of A, B and C's interests are $60, $28, and $12, so at formation they each own 60%, 28%, and 12% of equity in the company, respectively.

Hypothetical 5. The same as Hypothetical 4, but ABC will invest in an index of extremely risky small-cap technology stocks with 80% volatility, and for 10 years, not 5.

The net present value at formation of A, B and C's interests are $27, $18, and $55, so at formation they each own, respectively, 27%, 18%, and 55% of the company.

251. Membership interests are contingent, residual claims on the company's equity, so like all forms of equity are call options on the partnership's terminal wealth. Typically, profits interests as call options are struck "at the money" or "out of the money" relative to the fair market value of the partnership on receipt of the interest, conveying a "stake" in some part of future wealth

accretion only, but that need not be the case. Moreover, the present expected value of a profits interest can exceed, sometimes greatly exceed, the value of even all the capital interests together.

FRAUD ON BAYROCK

292.     <u>The only thing "conversion" did was change the labels, all the rights already existed</u>.

297.     Plaintiffs don't dispute this; Akerman ought to recognize common law fraud, wire fraud, and RICO substantive and conspiracy violations when they see them. <u>Especially in a mirror</u>.

299.     Banyan Bay produced a total of about $17,000,000 in proceeds, about $8,000,000 of it Bayrock Banyan's, and Bayrock couldn't get most of it for fear of suing and revealing their own crime in the matter, taking only a small partial payment from Samuel in response to their threats.

300.    **Option Fraud**. Satter's "option" to buy 10% of the Samuel Banyan partnership interests for $1, substantially likely to be exercised, is ownership for tax purposes, making Alarga a partner in Samuel Banyan (as added complication, sometime after 2003 Samuel refused to  honor the "option", claiming Satter forged the document containing it and no "option" ever existed).

309.     So the fraud on the IRS Plaintiffs allege was not that they illegally reported it as "debt", because they didn't, they reported it correctly as a partnership interest; it was something much simpler, the intentional failure to report millions of dollars of partnership income.

**THE THIERIOT FRAUDS**

312.    In previous sections, Plaintiffs alleged that Arif, Satter, and Schwarz used sham "loans" in the context of compensation fraud, illegally disguising taxable transfers of money from a partnership, Bayrock Group LLC, to a partner, Satter, as such a "loan", committing primary fraud targeted both at the IRS and at the federal judiciary (defrauding a U.S. Probation Officer).

313.    Plaintiffs also alleged that Arif, Satter, and Schwarz used sham "loans" in the context of debt/equity fraud, committing primary fraud targeted at the Cayres and secondary, related fraud targeted at the IRS (failure to report income).

314.    Plaintiffs now allege Arif, Satter, and Schwarz again used sham "loans" in the context of debt/equity fraud, committing primary fraud targeted at the IRS (a disguised sale of partnership interests) and secondary, related fraud targeted at a partner and at the New York State judiciary.

315.    Specifically, Arif and Satter defrauded the IRS by not reporting the $920,000 gain on the sale of membership interests to one Elizabeth Thieriot, which they disguised as a sham "loan", then with Schwarz, embezzled all the distributions due Thieriot in respect of her membership interest and conducted bad faith litigation to frustrate her legitimate exercise of her rights, knowingly facilitated by Akerman Senterfitt, which perpetrated fraud on the court.

FRAUD ON THIERIOT

317.     Ten weeks later, Arif and Satter convinced Elizabeth Thieriot to buying 4% of Bayrock Group's Ocean Club membership interests for $1,000,000.

318.     Thieriot was Arif's friend and Satter's landlord; she owned the house he lived in while Bayrock paid his $11,000 rent to her as part of the tax fraud and obstruction of justice Arif and Satter were engaged in to hide his million dollar skim.

Fraud on the IRS

319.     The $1,000,000 didn't come to rest in Ocean Club; it went to Bayrock Group LLC, where it was used for purposes including Satter's skim. This is consistent with the documents, which have Thieriot purchase of some of Bayrock Group LLC's existing membership interests in Ocean Club rather than contributing to Ocean Club in return for newly issued membership interests.

320.     **Ocean Club Was a Tax Partnership**. Bayrock Group was not the sole member and Ocean Club was a tax partnership[17], not a disregarded entity.

321.     **A Disguised Sale of Partnership Interests**. No later than January 2004, Bayrock Group LLC closed the sale to Thieriot and realized taxable income of about $920,000  . To evade tax they had Bayrock Group LLC fail to report the partnership level income, employing an artifice to defraud, a "disguised sale of partnership interests". Here's how:

---

[17] By January 1, 2003 Satter owned membership interests in Bayrock Ocean Club LLC, the financial interest components conveying about a 50% profits interest. In addition, as the Ocean Club partnership tax returns for 2003 show, RIF International, a corporation wholly owned and controlled by Arif and used for the purpose of being a minority member in a limited liability company to ensure it was not a disregarded entity for tax purposes, owned 1%.

322.    This diagram shows the only two ways, as a matter of tax law, that Thieriot could agree with Bayrock Group to exchange $1,000,000 for 4% of "its" Ocean Club membership interests:



**FIGURE 6**

323.    <u>Taxable Sale (Scenario 1)</u>. Thieriot pays $1,000,000 to Bayrock Group, which transfers a portion of its Ocean Club membership interests to Thieriot and realizes $920,000 in taxable income.

324.    <u>NonTaxable Contribution (Scenario 2)</u>. Thieriot contributes $1,000,000 to Ocean Club which issues her membership interests, diluting only Bayrock Group's ownership; the $1,000,000 comes to rest in Ocean Club for its proper use.

325.    That only Bayrock suffers an ownership decrease is not determinative; <u>what determines whether this is a taxable sale or nontaxable capital contribution is where the money comes to rest.</u>

| Partner | Before | Scenario 1 | Scenario 2 |
|---------|--------|------------|------------|
| **Bayrock** | X % | X − Y % | X − Y % |
| | | **TAX** | **NO TAX** |
| [Ocean] | | $1,000,000 | $ 0 |
| | | $ 0 | $1,000,000 |
| **Others** | 100 − X % | 100 − X % | 100 − X% |
| **Thieriot** | ----- | Y % | Y % |
| | | ($1,000,000) | ($1,000,000) |

326.    Intent matters too, but what's important is that the parties not disguise a taxable sale as a non-taxable contribution, and like most of tax fraud, to find it, one need only <u>follow the money</u>.



**FIGURE 7**

328.    Substance over form and step transaction doctrines also give the same result: this was a sale of Bayrock Group's partnership interests in Ocean Club for $1,000,000, yielding $920,000 of income and $400,000 of tax evasion by Arif and Satter, Bayrock Group's two partners (then).

329.     Scienter in a Sham "Loan". Disguised sales became such common abuse that decades ago they got their own statutory prohibition, IRC §707(a)(2)(B). This is detailed in a subsequent section, the FL FRAUDS, where Plaintiffs allege Arif, Satter, and Schwarz did the same thing in 2007, but 50 times larger, causing Bayrock Group LLC to disguise a $50,000,000 sale of Bayrock subsidiary partnership interests to evade $20,000,000 of their personal tax liability, ¶533 *et seq*.

331.     So they pretended the $1,000,000 was another "loan". Nothing to see, no disguised sale here, keep moving please. This being Bayrock, that meant another sham "loan" on which no one paid "principal", no one paid "interest", no one intended to, no one accrued OID "interest", no one reported OID "interest", and no one believe they were in a "debtor/creditor" relationship.

332.     That shows scienter, because other than to try to get away with a disguised sale there was no reason to call it a "loan": either they would treat the "loan" with respect, and have to pay principal and interest, or they would disrespect it as the sham it really was, and look even worse.

333.     Furthermore, Bayrock Group had a basis in its Ocean Club membership interests exceeding $1,000,000. It could have taken a $1,000,000 distribution from Ocean Club without realizing income from the distribution *per se*, because it wasn't an excess distribution, so again, there was no reason to call it a "loan" other than to try to bury the disguised sale.

334.     The effort they undertook calling it a "loan" thus shows their intent to defraud, to use the Ocean Club partnership as a ruse, a mere conduit to pass the purchase money from buying partner (Thieriot) to selling partner (Bayrock Group LLC) to disguise the sale. This is tax fraud.

335.     The Bayrock Group LLC 2004, 2005, and 2006 partnership tax returns show this, showing $1,000,000 of "debt" owed to Bayrock Ocean Club LLC; this is confirmed by the Bayrock Ocean Club LLC partnership tax returns, which show $3,000,000 of "capital",

$2,000,000 of it Bayrock's and $1,000,000 Thieriot's, the latter "on loan" to Bayrock Group LLC. Of course, Ocean Club never reported or accrued any "interest" on that "loan".

336.    Miscellaneous Notes. It may be the $1,000,000 never even made it into Ocean Club for its quick trip right back out as a "loan" to Bayrock Group; that cannot be known until disclosure.

337.    Those Ocean Club tax returns do not reflect Satter's membership interests, or Kriss's or Woodring's, who had received membership interests by mid-2004. This is part of the pattern of continuing, related mail and wire tax fraud, and it may well be almost if not literally true that all, if not then almost all, of the hundreds of returns and schedules filed were, every one, fraudulent.

338.    Even if Ocean Club had been a single member entity at the time, the result would have been the same, a disguised sale by Bayrock Group LLC to Thieriot[19].

FRAUD ON THIERIOT AND ON THE NEW YORK SUPREME COURT

340.    On December 8, 2005, Thieriot, infuriated at the theft of the money from Ocean Club, which she learned of by reverse engineering the Ocean Club K-1's given her and then making

---

[19] Thieriot's acquisition of partnership interests in Ocean Club would have converted Ocean Club to a tax partnership. R Rev. Rul. 99-5, on such a conversion of a disregarded entity to a partnership, contains these examples:

> Situation 1. B, who is not related to A, purchases 50% of A's ownership interest in the [single member] LLC for $5,000. A does not contribute any portion of the $5,000 to the LLC. A and B continue to operate the business of the LLC as co-owners of the LLC.

> Situation 2. B, who is not related to A, contributes $10,000 to the LLC in exchange for a 50% ownership interest in the LLC The LLC uses all of the contributed cash in its business. A and B continue to operate the business of the LLC as co-owners of the LLC.

These are like Situation 1 and Situation 2 in the text. The only difference is in this Situation 1,Thieriot (B) is deemed to buy 4% of the assets of, not the partnership interests in, Ocean Club, then A (Bayrock Group) and B are deemed to contribute their respective ownership of those assets into the new tax partnership, Ocean Club, in return for partnership interests. The tax results would be the same.

inquiries, pursuant to the rights afforded her by her membership interests demanded access to Ocean Club's books and records.

341.    Bayrock Group and Ocean Club refused to give her any information, even though Arif, Satter, and Schwarz knew perfectly well she was a member, that they had stolen from her, and that she was entitled to what she was demanding, as the following allege in detail:

342.    In 2006, she sued in New York State Supreme Court, New York County, bringing actions for an accounting, to compel production of the books and records, and for pre-action disclosure.

344.    Martin Domb, an Akerman partner in its New York office, appeared in court for Bayrock in these actions. Through him, Akerman corrupted itself and perpetrated a fraud on the court.

345.    Akerman had formed Bayrock Ocean Club LLC, and knew at and at all times after its formation its only office was at Bayrock's offices in Trump Tower in New York City, as shown in this extract from in its Florida Articles of Organization, available free online 24x7:

ARTICLE II
ADDRESS

The mailing address and street address of the principal office of the limited liability company is 725 Fifth Avenue, 24th Floor, New York, NY 10022.

346.    Akerman also knew that the original Theriot negotiations for her purchase of membership interests were conducted in New York, as they were seated at the (virtual) table next to Bayrock.

348.     This was not mere attorney incompetence. This was fraud. This was deceit. This was collusion with Arif, Satter, and Schwarz, who simply had no intention of honoring Theriot's membership rights, as they would soon reveal with respect to the rights of other partners as well.

352.     Plaintiffs do not allege this was a meritless argument. That speaks for itself. Plaintiffs allege Domb, Akerman, and Arif, Satter, and Schwarz, themselves knew and believed it was a meritless argument and made it anyway in bad faith to keep Thieriot from her property.

355.     There is no doubt that had she not found her copy they would have continued to refuse her the benefit of her bargain, the exercise of her rights. They didn't they call her or counsel the

minute they found the signed copy. The minute they found the copy and knew she was a member was the moment they knew, these were lawyers and they <u>knew</u>, that Arif, Satter, Schwarz, and Bayrock owed her fiduciary duties <u>including the duty not to conceal those facts from her</u>.

356.     That's fraud by concealment in the context of a fiduciary duty to disclose, fraud on Thieriot by Schwarz, a licensed attorney, Arif, Satter, Bayrock Group LLC, Bayrock Ocean Club LLC, perpetrated with the specific intent of depriving her of her property (her distributions, her information, her chose in action, her derivative right *qua* Ocean Club to the honest services of company management and its attorneys), with the participation of Domb and Akerman.

357.     It's not the fraud on the court, which would have been an obstruction of justice predicate had this been federal litigation, that's of concern in this action, it's the fraud on Thieriot.

359.     Attorneys, especially those representing the company itself, have no right to knowingly facilitate the managers of the company when they wrongfully deny or conceal the existence of membership or the assertion by a member of her membership rights, and are guilty of breach of fiduciary duty, conspiracy, an aid and abetment of breach of fiduciary duty and fraud, if they do.

360.    And it wasn't just Thieriot; Arif, Satter, and Schwarz would go on in the case of other members, including Plaintiffs, to deny, elude, or evade their exercise of their membership rights, on equally ridiculous pretextual grounds, especially, like Thieriot, their rights to distributions and their rights to access the books and records, understandable given the financial corruption permeating Bayrock.

**THE OWNERSHIP FRAUDS**

362.    In the previous section, Plaintiffs alleged Arif and Satter had Bayrock Group LLC convey part ownership of a Bayrock subsidiary company to Elizabeth Thieriot by selling her some of its membership interests in the company, then later, with Schwarz's participation, and in conspiracy with Akerman, fraudulently concealed their knowledge and documentary proof of her part ownership of that company in a scheme to deprive her of the benefit of her membership interests.

363.    In this section and subsequent sections, Plaintiffs allege Arif, Satter, and Schwarz had Bayrock companies give themselves, Plaintiffs, and others part ownership of those companies by issuing them membership interests, then engaged in criminal conspiracies to, and did, defraud the IRS and state and local governments, lenders, condominium buyers, the town of Riverhead, New York, Plaintiffs, and others by fraudulently denying and concealing these ownerships and their knowledge and documentary proof of them.

364.    They also engaged in schemes to conceal material information from Bayrock owners, to whom they owed fiduciary duties of disclosure, in order to deprive them of money as well.

366.     Arif, Satter, Schwarz, and others have RICO principal and conspiracy liability, and state law principal, conspiracy, and accomplice liability, by reason of their, or others', commission of acts they knew, were reckless in not knowing, or should have known were illegal <u>because</u> of Arif, Satter, Schwarz, Plaintiffs', and others' ownership and creditor status in Bayrock companies.

367.   Defendants knew of these memberships and the laws concerning their conveyance, receipt, or ownership; not only did they know, they relied on their knowledge in deciding to convey them in the first place. Thus in breaking those laws these Defendants acted with scienter:

KRISS, SATTER, AND OTHERS ARE MEMBERS OF BAYROCK COMPANIES EARLY ON

368.   **Arif**. From its formation in 2002 until Satter joined shortly thereafter, Arif owned 100% of the membership interests in Bayrock Group LLC[20].

369.   **Satter**. Satter joined Bayrock as Arif's partner in 2002. By 2003 Arif had covertly given him membership interests in virtually all Bayrock companies, including Bayrock Group LLC. These interests were often held in his wife's name in shell companies or trusts as part of the effort to hide his ownership. He was never an employee of any Bayrock entity.

370.   There is documentation of his legal or beneficial ownership of membership interests in Bayrock companies from 2003, a letter where he and his wife promise Kriss 10% compensatory membership interests[21] in Bayrock companies or Bayrock Group LLC and to "gross him up" with membership interests in Satter companies that own Bayrock membership interests.

> [W]e have granted you interests in entities formed or to be formed by either or both of us, which in turn held interests in the Bayrock projects. In the future, you may receive **membership interests** directly from Bayrock Group or one of its affiliated entities.

371.   Later witnessed, notarized, authenticated documentation attests to Satter's ownership, as of January 1, 2003, of membership interests in virtually every Bayrock company, Exh. D.

372.   **Kriss**. Kriss joined Bayrock in 2003, on the condition that he be paid "sweat equity", meaning his ultimate compensation would over time depend significantly on the entrepreneurial success of Bayrock operations. By 2004 Kriss had received compensatory membership interests

---

[20] RIF International, the corporation wholly owned and controlled by Arif and used for just such purpose, owned 1%. For convenience this Complaint generally attributes RIF International's membership interests to Arif.

[21] "Compensatory membership interest" means a membership interest given for services or the promise of services.

in Bayrock companies, and was a member of, without limitation, Bayrock Ocean Club, Bayrock Merrimac, and Bayrock Camelback. This is from a 2004 services agreement, pursuant to which Kriss provided services to Bayrock Group LLC for a brief period starting in June 2004.

> WHEREAS, the Employee [Kriss] is also an unsalaried **member** of certain affiliated limited liability companies to wit: a) Bayrock Ocean Club LLC (10% **membership**) b) Bayrock Merrimac LLC (10% **membership**) c) Bayrock Camelback LLC (5% **membership**) in which entities the Employer [Bayrock Group LLC] is also a **member**.

374.   **Ejekam**. Ejekam joined Bayrock in 2003 on the condition that he be paid "sweat equity", receiving compensatory membership interests in Bayrock Spring Street and Bayrock Whitestone 2005. He was never an employee of any Bayrock entity.

THE 2005 PROTOCOL FORMALIZES USE OF COMPENSATORY MEMBERSHIP INTERESTS

377.     Method (1), ownership, was how Bayrock had always given sweat equity to Kriss *et al.* all along, by conveying membership interests. ¶370, ¶371, ¶373, and it was how Bayrock had given equity to Thieriot, selling her membership interests in Bayrock Ocean Club LLC, ¶317, so membership and membership interests were hardly novel concepts to any Defendant.

380.    Duffy did not discuss taxation, but noted membership would make service providers tax partners and a new law (§409A) imposed tax burdens on employees with deferred compensation.

381.    **Schwarz Joins Bayrock as a Member**. Soon after Duffy's note, in early 2005 Bayrock offered Schwarz, an Akerman attorney, a position as Bayrock Group's in-house general counsel.

383.    Schwarz, still at Akerman and still Bayrock's attorney during the negotiations, also gave Kriss personal legal advice[22] by email on March 24, 2005, telling Kriss while he (Schwarz) was negotiating his service agreement with Bayrock, Kriss should redo his service agreement with Bayrock in the same form as Schwarz's, and after Schwarz's contract was agreed on, which took months, Kriss did redo his agreement to match Schwarz's substantially, in reasonable reliance that, as his Akerman attorney for the matter, Schwarz had given him good advice to do so.

---

[22] Schwarz was simultaneously representing himself, Bayrock as their lawyer at Akerman, and Kriss, who was, independent of this, also a client of Akerman; then, after Schwarz joined Bayrock in April 2005 and disputes arose over his contract, Akerman represented him against Bayrock in those disputes as well as representing Bayrock against him.

391.     **<u>Taxation of Compensation</u>**. Understanding why he was upset and what he and others did next, and why they did it, requires knowing what they understood to be, the applicable law of the federal income taxation of non-cash "sweat equity" compensation. The relevant principles are reduced to chart, ¶392. Detailed allegations of the law *qua* fact, Plaintiffs' allegations of some or

all of what these Defendants correctly understood the law to be, which form part of the basis for subsequent allegations of their scienter when they subsequently violated it, are in Fn. 24.

392.    This is a sufficiently complete summary of the tax consequences of all three alternative contemplated conveyances, as Defendants and others correctly understood[24]:

---

[24] **Taxation of Non-Cash Compensation**. Until 2005, a service provider receiving a "mere promise to pay" unsecured and not backed by note did not recognize income, but a service provider receiving property, with few exceptions no matter what kind of property, a car, boat, banana, etc., recognized income equal to its actual value unless the property was not vested, in which case the service provider realized income when it vested at its actual value at that future time of vesting, or could elect to realize income upon receipt equal to its actual value as if it had been vested on receipt.

The exception was where the property was a partnership profits interest. The interest was property, and its value surely was more than zero, but for tax purposes it was treated <u>as if</u> its value was zero, so its receipt was not a taxable event <u>regardless of vesting</u>, (to be safe, certain safe harbor rules had to be followed.) So before 2005 the taxation of compensation for services, based on what was received, could be summarized:

**Property other than a partnership profits interest.** If the property was vested on receipt, the service provider had income on receipt equal to its value; if not vested, the service provider had income if and when it did vest equal to its value at the time of vesting, or could elect to realize income on receipt as if vested.

**Partnership profits interest.** The service provider has income deemed equal to $0 regardless of vesting.

**Mere promise to pay.** The service provider recognizes no income.

This changed as of 2005 with new IRC §409A, which made nonqualified "mere promises to pay", called nonqualified deferred compensation (NQDC), where a service recipient promised to pay a service provider in future years for work done in the present, taxable income. The income was recognized and became taxable at very high rates at the time such nonqualified promise to pay vested, with no opportunity to elect immediate inclusion on receipt as if it had been fully vested all along. So as of 2005, the taxation of compensation for services, base on what was received, was:

**Property other than a partnership profits interest.** If the property was vested on receipt, the service provider had income on receipt equal to its value; if not vested, the service provider had income if and when it did vest equal to its value at the time of vesting, or could elect to realize income on receipt as if vested.

**Partnership profits interest.** The service provider has income deemed equal to $0 regardless of vesting.

**Mere promise to pay.** If §409A violated (a nonqualified promise to pay in future years), the service provider has highly taxed income if and when the right vests, otherwise the service provider has no income.

In this action, the only alternatives considered were membership (partnership) interest or nonqualified deferred compensation (NQDC). There were only two kinds of partnership interests, capital and profits, so the only "property other than a partnership profits interest" being considered was a partnership capital interest. Rearranging gives a simplified list of the tax consequences of the non-cash compensation being considered for Schwarz.

**Membership Interest.** Schwarz acquires ownership as a member of one or more Bayrock companies receiving an incrementally vesting membership interest conveying either a:

<u>Profits interest</u>, and Schwarz, a partner, could have taxable income deemed equal to $0; or a

<u>Capital interest</u>, and Schwarz, a partner, would have taxable income equal to the value of the capital interest as it periodically vested or, if he elected, all at once on receipt as if fully vested.

**Deferred Compensation.** Schwarz, an employee whose right to future proceeds violates §409A, would incur potentially ruinous tax liability, and expense for Bayrock, on the occurrence of each incremental vesting.

| Conveyance Method | Fiscal Nature | Receipt Taxable? | If So, When? |
|---|---|---|---|
| (1) <u>Member</u> | Profits Interest | No | --- |
| (2) <u>Member</u> | Capital Interest | If Vesting | On Receipt or Vesting |
| (3) <u>Employee</u> | --- | If Vesting | On Vesting |

394.    He wanted his rights to future payments to incrementally <u>vest,</u> becoming nonforfeitable, and as of January 1, 2005, effective date of IRC §409A, that made his sweat equity toxic waste.

395.    Summarizing footnote 24, pursuant to §409A, since Schwarz's "economic interest" was nonqualified deferred compensation (NQDC), a "bad" promise to pay an employee in the future for work done in the present, as each portion vested its value would be includible in Schwarz's taxable income, requiring Bayrock to keep doing valuations, a mess of risk, expense, withholding.

398.    The Dogan-Schwarz Dilemma. So long as (i) Dogan would not let Schwarz have a membership interest; and (ii) Schwarz wanted incrementally vesting rights to future payments; there was a deadlock. The chart, ¶392, shows the only way to receive a compensatory vested or incrementally vesting right to future payment without current or incremental income recognition was where such right was encapsulated within a membership interest that was a profits interest.

399.    Emphasizing, the tax problem had nothing to do with whether the fiscal nature of the "economic interest" was related to Bayrock profit, and everything to do with the fact that the rights would vest. Once the decision was made to convey either NQDC or a membership capital interest, rather than a membership profits interest, vesting, not profits, created the tax problem.

400.    Whether a vesting NQDC or capital interest conveyed the right to be paid in amounts computed by reference to Fiji's sugar exports, the sunspot count on July 4th, or Bayrock's profits, if it vested, its receipt would be subject to valuation and present or deferred income inclusion.

401.    The fiscal nature only mattered if the right were conveyed via membership interest, not NQDC. Then §409A would not apply (as of early 2005), and the fiscal nature of the membership interest would determine whether it was a profits interest or a capital interest, which in turn would determine whether there was a tax problem with vesting.

402.    In the next allegations, the persons quoted correctly understood this and when they used the term "profits interest" they did so referring to, in the context of, a membership (partnership) interest that is a profits, not a capital, interest, contemplating Rev. Proc. 93-27 definition, ¶249.B.

403.    Resolution. Since Dogan wouldn't let him have a membership interest, Schwarz had a disaster, a contract that would bankrupt him in unfunded tax liability unless it were rescinded, but in that case he would have to accept non-vesting NQDC to avoid §409A income inclusion. He was highly motivated to preserve his deal, and tried to push Salomon into letting him have his NQDC and ignore §409A, and sought help from Akerman, by then long Bayrock's handmaiden.

[26] If a company found a dollar or a goose laid a golden egg on premises or a diamond fell out of the sky and landed on Arif's desk or there was a non-recognition exchange or a taxable exchange, the "Tier 2a" members got "a cut".

This did not preclude it from being a profits interest. In that sense, "profits" doesn't mean accounting profit, but a claim with a present value <u>uncertain</u> enough that it is deemed worth zero. For administrative convenience, ignoring sham, step, substance over form, and abuse doctrines, the present value of a partnership interest which would not share in distributions in a fair market value liquidation occurring at the time of receipt is uncertain enough that it is a profits interest. For example, a partnership that admits a service partner when its sole asset for which it paid $10,000,000 is worth $5,000,000 and gives her a partnership interest entitling her to 10% above $5,000,000, has given a profits interest even though if it liquidates in two years for $8,000,000 her $300,000 share is payable without any accounting "profit".

426.    Multi-level equity is common in such firms, such as "fund of funds" companies, where partners have equity in individual fund companies, to give them a share of that fund's success, and in the top management company, to give them a share of the whole firm's success.



429.   Considering only the top two levels, Bayrock Group and the Subs, after Arif's Tier 1, Satter owned 67% of Bayrock[27], Arif 14%, Plaintiffs 15%, and Schwarz 2%.

431.   In short, for expectations of profit sufficiently large relative to invested capital, usually the case in real estate development and the case with Bayrock from its inception through at least 2007, the vast majority of the value of the firm is embodied in its profits, not capital, interests;, measured by such value, because of the multi-layering, Satter owned most of Bayrock since 2003.

---

[27] No profits or proceeds could flow into Bayrock Group LLC without first flowing into, then out of, a holding company subsidiary. Once the Tier 1 distributions were satisfied, Satter owned 50% of the proceeds ("profits+"), not just the profits, of each subsidiary, as well as 50% of the proceeds, not just the profits, of Bayrock Group.

Since Bayrock Group owned the residual 28.5% to 38.5% of the Subs, Satter owned between 64% and 69% of the profits+ interests in the whole Bayrock Organization, or about 2/3.

438.     Therefore, because the only inputs into the computation of each member's tax distribution were (i) partnership items of income and loss; (ii) the distributive share thereof of each member; (iii) the same Assumed Tax Rate for each member; and (iv) the trailing history of distributions and prior distributive shares of each member; absolutely all of this information was available to the management of each company at all times without input from any member.

439.     **Each Partner Has a "Sleep Number"**. Like the adjustable mattress firm that advertises everyone can have their own "sleep number", by combining those four items, at any time, for every partner $P$ there was a fraction $X$ between 0 and 1 such that for every dollar of partnership taxable income, $P$ was entitled to a special tax distribution, without any intervening decision and with no more than mechanical computation, of $X_P \cdot \$1$. That fraction X might change from time to time as trailing tax allocations and distributions changed, but it was always there.

440.     More simply, by mere ministerial computation, every time the company realized $100 of net taxable income, every member became entitled to a certain share of it as a special tax distribution. One member might get $12 per $100, another $18, but whatever it was, each had his own "sleep number" based solely on current and trailing tax allocations and trailing distributions.

441.     Moreover, all tax distributions were not only subject to mere ministerial computation, but were payable absolutely, without any discretion, hold back, or reserving.

Fraudulent Concealment of Bayrock Ownership

448.     Accordingly, it is no surprise that in May 2009 Arif, Satter, Schwarz, Dogan, and other

"Bayrock Defendants" made court filings[29] describing Schwarz's Bayrock status as

> Julius Schwarz, Bayrock Group's Executive Vice President and former General Counsel
> and **a member of Bayrock Group and certain Company Entities**. [Emphasis added.]

449.     Of course Schwarz was then, and had been since 2005, a member of Bayrock Group and

certain Company Entities. That was the intended result of all the planning throughout 2005.

450.     These service providers were not the only owners of membership interests in this action:

451.     Elizabeth Thieriot had bought membership interests in Bayrock Ocean Club LLC; recall

her Memorandum of Understanding, provided, ¶138:

> BG [Bayrock Group LLC] is currently the sole member of Bayrock Ocean Club LLC
> ("BOC"). BOC owns a 50% membership interest in 550 Seabreeze ... [Thieriot shall
> purchase from BG a 4% membership interest in BOC for $1 million ... ET shall have an
> option to invest up to $2,000,000 to acquire additional membership interests in BOC and
> other BG projects. The price ... shall remain fixed at $250,000 per 1% membership
> interest...Whenever cash is distributed ... it shall be distributed to the investors at the
> same time and in proportion to their relative ownership interests.

---

[29] *Kriss v. Bayrock* et al., C.A. No. 4154-VCS, Del. Ch. 2008, Opening Brief in Support of the Bayrock Defendants'
Motion to Dismiss, Pg. 4

454.    Arif and Dogan knew what it meant to convey membership interests and make people members. Dogan knew because he was the one who held Schwarz up for months precisely because he didn't want Schwarz to be a member, before relenting.

455.    Not only was Arif a signatory to every one of those agreements, Satter insisted they be first translated into Russian, Arif's native language, because he rightly suspected Arif would one day try to claim he hadn't understood what he was signing; these was done, and Arif read them.

458.     <u>Capmark</u>. For example, mere weeks after the November 2005 agreements were executed, and mere days after the December, 2005 agreement which accelerated the vesting on Woodring's 10% membership interest in Bayrock Camelback LLC, Schwarz perpetrated a fraud on Capmark.

459.     Schwarz had a pre-existing relationship with Capmark from his time at Akerman, and wanted them to lend$12,000,000 loan on the Trump Phoenix, later increased to $17,000,000.

464.     This, however, was not the sole objective of the concealment fraud on Capmark.

477. They did not, they only pretended to, but Satter was able to use this to illegally extract many millions of dollars from Bayrock, which had no business using its funds to "pay him off".

478. <u>Halberg's Conspiracy Liability</u>. Halberg knew for a long time about Satter's ownership; he knew from before he joined Bayrock, when he was at Kramer Levin, because he was part of the team that filed the fraudulent condominium documents for Trump SoHo that hid Satter.

479. Moreover, the idea that he actually believed what he wrote cannot be taken seriously. He is paid $500,000 a year by Bayrock for legal skills and either is heroically incompetent and

believes that equity given for services "doesn't count" as ownership because there is no risk of loss of money, which will be news to the hundred million or so workers throughout the United States who received equity as part of their compensation and now will learn they don't "really" own equity because they didn't pay cash, or he knows it is pretext for continuing the fraud and falsifying the audit iStar had just demanded.

480.    The overwhelming likelihood, particularly given the facts and circumstances of their attempts to hide Satter and the tone of the letter, show that Halberg had the same criminal scienter as Arif, Satter, and Schwarz, and knew very well this was fraud on iStar.

481.    This is not his only overt act in knowing support of their crimes of concealment, nor was his knowledge confined to concealment of Satter from iStar.

482.    For example, on September 15, 2009 he personally refused, by interstate email, Kriss's demand for access to Bayrock books and records, primarily its tax returns and records, as of right, and he did so to further the concealment of those records from Kriss and from the IRS to continue to maintain and cover-up the tax frauds.

485.     Probably the best example of Schwarz's attitudes towards audits and financial fraud and his casual indifference to betraying Bayrock partners is this email sequence. Bayrock had a project accountant / examiner working at their offices, his salary charged to the Trump SoHo project. This was to accommodate the Sapirs, who had a long history of (understandable) suspicion of financial fraud at Bayrock.

489.	This is completely in pattern with all their other pretexts for their fraudulent concealments of their financial crimes from their own partners, to whom they owe fiduciary duties of disclosure, as they two years earlier did to Thieriot by fraudulently denying she was a member and Bayrock Ocean Club did business in New York, and as they did a year later to Kriss when he demanded books and records, in particular tax records, and Halberg refused.

491.     These crimes are alleged with specificity in the section SATTER FRAUDS II. When the fraudulent Satter "loans" caught up wth them and Bayrock Group LLC's 2004 return was audited, and the examiner questioned the obviously fraudulent "loans", they conspired to and did lie, claiming he was an employee and not a partner, concealing from the examiner this November 2005 agreement that showed he had been a partner since 2003. Then they misappropriated millions of dollars from Bayrock to pay Satter's personal tax liability, using a fraudulent $5,000,000 W-2 to make it look like the fraudulent "loans" were current wages, in doing so creating millions of dollars of further unreported income to Satter

492.     **The Fraud II**. As part of this scheme, they conspired to obstruct the administration of the IRS, and conspired to and did, give knowingly false information to one or more IRS examiners in the course of an audit of Bayrock Group's 2004 tax return  , and file over a hundred fraudulent federal, state, and local tax returns and schedules and failed to file dozens more.

493.     **The Law**. A member of a limited liability company that is a tax partnership, as Bayrock Group LLC was, can never be its employee for tax purposes, only a partner

504.    These merger plans never matured because of FL's 2008 bankruptcy, precipitated by the discovery that FL was one of the now-infamous companies looting Iceland through the exercise of a corrupt hegemony over its banking system., but in 2007 that was not known or foreseeable.



**FIGURE 12**

535.    To understand how a venture of two new partners became a quarter billion dollars of money laundering and tax fraud requires first assuming a fiction, that the compensatory membership interests did not exist in 2007 and the state of the world was "Bayrock Group owns 100% of the Subs and Arif (and RIF) owns 100% of Bayrock Group".

536.    That simplified the deal. FL would be a partner in the Subs, turning FIGURE 12[32] into FIGURE 13.  In fact, this is how Bayrock and FL ran negotiations from the start, all the drafts stating Bayrock Group owned all the membership interests in the Four Subs[33].



**FIGURE 13**

537.    As with Thieriot, the question was how to convey partnership interests in the Subs to FL. Bayrock Group could sell FL some of its partnership interests in the Subs, or the Subs could issue interests to FL, diluting Bayrock Group's. Bayrock Group and FL would end up with the same partnership interests; the difference was where the $50,000,000 would end up, and whether a tax bill came with it.

538.    If Bayrock Group sold, the $50,000,000, and a tax bill, would be in Bayrock Group, **S1**. If the Subs issued interests, the $50,000,000 would be in the Subs, **S2**, with no tax. If the Subs then made a related transfer of the $50,000,000 back Bayrock Group, it would be a disguised sale, and the $50,000,000 would be in Bayrock Group, and a tax bill, **S3**.

---

[32] The thick gray arrows indicate flows that are fictitious, and assumed for purposes of this temporary assumption.

[33] At the time it was plausible Arif, Satter, and Schwarz intended to make it true, presumably by buying back all, or enough of, the service providers' compensatory membership interests. Kriss complained the deal couldn't close because Bayrock didn't own all the membership interests, but FL said it was Bayrock's problem to fix and when he complained to Arif, Satter, and Schwarz, they told him to shut up, it would be taken care of before the deal closed.

539. **Bayrock Group Needs the Cash**. Since from their perspective, as would be revealed later, the point of the deal was to get $50,000,000 to Bayrock Group, and from there directly or indirectly into the hands of Arif, Satter, and Schwarz, *infra*, from the start the deal was structured as a sale, **S1**. FL would transfer $50,000,000 plus other consideration to Bayrock Group, and Bayrock Group would assign FL financial interest components of its membership interests in the Four Subs.



FIGURE 14

540. This was the form of this part of the deal from January 2007 through April 2007, Bayrock was selling and FL was buying (the joint venture part will be alleged shortly).

541. Spent Before It's Even Received. Even from the start of negotiations, much of the $50,000,000 was spoken for:

542. There was $7,500,000 of debt encumbering some of Bayrock Group LLC's membership interests in the Four Subs, and that had to be paid back or the deal couldn't close.

543. $500,000 would go for legal fees.

544. $2,500,000 would go for commissions. $800,000 would be paid as a success fee to Alfa Consulting in Reykjavik, which was two 20-year-olds with no credentials fronting for board members of FL for them to get kickbacks from FL deals. $1,700,000 would be paid as a success fee to Defendant Sal Lauria, an organized crime confederate from Satter's days running State Street, who like Satter had been barred from the securities industry for life as a result of a felony conviction and whose chief claim to the money seems to have been as courtesy Satter gave him on Bayrock's dime, in gratitude for Lauria's serving a prison sentence for racketeering while Satter avoided prison by testifying against 20 Mafia and Russian mob associates.

---

[34] Assuming Akerman Senterfitt did ask him to take over its New York office, it is a Pygmalion syndrome explanation why Akerman would file deceptive court documents at Schwarz's request, aid and abet Scharz's breach of fiduciary duty, help cover up Satter's ownership, and just recently in 2010 suborn Schwarz's perjury.

557.    This meant if the deal ever consummated, Bayrock Group would be prohibited from making any tax or general distributions from the FL proceeds other than those allowed to Arif.

558.    Yet, over a year earlier, the 2005 Protocol had amended the Bayrock Group LLC operating agreement (and the agreements of all the other Company Entities), to include tax and general distribution provisions, and in particular the tax distributions were rigidly required.

559.    And pursuant to New York law, the contract with FL could not be deemed to have amended any tax allocation provisions or tax or general distribution provisions, or anything else, in the Bayrock Group operating agreement, because Kriss, for one, never gave his written (or any other) consent, which would have been required.

560.    So from January through April 2007 Satter, and Schwarz were negotiating an agreement which if it had ever gone in force would have bankrupted Arif if he didn't get a $20,000,000 tax distribution or could have been instantly breached if he did[35] (such breach by the contract terms entitling FL to restitution of the whole $50,000,000), and would have been an anticipatory breach and a repudiation of the limited liability company agreement at its most basic level of good faith.

561.    It is thus no surprise that Arif, Satter, and Schwarz never let this deal go in force, and never could, unless (i) Arif agreed to pay his $20,000,000 tax bill personally (and he did not have the means),  leaving that money in Bayrock Group; or (ii) the taxes could be made to disappear.

562.    Even then, they couldn't commit the deal because of the reality vs. the fictive assumption of who owned the membership interests in the Four Subs, not just Bayrock Group.

---

[35] This is on the fictive assumption Arif, with RIF, owned all of Bayrock Group and so would have allocated to him the entirety of the $42,000,000 taxable gain. In reality the other members of Bayrock Group, the service providers holding their compensatory membership interests, would have allocations of income, most prominently Satter, nearly 50%.

563. According to the deal as it stood in draft all those months, Bayrock Group would assign FL enough of the financial interest components of its membership interests in the Four Subs so that FL would receive, jointly and severally, 100% of all the proceeds received by the Four Subs from the lower tiers until its preference return of $50,000,000 accreting, then 50%.

564. But Bayrock Group didn't own sufficient membership interests in the Four Subs to make this work. Even if Satter and Schwarz made their members interests in the Four Subs available, it would not be sufficient because of the preference return; all members would have to be hit, ¶531.

565. Putting all these problems together and discarding the fictive assumption, confronting the reality of all those service provider compensatory membership interests, which accounted for 67% of all the ownership of the Subs and 62% of the ownership of Bayrock Group, Arif, Satter, and Schwarz could never commit to this deal unless :

    A.   One of these things occurred:

        I.   All partners in Bayrock Group waived tax distributions and paid their $20,000,000 aggregate tax bill personally, leaving that money in Bayrock Group; or

        II.   The taxes could be made to disappear.

    B.   And one of these things occurred:

        I.   All partners in the Four Subs, not just Bayrock Group, took a hit, reducing their partnership interests by, in the aggregate, the partnership interests FL would get; or

        II.   Their partnership interests in the Four Subs could be made to disappear.

566. Moreover, there was a ticking bomb, Satter's organized crime history. FL knew of it (Satter told them), but, having been in trouble with Icelandic regulators before (its former chairman had been convicted of accounting fraud and had to resign), they were constantly worried that before a solution was found, the regulators would demand a due diligence report on Bayrock, and his majority ownership in the company along with his racketeering and assault convictions would be revealed, and the deal would not consummate.

572.     Pisem engaged to represent Bayrock Group and each of Arif, Satter, Schwarz, and Kriss, simultaneously  . But Pisem never met with Kriss, or obtained conflicts waivers from him or even warned him of conflicts. Instead Pisem took his fee and instructions from Bayrock and betrayed Kriss, his own client, even to the extent of hiding his existence and representation from Kriss, who never knew of Pisem's representation, concealment of it, and betrayal until late 2008.

575.     Before alleging details of that tax fraud, which was not consummated but led to a larger fraud, Plaintiffs first allege Pisem's related advice to commit a racketeering predicate crime.

576.     **Pisem Issues a Should Opinion on Money Laundering to Evade Taxation**. As part of the regime of United States taxation, federal income tax law imposes withholding requirements on domestic partnerships with foreign partners, requiring the domestic partnership to withhold against the foreign partner's distributive share of partnership income effectively connected with the operation of a business in the United States, even if there is no cash distributable to the foreign partner (i.e., even if there is an unfunded tax liability), and imposes personal liability on those responsible who fail to perform that withholding.

577.     This is not optional. There is an exception where a domestic partnership has a partner which is a legitimate, non-abusive upper-tier domestic partnership which itself has a foreign partner, in which cases the two domestic partnerships can agree which will withhold, but it is illegal to create a sham tax partnership for no appropriate business purposes (let alone for no other purpose at all) but evasion of this withholding obligation. Yet that's exactly what Pisem did, advise them to create a sham upper tier partnership to evade foreign withholding obligations.

591.    Compare this with the statutory language, §707, of which Pisem, a tax lawyer expert in

that statute, ¶726, was aware (he discussed "disguised sale" risks in emails to Bayrock, fn.38):

> If (i) there is a ***direct or indirect transfer of money or other property by a partner to a partnership***, (ii) ***there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner)***, and (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property, such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership. [Emphases added.]

592.    He knew he was <u>indirectly transferring</u> distributions from the Subs for $42,000,000.

594.    First, maintaining the fictive assumption that Bayrock Group was 100% owned by Arif (with RIF), Arif's partnership interests in Bayrock Group would be diminished by the exact same amount as these new, abusive partnership interests in Bayrock Group that FLG was getting.

595.    Thus, if there were a related direct or indirect transfer to Arif, along with the reduction in his partnership interests matching the newly acquired interests of FLG, that transfer would complete a disguised sale of Arif's partnership interests in Bayrock Group to FLG, ¶582.A[37].

596.    Tevfik was supposed to clear, after taxes, $8,000,000 from Bayrock Group after it got its $50,000,000. So far, Pisem's plan got $42,000,000 into Bayrock Group for 84% of the desired distributions from the Four Subs; here's how Pisem "filled the gap" *in re* the $8,000,000 an 16%.

---

[37] Again, all this is really a disguised sale of partnership interests in the Four Subs themselves, as the substance is the paired indirect transfers of distributions from the Four Subs disguised as distributions from Bayrock Group.

602.    In other words, "Why are you pretending a purchase is a 'loan', and if this isn't tax fraud why isn't that 'loan' mentioned anywhere in the deal documents and just hidden off somewhere?"

608.    FL's Preference Return. FL originally wanted partnership interests in the Four Subs with a preference return of 100% of all the distributions received by the Four Subs until such time as FL received $50,000,000 accreting at 7.5% per year, then 50% of the distributions after that.

609.    That would be a claim on more than 50% of the distributions. Since the capital base in the Four Subs totaled about $8,000,000, that would be a claim on more than 50% of all the profits (defined as distributions in excess of members' paid-in equity) the Four Subs would receive.

610.    During  negotiations, FL sent word that under Icelandic accounting rules, they couldn't own (have a claim on) more than 49.9% of these companies (or more than 49.9% of Bayrock Group, during the time the sham 84% partnership interest scheme was being discussed).

611.    Only a few years earlier, FL's chairman had been convicted of accounting fraud, so FL

was at least for a while appearing honest (until a year and a half later when it blew up in scandal,

along with Iceland, and Iceland's former Prime Minister referred to FL as "another Enron").

622.     That is, if they got away with pretending the stream of profits from condominium sales bubbling up from lower tiers through the Four Subs into Bayrock Group, and from there 16% of it out to Arif as a "distribution" in respect of his new partnership interests, which "distribution" he would immediately flip over to FL as "loan repayments", was somehow converted from taxable effectively connected income into "loan interest", it might not be taxable in the United States.

623.     This hit home at Kramer Levin. Why stop at 16%? If FL was getting back $143,000,000 (Plaintiffs estimate) or $159,000,000 (Bayrock's) within two years, all of it taxable at near 50% rates, thus a tax bill of up to $80,000,000 or so, why stop at "disappearing" 16% of it, why not call it all "interest", or at least all but $50,000,000 of it "interest", the $50,000,000 "principal".

627.   <u>Intermediary Transaction Tax Shelter Fraud</u>: Thus, though it is abusive and illegal to form a partnership as a transaction intermediary where (i) the principals already intended to make a deal before the intermediary; (ii) the intermediary is controlled by one of the principals; (iii) the intermediary assumes no risk and is a mere conduit); (iv) the intermediary was brought into the transaction at the behest of the taxpayer; and (v) there is no non-tax avoidance business purpose to the intermediary's participation in the transaction; back again is Pisem's advice to money laundering the transaction through a sham partnership (his "domestic holding partnership") created for the illegal purpose of removing foreign partner withholding obligations from Bayrock.

628.   Plaintiffs aver there is substantial evidence by which they reasonably believe Pisem and Roberts & Holland are in the business of promoting the use of sham domestic tax partnerships as illegal and abusive transaction intermediaries formed for the tax avoidance purpose of shifting foreign partner withholding obligations away from the proper partnership. Pending disclosure, Plaintiffs may amend to include as an additional basis for liability Pisem's operation of Roberts & Holland as a RICO enterprise engaged in the pattern crimes of mail and wire tax shelter fraud.

630.     This is the form of the deal they consummated a month later, except in an even "worse" (far more blatantly illegal) structure:

634.     As the first part could have been solved honestly by Bayrock

Group partners waiving tax distributions, or giving up the deal, the

second part could have been solved honestly by buying membership

interests from service providers, or making some deal with them.

635. Instead, Arif, Satter, and Schwarz chose to fraudulently "disappear" those membership interests, just as they decided to fraudulently disappear their tax liabilities on the disguised sale.

640.     Satter, and Schwarz didn't care about their membership interests in the Four Subs because of what they would get from the $50,000,000 once it got to Bayrock Group. That left these three minority members in the Four Subs, who did care about their membership interests.

643.     The "Loan" That Wasn't. Until some future time **T** when FLG had received $50,000,000 accreting at 8.4%, which might never come, the Four Subs were required to take 100% of all cash available for distribution to their members and "step in front of it" by intercepting the money,

putting a yellow sticky on it saying "loan payment", and flipping it over to FLG in Delaware, which as a sham money-laundering conduit it was would then flip it over to FL in Iceland. After time $T$, they would keep doing this with 49% oand distribute the other 51% to the members.

645.     This is nothing more than making FLG a partner with an initial preferred return followed by a 49% co-equal return.

646.     Moreover, after the so-called 15 year term of the "loan" runs out, at and after its "maturity date", did the payments stop, as you might expect in the case of any kind of real "loan"? No. In form they did, but not in substance.

---

[41] ¶251, "Membership interests are contingent, residual claims on the company's equity, so like all forms of equity are call options on the partnership's terminal wealth.."

664.    **Four Badges of Fraud**. Four indicia compel the conclusion this was fraud, this was intentional, not merely grossly negligent or negligent.

    A.    Schwarz's predisposition and knowledge of this kind of fraud.

    B.    Schwarz's recorded admissions of his scienter, and that of Arif.

    C.    Certain language in the "loan" agreement.

    D.    Schwarz's companion insurance fraud against AIG.

667.     Schwarz was protecting himself from an earnings stripping fraud just like this, someone making a purported "loan" to the company at a huge rate of "interest" to "suck the profits" out.

668.     Two years later Schwarz (and the others) did exactly that, call the sale to FLG a "loan" and place it down one level in the Subs where it was intended, with its 72% effective interest rate, ¶653, to wipe out any profits and thus "disappear" Woodring and Ejekam's distributions.

677.    *Language in the Loan Agreement.* In addition to the language quoted above which makes clear this is no "loan" but a residual claim on member's equity (i.e. a partnership interest), ¶644, the "loan" agreement prohibits the use of "loan" proceeds for distributions to anyone other than (i) Bayrock Group LLC (from the Four Subs); and (ii) Arif (from Bayrock Group LLC).

678.    This completely contravenes the limited liability company agreement of Bayrock Group LLC, and while it is legally ineffective in terms of eliminating Kriss's rights to distributions from Bayrock Group LLC, he can still enforce the limited liability company agreement, nevertheless

by agreeing not to honor its obligations to Kriss and the other members of Bayrock Group, this is a complete repudiation of every statutory, fiduciary, and contractual duty existing with respect to that limited liability company agreement, the members, the company, and its managers.

679.     It is also a *per se* act of oppression. Not only does it constructively dilute Kriss in the Four Subs and in Bayrock Group itself, even though his membership interests are specified in the limited liability company agreements as non-dilutable, it turns his membership interests in particular, and those of Ejekam and Woodring, ino toxic waste because of tax consequences.

682.     While the rules for that are complex in the partnership context, they can be simplified as, "Unless the partnership (each of the Four Subs) had certain expenses during the year of distribution (2007), in which case some of the debt proceeds can be allocated to those expenses, then standard interest-tracing rules apply."

683.     Since the Four Subs were passive holding companies and had no operating expenses other than franchise taxes, there would be no such allocations possible.

684.     That meant that standard interest tracing rules would apply, Reg. §1.163-8T, and that meant the entire $50,000,000 would have to be traced to the ultimate distributees, first Arif, and then all the hidden partners in Russia and Kazakhstan participating through Bayrock Holdings, every dime of it to see what their proceeds were spent on, every dacha, and then that would determine how the "interest" on the "loan" is treated for tax purposes.

685.     In simple terms, if Arif took his $5,000,000 (that was the final amount he took net of tax and net of Bayrock Holdings, not $8,000,000) and bought a yacht, then at least 10% of all the

"interest" paid by the Four Subs would be nondeductible, and would have to be shown on their K-1's as "interest expense allocated to debt-financed distributions" and then broken down by category, so much for personal use (non-deductible), so much for investment use, and so on.

686.    Schwarz was wrong, the "interest" would not be deductible at the partnership level at all, and very likely not be deductible, or subject to complex limitations, at the partner level.

690.     Under state law, the intentional termination of tax distributions from an S corporation or partnership to harm the minority is a "squeeze out" or other oppressive conduct for which Plaintiffs can and do elect the remedy of a forced sale.

691.     And that's only the first serious tax error Schwarz made. The second one was horrific.

700.    *Schwarz's Companion Insurance Fraud on AIG*. When Schwarz began to plan these crimes, he insisted Bayrock buy a Director's and Officer's Liability Policy. He harangued Satter, Kriss with emails insisting that even though Bayrock had almost no cash left, even if it had to finance the premium, the policy "had" to go in force before the closing date of the FL transaction.

701.    He knew he would be, Arif, and Satter would breaching fiduciary duties and hoped the inevitable lawsuits would be covered by AIG (Defendant National Union).

705.    **Final Word on the Disguised Sale and Debt/Equity Frauds**. The whole business of pretending FLG was a "lender" to the Four Subs was the only way to avoid §707 disguised sale treatment, because disguised sale treatment presupposes that the buying partner is a partner.

714. **<u>Final Word on Pisem's Scienter</u>**. Pisem and the others perpetrated these frauds in May

2007, less than nine months after the 2nd Circuit decided *Castle Harbour*, on-all-fours controlling

authority on debt/equity partnership tax controversies, according to which FL's interests in the Four Subs were clearly equity, not "debt".

715.     The idea that Pisem did not well know of *Castle Harbour* is ridiculous, it is one of the most important appellate decisions in partnership taxation in the one hundred year history of tax law, particularly for its incorporation of debt-equity analysis in applying the *Culbertson* totality of the circumstances test to determine the existence of partnership equity and therefore partnership.

716.     But the smoking gun, the unavoidable proof of his scienter, is on the disguised sale side, which itself is motivation for him and others to insist that this was "debt", not equity.

717.     Disguised sales became such common methods of abuse that decades ago they got their own statutory prohibition, §707(a)(2)(B). Then, in November 2004, Treasury published proposed regulations (Reg-149519-03), which adopted a "but for" test: there would be a disguised sale only if the transfer of consideration to the selling partner (Bayrock Group LLC) would not have been made "but for" the transfer of consideration from the purchasing partner (FL).

718.     The regulations attracted comment. The author of the ABA Section of Taxation's 2005 *Comments Concerning Disguised Sales of Partnership Interests*, for one, felt the "but for" test too broad, proposing a "double but for" test: there would be a disguised sale only if each transfer, to the selling partner and from the purchasing partner, would not have been made but for the other.

719.     The author of the 2005 *Report on Disguised Sales of Partnership Interests* of the New York State Bar Association ("NYSBA") Tax Section also felt the regulations too broad, and said there should be a disguised sale only if the two transfers were "directly related".

720.     The author of that report opined that the transfers would be *per se* "directly related" if the agreement between the partners required the transfer to the selling partner be made in return for the transfer from the purchasing partner.

721.     This is what was done here, FLG requiring the Four Subs to transfer the $50,000,000 upstream to Bayrock Group in return for FLG's transfer of the $50,000,000 into them.

722.     The author of that report opined that otherwise, the transfers should be "directly related" if some of these factors were present: (i) there were negotiations between seller and purchaser; (ii) they entered into an agreement relating to the transfers; (iii) the time and amount of the transfer to the seller were known by the time of the transfer from the purchaser; (iv) the seller could assert a right to the transfer; and (v) partnership distributions effectuated an exchange of the benefits and burdens of ownership of the interests.

723.     Every one of those factors is present here.

724.     The author of that report is on the Executive Committee of the NYSBA Tax Section.

725.     The author of that report is co-chair of the Section's Committee on Pass-Thru Entities.

726.     The author of that report is Elliot Pisem.

727.     The author of that report advised Bayrock and FL to do what he himself believed illegal.

728.     In disguising this sale of partnership interests, they duplicated the total dependence of FL's return of their money, let alone on their money, on the entrepreneurial success of partnership operations, and they duplicated the economic substance of partnership; yet, staring at the sun and calling it the moon, they called FL a "lender", not a partner; they called the payments to FL ostensibly nontaxable "interest", not profits distributions in respect of partnership interests; they told Subchapter K, §1001, and §1446 to go to hell, *et voila*, they took $100,000,000 of U.S. tax on $250,000,000 of effectively connected Bayrock income and wished it away into the cornfield.

734.    Of course it's 62 per cent, not 49 per cent, but:

736.    QED.

**THE SATTER FRAUDS II**

737.    By late 2007, Satter's million dollar a year skim had reached $3,750,000. Pursuant to a "note" executed in 2006, with "interest" he "owed" nearly $5,000,000, but the "note" was a sham, as Schwarz can be heard admitting to Kriss on the MP3 Kriss made., ¶236.

738.    Schwarz then executed a scheme he had been planning all through 2007 to betray Arif and Satter by taking advantage of their legal exposure for the years of tax fraud on those "loans".

739.    After planting or encouraging a New York Times story, Exh. B, about Satter's mob ties to whip up pressure from Bayrock lenders to get rid of Satter, Schwarz attempted to extort Arif and Satter into handing Bayrock over to him, under the guise of launching a quite unethical, and by its terms quite criminal, hostile takeover of his own client Bayrock, using its own money.

741.    Schwarz should have left extortion to the professionals, because this blew up in his face.

742.    Within days, thanks to that article Bayrock's audit problems tripled when iStar, the $275,000,000 Trump SoHo construction lender, not thrilled that it now looked like they were

financing a Mafia and Russian mob project, said they, too, would audit Bayrock, followed days later by the Sapir Organization, Bayrock's money partner in Trump SoHo, which, not to be outdone, said it would conduct not just an audit, but a full forensic fraud audit, of Bayrock.

759.    (In fact, they paid only half what they calculated they needed to, "only" $1,700,624.)

760.    In other words, they were figuring out which fraudulent cover story was cheapest for them to use to get that skim off the books and keep the IRS from coming after Arif, Satter, and Schwarz; this is to say the least a novel concept in tax law, that the correct tax treatment of all these skims is whichever tax treatment costs you less to try to get away with.

## PRAYERS FOR RELIEF

767.    **Money Damages**. For these Defendants' violation of 18 USC §1962(c) by their operation of Bayrock Group LLC through a pattern of racketeering, and their violation of 18 USC §1962(d) by conspiring to so violate 18 UC §1962(c), Plaintiffs pray this Court award them treble money damages for the injury they suffered to their business or property, as such has the meaning set forth in 18 USC §1964(c), the amount of such damages to be determined at trial, judgment for the entire such amount to be awarded against each and all of these Defendants, jointly and severally.

768.    Plaintiffs emphasize that they plead, in the alternate, though all claims are duplicated in each alternate, that the RICO enterprise in question in in chief, which defendants operated through a pattern of crime and in doing so were furthered in conspiracy by the conspiracy defendants, was, (i) in the first alternate, the legal entity that was Bayrock Group LLC; and in the second alternate, the association in fact that was Arif, Sater, and Schwarz.

769.    **Attorney's Fees and Costs**. For these Defendants' same violation of 18 USC §1962(c) and §1962(d), Plaintiffs pray this Court award them  their attorneys fees and costs of this action, judgment for the entire amount of which to be awarded against each and all of these Defendants, jointly and severally.

770.    **Equitable Relief**. For these Defendants' same violation of 18 USC §1962(c) and §1962(d), pursuant to 18 USC §1962(a) and, alternatively, in its exercise of its inherent equitable powers, Plaintiffs pray this Court enter judgments:

A.    Ordering each such Defendant to divest himself of every interest, direct or indirect, in Bayrock Group LLC and in each and every other component of the Bayrock Organization as this Court shall determine is just and proper.

161

B. Ordering each such Defendant to disgorge any and all amount(s) by which they were unjustly enriched as a result of their violation of 18 USC §1962(c) and §1962(d).

C. Ordering the judicial dissolution of Defendants Bayrock Group LLC, Bayrock Spring Street LLC, Bayrock Whitestone LLC, Bayrock Merrimac LLC, and Bayrock Camelback LLC, and such other entities as this court shall determine is just and proper.

D. Ordering such other relief as it shall deem just and proper.


**AGAINST THE RICO CONSPIRACY DEFENDANTS**

771. **Money Damages**. For these Defendants' violation of 18 USC §1962(d) by their conspiring to violate 18 UC §1962(c), Plaintiffs pray this Court award them treble money damages for the injury they suffered to their business or property, as such has the meaning set forth in 18 USC §1964(c), the amount of such damages to be determined at trial, judgment for the entire such amount to be awarded against each and all of these Defendants, jointly and severally.

772. **Attorney's Fees and Costs**. For these Defendants' same violation of 18 USC §1962(d), Plaintiffs pray this Court award them  their attorneys fees and costs of this action, judgment for the entire amount of which to be awarded against each and all of these Defendants, jointly and severally.

773. **Again Plaintiffs make these claims as to, identically, each alternate RICO enterpirse pled**. ¶768.

774. **Equitable Relief**. For these Defendants' same violation of 18 USC §1962(d), pursuant to 18 USC §1962(a) and, alternatively, in its exercise of its inherent equitable powers, Plaintiffs pray this Court enter judgments:

A. Ordering each such Defendant to divest himself of every interest, direct or indirect, in Bayrock Group LLC and in each and every other component of the Bayrock Organization as this Court shall determine is just and proper.

B.    Ordering each such Defendant to disgorge any and all amount(s) by which they were unjustly enriched as a result of their violation of 18 USC §1962(d).

C.    Ordering such other relief as it shall deem just and proper.

**AGAINST ALL DEFENDANTS EXCEPT NATIONAL UNION**

775.    Against the professionals themselves jointly and severally and their firms, that is, Salomon and Weinrich with respect to Salomon & Company, Domb with respect to Akerman Senterfitt, Brown, Stachenfeld, and Granin with respect to Duval & Stachenfeld, Gilbert with respect to Nixon Peabody; and Pisem with respect to Roberts & Holland; without limitation, disgorgement and restitution of all fees, compensation, payments, and remuneration ever received at any time from any person in or in relation to or in respect of any work done for or in relation to or in respect of the Bayrock Organization or any other Defendant in connection therewith; damages for breach of fiduciary duty; damages for malpractice; in particular this includes assertions the existence of direct attorney client relationships between Kriss and Akerman and Pisem, and all allegations including without limitation as to breach of fiduciary duty and malpractice made against them are also made against them by Kriss as a client as well as by all Plaintiffs in all relevant direct and derivative capacities hereunder.

776.    Against all Defendants, damages for, or the monetary equitable equivalent thereof, or non-monetary relief as may be the case, and without limitation, breach of contract, breach of fiduciary duty, tortious interference, unjust enrichment, prima facie tort, conversion, trespass to chattel, misappropriation, rescission, restitution, fraud, concealment, defalcation, malfeasance, negligence, intentional interference with contract, and all other damages or other relief at law or in equity, including attorneys fees and costs, as this Court may deem just and proper, and as to all Defendants, such liability to be all and each of primary, through aid and abettance, and through civil conspiracy, and in all cases joint and several.

**AGAINST ALL DEFENDANTS EXCEPT NATIONAL UNION**

777.    Against National Union, declaratory relief adjudicating the status of that certain Directors and Officers D&O Policy the issuance of which Plaintiffs allege to have been induced by fraud.

**AGAINST ALL DEFENDANTS**

778.    Each and every such prayer for relief explicitly or implicitly stated herein or as may be available is hereby demanded, in each combination, (i) directly, by Plaintiff Kriss; (ii) directly, by Plaintiff Ejekam; and (iii) derivatively, by Plaintiff Kriss on behalf of Bayrock Group LLC, Bayrock Spring Street LLC, and Bayrock Whitestone LLC; and by Plaintiff Ejekam on behalf of Bayrock Spring Street LLC and Bayrock Whitestone LLC.

===== end =====

**COUNSEL:**

Electronically signed this 1st day of April, 2013:


/s/ Frederick M. Oberrlander

Frederick M. Oberlander, Counsel for Plaintiffs

**THE LAW OFFICE OF FREDERICK M. OBERLANDER P.C.**
Frederick M. Oberlander, Esq. (FO1955)
28 Sycamore Lane, Box 1870
Montauk, New York 11954
212.826.0357    Tel
212.202.7624    Fax
fred55@aol.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NY**

J. L. KRISS and MICHAEL "CHUDI" EJEKAM, directly and derivatively on behalf of BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; and BAYROCK WHITESTONE LLC;

Plaintiffs,

v.

BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ; FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA; ALEX SALOMON; JERRY WEINRICH; SALOMON & COMPANY PC; AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN; DUVAL & STACHENFELD LLP; BRUCE STACHENFELD; DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT; ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL; MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC: BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.; and NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.;

Defendants

and

BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC, and BAYROCK WHITESTONE LLC

Nominal Defendants (Derivative Plaintiffs)

**FIRST AMENDED VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

## VERIFICATION

I, Frederick M. Oberlander, counsel for Plaintiffs Kriss and Ejekam, declare as follows:

I have reviewed this complaint, which has been prepared after extensive investigation. I have direct and indirect personal knowledge of the facts herein alleged. As to those allegations of which I have personal knowledge, I believe them to be true, and as to those allegations of which I have indirect personal knowledge, including for example only and without limitation by review of the files maintained for the prosecution of this action and interviews with Plaintiffs and others, I believe them to be true based thereon. In particular, and without limitation, I well believe it to be true based on the information in my files and interviews with Plaintiffs that each obtained his membership interests in the respective Bayrock limited liability companies as alleged herein generally, for example only in ¶24, ¶25, and ¶362 through ¶446 as compensatory interests and have without interruption owned them through and this date.

I state under penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2013

/s/ Frederick M. Oberlander