**SIMON & PARTNERS LLP**

**THE FRENCH BUILDING**
**551 FIFTH AVENUE**
**NEW YORK, NEW YORK 10176**
**www.simonlawyers.com**

(212) 332-8900

FAX: (212) 332-8909

BRADLEY D. SIMON
BRIAN D. WALLER
KENNETH C. MURPHY

NEW YORK
WASHINGTON, D.C.
PARIS

J. EVAN SHAPIRO
—————
COUNSEL
PAMELA B. STUART
NEAL M. SHER
GENEVIEVE SROUSSI
STEPHENIE L. BROWN
HARRIET TAMEN

July 8, 2015

**Via Federal Express**
The Honorable Frank Maas
United States Magistrate Judge
U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   *Kriss et al. v. Bayrock Group et al.*
**Civil Docket No: 10 Civ. 3959 (LGS) (FM)**

Dear Judge Maas:

Plaintiffs Jody Kriss and Michael Chu'di Ejekam write in response to the following documents filed on ECF in the above-referenced matter on July 1, 2015: (1) a letter dated July 1, 2015, submitted by Walter Saurack on behalf of Defendants Bayrock Group LLC, Bayrock Spring Street, LLC, Bayrock Whitestone LLC, Bayrock Camelback LLC, and Bayrock Merrimac LLC (the "Bayrock Defendants Letter"); and (2) a letter dated July 1, 2015 submitted by Michael Beys on behalf of Defendant Felix Satter (aka Felix Sater) (the "Satter Letter," and collectively with the Bayrock Defendants Letter, the "Defendants' Letters").

**Defendants' Letters Fail to Comply with Your Honor's Order of June 19, 2015**

Your Honor's order dated June 19, 2015 requires that "Defendants submit a letter to the Court identifying specific paragraphs in the Plaintiff's second amended complaint *that they believe are sourced from privileged documents*." (Docket No. 171) (emphasis added). The wording of this order reflects the fact that Plaintiffs' Proposed Second Amended Complaint (the "SAC") no longer contains any information from presently sealed documents in Defendant Felix Satter's racketeering case in the Eastern District of New York. Further, it also reflects an acknowledgement made by Your Honor during the telephone conference held in this case on June 15, 2015 (*See* Docket No. 171) – that Your Honor's Report and Recommendation (the "January R & R") (Docket No. 97),[1] which ordered that all of the paragraphs Defendants had identified as objectionable be stricken from Plaintiffs' First Amended Complaint (the "FAC"),

---

[1] For your reference, Judge Schofield's opinion adopting the January R&R is found at Docket No. 126.

SIMON & PARTNERS LLP

was decided on the grounds that Plaintiffs' former counsel Fred Oberlander had refused numerous times to cooperate with Defendants and the Court to resolve the issues concerning the FAC – and *not based on any thorough review or analysis of the objected-to paragraphs*. Your Honor never ruled that all of the paragraphs stricken from the FAC contained privileged or sealed material, or were based on information Oberlander obtained from Joshua Bernstein. Moreover, as Your Honor remarked during the telephone conference, the list of paragraphs in the FAC to which the Defendants had objected was *substantially overbroad*.

Neither of Defendants' Letters identifies any particular text or paragraphs in the SAC that Defendants *believe are privileged*, as Your Honor requested. This is not surprising as the SAC does not contain any privileged content and is not based on any privileged document. Nevertheless, Defendants' Letters object *on other grounds* to **48 paragraphs in the SAC**, which contain **approximately 12 pages of single-spaced text**.

The Bayrock Defendants Letter objects to 15 paragraphs from the SAC "on the basis that [they] incorporate information from the First Amended Complaint ('FAC') that was stricken by the Court." (Docket No. 172 at 1.)  The word "privileged" is used only once in the Bayrock Defendants Letter with respect to the SAC, in a discussion of paragraph 211 of the SAC. (*See* Docket No. 172 at 1). The Letter states that Paragraph 211 "makes allegations regarding the alleged roles of Bayrock's attorneys in an investment deal with FL Group" and that "this same information was alleged in stricken paragraphs of the FAC, which were based on privileged and confidential information." (Docket No. 172 at 1.)  Yet, as explained more fully below, with respect to even to this one paragraph, the Letter fails to provide a basis for belief that it is sourced from privileged documents: The fact that particular attorney or law firm Defendants in this matter performed certain generic tasks on a specific transaction is not protected by the attorney client privilege.  With respect to all the other paragraphs of the SAC they object to, the Bayrock Defendants assert only that the paragraphs "make allegations regarding the FL Group Investment, Satter's involvement in Bayrock, and the structure of certain investments and business deals by Bayrock *that are also based on stricken paragraphs of the FAC*." (Docket No. 172 at 1) (emphasis added).  The Bayrock Defendants do not even attempt to assert that any of the content in these remaining paragraphs are privileged.[2]

The Satter Letter similarly fails to follow Your Honor's June 19 order. Despite Your Honor's statement during the telephone conference of June 15 that the Court would not entertain anything along the lines of a motion effectively dismissing the SAC in its entirety because of Oberlander's conduct with respect to the Bernstein documents, Satter claims that the entire SAC is derived from the Bernstein hard drive and asserts that "[e]verything that follows from Bernstein's theft of the hard drive is fruit of the poisonous tree and should be excluded." (Docket No. 173 at 1.) This assertion is preposterous.  As the SAC alleges, Plaintiff Kriss worked as Director of Finance for Bayrock Group from a date in 2003 to a date in 2007.

---

[2] In addition, despite the fact that Your Honor stated during the June 15 telephone conference that a motion by Defendants seeking attorneys' fees for work performed by their counsel in connection with Oberlander's conduct would be premature, the Bayrock Defendants include such a motion in their letter. Plaintiffs ask that the Court disregard that motion as the June 19 order did not give the Bayrock Defendants leave to make it.  Plaintiffs reserve their right to oppose a motion for attorneys' fees at a later time should Your Honor entertain it.

SIMON & PARTNERS LLP

Defendants have not disputed this fact, nor can they. In addition, the SAC itself cites numerous public sources as the basis of its contents. It thus cannot be the case that the entire SAC is based on the Bernstein hard drive. Plaintiffs reserve the right to address what is in effect Satter's motion to deny Plaintiffs leave to amend the FAC in the event Your Honor decides to consider it.

Although the Satter Letter states that it will identify paragraphs in the SAC which "we [sic] believe are sourced from privileged documents," it asserts with respect to the identified paragraphs only that they are based on documents from the Bernstein hard drive. (Docket No. 173 at 1) ("quite simply there is no possible way for Kriss to have had [Satter's personal financial information] except from the stolen hard drive" and "paragraphs 88-103, relating to Elizabeth Thieriot, are also derived from the stolen hard drive"). As discussed below, Satter's assertions about use of the Bernstein hard drive in the SAC are erroneous. In fact, the SAC itself reveals the source of the allegations about the investment made by Ms. Thieriot in Defendant Bayrock Ocean Club – the *public file* in the case that she filed against Bayrock in New York State Supreme Court, which contains each of the documents about the Thieriot investment cited in the *SAC*.

In short, Defendants are in violation of Your Honor's June 19 order and are wasting the Court's time. Plaintiffs do not believe that they are required by that order to respond to Defendants' objections to paragraphs in the SAC on bases other than privilege. During the June 15 conference call, Your Honor rejected Defendants' suggestion, reiterated in their letters, that Plaintiffs are required to exclude all content found in the stricken paragraphs (of the FAC) from the SAC. Nevertheless, in an attempt to reach expeditiously a resolution of the pending dispute over the SAC, Plaintiffs address each of the paragraphs identified in Defendants' Letters below.

**Plaintiffs' Responses to Defendants' Objections to Paragraphs from the SAC**

None of the paragraphs objected to by Defendants contains any matter protected by the attorney-client privilege. None of them refer to any legal advice given to Defendants, the content of any communication(s) between Defendants and counsel or any work product of counsel for any Defendant. By work product, we refer to confidential documents and legal analysis prepared by counsel in anticipation of litigation or any text that reflects such documents or analysis. Plaintiffs are willing to meet-and-confer with Defendants over specific sentences or phrases in the SAC that they believe contain privileged matter. However, Defendants' Letters fail to identify any such matter in the SAC.

The table below provides responses to the objections in Defendants' Letters which appear to be based on the contention that some or all of the text in the objected-to paragraphs originate from either the FAC or from documents to which Plaintiffs only have access by virtue of the Bernstein hard drive. Plaintiffs submit the below responses in an effort to move this litigation forward. However, they expressly reserve the right to assert that they may include text from the paragraphs stricken from the FAC that do not contain any privileged or sealed matter.[3]

---

[3] As is made apparent throughout Plaintiffs' responses, much of the information contained in the paragraphs to which Defendants object will be readily obtained through the discovery process. As such, Defendants' objections to the presence of such information are unavailing in the context of this action,

SIMON & PARTNERS LLP

| | SAC Paragraph Objected To by Defendants[4] | Plaintiffs' Response |
|---|---|---|
| 9. | … Defendants managed to hedge against future losses by selling a 62% profit participation in Bayrock Group's four major projects – such 62% including Plaintiffs' rights to distributions from those projects – to FL Group…Arif and Satter's willingness to skirt the law and corporate formalities, and the indiscriminate transfers of Bayrock Group funds to Satter that continued for years… | The allegations in this paragraph are based upon Plaintiff Jody Kriss' recollection. Kriss was Director of Finance for Bayrock Group for 2003-2007, including the period during which the FL Group transaction occurred, and knew the parameters and key terms of the offers, agreements and documents comprising that transaction. The 62% figure is based on FL Group transaction documents (which would be subject to disclosure during the normal course of discovery) and the terms of which Kriss recalls. Kriss recalls Bayrock Group's transfers to Satter and those made on Satter's behalf. Kriss learned about the tax treatment of such payments during his tenure at Bayrock Group. |
| 69. | …. Satter and Arif agreed that Satter's compensation and advance on future Bayrock Group profits would be made in the form of "loans" and ad hoc transfers of funds or interests to third parties, including Satter's wife, who would act as conduits for Satter. The structure of the above-described payments to Satter, from 2003 through 2007, allowed Arif, Satter and Bayrock Group to avoid significant tax | The allegations in this paragraph are based upon Kriss' recollection. Kriss recalls learning about the agreements between Arif and Satter through his conversations with Satter. Kriss also recalls Bayrock Group's transfers to Satter and those made on Satter's behalf. In addition, he recalls learning that Satter's wife was involved in Satter's compensation from Bayrock Group when, in 2003, Satter presented Kriss with a letter *from both Satter and his wife* offering Kriss a |

even in light of Oberlander's conduct with respect to the Bernstein hard drive. *Cf. Fayemi v. Hambrecht & Quist, Inc.,* 174 F.R.D. 319 (S.D.N.Y. 1997).

In *Fayemi*, Magistrate Judge Francis refused to dismiss a Title VII complaint that relied upon documents about other employees' bonuses that plaintiff himself had obtained by entering his supervisor's office without permission and printing them out. Judge Francis found the plaintiff's own actions "an appropriate subject for sanctions" but that dismissal with prejudice, sought by defendants, was not justified under the circumstances: (1) there was little continuing prejudice to the defendants; (2) the information obtained by plaintiff was not privileged and was not of the type "that [he] would not have otherwise obtained" or that could not be "unlearned"; and (3) the information would be subject to the discovery process. Each of the three circumstances cited by Judge Francis in *Fayemi* are present in *this* matter as well. In fact, the circumstances in *Fayemi* offered a **stronger** basis for limiting a plaintiffs' right to allege facts in a complaint than those at bar. In *Fayemi*, it was the plaintiff himself – and not his counsel – who had obtained information for his complaint through improper means. Here the Court has not found that Plaintiffs actively engaged in any misconduct related to the retrieval of any information or documents.

---

[4] Defendants have not identified the specific text in the SAC paragraph they cite in their letters as objectionable. For brevity's sake, Plaintiffs have edited out language from the paragraphs objected to that is generic in nature and therefore not possibly privileged or sourced from any document on the Bernstein drive.

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | liability, in violation of federal and state tax law, and IRS regulations. The structure also violated the Operating Agreements for Bayrock Group and Defendant Bayrock Camelback. In addition to the payments made to Satter in lieu of standard compensation, Arif and Satter agreed that they would transfer substantial amounts from Bayrock Group and its investments to Satter to reimburse Satter for exorbitant personal expenses and to contribute to other investments in which Satter and Arif would own interests in a personal capacity. | percentage interest in all Bayrock projects on which Kriss would work. At Bayrock Group Kriss became aware that Bayrock Group had reimbursed Satter for exorbitant expenses and made payments to third parties in connection with investments that were not owned by Bayrock Group and in which Satter and/or Arif were involved. The allegations of tax law/regulation violations are legal assertions based on the fact that Satter performed services for Bayrock Group but received no compensation other than "loans" from the company for years. Kriss learned about the tax treatment of these payments during his tenure at Bayrock Group. |
| 70. | Satter received at least the following transfers from Bayrock Group between 2003 and 2007, which Bayrock Group treated neither as wages nor as distributions to a member for tax purposes at the time they were made: (2003) $355,000; (2004) $578,201.29; (2005) $673,160.25; (2006) $654,965.20; and (2007) $1,475,085.05. | The allegations in this paragraph are based upon Kriss' recollection. Kriss recalls becoming aware of the fact that Bayrock transferred millions to Satter while working at Bayrock Group. Kriss learned about the tax treatment of these payments during his tenure at Bayrock Group. The specific amounts of payments to Satter were listed in the FAC, in a paragraph to which Defendants did not object, presumably because these amounts can readily be obtained from Bayrock Group's financial records, which would be subject to disclosure during the normal course of discovery. |
| 71. | Because the Illegally-Structured Satter Payments were not treated as salary or regular partnership distributions, the nature of these payments is unclear. For example, upon information and belief, in 2004 approximately $175,000 was transferred directly from Bayrock Group to an escrow account used in connection with Satter's purchase of a home in Sands Point, New York for $1.75 million dollars. | The allegations in this paragraph are based on Kriss' recollection. Moreover, Defendants failed to object to the paragraphs in the FAC that include the allegations about Satter's Sands Point home. Bayrock Group documents concerning the transfer of the $175,000 from Bayrock would be subject to disclosure during the normal course of discovery. |
| 72. | By a date in 2008, Satter had received approximately $8 million from Bayrock Group and/or Bayrock Group subsidiaries, affiliates and related companies. The only individual associated with Bayrock Group who had received more than $8 million from Bayrock Group at the time was Arif. By a date in 2008, Arif had received at least approximately $14 million. | The allegations in this paragraph are based on Kriss' recollection of his review of Bayrock Group's financial records while at Bayrock Group. |
| 88. | In August 2003, Arif, Satter and Bayrock Group formed Defendant Ocean Club as a holding company for Bayrock Group's interests in the real estate development project located at 500 Seabreeze Boulevard | The allegations in this paragraph are based upon documents available on Florida's corporate entity search website and newspaper articles that can be retrieved using Google searches. |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | in Fort Lauderdale, Florida. That project was often referred to as the Trump International Beach Club. | |
| 89. | In the Autumn of 2003, Elizabeth Thieriot ("Thieriot"), then a resident of California, entered into a subscription agreement with Arif, Satter, Bayrock Group and Ocean Club by which Thieriot invested $1 million in the Trump International Beach Club by purchasing approximately 1 million "units" in Ocean Club. | The allegations in this paragraph are based upon a review of the publicly available docket sheet and filed documents in the action brought by Elizabeth Thieriot in New York State Supreme Court for the County of New York, *In re Application of Elizabeth L. Thieriot*, Index No. 105434/2006 (the "Thieriot Action"). In addition, they are based on Kriss' recollection. Kriss worked on the Trump International Beach Club project and was aware that in 2006 Ms. Thieriot brought a legal action against Bayrock Ocean Club in New York state court. |
| 90. | On or about November 13, 2003, Thieriot, Bayrock Group and Satter entered into a Memorandum of Understanding with respect to Thieriot's investment in Ocean Club that superseded the Autumn 2003 subscription agreement (the "Thieriot MOU"). The Thieriot MOU includes the following provisions: [...] | See Response to Paragraph 89. |
| 91. | During the negotiations with Thieriot for an investment in Ocean Club, Ocean Club, Arif and Satter concealed the Material Information, the Bad Faith Practices and the Illegally-Structured Satter Payments from Thieriot [...] | See Response to Paragraph 89. The allegation concerning concealment in this paragraph is based upon the fact that Thieriot invested $1 million in Bayrock Ocean Club. Nothing in the documents filed in her New York state court action indicates that she knew about Satter's criminal past, the fact that Satter and Arif planned on skirting legal requirements and that Satter was being compensated for work he was performing for Bayrock Group in the form of loans rather than wages or distributions. |
| 92. | On or about November 13, 2003, or a date shortly thereafter, Thieriot wired approximately $1 million dollars from a California bank account to a bank account located in either Florida or New York specified by Ocean Club, purchasing the 4% membership interest in Ocean Club. | See Response to Paragraph 89. |
| 93. | On or about September 2004, Ocean Club sent Thieriot an IRS Form 1065 for the calendar year 2003 stating that Thieriot was a 4% owner of Ocean Club and that she had contributed $1 million in capital during the year 2003. | See Response to Paragraph 89. |
| 94. | In April 2006, Thieriot brought an action against Ocean Club in New York State Supreme Court, County of New York, | See Response to Paragraph 89. |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | seeking an accounting for all profits, losses and expenses for Ocean Club for the period of September 1, 2003 to April 2006 […] | |
| 95. | The Thieriot Action alleges that in December 2005 Thieriot demanded access to Ocean Club's records pursuant to Florida statutory law.  It further alleges that although Ocean Club had provided her with some documents, it failed to permit her access to all the records that Ocean Club was required to keep under Florida law. | See Response to Paragraph 89. |
| 96. | On a date thereafter, Thieriot received an IRS Form 1065 for calendar year 2005 not for her interest in Ocean Club, but instead for Ocean Club's interest in 500 Seabreeze LLC (the "2005 Ocean Club K-1").  The 2005 Ocean Club K-1 states that for all of the calendar year 2005, Ocean Club only owned 10 percent (10%) – not 50% as stated in the Thieriot MOU.  The 2005 Ocean Club K-1 also states that Ocean Club received $1.5 million in "withdrawals and distributions" in 2005.  The 2005 Ocean Club K-1 had apparently been sent to Thieriot in a rushed attempt to make Bayrock Group appear more transparent after Defendants had, in complete disregarded of their obligations to Thieriot under the Thieriot MOU, sold 4/5ths of Ocean Club's membership interest in 500 Seabreeze without modifying that document, obtaining Thieriot's consent or notifying her […] | See Response to Paragraph 89. |
| 97. | The Thieriot Action alleged that the $1.5 million distribution/payment that appears on the 2005 Ocean Club K-1 represents the amount paid by 500 Seabreeze to Ocean Club in exchange for Ocean Club reducing its ownership interest in 500 Seabreeze from 50% to 10% […] | See Response to Paragraph 89. |
| 98. | In fact, the $1.5 million was paid by a third party, a Florida-based developer, to 550 Seabreeze for distribution to Ocean Club, to purchase 80% of Ocean Club's membership interests in 550 Seabreeze. Upon information and belief, the $1.5 million was wired to a Florida bank account in Ocean Club's name and on a date thereafter a portion of such funds | See Response to Paragraph 89. |

7

SIMON & PARTNERS LLP

|  | greater than $5,000.00, or all of the funds, was/were wired to the New York bank account(s) of Bayrock Group, Arif and/or Satter. |  |
|---|---|---|
| 99. | Upon information and belief, Defendants Salomon, Weinreich and Salomon & Co. prepared accounting documents in connection with Thieriot's investment in Ocean Club, some of which concealed Satter's managerial and ownership interests in Bayrock Group and Ocean Club. | The allegations in this paragraph are based upon a review of the publicly available docket sheet and filed documents in the Thieriot Action. In addition, they are based on Kriss' recollection. Kriss worked on the Trump International Beach Club project and was aware that in 2006 Ms. Thieriot brought a legal action against Bayrock Ocean Club in New York state court. |
| 100. | Defendants Schwarz, Salomon, Weinreich and Salomon & Co., each participated in (1) the sale of Ocean Club's interests in 500 Seabreeze and (2) the refusal to provide Thieriot with a full and fair accounting of Ocean Club. ███████████████████████████████████████████ | See Response to Paragraph 99. The allegations in this paragraph are also based upon (1) the fact that Defendant Schwarz was acting as General Counsel of Bayrock Group in 2005, when Bayrock Ocean Club sold its interests in 500 Seabreeze; (2) the fact that the file in Thieriot's New York state court action contains federal tax filings for Bayrock Ocean Club that were sent to Thieriot "c/o Salomon & Co."; and (3) Kriss' recollection that Salomon, Weinreich and Salomon & Co. were typically involved in transactions conducted by Bayrock Group such as the sale of membership interests in Bayrock Group investments. ████████████████████████ |
| 101. | For the purpose of executing or attempting to execute the above-alleged fraud upon Thieriot, Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires. Such communications relate to, inter alia, the Thieriot investment, the unreported distribution of $1.5 million to Ocean Club, the reduction of Ocean Club's ownership interest in 550 Seabreeze and the refusal to provide Thieriot with a full and fair accounting of Ocean Club and 500 Seabreeze. | See Response to Paragraph 99. The allegations in this paragraph are also based upon Kriss' recollection that Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. communicated with each other and third parties regarding the Trump Beach Club project through U.S. and international mail, by fax and over the telephone. |
| 102. | Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. and, upon information and | The allegations in this paragraph are based upon a review of the publicly available docket sheet and filed documents in the Thieriot Action. In |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | belief, other unknown individuals employed by or associated with Bayrock Group, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of the Thieriot Fraud, and that such use was an essential part of that fraud. | addition, they are based on Kriss' recollection. Kriss worked on the Trump International Beach Club project and was aware that in 2006 Ms. Thieriot brought a legal action against Bayrock Ocean Club in New York state court.<br><br>The allegations in this paragraph are also based upon Kriss' recollection that Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. communicated with each other and third parties regarding the Trump Beach Club project through U.S. and international mail, by fax and over the telephone. |
| 103. | [...] a portion of the $1.5 million represented proceeds to which Thieriot was entitled but had been denied.  Arif, Satter and Ocean Club, who knew the terms of the Thieriot MOU, knew that the transferred portion of the $1.5 million was stolen, converted and/or taken by fraud. | See Response to Paragraph 102.<br><br>The allegation concerning concealment in this paragraph is based upon the fact that Thieriot invested $1 million in Bayrock Group. Nothing in the documents filed in her New York state court action indicates that she knew about Satter's criminal past, the fact that Satter and Arif planned on skirting legal requirements and that Satter was being compensated for work he was performing for Bayrock Group in the form of loans rather than wages or distributions. |
| 147. | [...] Defendants structured, entered into and/or facilitated a $50 million transaction that disavowed membership interests held by Plaintiffs and Woodring.  This $50 million investment by Icelandic private equity behemoth FL Group (the "FL Group Investment"), resulted in the distribution of the company proceeds of Defendants Merrimac, Camelback, Whitestone and Spring Street to Bayrock Group, and then distributions from Bayrock to Arif, Satter and Schwarz.  Under the terms of the compensation agreements and the operating agreements for these entities, Plaintiffs and Woodring should have received distributions at the time of the distributions to Bayrock Group, Arif, Satter and Schwarz [...] | The allegations in this paragraph are based upon Kriss' recollection and conversations he had with Beau Woodring, a former employee of Bayrock Group.  The terms of the FL Group transaction are stated in the closing documents effecting the transaction, which would be subject to disclosure during the normal course of discovery. |
| 148. | In addition, Arif, Satter and Schwarz used proceeds created from the FL Group Investment to make improper and/or illegal payments to Salomon, Weinreich, Salomon & Co., Lauria, or to third parties for the benefit of Arif and Satter.  Such payments include a purported professional "fee" of approximately $1.5 million relating to the | The allegations in this paragraph are based upon Kriss' recollection and Kriss' knowledge of Defendant Lauria's professional background.  The allegation concerning about Lauria's sentence is based upon the publicly available docket sheet and publicly available documents in the 1998 Eastern District of New York criminal case against him, 98-cr-01102-ILG. |

SIMON & PARTNERS **LLP**

| | | | |
|---|---|---|---|
| | | FL Group Investment to Lauria. Lauria, who had worked alongside with Satter on the White Rock/State Street securities fraud and money laundering racket – but in contrast to Satter had been sentenced to five years of probation and one year of home confinement for his participation in that racket – had no significant professional finance or real estate background prior to the consummation of the deal. | |
| 149. | | [...] Defendants, and upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires. The communications relate to, inter alia, (a) negotiations with Plaintiffs and Woodring over their compensation agreements; (b) the Illegally-Structured Satter Payments; and (c) the FL Group Investment. | The allegations in this paragraph are based upon Kriss' recollection that Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. communicated with each other and third parties through U.S. and international mail, by fax and over the telephone, regarding the equity compensation agreements, the FL Group transaction and the illegally-structured payments from Bayrock Group to Satter. |
| 150. | | Defendants, and upon information and belief, other unknown individuals employed by or associated with Bayrock Group knew, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of each of the frauds perpetrated against Plaintiff Kriss, Plaintiff Ejekam and Beau Woodring, and that such use was an essential part of the frauds. | The allegations in this paragraph are based upon Kriss' recollection that Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. communicated with each other and third parties through U.S. and international mail, by fax and over the telephone, regarding the equity compensation agreements, the FL Group transaction and the illegally-structured payments from Bayrock Group to Satter. |
| 151. | | While negotiating the terms of the FL Group Investment, Defendants and FL Group knew that pursuant to the terms of their compensation agreements Kriss, Ejekam and Woodring owned membership interests in one or more of Merrimac, Camelback, Whitestone and/or Spring Street. Nevertheless the parties entered into a transaction that was based upon the false assumption that Bayrock Group owned 100% of the membership interests in those four entities. | The allegations in this paragraph are based upon Kriss' recollection of the FL Group transaction and conversations he had with Defendants Arif, Satter, Schwarz, and representatives of FL Group. |
| 152. | | At the time of the FL Group Investment, Bayrock Group had already transferred more than 61% of each these four entities' membership interests (with respect to profit participation), with 50% of such | The allegations in this paragraph are based upon Plaintiffs' equity compensation agreements and Kriss' recollection of conversations he had with Woodring, Schwarz and Satter. The facts alleged in this paragraph are based on agreements made |

**SIMON & PARTNERS** LLP

| | | |
|---|---|---|
| | interests in each of those entities owned by Satter, 10% owned by Kriss and 1.5% owned by Schwarz. | between defendants that would be subject to disclosure during the normal course of discovery. |
| 153. | Nevertheless, the FL Group Investment, initially conceived as a sale to FL Group of approximately 62% of the membership interests in those entities, effectively transferred the right to receive profits attached to the professionals' membership interests in the four Bayrock Group investment vehicles from Bayrock Group to FL Group.  Defendants, including Merrimac, Camelback, Whitestone and Spring Street, stole or wrongfully converted the vested membership interests of Kriss, Ejekam, and Woodring, and then effectively sold these to FL Group. | The allegations in this paragraph are based upon Plaintiffs' equity compensation agreements and Kriss' recollection.  The terms of the FL Group transaction are stated in the closing documents effecting the transaction, which would be subject to disclosure during the normal course of discovery. |
| 154. | As alleged more fully below, the FL Group Investment transferred the $50 million through Merrimac, Camelback, Whitestone and Spring Street, which then distributed the funds directly to Bayrock Group. However the $50 million was wired directly from FL Group to a bank account in the name of Bayrock Group.  From there, Arif, Satter, Schwarz and Lauria caused those funds, which included moneys to which Kriss, Ejekam and Woodring were entitled by virtue of their right to distributions as members of the four entities, to be transferred in interstate or foreign commerce.  For example, Arif, Satter, Schwarz and/or Lauria caused the transfer of approximately $1.4 million Bayrock Group's bank account in the U.S. to a French person or entity or bank for an investment in Les Ambassadeur Hotel in Juan Les Pins, France. | See Response to Paragraph 153.  Kriss recalls learning of the $1.4 million in connection with the investment in Les Ambassadeur Hotel while at Bayrock Group.  Transfers of the $50 million from Bayrock Group's account are recorded in Bayrock Group's financial records, which would be subject to disclosure during the normal course of discovery. |
| 155. | At the time Arif, Satter, Schwarz and Lauria caused such transfers to be made, each knew that the vested membership interests of Plaintiffs and Woodring entitled them to distributions from the $50 million received from FL Group. Each of these defendants therefore knew that a portion of that $50 million had been stolen, converted or taken by fraud. | The allegations in this paragraph are based upon (1) Plaintiffs' equity compensation agreements; (2) Kriss' recollection; (3) Kriss' conversations with Beau Woodring; (4) the fact that Defendants Arif, Satter and Schwarz were involved in the negotiations and drafting of the equity compensation agreements of Plaintiffs and Woodring; and (5) the roles generally played by Arif, Satter and Schwarz in connection with money transfers made by Bayrock Group. |
| 171. | In 2005, Bayrock Group hired Defendant Julius Schwarz as its Executive Vice | The allegations in this paragraph are based upon Plaintiffs' equity compensation agreements, Kriss' |

11

**SIMON & PARTNERS** LLP

| | | |
|---|---|---|
| | President and General Counsel from law firm Akerman Senterfitt, which had represented Bayrock Group in connection with various transactions. Bayrock Group and Schwarz engaged in lengthy negotiations over the form of Schwarz' compensation. Defendants Salomon, Weinreich, Salomon & Co., accountants and Defendant Mel Dogan, an attorney, representing Bayrock Group, took part in these negotiations. The parties ultimately agreed that Schwarz would be paid partially with profit participation in the form of vesting membership interests in Bayrock Group and some of Bayrock Group's subsidiaries. Schwarz's agreement was crafted by Defendants Salomon, Weinreich, Salomon & Co. and Dogan, who knew at the time that the part of Schwarz' compensation package dealing with profit participation would be used in compensation agreements for others providing services to Bayrock Group, including Satter and Plaintiff Kriss. The extent of each of their profit participation would differ – Satter receiving a much larger share than either Kriss or Schwarz, and Schwarz receiving a considerably smaller share than Kriss' 10%. | recollection and Kriss' conversations with Defendants Schwarz, Arif and Satter. |
| 172. | Around the time in 2005 when Schwarz's compensation agreement was presented to Schwarz, Kriss was asked to amend and/or restate his existing compensation agreement with Bayrock Group so that it would conform to the profit participation portion of Schwarz's compensation agreement. | The allegations in this paragraph are based upon Kriss' recollection. |
| 173. | Upon information and belief, the 2005 compensation agreements for Schwarz, Satter and Kriss granted each of them membership interests in Bayrock Group itself, and in some or all of the investment vehicles Bayrock Group had formed to date, and those it would form in the future. These membership interests were subject to a vesting schedule and – to the extent they vested – would entitle their owners to distributions from the Bayrock entities when each such entity's "[p]roceeds are available for distribution." The agreements provided that the membership | The allegations in this paragraph are based upon Plaintiffs' equity compensation agreements, Kriss' recollection and Kriss' conversations with Defendants Satter and Schwarz about their equity compensation agreements. |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | interests would vest at the very latest, after such time as Arif had "first received a 10% return of his Total Principal Capital Contribution." But under the vesting schedule, the membership interests began to vest earlier. The vesting schedule provides: [...] | |
| 174. | In order to entice Kriss to amend the 2004 Kriss Agreement, the 2005 compensation agreement executed by Kriss, Arif and Bayrock (the "2005 Kriss Agreement") contained the following provisions: [...] | The allegations in this paragraph are based upon Kriss' equity compensation agreement. |
| 191. | On a date in 2003, Non-Party Beau Woodring agreed to provide professional services to Bayrock Group, Arif and Satter on the basis of a profit participation in some of Bayrock Group's investments he would receive in the future [...] Woodring provided his services in connection with some of Bayrock Group's investments, including its two Fort Lauderdale projects and the Trump Phoenix project. | The allegations in this paragraph are based upon Kriss' conversations with Beau Woodring. |
| 192. | In 2004, Woodring entered into an compensation agreement with Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback that granted Woodring 5% membership interests in each of Merrimac and Ocean Club, and a 10% membership interest in Camelback. | The allegations in this paragraph are based upon Kriss' conversations with Beau Woodring. |
| 193. | While conducting negotiations with Woodring over his 2004 compensation agreement, Arif and Satter, Merrimac, Ocean Club and Camelback concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation [...] | The allegations in this paragraph are based upon Kriss' conversations with Beau Woodring. |
| 194. | Believing that Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback had entered into his 2004 compensation agreement in good faith, Woodring provided these defendants with valuable services for the remainder of 2004 and much of 2005. | The allegations in this paragraph are based upon Kriss' conversations with Beau Woodring. |
| 195. | In 2005, shortly after Schwarz was hired by Bayrock, Woodring informed Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback that he would be moving with his family and wanted to | The allegations in this paragraph are based upon Kriss' recollection and his conversations with Beau Woodring. |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | separate from Bayrock Group. Woodring negotiated with Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback a separation agreement (the "2005 Woodring Agreement"). | |
| 196. | In order to entice Woodring to enter into the 2005 Woodring Agreement, Arif, Satter, Schwarz, Merrimac, Ocean Club and Camelback included the following provisions: […] | The allegations in this paragraph are based upon Kriss' recollection and his conversations with Beau Woodring. |
| 197. | While conducting negotiations with Woodring over the 2005 Woodring Agreement, Defendants Arif, Satter, Schwarz and Camelback concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation […] | The allegations in this paragraph are based upon Kriss' recollection and his conversations with Beau Woodring. |
| 198. | Woodring executed the 2005 Woodring Agreement believing that Arif, Satter, Bayrock Group, and Camelback intended to honor the terms of that Agreement. | The allegations in this paragraph are based upon Kriss' recollection and his conversations with Beau Woodring. |
| 199. | Each of Defendants Schwarz, Salomon, Weinreich, Salomon & Co. and Dogan had knowledge of terms included in the 2005 Woodring Agreement and knew that the Agreement had granted Woodring a fully-vested 10% membership interest in Camelback. Each also knew that these membership interests entitled him to distributions when Camelback proceeds were "available for distribution." | The allegations in this paragraph are based upon Kriss' recollection and his conversations with Beau Woodring. They are also based on Kriss' recollection of the role played by Defendants Schwarz, Salomon, Weinreich, Salomon & Co. and Dogan in connection with the compensation arrangements of Bayrock Group employees and officers during Kriss' tenure at Bayrock Group. |
| 201. | In January 2007, Bayrock Group made a presentation to FL Group focusing on four of its investments: (1) Trump SoHo, for which Defendant Spring Street had been formed; (2) the Trump Phoenix project, for which Defendant Camelback had been formed; (3) the Trump International Hotel & Tower Fort Lauderdale, for which Defendant Merrimac had been formed; and (4) a condominium complex located in Whitestone, Queens, New York, for which Defendant Whitestone had been formed. At that presentation, Bayrock Group touted that these four investments were projected to generate profits to Bayrock Group of approximately $227.5 million, broken down as follows: (1) approximately $69 | The allegations in this paragraph are based upon Kriss' recollection. As Director of Finance for Bayrock Group during 2007, Kriss worked on a non-confidential presentation Bayrock Group made to third party FL Group in January 2007 concerning four Bayrock investments: Trump SoHo, Trump Camelback, Waterpointe and Trump International Tower & Hotel Fort Lauderdale. Kriss recalls that the total anticipated profits generated from these four projects was expected to exceed $200 million. The exact profit figures are based upon a copy of the Bayrock Group presentation which Kriss saved onto a personal computer while he was working at Bayrock Group. This document would be subject to disclosure during the normal course of discovery. |

14

SIMON & PARTNERS LLP

|  | | |
|---|---|---|
|  | million in profit by Trump SoHo; (2) approximately $89 million by Trump Phoenix; (3) approximately $31 million by Trump Fort Lauderdale; and (4) approximately $38 million by the Whitestone project. | |
| 206. | During negotiations with FL Group over the terms of the FL Group Investment during 2006 and 2007, the parties – including FL Group – were aware of the terms of the compensation agreements of Kriss, Ejekam and Woodring. Nevertheless, the parties based the FL Group Investment on an assumption that Bayrock Group owned a 100% membership interest in each of Merrimac, Camelback, Whitestone and Spring Street. No Defendant ever sought to purchase any membership interests in these entities from Plaintiffs or from any other financial professional owning such interests. | The allegations in this paragraph are based upon (1) Plaintiffs' equity compensation agreements; (2) Kriss' recollection; (3) conversations Kriss had with Defendants Arif, Satter, Schwarz, and representatives of FL Group; and (4) Kriss' conversations with Beau Woodring.  The terms of the FL Group transaction are stated in the closing documents effecting the transaction, which would be subject to disclosure during the normal course of discovery. |
| 207. | No third-party consents from Plaintiffs or any of the other finance professionals granted membership interests in Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street in their compensation agreements were requested or obtained in connection with the FL Group Investment. | The allegations in this paragraph are based upon (1) Kriss' recollection; (2) conversations Kriss had with Defendants Arif, Satter, Schwarz, and representatives of FL Group; and (3) Kriss' conversations with Beau Woodring. |
| 211. | Each of Defendants Dogan, Pisem and Roberts & Holland played a critical role in planning and executing the FL Group Investment, providing legal advice, communicating with counsel representing FL Group and negotiating and drafting the documents that embodied the transaction. Each of these Defendants drafted documents and/or deal terms that concealed or disavowed the membership interests of Plaintiffs and Woodring, and provided legal advice with respect to such documents and terms.  At the time they did so, Dogan, Pisem and Roberts & Holland knew (a) that Plaintiffs and Woodring owned membership interests in Merrimac, Camelback, Whitestone and/or Spring Street; (b) the vesting schedule for – and the vesting status of – those interests; (c) the terms of the compensation agreements; and (d) that the membership interests, to the extent they had vested, entitled Plaintiffs and Woodring to distributions | The allegations in this paragraph are based upon (1) Plaintiffs' equity compensation agreements; (2) Kriss' recollection of the FL Group transaction; (3) conversations Kriss had with Defendants Arif, Satter, Schwarz, and representatives of FL Group;  and (4) Kriss' conversations with Beau Woodring.  The terms of the FL Group transaction are stated in the closing documents effecting the transaction, which would be subject to disclosure during the normal course of discovery.

The allegations in this paragraph are also based upon Kriss' specific recollection of the roles played by Defendants Dogan, Pisem and Roberts & Holland in connection with the drafting of the equity compensation agreements of Plaintiffs and Woodring, and the FL Group transaction.

Kriss' recollection of the fact that "Defendants Dogan, Pisem and Roberts & Holland played a critical role in planning and executing the FL Group Investment, providing legal advice, |

**SIMON & PARTNERS** **LLP**

| | | |
|---|---|---|
| | from the four entities [...] Each of Dogan, Pisem or Roberts & Holland failed to advise Arif, Satter, Schwarz, Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street that transferring rights associated with the membership interests owned by Plaintiffs and Woodring to FL Group was wrongful, illegal and/or criminal. | communicating with counsel representing FL Group and negotiating and drafting the documents that embodied the transaction" is not privileged. Under New York law, the fact of representation is not protected by the attorney client privilege. *See, e.g., Sudarsky v. New York*, 1990 U.S. Dist. LEXIS 16045, at *3, 89 Civ. 5150 (RJW) (S.D.N.Y. Nov. 28, 1990). Accordingly, parties in federal litigation routinely produce invoices for legal services in connection with fee applications, redacting only the portions of the invoices that provide the content of legal advice or attorney-client communications.[5] |
| 248. | The remaining Defendants conducted one or more of the Investor Frauds, the Loan Frauds and the Professional Frauds and/or, either directly or indirectly, participated in the conducting of one or more of those Frauds by the Bayrock Group enterprise as set forth below: [...] | See Responses to Paragraphs 9, 69-71, 89, 91-92, 98-101, 147-148, 151-154, 172-174, 194, 199-201, 207, 211. |
| 248a. | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Initial Trump Transactions concealing Satter's ownership interest and managerial role in Bayrock Group and Defendants Ocean Club, Merrimac and Camelback [...] | The allegations in this paragraph are based upon Kriss' recollection of the roles played by Defendants Salomon, Weinreich and Salomon & Co. generally as accountants for Bayrock Group. |
| 248b. | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) participated in (1) the sale of Ocean Club's interests in 500 Seabreeze, and (2) the refusal to provide Thieriot with a full and fair accounting of Ocean Club ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and (b) caused documents effecting or relating to these acts to be sent through the interstate mails or interstate wires (such documents including, but not | The allegations in this paragraph are based upon a review of the publicly available docket sheet and documents filed in the Thieriot Action. The allegations in this paragraph are also based upon Kriss' recollection that the Trump International Ocean Club project involved use of the mail, other delivery services, fax and telephone calls, to distribute or disseminate documents or information, including legal and financial documents prepared and/or executed by Defendants Schwarz, Salomon, Weinreich and |

---

[5] *See, e.g., Zhou v. State Univ. of N.Y. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 176584, at *10, 08-CV-0444 (GTS/ATB), (N.D.N.Y. Dec. 23, 2014) (in an intellectual property case, court remarked on the redaction of portions of billing narratives in a produced legal invoice and mentioning non-redacted entries from the same invoices such as "finalize and file" a notice of appeal and "review and copy movies"); *Avnet v. Avana Techs., Inc.*, 2014 U.S. Dist. LEXIS 117203, at *3-4, 13-cv-00929-GMN-PAL (D. Nev. Aug. 20, 2014) (rejecting plaintiffs' argument that portions of legal invoice containing "typical attorney tasks such as 'review background material; work on drafting complaint,' 'correspond with local counsel re engagement and filing of complaint,' [and] 'correspond with opposing counsel re upcoming deadlines in case,'" were protected by attorney client privilege or work product).

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | limited to, federal tax filings made on behalf of Bayrock Group, Ocean Club or 550 Seabreeze and sent to the IRS and/or Elizabeth Thieriot). | Salomon & Co. ███████████████ ███████████████████████████ ████ |
| 248c. | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents concealing Satter's ownership interest and managerial role in Bayrock Group and Defendant Ocean Club […] | The allegations in this paragraph are based upon a review of the publicly available docket sheet and filed documents in the Thieriot Action. In addition, they are based on Kriss' recollection. The allegations in this paragraph are also based upon the fact that throughout 2005 and 2006 Defendants Salomon, Weinreich and Salomon & Co. acted as the accountants for Bayrock Group, and upon Kriss' recollection that these three Defendants typically were involved in transactions conducted by Bayrock Group such as the sale of membership interests in Bayrock Group investments. The allegation concerning concealment in this paragraph is based upon the fact that Thieriot invested $1 million in Bayrock Ocean Club. Nothing in the documents filed in the Thieriot Action indicates that she knew about Satter's criminal past, the fact that Satter and Arif planned on skirting legal requirements and that Satter was being compensated for work he was performing for Bayrock Group in the form of loans rather than wages or distributions. |
| 248d. | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) participated in (1) the sale of Ocean Club's interests in 500 Seabreeze, and (2) the refusal to provide Thieriot with a full and fair accounting of Ocean Club ███████████████████ ███████████; and (b) caused documents effecting or relating to these acts to be sent through the interstate mails or interstate wires (such documents including, but not limited to, federal tax filings made on behalf of Bayrock Group, Ocean Club or 550 Seabreeze and sent to the IRS and/or Elizabeth Thieriot). | The allegations in this paragraph are based upon a review of the publicly available docket sheet and documents filed in the Thieriot Action, and Kriss' recollection. The allegations in this paragraph are also based upon Kriss' recollection that the Trump International Ocean Club project involved use of the mail, other delivery services, fax and telephone calls, to distribute or disseminate documents or information, including legal and financial documents prepared and/or executed by Defendants Schwarz, Salomon, Weinreich and Salomon & Co. ████████████████ ████████████████████████████ ██████████████ |
| 248e. | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Bayrock Investment in CDP concealing Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback  […] | The allegations in this paragraph are based upon Kriss' recollection of the role Defendants Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with its investments. |
| 248f. | *Schwarz*, **Salomon, Weinreich and Salomon & Co.** (a) prepared, approved | The allegations in this paragraph are based upon Kriss' recollection of the role Defendants |

| | | |
|---|---|---|
| | and/or executed the agreements, applications and other paperwork for the additional $5.1 million in financing obtained from Capmark Finance by CDP, knowing that the financing violated CDP's Operating Agreement and improperly converted Camelback Plaza's membership interest in CDP; and (b) caused such documents to be sent through the interstate mails or interstate wires. | Schwarz, Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with loan applications to finance Bayrock Group's investments.<br><br>The allegations in this paragraph are also based upon the fact that Defendant Schwarz routinely executed the loan documentation for financing for Bayrock Group investments.  For example, as established by documents in the publicly available file for *Capmark Finance, Inc. v. 151-45 Sixth Road Whitestone Partners LLC, et al.*, Index No. 126/2010, New York Supreme Court for Queens Co. (the "Capmark Whitestone Foreclosure Action"), Schwarz executed documents applying for a $26.5 million dollar loan from Capmark Finance in connection with Bayrock Group's investment in Waterpointe (otherwise known as the Whitestone project). |
| 248g. | **Schwarz** requested, approved and/or otherwise caused transfers of funds from an Arizona bank account in the name of CDP in interstate or foreign commerce, knowing that those funds were converted or taken by fraud, in that the funds were the proceeds of $5.1 million in financing that violated CDP's Operating Agreement and violated an express promise made by Defendant Bayrock Camelback in an agreement with Camelback Plaza. | The allegations in this paragraph are based upon (1) Kriss' recollection of the role Defendant Schwarz played as General Counsel of Bayrock Group in connection with its investments; (2) Kriss' recollection of the Bayrock Group's Camelback Plaza investment; and (3) pleadings and documents filed in an Arizona legal action *Camelback Plaza Development v. Bayrock Group et al.*, CV 2007-000117 (Arizona Superior Court for Maricopa County). |
| 248h. | **Schwarz** executed the loan documentation for the additional $5.1 million in financing obtained from Capmark Finance by CDP. | The allegations in this paragraph are based upon the fact that Defendant Schwarz routinely executed the loan documentation for financing for Bayrock Group investments.  For example, as established by documents in the publicly available file for the Capmark Whitestone Foreclosure Action, Schwarz executed documents applying for a $26.5 million dollar loan from Capmark Finance in connection with Bayrock Group's investment in Waterpointe (otherwise known as the Whitestone project). |
| 248i. | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Trump SoHo investment concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Spring Street, and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. | The allegations in this paragraph are based upon Kriss' recollection of the role played by Defendants Salomon, Weinreich and Salomon & Co. in connection with the Trump SoHo investment. |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| 248j. | **Schwarz** requested, approved and/or otherwise caused transfers of funds, received from the Sapir Group as a result of the Trump SoHo Fraud, from an account in New York for Bayrock Group, Spring Street, or an affiliate or subsidiary of Bayrock Group, in interstate or foreign commerce. At the time of such actions, Schwarz knew that those funds were converted or taken by fraud [...] | The allegations in this paragraph are based upon Kriss' recollection. |
| 248k. | **Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other paperwork for the financing obtained from iStar Financial in connection with the Trump SoHo project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. | The allegations in this paragraph are based upon Kriss' recollection of the role played by Defendants Salomon, Weinreich and Salomon & Co. in connection with the Trump SoHo investment and, more generally, financing obtained by Bayrock Group for its investments. |
| 248l. | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other paperwork for the 2006 $5.1 million financing obtained from Capmark Finance Inc./GMAC Mortgage Corporation in connection with the Trump Phoenix project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. | The allegations in this paragraph are based upon Kriss' recollection of the role Defendants Schwarz, Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with loan applications made in connection with Bayrock Group's investments. The allegations in this paragraph are also based upon the fact that Defendant Schwarz routinely executed the loan documentation for financing for Bayrock Group investments. For example, as established by documents in the publicly available file for the Capmark Whitestone Foreclosure Action, Schwarz executed documents applying for a $26.5 million dollar loan from Capmark Finance in connection with Bayrock Group's investment in Waterpointe (otherwise known as the Whitestone project). |
| 248m. | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other for the financing obtained from Capmark Finance Inc. in connection with the Bayrock Whitestone project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Whitestone and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent | The allegations in this paragraph are based upon (1) documents in the publicly available file for the Capmark Whitestone Foreclosure Action, which include a copy of financing documents with Capmark Finance executed by Defendant Schwarz; and (2) Kriss' recollection of the role Defendants Schwarz, Salomon, Weinreich and Salomon & Co. played in connection with loan applications to finance Bayrock Group projects. |

**SIMON & PARTNERS** LLP

| | | |
|---|---|---|
| | through the interstate mails or interstate wires. | |
| 248n. | **Schwarz** (a) concealed the Illegally-Structured Satter Payments; (b) used company proceeds that should have been distributed to Plaintiffs and Woodring pursuant to their compensation agreements with Merrimac, Camelback, Whitestone and/or Spring Street to make wrongful payments to Defendants Salomon, Weinreich, Salomon & Co. and Lauria, or wrongful payments to third parties for the benefit of Arif and Satter; and (c) caused documents relating to these acts to be sent through the interstate mails and interstate wires. | The allegations in this paragraph are based upon Kriss' recollection. Kriss recalls that Schwarz was involved in the negotiation of the equity compensation agreements of Plaintiffs and Beau Woodring. He also recalls that Schwarz knew about Bayrock Group transfers to Satter and to third parties starting in 2005, and that Schwarz was involved in preparing Bayrock Group's tax filings for 2005 and 2006. |
| 248o. | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) approved some or all of the Illegally-Structured Satter Payments and/or created documentation to conceal the nature of such Payments, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities, and (2) the Payments and their concealment would harm such interests; and (b) caused documents in connection with such approval and/or documentation to be sent through the interstate mails and interstate wires. | The allegations in this paragraph are based upon Kriss' recollection of the role Defendants Schwarz, Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with money transfers, payments of compensation and tax filings relating to these. They are also based upon his recollection that Schwarz was involved in the negotiation of the equity compensation agreements of Plaintiffs and Beau Woodring. |
| 248p. | **Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland** (a) approved, drafted and/or executed transaction documents in connection with the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities, and (2) the FL Group Investment would harm those interests; and (b) caused such transaction documents to be sent through the interstate mails and interstate wires. | The allegations in this paragraph are based upon (1) Kriss' recollection; (2) Plaintiffs' equity compensation agreements; (3) the role Defendants Schwarz, Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with investments and corporate transactions; and (4) Kriss' conversations with Beau Woodring. Kriss recalls that Schwarz, Salomon, Weinreich, Dogan, and Salomon & Co. were involved in the negotiation of Schwarz's equity compensation agreement and understood that the other Bayrock Group principals including Kriss – like Schwarz – were given membership interests in Bayrock Group entities as compensation. Kriss also recalls that Schwarz was involved in the negotiation of the equity compensation agreements of Plaintiffs and Beau Woodring. |
| 248q. | **Dogan, Pisem and Roberts & Holland** devised the structure for the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in | The allegations in this paragraph are based upon Kriss' recollection. Kriss recalls that Dogan was involved in the negotiation of Schwarz's equity compensation agreement and understood that the |

SIMON & PARTNERS LLP

| | | |
|---|---|---|
| | Bayrock entities, and (2) said structure would harm those interests; and (b) caused documents relating to the structure for the FL Group Investment to be sent through the interstate mails and interstate wires. | other Bayrock Group principals including Kriss – like Schwarz – were given membership interests in Bayrock Group entities as compensation. |
| 248r. | **Schwarz and Lauria** caused the transfer of proceeds of the FL Group Investment into interstate and foreign commerce knowing that the FL Group Investment stole, converted or took by fraud the membership interests to which Plaintiffs and Woodring were entitled under their compensation agreements and/or the distributions to which Plaintiffs and Woodring were entitled by virtue of owning such membership interests. | The allegations in this paragraph are based upon Kriss' recollection. Kriss recalls that Schwarz was involved in the negotiation of the equity compensation agreements of Plaintiffs and Beau Woodring. |
| 248s. | **Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland** (a) approved, drafted and/or executed transaction documents in connection with the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities; (2) by executing the transaction documents Arif and Schwarz, Bayrock Group and the Bayrock entities were stealing or wrongfully converting those membership interests and the distribution rights attaching to them; and (3) the FL Group Investment for all intents and purposes sold those membership interests and rights from Bayrock Group or the Bayrock entities to FL Group, or an affiliate or subsidiary of FL Group. | The allegations in this paragraph are based upon (1) Kriss' recollection; (2) Plaintiffs' equity compensation agreements; (3) Kriss' conversations with Beau Woodring; and (4) the role Defendants Schwarz, Salomon, Weinreich and Salomon & Co. played generally at Bayrock Group in connection with investments and corporate transactions. Kriss recalls that Schwarz, Salomon, Weinreich, Dogan, and Salomon & Co. were involved in the negotiation of Schwarz's equity compensation agreement and understood that the other Bayrock Group principals including Kriss – like Schwarz – were given membership interests in Bayrock Group entities as compensation. Kriss also recalls that Schwarz was involved in the negotiation of the equity compensation agreements of Plaintiffs and Beau Woodring. |

Respectfully submitted,

Bradley D. Simon
J. Evan Shapiro
Simon & Partners LLP

*Attorneys for Plaintiffs Jody Kriss and Michael Ch'udi Ejekam*

cc: Walter A. Saurak, Esq.
Michael P. Beys, Esq.