Bradley D. Simon (BS 3406)
J. Evan Shapiro (JS 9903)
Simon & Partners LLP
551 Fifth Avenue
New York, New York 10176
(212) 332-8900

**UNITTED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

JODY KRISS and MICHAEL CHU'DI EJEKAM,

               Plaintiffs,

          -against-

TEVFIK ARIF, FELIX SATTER (aka FELIX
SATER), SALVATORE LAURIA, JULIUS
SCHWARZ, ALEX SALOMON, JERRY
WEINREICH, MEL DOGAN, ELLIOT PISEM,
BAYROCK GROUP LLC, BAYROCK OCEAN
CLUB LLC, BAYROCK MERRIMAC LLC,
BAYROCK CAMELBACK LLC, BAYROCK
WHITESONE LLC, BAYROCK SPRING STREET,
LLC, SALOMON & CO., CERTIFIED PUBLIC
ACCOUNTANTS, P.C., ROBERTS & HOLLAND
LLP, and JOHN DOES 1-100,

               Defendants.
-------------------------------------------------------------------X

**SECOND AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

10 CV 3959 (LGS) (FM) ("Kriss I")

Plaintiffs Jody Kriss and Michael Chu'di Ejekam, through their counsel,

Simon & Partners LLP, allege as follows for their Complaint herein:

**NATURE OF THE ACTION**

1.     This case alleges a RICO enterprise and/or a conspiracy to violate RICO,

formed by Defendants between 2003 and at least 2008.  For this six-year period, and

possibly longer, Defendants managed, operated and/or participated in the activities of

Defendant Bayrock Group LLC ("Bayrock Group"),[1] in whose name Defendants engaged in at least: (a) ten (10) frauds against a wide group of victims; (b) nine (9) violations of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315 ("NSPA"), related to the frauds; and (c) two (2) acts or threats involving murder and/or extortion.[2]  Defendants have profited handsomely from these unlawful acts, which have eluded in-depth prosecution until now.  This is a textbook RICO case: The facts alleged herein establish the type of infiltration of legitimate business by organized crime that the civil remedies of RICO were designed to thwart.

    2.    Defendant Tevfik Arif formed Bayrock Group in 2001 with the intention of expanding a real estate development empire he started in Kazakhstan and Turkey into the U.S.  Arif, a former high-level Soviet civilian official, has been linked to organized crime; in October 2010, he was arrested in Turkey on charges of running an international prostitution ring.  Arif's first significant hire for Bayrock Group, made in late 2002 or 2003, was Defendant Felix Satter – a man who only three or four years earlier had been convicted on a RICO count based on securities fraud and money laundering.  The conviction resulted from an investigation initiated by the FBI's Russian Organized Crime Division.  Satter had another conviction under his belt, one for a violent assault committed in 1991.  In 2003 or 2004, Satter began to use Bayrock Group as a means to enrich his right-hand man in the money-laundering racket, Defendant Salvatore Lauria.  Lauria, unlike Satter, was sentenced to five years of probation with one year of home

---

[1] Bayrock Group, alleged to be an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4), is not named as a Defendant in Plaintiffs' substantive and conspiracy RICO causes of action.

[2] Plaintiffs expect that discovery in this matter will yield evidence of additional predicate acts perpetrated by Bayrock Group involving two or more Defendants.

confinement for his participation in the racket. Despite the fact that Lauria had little or no experience in real estate development as of 2004, he received at least $1.5 million in consulting fees from Bayrock Group between 2004 and 2008.

3. In 2003, Arif partnered with Satter, ***giving him significant decision-making authority and a major share in Bayrock Group's profits***, thereby insuring that the enterprise would incorporate criminal methods such as extortion, and dispense with concerns of legitimate businesses such as keeping accurate books and paying taxes on wages. The deal – as memorialized in documents, and as described to Plaintiff Kriss – mysteriously did not require that Satter contribute one cent in capital to Bayrock Group. In contrast, Arif contributed millions. Satter's past demonstrated that he could offer Arif at least one asset: his familiarity with strong-arm tactics frequently used by organized crime. Plaintiffs believe that discovery focusing on the nature of the agreement reached between these two men will yield additional proof that – unbeknownst to the innocent parties that transacted with Bayrock Group – the enterprise involved criminal activities and the proceeds thereof.

4. Arif and Satter understood that in order to reap tremendous profit from Bayrock Group, they needed to become involved in large-scale high-profile real estate development projects. This would require (1) the financial assistance and prestige of high profile developers and wealthy investors; (2) hundreds of millions of dollars in debt financing; and (3) valuable services from highly-skilled and pedigreed finance professionals. Obtaining these would prove difficult if not impossible given Satter's criminal past. Satter's RICO conviction – which remained sealed until 2013, and was

thus not discoverable – established that Satter excels at defrauding investors and making illegal transfers of corporate funds without being detected.

5.      Bayrock Group thus embarked on a series of frauds designed to conceal Satter's conviction for the securities fraud/money laundering racket, and his expertise at committing corporate crime, from (1) real estate developers and investors, (2) financial institutions and (3) finance professionals.  The enterprise induced these three groups of outsiders to contribute prestige, capital, debt financing and highly valuable professional services with one or more of the following false promises: (a) Bayrock Group would grant them profit participation in Bayrock Group investments in the form of membership interests in limited liability companies; (b) Bayrock Group investments would be run in an above-board manner; and (c) Bayrock Group would live up to its contractual commitments.

6.      Ignorant of Satter's RICO conviction, and in many instances his managerial role and ownership interest in Bayrock Group – and reasonably relying on Bayrock Group's false promises – these third parties entered into agreements with Bayrock Group to their detriment.  Defendants refused to honor the agreements and wrongfully converted the interests in Bayrock Group investments for which their victims had bargained.  In order to maximize their profits from the frauds, on eight occasions Defendants received and transferred funds they knew had been unlawfully converted and/or taken by fraud in violation of the NSPA.  Defendants also profited when they converted, and then effectively sold, membership interests owned by their victims, and worth tens of millions of dollars, to an Icelandic company FL Group in 2007.  This transfer also violated the NSPA.

4

7.     Plaintiffs Jody Kriss and Ch'udi Ejekam are well-educated, highly-skilled and successful real estate finance and development professionals.  From 2003 through 2007 – years in which the value of urban real estate skyrocketed across the U.S. – Plaintiffs, enticed by Defendants' offers of significant participation in Bayrock Group's profits, passed up plentiful opportunities to earn millions of dollars in salary, or millions in equity, working for other real estate firms.  They assessed the profitability of the Bayrock Group projects on which they had already worked, and would continue to work, and made what they believed were informed decisions about their careers and income.

8.     In late May 2007, Defendants participated in a transaction with FL Group that brought proceeds of $50 million into Bayrock Group.  In substance, the transaction sold a majority participation in the greater than $200 million in profits that Bayrock Group projected it would earn from 4 of its development projects, including the Trump SoHo.  Defendants benefited tremendously from this deal, which guaranteed them returns on the financial and "sweat" investments they had made in Bayrock Group.  Defendants refused to share the $50 million in proceeds with *Plaintiffs who, as equity partners in the 4 projects* based on the valuable work they performed for Bayrock Group, *were entitled to millions in distributions*.  *Kriss received only a $500,000 "bonus"; Ejekam received nothing.*

9.     Informed of the risks of the marketplace, Defendants managed to hedge against future losses by selling a 62% profit participation in Bayrock Group's four major projects – such 62% including Plaintiffs' rights to distributions from those projects – to FL Group.  Defendants' fraud deprived Kriss and Ejekam of a similar opportunity.  Had the two men been informed about Satter's RICO conviction, Arif and Satter's willingness

to skirt the law and corporate formalities, and the indiscriminate transfers of Bayrock

Group funds to Satter that continued for years, Kriss and Ejekam would have had a

chance to hedge against the possibility that Defendants would ultimately rob them of the

equity-based compensation for which the two had bargained.

10. The frauds perpetrated by Defendants against developers and investors,

banks and finance professionals, together with Defendants' NSPA violations and acts of

extortion, constitute a "pattern" of racketeering "predicate acts" for purposes of RICO, 18

USC § 1964.  At least four of the predicate acts in the pattern injured Plaintiff Kriss;

another three injured Plaintiff Ejekam.  The predicate acts form a "pattern of

racketeering" for the purposes of RICO because they shared the same or similar goals,

employed common methods and were committed by the same group of Defendants.

11. This action further alleges that the acts of Defendants alleged herein that

injured Plaintiffs Kriss and Ejekam also violate New York common law.  Defendants

wrongfully converted – or aided and abetted the wrongful conversion of – Plaintiffs'

membership interests in Bayrock Group and its investments, which were worth millions.

Plaintiffs seek, *inter alia*, compensatory, punitive and/or treble damages, as well as

injunctive and declaratory relief.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331 because this case arises under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.  This Court has jurisdiction over

the subject matter of state law claims alleged herein under the principles of

supplementary jurisdiction, 28 U.S.C. § 1367.

13.     In addition, this Court has jurisdiction because Defendant Felix Satter (at other times known as Felix Sater) has indicated that in the event that this action proceeds with state law claims alone, Satter will nevertheless seek to have this action heard before this Court on the ground that he intends to assert defenses to Plaintiffs' claims that arise out of an alleged duty he has to enforce federal law as a government informant.  Relying upon 28 U.S.C. § 1442(a)(1), the Federal Officer Removal Statute, in June 2013 Satter removed from New York State court a related case, Kriss II, 13 CV 3906 (LGS) (FM). Kriss II is based on the transactions at issue in the present action.  On February 25, 2014, this Court rejected Plaintiffs' motion to remand Kriss II, noting that "[t]he purpose of the Federal Officer Removal Statute [is to] giv[e] federal officers, or persons acting under them, the 'protection of a federal forum' in which to have any defenses 'arising out of their duty to enforce federal law' heard."  Declining subject matter jurisdiction over this action may therefore prove futile.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims set forth herein occurred in this district.

## PARTIES

15.     Plaintiff Jody Kriss ("Kriss") is a resident of New York.

16.     Plaintiff Michael Ch'udi Ejekam ("Ejekam") is a U.S. citizen currently residing in Nigeria.

17.     Defendant Tevfik Arif ("Arif") is, upon information and belief, a resident of the U.K.  Arif resided primarily in New York from at least 2002 through at least 2008. Arif has always been a member of Defendant Bayrock Group LLC and has managed and

operated it from its offices in New York City using the title "Chairman" starting in June 2002. Arif continues to manage and participate in such manner.

18.     Defendant Felix Satter *also known as* Felix Sater ("Satter") is an individual residing in New York. Satter became a member of Defendant Bayrock Group LLC in late 2002 or the beginning of 2003 and, upon information and belief, remains a member today. Satter has participated in the management and operation of Bayrock Group using the titles "Chief Operating Officer" and/or "Managing Director" since a date in late 2002 or early 2003. Upon information and belief, Satter continues to manage and participate in such manner. A website that, upon information and belief, is operated by Satter, states the following: "Felix currently acts as the managing director for both Bayrock Group and Global Habitat Solutions."[3]

19.     Defendant Julius Schwarz ("Schwarz") is an individual residing in New Jersey. Schwarz was hired by Defendant Bayrock Group LLC in early 2005 as an Executive Vice President and General Counsel. Since November 2005, Schwarz has been a member of Defendant Bayrock Group LLC and at least five of its subsidiaries. Upon information and belief, Schwarz still serves as Bayrock Group's Executive VP.

20.     Defendant Salvatore Lauria ("Lauria") is an individual residing in Connecticut.

21.     Defendant Alex Salomon ("Salomon") is an individual residing in New York. Salomon, a certified public accountant, is the Managing Partner of Defendant Salomon & Co., Certified Public Accountants, P.C. Salomon worked as Defendant

---

[3] *See* https://about.me/felixsater (last visited on May 27, 2015 at 9:45 p.m.).

Bayrock Group LLC's primary service provider and contact at Salomon & Co., P.C. at all times relevant to this Complaint.

22.     Defendant Jerry Weinreich ("Weinreich") is an individual residing in New York.  Weinreich, a certified public accountant, is a Partner of Defendant Salomon & Co., Certified Public Accountants, P.C. and performed work for Bayrock Group LLC at all times relevant to this Complaint.

23.     Defendant Mel Dogan ("Dogan") is an individual residing in New York and practices law at offices located in New York.  As alleged more fully *infra*, Dogan participated in the negotiation and drafting of terms contained in Plaintiffs' equity compensation agreements with some of the Defendants.  In addition, Dogan represented multiple Defendants in a $50 million dollar transaction that is at the core of Plaintiffs' claims.

24.     Defendant Elliot Pisem ("Pisem") is a resident of New York and a partner of Defendant Roberts & Holland LLP, a law firm.  As alleged more fully *infra*, Pisem represented multiple Defendants in a $50 million dollar transaction that is at the core of Plaintiffs' claims.

25.     Defendant Bayrock Group LLC ("Bayrock Group") is a Delaware limited liability company formed on or about July 17, 2001.

26.     Defendant Bayrock Ocean Club LLC ("Bayrock Ocean Club" or "Ocean Club") is a Florida limited liability company formed on or about August 29, 2003.  Bayrock Group has always been the Managing Member of Ocean Club.

27.     Defendant Bayrock Merrimac LLC ("Bayrock Merrimac" or "Merrimac") is a Florida limited liability company formed on or about October 24, 2003.  Bayrock Group has always been the Managing Member of Merrimac.

28.     Defendant Bayrock Camelback LLC ("Bayrock Camelback" or "Camelback") is an Arizona limited liability company formed on or about February 9, 2004.  Bayrock Group has always been the Managing Member of Camelback.

29.     Defendant Bayrock Spring Street LLC ("Bayrock Spring Street" or "Spring Street") is a New York limited liability company formed on or about July 12, 2005.  Bayrock Group has always been the Managing Member of Bayrock Spring Street.

30.     Defendant Bayrock Whitestone LLC ("Bayrock Whitestone" or "Whitestone") is a New York limited liability company formed on or about July 22, 2005.  Bayrock Group has always been the Managing Member of Whitestone.

31.     Defendant Salomon & Co., Certified Public Accountants, P.C., ("Salomon & Co.") is (and was at all times relevant to this action) a New York professional corporation with its offices located in Nassau County, New York.

32.     Defendant Roberts & Holland LLP ("Roberts & Holland") is (and was at all times relevant to this action) a law firm with its headquarters located in New York. As alleged more fully *infra*, Roberts & Holland represented multiple Defendants in a $50 million dollar transaction that is at the core of Plaintiffs' claims.

33.     Defendant John Does 1-50 are affiliates, subsidiaries and related entities of or to Defendant Bayrock Group LLC and/or Defendant Tevfik Arif, doing business under the 'Bayrock' name, presently unknown to Plaintiffs.

34.     Defendant John Does 51-100 are entities through which Defendant Felix Satter has participated in the management and ownership of Defendant Bayrock Group LLC, or any entity that is an affiliate, subsidiary or a related entity of or to Defendant Bayrock Group LLC and/or Defendant Tevfik Arif, doing business under the 'Bayrock' name, presently unknown to Plaintiffs.

## SUBSTANTIVE ALLEGATIONS

### I.     Background: Felix Sater

35.     Defendant Felix Satter's actual name is Felix Henry Sater, which Satter changed from Haim Felix Sater.  Sometime in the early 2000s, Satter changed his last name by adding an extra "t" (making "Satter") in order to distance himself from a criminal past that would undoubtedly limit his professional opportunities.

36.      At age 18, Satter dropped out of Pace University and began to work at Bear, Stearns Companies, Inc.

37.     On a date in 1991, Satter and his friend, Defendant Salvatore Lauria, were celebrating the fact that Lauria had passed his stockbroker's exam at a bar in midtown Manhattan, El Rio Grande.  Satter got into an argument with a commodities broker that quickly escalated.  Satter grabbed a large margarita glass, smashed it on the bar and plunged the stem into the right side of the broker's face.  The victim suffered nerve damage and required 110 stitches to close the laceration on his face.  In 1993, Satter was convicted of this assault after a trial.  Satter went to prison and was barred from selling securities by the NASD.

38.     In 1998, a criminal complaint was filed against Satter and a co-conspirator alleging stock manipulation and money laundering based on an investigation commenced by *the FBI's Russian Organized Crime Division*.  The criminal complaint, which was

unsealed in 2013, alleges that Satter and a co-defendant operated a stock brokerage firm White Rock Partners & Co. ("White Rock"), which later changed its name to State Street Capital Markets ("State Street").  It further alleges that the two men manipulated shares of Holly Products Inc., a Pennsylvania company, and other companies, in a "pump and dump" scheme.  The scheme began when Satter and the co-defendant secretly acquired large blocks of stock on behalf of offshore corporations they controlled.  The FBI discovered that the two men inflated share prices by under-the-table payoffs pegged to sales volume to brokers at White Rock and other firms.  According to the complaint, the stock manipulation and money laundering operation built by Satter involved 30 foreign shell corporations and bank accounts.

    39.    The information filed by the United States Attorney for the Eastern District of New York in connection with the criminal case against Satter, 98-cr-01101-ILG (E.D.N.Y.), remained sealed until 2013 (the "Sater Information").  The Sater Information alleges that "White Rock was operated as a partnership by the defendant Felix Sater, [another defendant], Sal Lauria and John Doe #1."  It further alleges that Satter "supervised all aspects of White Rock's and State Street's business, including… the solicitation and structuring of securities underwritings; the trading of securities by White Rock and State Street; the management of client accounts; and the disbursement of profits generated by securities transactions."  The Sater Information states that because Satter, after his conviction for the 1991 stabbing, had agreed with the NASD to perform only clerical activities, he "***received substantial compensation greatly exceeding his***

*agreed-upon salary*…" (emphasis added).[4]  It also alleges that "[t]he chief goal of the White Rock/State Street Enterprise was to obtain significant sums of money by selling securities to investors on the basis of false and fraudulent statements about, among other things, ownership and control of securities…"

40.     The Docket Report of the 1998 criminal case against Satter is publicly available.  It shows that Satter was charged with one count of racketeering in that case and that he pleaded guilty to the count on December 10, 1998.

41.     As revealed in a publicly available documents in a related criminal case, 98-cr-01102-ILG (E.D.N.Y.), Defendant Salvatore Lauria pleaded guilty on or around December 10, 1998 to one count of racketeering based on his involvement as one of Satter's co-conspirators in the White Rock/State Street racket.

## II.     Tevfik Arif and the Formation of Bayrock Group LLC and the Bayrock Group RICO Enterprise

42.     Defendant Tevfik Arif was born in Kazakhstan.  Prior to the dissolution of the USSR, Arif, trained in economics, served as the Chief Economist and Deputy Director of the Hotel Management Department of the Soviet Ministry of Commerce and Trade.  After the fall of the Soviet empire, Arif formed numerous companies in the trade industry and founded the Specialty Chemicals Trading Co. ("SPTC") in 1991 in Kazakhstan.  SPTC traded chrome, rare metals and raw materials.  He then moved into the business of constructing resorts in Turkey through the Turkish company Sembol Construction.  Arif thereafter expanded into the hotel management business.  The first

---

[4] This statement in the Sater Information is critical to the frauds committed by the Bayrock Group enterprise.  None of the third parties that were defrauded by the Bayrock Group enterprise had any knowledge of Satter's significant experience either in defrauding investors, or transferring corporate proceeds to himself in a clandestine manner at the time the frauds were perpetrated.

13

hotel Arif developed and operated was Hotel Labada, a five-star resort located on the

Mediterranean coast in Antalya, Turkey.  Arif owned Hotel Labada, which is five-star

luxury hotel resort with 179 rooms and suites located on a 215,000 square foot estate, at

least until 2007.

43.     The substantial connection between former high-ranking U.S.S.R. officials

such as Arif and Russian organized crime is well-documented.[5]  Arif has been linked to

Russian organized crime.  In 2013 and/or 2014, a virtual deck of "Russian Mafia Cards"

was published online;[6] the deck included Arif's image on the card bearing the "queen of

clubs."[7]

---

[5] *See, e.g.,* Aaron Lukas and Gary Dempsey, "Mafia Capitalism or Red Legacy in
Russia" (Cato Institute, Mar. 4, 2000) ("[M]any members of today's criminal class are
current or former Soviet officials"), *available at*
http://www.cato.org/publications/commentary/mafia-capitalism-or-red-legacy-russia (last
visited June 2, 2015 at 3:10 p.m.); U.S. Dep't of Justice, "The Threat of Russian
Organized Crime" (June 2001), at 5 ("Contemporary Russian organized crime grew out
of the Soviet "nomenklatura" system (the government's organizational structure and
high-level officials) in which some individual "apparatchiks" (government bureaucrats)
developed mutually beneficial personal relationships with the thieves' world. The top of
the pyramid of organized crime during the Soviet period was made up of the Communist
Party and state officials who abused their positions of power and authority"), *available at*
https://www.ncjrs.gov/pdffiles1/nij/187085.pdf (last visited June 2, 2015 at 3:51 p.m.).

[6] *See* Julia Marsh, *Russian tycoon sues after appearing in virtual 'Russian mafia cards'*,
New York Post (Apr. 24, 2014), *available at* http://nypost.com/2014/04/24/russian-
tycoon-sues-after-appearing-in-virtual-russian-mafia-cards/ (last visited June 2, 2015 at
2:56 p.m.).

[7] *See* Thomas Jones, *Morals vs money: Where do you draw the line on potential Villa
owners?*, SB Nation (May 31, 2014), *available at*
http://7500toholte.sbnation.com/2014/5/31/5767052/villa-money-takeover-lerner-arif-
tevfik-anschutz-mls (last visited June 2, 2015 at 2:59 p.m.) (referring to Arif as "[a] man
so notorious that he was marked as the queen of clubs in a specially made Russian mafia
card game").

44.     In 2000, Arif purchased and "re-positioned" a 55,000 square foot waterfront shopping center in Brooklyn, New York, the Loehmann's Seaport Plaza.  In 2001, he sponsored a ground-up condominium development in Gravesend, Brooklyn.

45.     In July 2001, Arif formed a New York limited liability company called Bayrock Development LLC.  In August 2002, the name of the entity was changed to Bayrock Group LLC.  Arif, who had already invested in real estate development projects around the world, sought to build Bayrock into a real estate development and finance company operating in multiple states in the U.S., and in multiple nations around the world.  Upon information and belief, affiliates and/or subsidiaries of Bayrock Group, and/or entities otherwise related to Bayrock Group, own or hold ownership interests in real estate developments in Western Europe, Turkey and elsewhere along the Mediterranean Sea.[8]

46.     Upon information and belief, on a date in the first half of 2002, Defendants Arif and Satter became acquainted.  On a date during late 2002 or early 2003, the two defendants agreed that Arif would contribute capital to Bayrock Group and its investment activities, that Satter would help Arif run Bayrock Group's affairs, and that in return Satter would receive 50% of the profits earned through Bayrock Group's investments (the "Arif/Satter Agreement").  Under the Arif/Satter Agreement as Satter

---

[8] *See* "Bayrock Group, Redefining Real Estate Investment and Development," Slide Presentation (2007), available at
http://ksb.bg/images/stories/Bayrock%20Presentation.pdf (last visited May 29, 2015 at 3:46 pm) ("Bayrock Slide Presentation") ("Bayrock has completed investments in hotels, multi-family residential, retail and office properties in the United States and Europe… In Europe, Bayrock Group developed seven luxury waterfront hotel resorts on the Mediterranean Sea and throughout Europe").

explained it to Kriss, Satter would share some of the profits guaranteed him with the real estate and finance professionals Satter was to recruit for Bayrock Group.

47.     Plaintiffs expect that discovery will shed additional light on the nature of the agreement reached between Arif and Satter, light that will provide evidence of Arif's knowledge of Satter's involvement in the White Rock/State Street racket.  That Arif was willing to share Bayrock Group's profits so generously with Satter, despite the fact that Satter would not be contributing a cent of capital to the venture, is highly suspicious.  The deal cannot be explained by Satter's experience in real estate development, which, as of 2003, was neither extensive nor deep.  The deal may be explained by the fact that, given his past involvement in organized crime, Satter had the ability to serve Arif and Bayrock Group as an "enforcer" – an officer of the enterprise responsible for ensuring compliance by its participants with rules, orders and wishes issued from the top, using all means at his disposal.  As alleged more fully *infra*, Satter in fact performed such "enforcer" services on at least two occasions, threatening two victims of Bayrock Group's misconduct with serious bodily harm to prevent them from seeking legal redress.

48.     The purpose of the Arif/Satter Agreement was simple: the mutual enrichment of the two Defendants by any means.  They both knew that to succeed with their fledgling enterprise, they would need capital, knowledge, services and support from third parties.  Arif and Satter both understood that the interests of such outsiders – partners, lenders, investors and sweat-equity contributors – were to be treated as, at best, secondary and, at worst, utterly irrelevant.  Moreover, Arif and Satter understood that to succeed, they would have to conceal from lenders and investors that would be entrusting funds to Bayrock Group (1) Satter's past involvement with securities fraud, money

laundering and racketeering; (2) his experience with manipulating corporate structures to enrich himself without being discovered and (3) his decision-making authority and ownership stake with respect to the company.

49.   From 2003 until late 2006, Arif and Satter, controlling Bayrock Group, formed corporate Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street in connection with specific real estate investments/developments upon which the enterprise had embarked (collectively the "Bayrock Group Investments"). These five entities held Bayrock Group's ownership and management interests in the following real estate developments:

| Bayrock Ocean Club | Trump Int'l Beach Club, Fort Lauderdale, Florida |
| Bayrock Merrimac | Trump Int'l Hotel & Tower Fort Lauderdale, Florida |
| Bayrock Camelback | Trump Phoenix |
| Bayrock Whitestone | "Waterpointe", a condominium development in Whitestone, Queens, NY |
| Bayrock Spring Street | Trump SoHo |

50.   As set forth in greater detail *infra*, Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street were controlled by Arif and Satter through Bayrock Group.  At all times relevant to this action, Arif and Satter managed and operated these five Defendants as means to enrich themselves personally at the expense of third parties that had provided them, and would provide them, with loans, capital, goodwill, know-how and valuable services.  As alleged more fully *infra*, the Arif/Satter Agreement initiated an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(c) – an enterprise that operated in the form of Bayrock Group.

51.   The Bayrock Group enterprise (the "Enterprise") grew in size between its formation in 2003, and 2007.  At the time of the Arif/Satter Agreement, Arif and Satter were associated with the Enterprise.  By a date in 2003, Defendants Alex Salomon, Jerry

17

Weinreich, Salomon & Co., Bayrock Merrimac and Bayrock Ocean Club had become employed by or associated with the Enterprise.  In 2004, Defendants Bayrock Camelback and Salvatore Lauria became employed by or associated with the Enterprise.  In 2005, Defendants Julius Schwarz, Mel Dogan, Bayrock Spring Street and Bayrock Whitestone became employed by or associated with the Enterprise.  In 2007, Defendants Roberts & Holland and Elliot Pisem became employed by or associated with the Enterprise.

52.     At all times relevant to Plaintiffs' claims under RICO, 18 U.S.C. § 1962, ***Defendants Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street were the agents, principals, employees, servants, partners, joint venturers and representatives of each other***.  In performing the acts hereinafter alleged, each of Defendants Arif, Satter, Spring Street, Camelback, Ocean Club, Merrimac and Whitestone was acting within the scope and course of his (or its) authority as such agent, principal, employee, servant, partner, joint venturer and representative, and was acting with the permission and consent of the remaining Defendants listed in this paragraph.

53.     ***Starting on a date in 2003, Defendants Arif, Satter, Ocean Club, Merrimac, Salomon, Weinreich and Salomon & Co. were the agents, principals, employees, servants, partners, joint venturers and representatives of each other***.  In performing the acts hereinafter alleged, each of Defendants Arif, Satter, Ocean Club, Merrimac, Salomon, Weinreich and Salomon & Co. was acting within the scope and course of his (or its) authority as such agent, principal, employee, servant, partner, joint venturer and representative, and was acting with the permission and consent of the remaining Defendants listed in this paragraph.

18

54.    ***Starting on a date in 2004, Defendants Arif, Satter, Lauria, Ocean Club,
Merrimac, Camelback, Salomon, Weinreich and Salomon & Co. were the agents,
principals, employees, servants, partners, joint venturers and representatives of each
other***.  In performing the acts hereinafter alleged, each of Defendants Arif, Satter, Lauria,
Ocean Club, Merrimac, Camelback, Salomon, Weinreich and Salomon & Co. was acting
within the scope and course of his (or its) authority as such agent, principal, employee,
servant, partner, joint venturer and representative, and was acting with the permission and
consent of the remaining Defendants listed in this paragraph.

55.    ***Starting on a date in 2005, Defendants Arif, Satter, Lauria Ocean Club,
Merrimac, Camelback, Salomon, Weinreich, Salomon & Co., Julius Schwarz,
Bayrock Whitestone and Bayrock Spring Street*** were the agents, principals, employees,
servants, partners, joint venturers and representatives of each other.  In performing the
acts hereinafter alleged, each of Defendants Arif, Satter, Lauria Ocean Club, Merrimac,
Camelback, Salomon, Weinreich, Salomon & Co., Schwarz, Spring Street and
Whitestone was acting within the scope and course of his (or its) authority as such agent,
principal, employee, servant, partner, joint venturer and representative, and was acting
with the permission and consent of the remaining Defendants listed in this paragraph.

56.    ***Starting on a date in 2006 or 2007, Defendants Arif, Satter, Lauria,
Ocean Club, Merrimac, Camelback, Salomon, Weinreich, Salomon & Co., Schwarz,
Spring Street, Whitestone, Elliot Pisem and Roberts & Holland were the agents,
principals, employees, servants, partners, joint venturers and representatives of each
other***.  In performing the acts hereinafter alleged, each of Defendants Arif, Satter, Ocean
Club, Merrimac, Camelback, Salomon, Weinreich, Salomon & Co., Schwarz, Spring

Street, Whitestone, Lauria, Roberts & Holland and Pisem was acting within the scope

and course of his (or its) authority as such agent, principal, employee, servant, partner,

joint venturer and representative, and was acting with the permission and consent of the

remaining Defendants listed in this paragraph.

### III.   Participating In and/or Managing Bayrock Group, Defendants Perpetrate A Pattern of RICO Predicate Acts from 2003 to at Least 2008

  *A. Misrepresentations and Concealment of Material Information To Induce Investors, Lenders and Finance Professionals to Contribute to Bayrock Group*

  57. Commencing in 2003 and continuing until present, Defendants Arif and

Satter and Bayrock Group have been conducting, and engaging in, interstate and foreign

commerce, managing Bayrock Group as a multi-state, international real estate

development and investment operation.

  58. Commencing in 2003 and continuing until at least 2008, Bayrock Group

entered into (a) investment transactions with various entities and individuals, (b) loan

applications/agreements with financial institutions, and (c) equity compensation

agreements with highly-skilled finance professionals including Plaintiffs, without

informing those entities or individuals, financial institutions or professionals of the

following facts: (1) Satter's 1998 conviction; (2) Satter's familiarity with methods of

converting corporate assets into personal income without triggering detection; and (3) the

fact that under the Arif/Satter Agreement, Satter shared management and control of

Bayrock Group and its investments, and would receive a large share of Bayrock Group's

profits (the "**Material Information**").  Defendants Arif and Satter made promises and

approved contractual provisions that favored these outsiders to entice them to enter into

the agreements.  At the time the agreements were made, Arif and Satter agreed that going forward they would simply ignore these contract provisions and promises – along with federal and state law, and IRS regulations – whenever doing so would increase their take from the Enterprise (the "**Bad Faith Practices**").  As Plaintiffs allege *infra*, ***Arif and Satter implemented the Bad Faith Practices from 2003 to at least 2008.***

59.     At the time Bayrock Group entered into (a) investment transactions with various entities and individuals, (b) loan applications/agreements with financial institutions, and (c) equity compensation agreements with highly-skilled finance professionals including Plaintiffs, Arif and Satter – and, starting in late 2005, Defendant Julius Schwarz – intended that such entities and individuals, financial institutions and finance professionals would rely upon the omissions of the Material Information and the Bad Faith Practices from Defendants' representations in connection with such transactions and agreements.

60.     ***Had each individual or entity that Bayrock Group lured into such an agreement known the Material Information, and known about the Bad Faith Practices, it would have followed a different course of action in order to protect its interests. Such individuals and entities include (a) the investors and joint venturers who agreed to embark on development projects with Bayrock Group; (b) the lenders who financed Bayrock Group investments with hundreds of millions of dollars; and (c) the finance professionals who provided valuable services and know-how worth millions of dollars to Bayrock Group in exchange for equity compensation.  In some instances, these individuals and entities sustained significant financial injury as a result of their transactions with Bayrock Group while Defendants profited from them.***

61.     As time proceeded, additional Defendants – Lauria, Schwarz, Salomon, Weinreich, Salomon & Co., and others – as set forth more fully *infra*, participated with Defendants Arif, Satter and Bayrock Group in the type of activities specified in paragraphs 57-58, *supra*.  In doing so, such additional Defendants enriched themselves at the expense of (a) the investors and joint venturers who agreed to embark on development projects with Bayrock Group and/or its subsidiaries; (b) lenders who financed Bayrock Group investments with hundreds of millions of dollars; and (c) the finance professionals who provided valuable services to Bayrock Group in exchange for equity compensation.

62.     Defendant Satter has continued this pattern of fraud in activities that Plaintiffs believe may be related to Bayrock Group and Arif until as recently as 2013. Satter currently touts online his role as Managing Director of Bayrock Group.[9]  Plaintiffs believe that discovery in this action will reveal the involvement of other Defendants named in this Complaint in such recent frauds.

63.     Along with other Defendants as time proceeded, Arif, Satter, and others working for or on behalf of Bayrock Group *sent and/or received numerous communications and/or documents in furtherance of the Bayrock Group frauds herein alleged through U.S. interstate or international mail[10] and/or wires (i.e., using the*

---

[9] A visit to www.felixsater.com made on May 26, 2015 at approximately 3:30 p.m. revealed that that website provides a link to http://www.felixsaterweb.com/, which in turn states: "Felix Sater is a real estate developer, advisor, and angel investor based out of New York, New York. *Felix currently acts as the managing director for* both *Bayrock Group* and Global Habitat Solutions" (emphasis added).

[10] By alleging that Defendants "sent and/or received" communications by U.S. interstate and international mail, Plaintiffs intend to refer to both instances in which (1) a Defendant placed such communications in post office(s) or authorized depositories for

*telephone, fax machine and/or email via the Internet)*.  The Bayrock Group frauds

therefore constitute mail and wire frauds,[11] which are included as predicate acts of

"racketeering activity" under RICO, 18 U.S.C. § 1961.

64.    A substantial number of the communications made in furtherance of the

Bayrock Groups frauds alleged *infra* occurred between individuals and/or entities who

(or that) were located in different states – or in some instances, in different countries – at

the time the communications were made or received.  This fact is evident from the nature

of Bayrock Group's multi-state and international investments.  Bayrock Group's work

required that Arif, Satter and other Bayrock Group employees travel frequently to Florida

and Arizona, and remain in daily communication with Bayrock Group employees

working out of the company's Fifth Avenue offices in New York.  Moreover, Defendant

Arif has numerous investments in located in Turkey, including a chain of large resort

hotels that he owns and which use the brand name "Rixos".[12]  Some of the individuals

providing ongoing services to Bayrock Group – for example, Plaintiff Kriss – lived, at

least part time, in locations where Bayrock Group's investment projects were being

developed, such as southern Florida.  Thus communication between employees and

agents of Bayrock Group regularly crossed state lines and the U.S.'s international

boundary.

---

mail *and* (2) a Defendant *caused* such communications to be delivered by mail or a
similar carrier.

[11] *See* 18 U.S.C. §§ 1341 and 1343 (prohibiting mail fraud, and wire fraud, respectively).

[12] Upon information and belief, the Rixos properties are owned by Arif through an entity
related to Bayrock Group.

65.     In addition, to fully benefit from its frauds, the Bayrock Group needed to transfer funds – funds that at least some Defendants knew had been obtained through the Bayrock Group frauds – across state and international boundaries and through interstate and foreign commerce.  These transfers violated 18 U.S.C. § 2314 and therefore also constitute predicate acts of "racketeering activity" under RICO, 18 U.S.C. § 1961.

66.     The Bayrock Group also engaged in two "act[s] or threat[s] involving murder [and] extortion,"[13] that constitute predicate acts of "racketeering activity" under RICO, 18 U.S.C. § 1961.

67.     The Bayrock Group frauds, transfers of converted funds and securities, and acts of extortion alleged more fully *infra* exemplify the circumstances that drove Congress to enact the civil provisions of RICO in the first place – the infiltration of organized crime into legitimate businesses such as real estate.[14]  Bayrock Group's unlawful acts were related to one another and formed ***a pattern of racketeering activity***. The frauds were perpetrated in furtherance of a common goal, to enrich Defendants Arif, Satter, Lauria, Schwarz and the Defendant attorneys and accountants who aided them. The frauds had nearly the same participants, and the victims were all third parties with something of value that the Bayrock Group needed to further enrich Defendants. Moreover, in perpetrating the Bayrock Group frauds, Defendants used the same methods over and over again, *inter alia*: (1) concealing the **Material Information** and **Bad Faith Practices**; (2) making false promises regarding compensation or investment gains that

---

[13] 18 U.S.C. § 1961(1)(A).

[14] *See, e.g.,* S. Rep. No. 2370, 81st  Cong., 16 (1950); S. Rep. No. 141-82 at 33 (1951); 111 Cong. Rec. 9567 (1969).

Defendants never intended to keep; (3) converting the fraud victims' interests; and (4)

refusing to provide their victims with access to Bayrock Group financial records.

> **B.** **Unbeknownst to Their Victims, Defendants Participate, Manage and
> Conduct Bayrock Group Flouting Federal and State Law, IRS Regulations
> and Corporate Formalities.**

<u>Defendants Arif and Satter</u>

68.    As alleged *supra*, in late 2002 or early 2003, Defendants Arif and Satter

made a deal by which Satter would manage and control Bayrock Group with Arif and

receive 30% to 50% of the profits earned from all of Bayrock Group's investment

activities.  In connection with the Arif/Satter Agreement, the two men agreed that Satter

would begin to receive payments from Bayrock Group on a routine basis as (a)

compensation for his co-management of Bayrock Group, and (b) an advance on his share

of future profits.

69.    Paying Satter millions in the form of salary or corporate distributions

meant documenting his role in Bayrock Group in financial, corporate and government

records and filings.  In the unlikely event that an investor or bank *were* to uncover

Satter's RICO conviction, such documentation would prove fatal to Bayrock Group's

plans.  Accordingly, Satter and Arif agreed that Satter's compensation and advance on

future Bayrock Group profits would be made in the form of "loans" and *ad hoc* transfers

of funds or interests to third parties, including Satter's wife, who would act as conduits

for Satter.  The structure of the above-described payments to Satter, from 2003 through

2007, allowed Arif, Satter and Bayrock Group to avoid significant tax liability, in

violation of federal and state tax law, and IRS regulations.  The structure also violated the

Operating Agreements for Bayrock Group and Defendant Bayrock Camelback.  In

addition to the payments made to Satter in lieu of standard compensation, Arif and Satter

agreed that they would transfer substantial amounts from Bayrock Group and its

investments to Satter to reimburse Satter for exorbitant personal expenses and to

contribute to other investments in which Satter and Arif would own interests in a personal

capacity.

70.     Satter received *at least* the following transfers from Bayrock Group

between 2003 and 2007, which Bayrock Group treated neither as wages nor as

distributions to a member for tax purposes at the time they were made: (2003) $355,000;

(2004) $578,201.29; (2005) $673,160.25; (2006) $654,965.20; and (2007) $1,475,085.05.

Plaintiffs believe that discovery in this action will reveal that Bayrock Group and/or its

affiliates, subsidiaries and related companies transferred additional funds to Satter in lieu

of standard compensation, as reimbursement for his personal expenses and to contribute

to other investments Satter and Arif made outside the context of Bayrock Group (together

with all other payments listed in this paragraph, the "Illegally-Structured Satter

Payments").

71.     Because the Illegally-Structured Satter Payments were not treated as

salary or regular partnership distributions, the nature of these payments is unclear.  For

example, upon information and belief, in 2004 approximately $175,000 was transferred

directly from Bayrock Group to an escrow account used in connection with Satter's

purchase of a home in Sands Point, New York for $1.75 million dollars.  Plaintiffs

believe that discovery will shed greater light on the nature of the payments to Satter.

72.     By a date in 2008, Satter had received approximately $8 million from

Bayrock Group and/or Bayrock Group subsidiaries, affiliates and related companies.  The

only individual associated with Bayrock Group who had received more than $8 million from Bayrock Group at the time was Arif.  By a date in 2008, Arif had received at least approximately $14 million.

Defendants Salomon, Weinreich & Salomon & Co.

73.     Defendants Salomon and Weinreich operate an accounting practice, Salomon & Co., in East Rockaway, Queens.  Salomon, Weinreich and Salomon & Co. have few clients that provide them with the sizeable amount of fees that Bayrock Group paid them from 2003 through 2008.  At all times relevant to this Complaint, Salomon, Weinreich and Salomon & Co. were interested at keeping the Bayrock Group account and, more generally, Arif's business, at all costs.

74.     As Bayrock Group's accountants, Defendants Salomon, Weinreich and Salomon & Co. performed the accounting work associated with the Illegally-Structured Satter Payments.  These Defendants were therefore aware, as early as a date in 2003, that Satter had a managerial role and a major ownership interest in Bayrock Group and its investments.

75.     Employed by Arif, Satter, Bayrock Group and other Defendants, Salomon, Weinreich and Salomon & Co. prepared financial statements, tax filings and related documents for Bayrock Group and its investment affiliates and subsidiaries.  Salomon, Weinreich and Salomon & Co. performed such accounting duties in a manner designed to conceal the illegality and impropriety of the Illegally-Structured Satter Payments, and more generally, to create the false impression that Bayrock Group and its investments were being operated in a routine and above-board manner.  Concealing the true nature of the payments to Satter – salary for co-managing Bayrock Group and advances on

27

Bayrock Group investment profits – effectively concealed from potential investors in Bayrock Group investments, and from future lenders, the fact that a felon convicted of a financial crime was running the operation with which they were considering doing business.  Salomon, Weinreich and Salomon & Co. as CPAs understood fully both (1) the payments to Satter violated federal and state law, and IRS regulations, and (2) to prepare and/or execute accounting documents that made these payments appear routine or ordinary was illegal and improper.

Defendant Schwarz

76.    Defendant Schwarz, acting as Bayrock Group's General Counsel and Executive Vice President starting on a date in 2005, also participated directly and indirectly in Bayrock Group's frauds and other improper and illegal activity.

77.    As General Counsel, Schwarz oversaw salary payments, partnership distributions, loans and federal and state tax filings made by Bayrock Group and each of its investment vehicles, including but not limited to Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.  In that role Schwarz also drafted and/or reviewed all transactional documents relating to Bayrock Group's loans and investments. In addition, Schwarz routinely reviewed and negotiated investments made by third parties in Bayrock Group and its subsidiaries, affiliates and related entities.

78.    Schwarz oversaw the preparation of the financial records for Bayrock Group and its investment vehicles, and oversaw the accounting work performed by Defendants Salomon, Weinreich and Salomon & Co. on Bayrock Group's behalf. Schwarz gave Salomon, Weinreich and Salomon & Co. direction and instruction, causing these Defendants to prepare financial statements, tax filings and related documents in a

manner designed to conceal improper and/or illegal Bayrock Group transactions, create the impression that Bayrock Group and its investments were being operated in a routine and above-board manner and disguise the extent of Satter's managerial role and ownership interest in Bayrock Group.

79.     Schwarz also oversaw the transactions by which Bayrock Group, and its subsidiaries, affiliates and related entities, applied for and obtained loans from financial institutions.  Schwarz typically signed the documents required by such financial institutions in order for Bayrock Group and/or its subsidiaries, affiliates and related entities to receive financing.  Some of these forms concealed the Material Information and the Illegally-Structured Satter Payments.  At the time Schwarz prepared and executed such forms, he knew or had reason to know the Material Information, and he knew or had reason to know about the Illegally-Structured Satter Payments.  At such time Schwarz also knew that concealing the Material Information and the Illegally-Structured Satter Payments was illegal and improper.

## IV.     The Details: The Investor Frauds and Related NSPA Violations

### A.     *The Initial Trump Transactions Fraud*

80.     In 2003, Bayrock Group had an office located on the 24th floor of Trump Tower located at 725 Fifth Avenue, New York, New York.  Through a leasing agent for Trump Tower, Arif and Satter were introduced to the President of the Trump Organization.

81.     During 2003, Bayrock Group had succeeded at obtaining the Trump Organization's involvement in the Bayrock Group investment in Phoenix, and the two

located in Fort Lauderdale.  The Trump Organization agreed to become involved in these projects and to have them marketed using the Trump brand.

82.     During their negotiations with the Trump Organization, ***Arif and Satter concealed the Material Information, the Bad Faith Practices and the Illegally-Structured Satter Payments***.  Had the Trump Organization known the Material Information, and been aware of the Bad Faith Practices and the Illegally-Structured Satter Payments, the Trump Organization would never have agreed to partner with Bayrock Group on the Fort Lauderdale and Phoenix projects.

83.     In a 2007 deposition in an unrelated case, Donald Trump, CEO of the Trump Organization ("Trump"), testified that Arif had assured him that Satter was not a partner in Bayrock Group.  Revealing Arif's need to add a veneer of legitimacy to Bayrock, Trump also testified that Arif had offered, in exchange for use of the Trump name alone, a 20 to 25 percent interest in Bayrock Group's overseas projects, management fees and possibly a percentage of gross revenues.

84.     Trump and the Trump Organization were harmed when the New York Times reported in December 2007 about Satter's racketeering conviction and his involvement in Bayrock Group.  Trump, a highly visible figure, suffered embarrassment due to the revelations.  He denied knowledge of Satter's conviction and involvement in Bayrock Group, and subsequently distanced himself from Arif, Satter and Bayrock Group.

85.     Defendants Salomon, Weinreich and Salomon & Co. prepared accounting documents in connection with the acquisition of Trump branding for Bayrock Group's Phoenix and Fort Lauderdale investments.  Some of these documents concealed Satter's

managerial role and ownership interest in Bayrock Group and Defendants Camelback, Merrimac and Ocean Club.

86.     For the purpose of executing or attempting to execute the above-alleged fraud upon the Trump Organization, Arif, Satter, Salomon, Weinreich and Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires.[15]  Such communications relate to, *inter alia*, the acquisition of Trump branding for Bayrock Group's Phoenix and Fort Lauderdale investments.

87.     Arif, Satter, and upon information and belief, Salomon, Weinreich and Salomon & Co. and other unknown individuals employed by or associated with Bayrock Group knew, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of the Initial Trump Transactions Fraud, and that such use was an essential part of that fraud.

**B.**     *Elizabeth Thieriot and Bayrock Ocean Club: The Thieriot Fraud and a Related Interstate Transfer of Stolen/Converted Funds*

88.     In August 2003, Arif, Satter and Bayrock Group formed Defendant Ocean Club as a holding company for Bayrock Group's interests in the real estate development project located at 500 Seabreeze Boulevard in Fort Lauderdale, Florida.  That project was often referred to as the Trump International Beach Club.

---

[15] The communications alleged to have been sent/received by "mail" throughout this Complaint include but are not limited to letters, forms, applications and documents.  The communications alleged to have been sent/received by "wires" throughout this Complaint include but are not limited to communications made by telephone, fax and email over the Internet.

89.     In the Autumn of 2003, Elizabeth Thieriot ("Thieriot"), then a resident of California, entered into a subscription agreement with Arif, Satter, Bayrock Group and Ocean Club by which Thieriot invested $1 million in the Trump International Beach Club by purchasing approximately 1 million "units" in Ocean Club.

90.     On or about November 13, 2003, Thieriot, Bayrock Group and Satter entered into a Memorandum of Understanding with respect to Thieriot's investment in Ocean Club that superseded the Autumn 2003 subscription agreement (the "Thieriot MOU"). The Thieriot MOU includes the following provisions:

a.   Bayrock Group was "currently the sole member" of Ocean Club.

b.   Ocean Club "*owns a 50% membership interest* in 550 Seabreeze Development LLC… which owns the… parcel of land located at 550 Seabreeze Blvd, Ft Lauderdale, FL on which it is developing a condo-hotel to be known as Trump International Beach Club." (emphasis added)

c.   In exchange for her $1 million investment, Thieriot would receive a 4% membership interest in Ocean Club; and

d.   "Whenever cash is distributed to the investors in [Ocean Club] and other [Bayrock Group] projects, it shall be distributed to the Investors [including Thieriot] at the same time and in proportion to their relative ownership interests."

91.     During the negotiations with Thieriot for an investment in Ocean Club, *Ocean Club, Arif and Satter concealed the Material Information, the Bad Faith Practices and the Illegally-Structured Satter Payments from Thieriot*. Had they revealed the Material Information to her, and had she been aware of the Bad Faith

32

Practices and the Illegally-Structured Satter Payments, Thieriot would never have made the $1 million investment in Ocean Club; she would have pursued more trustworthy investment opportunities elsewhere.

92.     On or about November 13, 2003, or a date shortly thereafter, Thieriot wired approximately $1 million dollars from a California bank account to a bank account located in either Florida or New York specified by Ocean Club, purchasing the 4% membership interest in Ocean Club.

93.     On or about September 2004, Ocean Club sent Thieriot an IRS Form 1065 for the calendar year 2003 stating that Thieriot was a 4% owner of Ocean Club and that she had contributed $1 million in capital during the year 2003.

94.     In April 2006, Thieriot brought an action against Ocean Club in New York State Supreme Court, County of New York, seeking an accounting for all profits, losses and expenses for Ocean Club for the period of September 1, 2003 to April 2006.  (*In re Application of Elizabeth L. Thieriot*, Index No. 105434/2006) (the "Thieriot Action").

95.     The Thieriot Action alleges that in December 2005 Thieriot demanded access to Ocean Club's records pursuant to Florida statutory law.   It further alleges that although Ocean Club had provided her with some documents, it failed to permit her access to all the records that Ocean Club was required to keep under Florida law.

96.     On a date thereafter, Thieriot received an IRS Form 1065 for calendar year 2005 *not for her interest in Ocean Club, but instead for Ocean Club's interest in 500 Seabreeze LLC* (the "2005 Ocean Club K-1").  The 2005 Ocean Club K-1 states that for all of the calendar year 2005, Ocean Club only owned *10 percent (10%)* – not 50% as stated in the Thieriot MOU.  The 2005 Ocean Club K-1 also states that Ocean Club

received $1.5 million in "withdrawals and distributions" in 2005.  The 2005 Ocean Club K-1 had apparently been sent to Thieriot in a rushed attempt to make Bayrock Group appear more transparent after ***Defendants had, in complete disregarded of their obligations to Thieriot under the Thieriot MOU, sold 4/5ths of Ocean Club's membership interest in 500 Seabreeze without modifying that document, obtaining Thieriot's consent or notifying her***.  This document was prepared and/or approved by Defendants Schwarz, Salomon, Weinreich and Salomon & Co.

97.     The Thieriot Action alleged that the $1.5 million distribution/payment that appears on the 2005 Ocean Club K-1 represents the amount paid by 500 Seabreeze to Ocean Club in exchange for Ocean Club reducing its ownership interest in 500 Seabreeze from 50% to 10%.  Moreover, it alleges that Thieriot had not received any of the proceeds of such sale, despite the fact under the Thieriot MOU, in such an event Ocean Club was required to pay Thieriot a portion of such proceeds.

98.     In fact, the $1.5 million was paid by a third party, a Florida-based developer, to 550 Seabreeze for distribution to Ocean Club, to purchase 80% of Ocean Club's membership interests in 550 Seabreeze.  Upon information and belief, the $1.5 million was wired to a Florida bank account in Ocean Club's name and on a date thereafter a portion of such funds greater than $5,000.00, or all of the funds, was/were wired to the New York bank account(s) of Bayrock Group, Arif and/or Satter.

99.     Upon information and belief, Defendants Salomon, Weinreich and Salomon & Co. prepared accounting documents in connection with Thieriot's investment in Ocean Club, some of which concealed Satter's managerial and ownership interests in Bayrock Group and Ocean Club.

34

100.    Defendants Schwarz, Salomon, Weinreich and Salomon & Co., each participated in (1) the sale of Ocean Club's interests in 500 Seabreeze, and (2) the refusal to provide Thieriot with a full and fair accounting of Ocean Club. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

101.    For the purpose of executing or attempting to execute the above-alleged fraud upon Thieriot, Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires.  Such communications relate to, *inter alia*, the Thieriot investment, the unreported distribution of $1.5 million to Ocean Club, the reduction of Ocean Club's ownership interest in 550 Seabreeze and the refusal to provide Thieriot with a full and fair accounting of Ocean Club and 500 Seabreeze.

102.    Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Ocean Club, Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of the Thieriot Fraud, and that such use was an essential part of that fraud.

103.    The transfer of some or all of the $1.5 million transferred by Ocean Club to Bayrock Group, Arif and/or Satter, constituted the transfer in interstate commerce of money stolen, converted and/or taken by fraud, because a portion of the $1.5 million represented proceeds to which Thieriot was entitled but had been denied.  Arif, Satter and

Ocean Club, who knew the terms of the Thieriot MOU, knew that the transferred portion of the $1.5 million was stolen, converted and/or taken by fraud.

> C.  *The Camelback Plaza Fraud and Related Money Transfers*

104.    In 2003, Arif, Satter and Bayrock Group began investment negotiations with Camelback Plaza Development LLC ("Camelback Plaza"), an Arizona company that owned a leasehold interest and fee title option in a property located in Phoenix, Arizona, and Camelback Plaza's two co-managing members, Ernest R. Mennes ("Mennes") and Irving L. Bush ("Bush").

105.    In October 2001, Camelback Plaza placed the Phoenix property into bankruptcy proceedings.  Camelback Plaza developed a Chapter 11 Bankruptcy Plan for the Phoenix property that entailed construction of a Trump-branded property financed by loans with Bayrock Group overseeing the process.  In developing the Plan, the parties agreed that Bayrock would contribute at least $4.5 million in equity to the development property.  The Chapter 11 Plan was confirmed on February 12, 2004.  **While negotiating with Camelback Plaza with respect to the Phoenix property,** *Defendants Arif and Satter concealed the Material Information, the Bad Faith Practices and the Illegally-Structured Satter Payments.*

106.    In connection with Bayrock Group's investment in Camelback Plaza's Phoenix property, Arif, Satter and Bayrock Group created Defendant Camelback, a holding company for Bayrock Group's interests in the Phoenix property.

107.    Pursuant to the agreements between Bayrock Group and Camelback Plaza, the two parties formed an investment vehicle in which Bayrock Group, through Bayrock Camelback, had a controlling interest – Camelback Development Partners LLC, an

Arizona limited liability corporation ("CDP").  Under the deal, Camelback Plaza conveyed ownership of the Phoenix property to CDP.  Had Bayrock Group, Arif and Satter *revealed* the Material Information to Camelback Plaza, and had Camelback Plaza been aware of the Bad Faith Practices and the Illegally-Structured Satter Payments, Camelback Plaza would have rejected Bayrock Group's proposals, never have entered into the Bankruptcy Plan, and never have conveyed the Phoenix property to CDP.

108.    In 2006, CDP obtained a $12.2 million loan from Capmark Finance f/k/a GMAC Mortgage Corporation ("Capmark"), a California corporation.  The version of CDP's Operating Agreement effective as of the date Capmark agreed to the $12.2 million loan, states that until the loan was fully repaid, CPD "shall not incur any debt, secured, unsecured, direct or contingent (including, without limitation, guaranteeing any obligations), other than [the $12.2 million Capmark loan], any and all obligations relating to the [the $12.2 million Capmark loan], or otherwise expressly permitted under the [Capmark] Loan Agreement and/or other [Capmark] Loan Documents…"  Before having fully repaid the $12.2 million loan, CDP modified that loan to obtain an additional $5.1 million from Capmark.

109.    In January 2007, Camelback filed a Complaint and an Emergency Application for Appointment of Receiver in Arizona Superior Court for Maricopa County (the "Arizona Action"), naming as defendants, *inter alia*, Bayrock Group, Bayrock Camelback, Arif, Satter and Schwarz (***Camelback Plaza Development v. Bayrock Group et al.,*** CV 2007-000117).  Camelback Plaza also named Plaintiff Kriss as a defendant, although neither of the two documents filed by Camelback alleges any action taken specifically by Kriss in connection with the Phoenix investment.

110.    The Arizona Action alleges that in the initial negotiations in 2003 and early 2004, Bayrock Group represented to Camelback Plaza that Bayrock Group, as controlling member of CDP, would retain Ernst & Young as the accountants for the redevelopment of the Phoenix property and would provide Camelback Plaza with financial information prepared pursuant to generally accepted accounting principles.

111.    The Arizona Action additionally alleges that the parties agreed that the proceeds from the $12.2 million Capmark loan would be used to retire a Capmark loan, and other claims against Camelback Plaza that were outstanding at the time the Bankruptcy Plan was confirmed in February 2004.

112.    The Arizona Action further alleges that Bayrock Group, Defendant Camelback, Arif and Satter never intended to honor the promises they had made to Camelback Plaza during the negotiations.

113.    The Arizona Action alleges the following contractual breaches and misconduct on the part of Bayrock Group, Bayrock Camelback, Arif, Satter and Schwarz:

a.  Bayrock Camelback and other Defendants failed to inform Camelback Plaza of the criminal histories of Satter and Lauria;

b.  They did not retain Ernst & Young as accountants;

c.  They did not maintain financial information prepared pursuant to generally accepted accounting principles;

d.  They refused to provide financial information about CDP to Camelback Plaza when Camelback Plaza asked for it;

e.  Fully aware of the prohibition on the incurring of additional debt by CDP under CDP's Operating Agreement, they caused CDP to modify the

original $12.2 million loan and incur an additional $5.1 million in debt

from Capmark, allegedly secured by a deed of trust against the Phoenix

property;

f.   They continuously skimmed funds from CDP for their exclusive benefit

and at the detriment of Camelback Plaza, including (1) funds that paid for

their personal expenses; (2) over $100,000 to pay legal bills for other

investments; and (3) funds to pay for the development of a *different*

*property* that would use the Trump International branding that Arif, Satter

and Bayrock Group had promised to Camelback Plaza;

g.   A former representative of Bayrock Group had admitted to Mennes that

Arif, Satter and Bayrock Camelback had misappropriated CDP funds; and

h.   Between $4 and $10 million of CDP cash assets under Bayrock

Camelback's management could not be accounted for.

114.   In addition, the Arizona Action alleges that on or about February 25, 2006,

Satter called Mennes, and threatened to arrange for Satter's cousin to "electrically shock

[ ] Mennes' testicles, cut off [ ] Mennes' legs, and leave [ ] Mennes dead in the trunk of

his car if [ ] Mennes disclosed to any party any of suspected improprieties and past

criminal conduct involving the Bayrock Defendants and CDP."

115.   Defendants Salomon, Weinreich and Salomon & Co. prepared accounting

documents in connection with Bayrock Group's investment in CDP, some of which

concealed Satter's managerial role and ownership interests in Bayrock Group and Ocean

Club.  In addition, upon information and belief, Salomon, Weinreich and Salomon & Co.

prepared accounting documents in connection with the additional $5.1 million in

financing obtained from Capmark by CDP, knowing that the financing violated CDP's
Operating Agreement and would materially damage Camelback Plaza's membership
interest in CDP.

116.    Defendant Schwarz had primary responsibility for negotiating the terms of
the additional $5.1 in financing obtained from Capmark by CDP.  Schwarz prepared
and/or executed the agreements, applications and other paperwork in connection with that
additional financing.  At the time Schwarz knew that the $5.1 in financing violated
CDP's Operating Agreement and would materially damage Camelback Plaza's
membership interest in CDP.

117.    The Arizona Action alleges that Camelback Plaza sustained significant
financial injury due to the above-recounted actions by Defendants.

118.    For the purpose of executing or attempting to execute the above-alleged
fraud upon Camelback Plaza, Defendants Arif, Satter, Schwarz, Salomon, Weinreich,
Bayrock Camelback, Salomon & Co. and, upon information and belief, other unknown
individuals employed by or associated with Bayrock Group, sent and/or received
communications through the U.S. interstate and international mail and wires.  Such
communications relate to, *inter alia*, the Camelback Plaza investment, CDP's
negotiations with Capmark for the additional $5.1 million loan and the improper and
unauthorized use of CDP funds to pay for personal expenses of Defendants and for other
Bayrock Group investments.

119.    Arif, Satter, Schwarz, Salomon, Weinreich, Bayrock Camelback, Salomon
& Co. and, upon information and belief, other unknown individuals employed by or
associated with Bayrock Group, knew, expected, reasonably foresaw, and intended that

the facilities of U.S. interstate and international mail and wires would be used in furtherance of the Camelback Plaza Fraud, and that such use was an essential part of that fraud.

120.    Upon information and belief, Arif, Satter, Schwarz and Camelback Bayrock transferred a portion of the additional $5.1 in financing obtained from Capmark by CDP exceeding $5,000.00 through interstate commerce or foreign commerce.  Arif, Satter, Schwarz and Camelback Bayrock, who knew the terms of the CDP Operating Agreement, knew that the transferred portion of the $5.1 million was stolen, converted and/or taken by fraud.

D.    *Trump SoHo Fraud*

121.    In 2005, as explained more fully *infra*, Plaintiff Ejekam, who was providing services to Bayrock Group, identified a large parcel of land in lower Manhattan on the border of the SoHo Cast Iron Historic District, and therefore not subject to that District's height and other design restrictions.  It was a major find: Not only did the zoning of the parcel accommodate a 47-story condominium hotel to be built; the owner was looking to sell and wanted to do so without using a broker.  This "holy grail" of real estate acquisitions allowed Arif, Satter and Bayrock Group to become investment partners in the Trump SoHo condominium-hotel alongside the Trump Organization and the Sapir Organization, the company of (now deceased) Russian billionaire and New York real estate investor Tamir Sapir.

122.    In connection with the investment in Trump SoHo, Arif, Satter and Bayrock Group created Defendant Spring Street as a holding company for Bayrock Group's ownership interest in the Trump SoHo.

123.    During their negotiations with the Trump Organization and the Sapir

Organization concerning the Bayrock Group and Defendant Spring Street's investment in

the Trump SoHo, Defendants Arif, Satter, and Spring Street *concealed the Material*

*Information, the Bad Faith Practices and the Illegally-Structured Satter Payments*.

Further, as Donald Trump has testified in another lawsuit, Arif had assured Trump that

Satter was not a partner in Bayrock Group/Spring Street.  Had these Defendants revealed

the Material Information to the Trump and Sapir Organizations at the time of the

negotiations, and had the two organizations been aware of the Bad Faith Practices and the

Illegally-Structured Satter Payments, the two organizations would never have allowed

Bayrock Group/Spring Street to invest in Trump SoHo.

124.    In connection with its investment in the Trump SoHo, the Sapir

Organization transferred money to Bayrock Group or Spring Street – or another affiliate

or subsidiary of Bayrock Group or an entity otherwise related to Bayrock Group.  The

Sapir Organization reasonably relied upon the representations and omissions made by

Arif, Satter and Spring Street, alleged *supra* in making such transfers.

125.    Donald Trump, the Trump Organization and the Sapir Organization were

harmed when the New York Times reported in December 2007 about Satter's

racketeering conviction and his involvement in Bayrock Group.

126.    In addition, after the New York Times article appeared, iStar, which had

lent approximately $300 million to the Trump SoHo developers combined (including

Bayrock Group) demanded an audit of Spring Street's books.  The Sapir Organization

demanded a forensic audit of Spring Street's finances.

127.    Defendants Schwarz, Salomon, Weinreich and Salomon & Co. prepared, submitted and/or executed accounting documents used by Bayrock Group in obtaining and negotiating the terms of its investment in Trump SoHo, including documents concealing (1) Satter's managerial duties and ownership interests with respect to Bayrock Group and Spring Street, and/or (2) the Illegally-Structured Satter Payments.

128.    Arif, Satter, Schwarz, Salomon, Weinreich, Spring Street, Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires.  Such communications relate to, *inter alia*, Bayrock Group's investment in the Trump SoHo.

129.    Arif, Satter, Schwarz, Salomon, Weinreich, Spring Street, Salomon & Co. and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, knew, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of the Trump SoHo Fraud, and that such use was an essential part of that fraud.

130.    Fendi Casa, the furniture, design and "lifestyle" division of the Italian fashion company Fendi, provided the interior furnishings of Trump SoHo.  Arif, Satter, Schwarz and Spring Street caused money received from the Sapir Organization for the Trump SoHo to be transferred from a bank account of Bayrock Group, Spring Street and/or another affiliate or subsidiary of Bayrock Group or an entity otherwise related to Bayrock Group, into interstate or foreign commerce, to, *inter alia*, make payments to Fendi Casa.  These payments were made in connection with the purchase of furnishings, materials and design services for the Trump SoHo.  At the time Arif, Satter, Schwarz and

Spring Street caused such transfers, they knew that such funds from the Sapir

Organization had been taken by fraud.

**V.**     **The Details: The Lender Frauds**

131.     In order to proceed with its investments, Bayrock Group required debt

financing.  Bayrock Group, and/or its subsidiaries, affiliates and related entities, applied

for and received various forms of debt financing from financial institutions.  ***Each and***

***every one*** of the applications for such financing, made to financial institutions and

executed by a principal of Bayrock Group (typically Schwarz), ***concealed the Material***

***Information, the Bad Faith Practices and the Illegally-Structured Satter Payments***

from the financial institutions.  Had the financial institutions been aware of these facts,

they would have denied to Bayrock Group, and/or its subsidiaries, affiliates and related

entities, such financing.

132.     The below list represents some of the debt financing obtained by Bayrock

Group, and/or its subsidiaries, affiliates and related entities, during the period 2003

through 2007:

| Financial Institution/Date | Bayrock Investment | Financing Obtained |
|---|---|---|
| iStar Financial, **2005** | Trump SoHo through use of Defendant Spring Street | $275 million |
| Capmark Finance, Inc. f/k/a GMAC Mortgage Corporation, **2006** | Trump Phoenix through use of Defendant Camelback | $17.3 million |
| Capmark Finance Inc., **2006** | Waterpointe/Whitestone through use of Defendant Whitestone | $27.65 million |

133.     Defendant Schwarz played a critical role in the Capmark Finance Lender

Frauds referenced *supra*.  As a partner at Akerman Senterfitt LLP, Schwarz had worked

on transactions involving Capmark Finance, Inc.  His involvement in obtaining of $44.95

million in financing from Capmark wrongfully assured Capmark that it could trust the representations that Defendants Arif, Satter, Schwarz, Bayrock Group, Camelback, Whitestone and Spring Street had made in connection with the loan applications for the Camelback and Whitestone projects.

134.    Defendants Salomon, Weinreich and Salomon & Co. prepared accounting documents used by Defendants Bayrock Group, Camelback, Whitestone and Spring Street for the purpose of obtaining debt financing from iStar Financial and/or Capmark Finance.  Some of these documents concealed Satter's managerial and ownership interests in Bayrock Group, Camelback, Whitestone and Spring Street.

135.    iStar Financial and Capmark Finance Inc. were harmed by the above-alleged frauds.  Upon information and belief, iStar Financial engaged in expensive unanticipated audits of Bayrock Group and Spring Street after that lender had learned about Satter's criminal background, and his managerial role and ownership interest in Bayrock Group, from the December 2007 New York Times article.  Capmark Finance was injured when the Bayrock entity that received the financing for the Whitestone condominium project, 151-45 Sixth Road Whitestone Partners LLC, defaulted on a $27.675 million note.

136.    Plaintiff believes that discovery in this action will reveal numerous transfers by numerous Defendants of portions (greater than $5,000.00) of the funds obtained from iStar Financial and Capmark Finance Inc. through the three Lender Frauds alleged *supra*.  Arif, Satter, Schwarz, Camelback, Whitestone and Spring Street knew such transferred funds had been stolen, converted or taken by fraud by virtue of their involvement in one or more of the Lender frauds.  Plaintiffs believe that some of these

transfers were made in interstate or foreign commerce, given that Camelback is located in Arizona, and that Bayrock Group was also engaged in real estate developments in Florida, New York, Europe and Turkey.  Thus Plaintiffs expect to add additional NSPA violations to the list of predicate acts establishing the pattern of racketeering perpetrated by Bayrock Group.

137.    For the purpose of executing or attempting to execute the above-alleged frauds upon iStar Financial and/or Capmark Finance Inc., Arif, Satter, Schwarz, Salomon, Weinreich, Salomon & Co., Camelback, Whitestone and Spring Street, and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through U.S. interstate and international mail and wires.  Such communications relate to, *inter alia*, (a) Bayrock Group's investment in the Trump SoHo and related financing; (b) Bayrock Group's investment in Trump Phoenix and related financing; and/or (c) Bayrock Group's investment in the Whitestone condominium project and related financing.

138.    Arif, Satter, Schwarz, Salomon, Weinreich, Salomon & Co., Camelback, Whitestone and Spring Street, and, upon information and belief, other unknown individuals employed by or associated with Bayrock Group, knew, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of one or more of the Lender Frauds, and that such use was an essential part of that/those fraud(s).

## VI.   The Details: The Financial Professional Frauds and Related Violations of the NSPA

### A.   *The Financial Professional Frauds*

139.   In late 2002 or early 2003, when Defendants Arif and Satter agreed to manage and operate Bayrock Group in a manner maximizing their personal gain at the expense of third parties, the two understood that they would require the assistance of highly-skilled finance professionals to generate profits from the Bayrock Group's investments.  They also understood that such professionals command annual salaries from such employers as investment banks in the high six-figures and low seven-figures.  Such high salaries conflicted with their goal of maximizing their personal gain from Bayrock Group.  Arif and Satter understood that Bayrock Group's investments might generate hundreds of millions of dollars in future profits, and that participation in such profits would offer an appealing alternative to annual salaries between $500,000 and $1.5 million.  At the same time, Arif and Satter did not wish to share the profits generated by Bayrock Group investments in any meaningful way.

140.   Arif and Satter thus embarked on a four-year run of enticing talented finance professionals to provide valuable services to Bayrock Group and its investments in exchange for empty promises of vesting limited liability company membership interests in Bayrock Group and some of its subsidiaries and affiliates.  Neither Arif nor Satter ever intended to honor such promises, which were the central feature of the compensation agreements that the finance professionals entered into with Arif, Satter, Bayrock Group and Bayrock Group entities starting in 2003.

141.   Plaintiffs Kriss and Ejekam are two of these professionals.  Another is Beau Woodring, who is not a party to this action.

47

142.    Starting in 2005, when he began as Bayrock Group's General Counsel and Vice President, Schwarz negotiated and/or drafted the terms that would be used in compensation agreements for Plaintiffs Kriss and Ejekam, and other professionals.  He also negotiated and/or drafted the terms of an agreement by which, as alleged more fully *infra*, Woodring ceased providing services to Bayrock Group, and traded in partially-vested membership interests in two Bayrock Group investment entities for a 10% fully-vested membership interest in one such vehicle.

143.    At the time Arif, Satter, Schwarz, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street negotiated with Plaintiffs and Woodring, ***these Defendants concealed Material Information,[16] the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation***.  Reasonably relying on the representations of Arif, Satter, Schwarz, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street about equity compensation, Plaintiffs and Woodring entered into equity compensation agreements with some or all of those defendants.  Had Plaintiffs and Woodring been aware of the concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation, Plaintiffs and Woodring would have had the

---

[16] Plaintiffs knew that Satter had a significant stake in Bayrock Group and its investments.  They were also aware that he had a hand in the control and management of Bayrock Group.  However, neither Plaintiff, nor Woodring was aware at the time he entered into his equity compensation agreement(s) of either (1) Satter's 1998 conviction for securities fraud/money laundering/racketeering, or (2) Satter's familiarity with methods of converting corporate assets into personal income without causing detection.  Neither Plaintiff learned about Satter's RICO conviction until a date in or after December 2007.

opportunity to make an informed decision about their equity compensation and professional futures.

      B.    *The Unlawful Conversion and/or Theft of the Finance Professionals'*
            *Membership Interests and Rights in Bayrock Group Investment Entities*

     144.   In addition to fraudulently inducing Plaintiffs and Woodring to enter into equity compensation agreements, Defendants also converted the membership interests transferred to them under those agreements in two ways.

     145.   First, Plaintiffs and Woodring owned membership interests in Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and/or Spring Street that were vested at times when the Illegally-Structured Satter Payments were made.  Such payments represented distributions of the proceeds of Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and/or Spring Street when made.  Under the equity compensation agreements, Plaintiffs and Woodring were entitled to receive distributions when another member of Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and/or Spring Street received such distributions.  However, Plaintiffs and Woodring never received distributions from those entities at the time the entities distributed proceeds to Satter.

     146.   Defendants Schwarz, Salomon, Weinreich and Salomon & Co. approved some or all of the Illegally-Structured Satter Payments and/or created documentation to conceal the nature of such Payments.  They also knew the terms of the equity compensation agreements into which Plaintiffs and Woodring had entered.  Thus in some instances, Schwarz, Salomon, Weinreich and Salomon & Co. knew or had reason to know that by approving and or creating documentation to conceal the nature of the distributions from Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone

and/or Spring Street, they were harming the rights of Plaintiffs and/or Woodring to obtain distributions as members of one or more of those entities under their equity compensation agreements.

147.    Second, as alleged more fully *infra*, in 2007, Defendants structured, entered into and/or facilitated a $50 million transaction that disavowed membership interests held by Plaintiffs and Woodring.  This $50 million investment by Icelandic private equity behemoth FL Group (the "FL Group Investment"), resulted in the distribution of the company proceeds of Defendants Merrimac, Camelback, Whitestone and Spring Street to Bayrock Group, and then distributions from Bayrock to Arif, Satter and Schwarz.  Under the terms of the equity compensation agreements and the operating agreements for these entities, Plaintiffs and Woodring should have received distributions at the time of the distributions to Bayrock Group, Arif, Satter and Schwarz.  The only funds received by Plaintiffs and/or Woodring in connection with the FL Group Investment was a $500,000 "bonus" paid to Plaintiff Kriss in 2007.  That amount represents only a small fraction of the millions in distributions to which Plaintiff Kriss was entitled at the time it was made.

148.    In addition, Arif, Satter and Schwarz used proceeds created from the FL Group Investment to make improper and/or illegal payments to Salomon, Weinreich, Salomon & Co., Lauria, or to third parties for the benefit of Arif and Satter.  Such payments include a purported professional "fee" of approximately $1.5 million relating to the FL Group Investment to Lauria.  Lauria, who had worked alongside with Satter on the White Rock/State Street securities fraud and money laundering racket – but in contrast to Satter had been sentenced to five years of probation and one year of home confinement

for his participation in that racket – had no significant professional finance or real estate background prior to the consummation of the deal.

149.    For the purpose of executing or attempting to execute the above-alleged frauds upon Plaintiffs and Woodring, Defendants, and upon information and belief, other unknown individuals employed by or associated with Bayrock Group, sent and/or received communications through the U.S. interstate and international mail and wires. The communications relate to, *inter alia*, (a) negotiations with Plaintiffs and Woodring over their equity compensation agreements; (b) the Illegally-Structured Satter Payments; and (c) the FL Group Investment.

150.    Defendants, and upon information and belief, other unknown individuals employed by or associated with Bayrock Group knew, expected, reasonably foresaw, and intended that the facilities of U.S. interstate and international mail and wires would be used in furtherance of each of the frauds perpetrated against Plaintiff Kriss, Plaintiff Ejekam and Beau Woodring, and that such use was an essential part of the frauds.

151.    While negotiating the terms of the FL Group Investment, Defendants and FL Group knew that pursuant to the terms of their equity compensation agreements Kriss, Ejekam and Woodring owned membership interests in one or more of Merrimac, Camelback, Whitestone and/or Spring Street.  Nevertheless the parties entered into a transaction that was based upon the false assumption that Bayrock Group owned 100% of the membership interests in those four entities.

152.    At the time of the FL Group Investment, Bayrock Group had already transferred more than 61% of each these four entities' membership interests (with respect

to profit participation), with 50% of such interests in each of those entities owned by Satter, 10% owned by Kriss and 1.5% owned by Schwarz.

153.     Nevertheless, the FL Group Investment, initially conceived as a sale to FL Group of approximately 62% of the membership interests in those entities, effectively transferred the right to receive profits attached to the professionals' membership interests in the four Bayrock Group investment vehicles *from Bayrock Group* to FL Group. Defendants, including Merrimac, Camelback, Whitestone and Spring Street, stole or wrongfully converted the vested membership interests of Kriss, Ejekam, and Woodring, and then effectively sold these to FL Group.   Those stolen or wrongfully converted vested membership interests are "securities" within the meaning of 18 U.S.C. § 2315. The FL Group Investment effectively transferred those securities across "a state or United States boundary" within the meaning of 18 U.S.C. § 2315.

154.     As alleged more fully below, the FL Group Investment transferred the $50 million through Merrimac, Camelback, Whitestone and Spring Street, which then distributed the funds directly to Bayrock Group.  However the $50 million was wired directly from FL Group to a bank account in the name of Bayrock Group.  From there, Arif, Satter, Schwarz and Lauria caused those funds, which included moneys to which Kriss, Ejekam and Woodring were entitled by virtue of their right to distributions as members of the four entities, to be transferred in interstate or foreign commerce.  For example, Arif, Satter, Schwarz and/or Lauria caused the transfer of approximately $1.4 million Bayrock Group's bank account in the U.S. to a French person or entity or bank for an investment in Les Ambassadeur Hotel in Juan Les Pins, France.

155.    At the time Arif, Satter, Schwarz and Lauria caused such transfers to be made, each knew that the vested membership interests of Plaintiffs and Woodring entitled them to distributions from the $50 million received from FL Group. Each of these defendants therefore knew that a portion of that $50 million had been stolen, converted or taken by fraud.

## VII.    The Details: The Fraud Against Plaintiff Jody Kriss

### A.    The Beginning

156.    Plaintiff Jody Kriss received a Bachelor of Science in Economics from The Wharton School of the University of Pennsylvania in 1997.  He is currently the Principal and Co-Founder of East River Partners LLC, a residential real estate development and investment firm conducting residential real estate projects in Manhattan and Brooklyn.

157.    Kriss began his career as an Analyst and Project Manager at the Athena Group where he helped execute the financing and development of 838 Fifth Avenue, a condominium located on Central Park at 65th Street that was the first in New York City to reach $2,000 per square foot in sales in 1999.

158.    In 2001, Plaintiff Jody Kriss commenced work for a boutique real estate investment banking firm in New York City, APC Realty Advisors ("APC").  His job at APC was to prepare analysis and presentations of investment opportunities for potential investors.  At the time, Satter was working at APC, his job being to originate business for the company – that is, to identify clients needing assistance with raising capital for real estate projects.  Kriss and Satter worked together on some projects.

159.    Kriss left APC in September 2002 after management changes occurred. After leaving, Kriss began to live part-time in Miami, Florida to pursue professional/investment opportunities there.

160.    In the Autumn of 2002, Arif emailed or telephoned Kriss to inform him that he (Satter) was working with Arif in connection with Bayrock Group's possible acquisition of a hotel in Miami Beach.  Arif sought Kriss' assistance with the due diligence review for that potential acquisition.  Kriss agreed to look at the hotel.

161.    On a date in or around December 2002, at Satter's request, Kriss joined Satter and Arif on a property tour of the Miami Beach hotel and attended several meetings about the possible acquisition of the hotel with these two defendants.

162.    Early in 2003, Satter contacted Kriss and informed him that Bayrock Group had entered into an agreement to acquire a controlling equity interest in an entity facing bankruptcy that owned a large property in Phoenix, Arizona.  Bayrock Group invited Kriss to accompany Satter on a trip to Phoenix to review the property.  Bayrock Group's investment in the Phoenix property was managed through a subsidiary of Bayrock Group, Defendant Camelback.

B.    *The Initial Bayrock Group/Kriss Agreement*

163.    On the flight returning from Phoenix to New York City, Satter informed Kriss that he had reached an agreement with Arif that Arif would contribute capital to Bayrock Group and its investment activities, that Satter would help Arif run the company's affairs, and that in return Satter would receive 50% of the profits of Bayrock Group's investments.  Satter proposed that Kriss provide his professional services to Bayrock Group in exchange for 10% of the profits from Bayrock Group's investment

activities.  Under the proposal, Kriss would receive the 10% from Bayrock Group, and

Satter's share of the profits would be reduced to 40%.  On information and belief, Satter

never intended to honor his oral promise to pay Kriss profits from Bayrock Group;

instead, he made the promise to obtain Kriss' valuable professional services in exchange

for compensation that was significantly below market-rate given Kriss' substantial talents

and pedigree.

164.   Kriss accepted Bayrock Group's offer, and sometime in Spring 2003 the

agreement between Kriss and Bayrock Group was memorialized in a letter written by

Satter, but written so as to appear to have been drafted by both Satter and his wife.  The

letter states:

> [W]e have granted you interests in entities formed or to be
> formed by either or both of us, which in turn hold interests
> in Bayrock projects.  In the future, you may receive
> membership interests directly from Bayrock Group or one
> of its affiliated entities.

165.   Kriss was made Bayrock Group's Director of Finance.  In that role, Kriss

took on the following responsibilities: (1) analyzing and evaluating new investment

opportunities for Bayrock Group; (2) finding additional sources of capital for Bayrock

Group's investment projects; and (3) overseeing the development process at each of

Bayrock Group's Fort Lauderdale, Phoenix and New York City projects, including

obtaining governmental and regulatory approvals.  Kriss served as Bayrock Group's

Director of Finance through mid-September 2007, when he took a leave of absence from

the company.

166.   In 2003 and 2004, Bayrock Group made a series of investments that Kriss

helped spearhead.  These included investments in (1) Midtown Miami, a 56-acre parcel

of land located close to midtown Miami being developed for both residential and retail use; (2) Banyan Bay, a 405-unit luxury condominium complex on 17.5 acres located very close to the Midtown Miami site; (3) a Fort Lauderdale condominium/hotel hybrid project that became known as Trump International Beach Club; and (4) a Fort Lauderdale condominium/hotel hybrid project that later became known as the Trump International Hotel and Tower Fort Lauderdale.

C.   *The 2004 Bayrock Group/Kriss Agreement*

167.   On June 29, 2004 Kriss entered into a written agreement with Bayrock Group, Arif, Satter and Defendants Camelback, Ocean Club and Merrimac (the "2004 Kriss Agreement"). The 2004 Kriss Agreement provides that Bayrock Group would employ Kriss on a full-time basis as Director of Finance for a three-year term, and that Kriss would "render his services in New York City and/or Miami/Ft Lauderdale and/or such other place(s) to be mutually agreed upon by the parties."

168.   Under the 2004 Kriss Agreement, Kriss was to receive $10,000 per month in taxable wages. The 2004 Kriss Agreement also provided Kriss, as additional compensation for his services, with the following membership interests in entities in which Bayrock Group was a controlling member: (1) a 10% membership in Defendant Ocean Club; (2) a 10% membership interest in Defendant Merrimac; and (3) a 5% membership interest in Defendant Camelback. The Agreement states that the membership interests in these entities granted to Kriss "will be set forth in the operating agreements of the following affiliated entities: Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC." The 2004 Kriss Agreement further states

that once certain conditions were met, Kriss would "receive distributions in the aforesaid limited liability companies in the proportions set forth in said operating agreements."

169.    The 2004 Kriss Agreement further provides:

> In event of termination of employment… [Kriss'] right to receive any further compensation as a member of any of the aforesaid limited liability companies shall be limited as follows: a) in the event employee is terminated by [Bayrock Group, Kriss] shall be deemed fully vested [and] b) in the event [Kriss] leaves voluntarily during the term hereof, he shall only be vested on a prorated basis for the term served under this agreement.

170.    While conducting negotiations with Kriss over the 2004 Kriss Agreement, Arif, Satter, Ocean Club, Merrimac and Camelback **concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation.** Had Arif or Satter informed Kriss of these facts, Kriss would either have pursued other professional opportunities or demanded a high six-figure, or low seven-figure, annual salary for each year he provided valuable services to Defendants.

D.    *The 2005 Bayrock Group/Kriss Agreement*

171.    In 2005, Bayrock Group hired Defendant Julius Schwarz as its Executive Vice President and General Counsel from law firm Akerman Senterfitt, which had represented Bayrock Group in connection with various transactions.  Bayrock Group and Schwarz engaged in lengthy negotiations over the form of Schwarz' compensation. Defendants Salomon, Weinreich, Salomon & Co., accountants and Defendant Mel Dogan, an attorney, representing Bayrock Group, took part in these negotiations.  The parties ultimately agreed that Schwarz would be paid partially with profit participation in the form of vesting membership interests in Bayrock Group and some of Bayrock

Group's subsidiaries.  Schwarz's agreement was crafted by Defendants Salomon,

Weinreich, Salomon & Co. and Dogan, who knew at the time that the part of Schwarz'

compensation package dealing with profit participation would be used in compensation

agreements for others providing services to Bayrock Group, including Satter and Plaintiff

Kriss.  The extent of each of their profit participation would differ – Satter receiving a

much larger share than either Kriss or Schwarz, and Schwarz receiving a considerably

smaller share than Kriss' 10%.

172.    Around the time in 2005 when Schwarz's compensation agreement was

presented to Schwarz, Kriss was asked to amend and/or restate his existing compensation

agreement with Bayrock Group so that it would conform to the profit participation

portion of Schwarz's compensation agreement.

173.    Upon information and belief, the 2005 compensation agreements for

Schwarz, Satter and Kriss granted each of them membership interests in Bayrock Group

itself, and in some or all of the investment vehicles Bayrock Group had formed to date,

and those it would form in the future.  These membership interests were subject to a

vesting schedule and – to the extent they vested – would entitle their owners to

distributions from the Bayrock entities when each such entity's "[p]roceeds are available

for distribution."  The agreements provided that the membership interests would vest at

the very *latest*, after such time as Arif had "first received a 10% return of his Total

Principal Capital Contribution."  But under the vesting schedule, the membership

interests began to vest earlier.  The vesting schedule provides:

5. <u>VESTING SCHEDULE</u>

… [W]ith respect to any particular Company Investment [],
Executive's Membership Interest will vest on the basis of

the earlier of (i) one-thirty-sixth (1/36[th]) per month from
and after the later of (y) the Company Investment Date [ ]
or (z) the Effective Date, or (ii) the date upon which the
Principal receives Company Proceeds from a Company
Investment [ ].[17]

174.    In order to entice Kriss to amend the 2004 Kriss Agreement, the 2005

equity compensation agreement executed by Kriss, Arif and Bayrock (the "2005 Kriss

Agreement") contained the following provisions: (1) a provision granting Kriss "a non-

dilutable 10% non-voting membership interest in the Company [Bayrock Group] and the

Company Entities ["Company Entities" being defined as "the affiliates, subsidiaries and

related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock'

name"]; (2) a provision purporting to amend and modify the operating agreements for

Bayrock Group and the Company Entities "to incorporate the provisions" granting Kriss

membership interests; (3) a provision stating that: "Tevfik Arif, the direct and/or indirect

majority member of the Company and each Company Entity, hereby executes this

Agreement in order to acknowledge and to confirm his agreement to the foregoing"; and

(4) the vesting provisions set forth in paragraph 173 *supra*.

175.    While conducting negotiations with Kriss over the 2005 Kriss Agreement,

Defendants Arif, Satter, Bayrock Group, Spring Street, Ocean Club, Merrimac,

Whitestone and Camelback **concealed Material Information, the Bad Faith Practices,**

**the Illegally-structured Satter Payments and the fact that Arif and Satter never**

---

[17] The agreements define "Principal" as Arif ; "Effective Date" as February 1, 2003; the
"Company" as Bayrock Group and "Company Entities" as Bayrock Group "and/or the
affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing
business under the 'Bayrock' name."  They define "Company Investments" as
"investments by the Company or any Company Entity…"; and "Company Investment
Date" as "the date on which either an agreement has been executed or an investment has
been made by a Company Entity with respect to a Company Investment."

*intended to honor their promises of equity compensation.*  Had Arif or Satter informed Kriss of these facts, Kriss would either have pursued other professional opportunities or demanded a high six-figure, or low seven-figure, annual salary for each year he provided valuable services to Defendants.

176.    Kriss executed the 2005 Kriss Agreement believing that Arif, Satter, Bayrock Group, Spring Street, Ocean Club, Merrimac, Whitestone and Camelback intended to honor the terms of that Agreement.

177.    Each of Defendants Salomon, Weinreich, Salomon & Co. and Dogan knew: (a) the 2005 Kriss Agreement granted Kriss membership interests in Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street that were subject to a vesting schedule; (b) such vesting schedule, at least in rough terms; (c) that under the Agreement, Kriss' membership interests would fully vest once Arif received his "10% return"; and (d) to such extent as they were vested, the membership interests entitled Kriss to distributions when proceeds of Bayrock Group, Spring Street, Ocean Club, Merrimac, Whitestone and/or Camelback were "available for distribution."

178.    Believing that Arif, Satter, Bayrock Group, Spring Street, Ocean Club, Merrimac, Whitestone and Camelback had entered into the 2005 Kriss Agreement in good faith, Kriss provided these Defendants with valuable services for the remainder of 2005, during all of 2006, and for 8 to 9 months of 2007, foregoing annual salaries adding up to millions of dollars, and passing up lucrative and plentiful opportunities elsewhere.

## VIII.   The Details: The Fraud Against Plaintiff Chu'di Ejekam

179.    On a date in 2003, Plaintiff Ejekam agreed to provide consulting services to Bayrock Group, Arif and Satter for fixed fee payments plus profit participation in the

Bayrock Group's investments upon which he worked.  It was understood by all parties to the agreement that Ejekam would have charged much higher fixed fees had profit participation not been included in his compensation package.

180.    Ejekam's primary service to Bayrock Group, Arif and Satter was to identify co-investors to fund some of Bayrock Group's investments.

181.    While conducting negotiations with Ejekam over his 2003 agreement to provide services, Arif, Satter and Bayrock Group *concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation.*  Had Arif or Satter informed Ejekam of these facts, Ejekam would either have pursued other professional opportunities or demanded high six-figure, or low seven-figure, fixed fee payments in connection with the specific projects for which he provided valuable services to Defendants.

182.    Believing that Arif, Satter, Bayrock Group, Spring Street and Whitestone had entered into his 2003 equity compensation agreement in good faith, Ejekam provided these defendants with valuable services during 2003, 2004 and most of 2005.

183.    In 2005, Ejekam procured Gmul, an Israeli investment firm, as the source of 90% of the capital required to pursue the Whitestone project – the acquisition of a 13-acre parcel of land on the waterfront section of Whitestone, Queens, New York, its rezoning to residential use, and the development of a condominium complex.  In exchange for these services, Arif, Satter, Bayrock Group and Whitestone agreed to grant Ejekam a 2% membership interest in Whitestone (the "2005 Ejekam Whitestone

Agreement"). Ejekam received fixed payment(s) for his work on the Whitestone project totaling $74,000.

184.    Also in 2005, Ejekam brought an unparalleled opportunity to Arif, Satter and Bayrock Group – a parcel of land that could accommodate a 47-story tower a few blocks from SoHo, and a seller looking to negotiate without use of a broker. Ejekam's discovery led to a joint venture with the Trump and Sapir Organizations on what would become Trump SoHo. In exchange for these services, Arif, Satter, Bayrock Group and Spring Street agreed to grant Ejekam a 2% membership interest in Spring Street (the "2005 Ejekam Spring Street Agreement"). Ejekam received fixed payment(s) for his work on Trump SoHo totaling $200,000.00.

185.    The 2005 Ejekam Whitestone Agreement concerning the Whitestone project was memorialized in a written agreement dated October 6, 2006 (the "2006 Ejekam Whitestone Agreement"). The Ejekam Whitestone Agreement states:

> As consideration for Ejekam's efforts in identifying and
> assisting in the acquisition of the property located at 151-46
> Sixth Road in Whitestone, New York (the "Project"),
> Ejekam shall be entitled, following the return to Tevfik Arif
> and/or Bayrock of one hundred percent (100%) of the
> cumulative capital advanced in the Project plus a ten
> percent (10%) preferred return thereon, the right to a 2%
> membership profit interest in Bayrock Whitestone, LLC.

186.    The 2005 Ejekam Spring Street Agreement was memorialized in a written agreement dated October 6, 2006 (the "2006 Ejekam Spring Street Agreement"). The Ejekam Spring Street Agreement states:

> As consideration for Ejekam's efforts in identifying and
> assisting in the acquisition of the property located at 246
> Spring Street, New York, New York (the "Project"),
> Ejekam shall be entitled, following the return to Tevfik Arif
> and/or Bayrock of one hundred percent (100%) of the

cumulative capital advanced in the Project plus a ten percent (10%) preferred return thereon, the right to a 2% membership profit interest in Bayrock Spring Street, LLC.

187.    The 2006 Ejekam Whitestone and 2006 Ejekam Spring Street Agreements (collectively, the "2006 Ejekam Agreements") contained a provision deeming the Operating Agreements of Bayrock Whitestone and Bayrock Spring Street amended and modified to incorporate these grants of membership interests.  The 2006 Ejekam Agreements contain a provision stating that Arif was executing each as "the direct and/or indirect majority member of [Bayrock Spring Street/Bayrock Whitestone]… in order to acknowledge and to confirm his agreement" to the grant of membership interests.

188.    While conducting negotiations with Ejekam over the 2006 Ejekam Agreements, Defendants Arif, Satter, Bayrock Group, Spring Street, and Whitestone *concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation.*  Had Arif or Satter informed Ejekam of these facts, Ejekam would either have pursued other professional opportunities or demanded high six-figure, or low seven-figure, fixed payments in connection with the two projects for which he provided valuable services to Defendants.

189.    Ejekam executed the 2006 Ejekam Agreements believing that Arif, Satter, Bayrock Group, Spring Street and Whitestone intended to honor the terms of those Agreements.

190.    Each of Defendants Schwarz, Salomon, Weinreich, Salomon & Co. and Dogan had knowledge of the terms of the 2006 Ejekam Agreements.  In particular, these Defendants knew that Ejekam's right to "membership profit interests" would come into

being upon Arif/Bayrock Group receiving a 10% preferred return on his/its capital contribution advanced in the Whitestone project (for the Ejekam Whitestone Agreement) or in Trump SoHo (for the Ejekam Spring Street Agreement).

## IX.    The Details: The Fraud Against Non-Party Beau Woodring

191.    On a date in 2003, Non-Party Beau Woodring agreed to provide professional services to Bayrock Group, Arif and Satter on the basis of a profit participation in some of Bayrock Group's investments he would receive in the future, rather than a guaranteed salary that would be less than he could have commanded at a different real estate finance and development firm.  Woodring provided his services in connection with some of Bayrock Group's investments, including its two Fort Lauderdale projects and the Trump Phoenix project.

192.    In 2004, Woodring entered into an equity compensation agreement with Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback that granted Woodring 5% membership interests in each of Merrimac and Ocean Club, and a 10% membership interest in Camelback.

193.    While conducting negotiations with Woodring over his 2004 equity compensation agreement, Arif and Satter, Merrimac, Ocean Club and Camelback *concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the fact that Arif and Satter never intended to honor their promises of equity compensation.*  Had Arif or Satter informed Woodring of these facts, Woodring would either have pursued other professional opportunities or demanded high six-figure, or low seven-figure, annual salaries for providing valuable services to Defendants.

194.     Believing that Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback had entered into his 2004 equity compensation agreement in good faith, Woodring provided these defendants with valuable services for the remainder of 2004 and much of 2005.

195.     In 2005, shortly after Schwarz was hired by Bayrock, Woodring informed Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback that he would be moving with his family and wanted to separate from Bayrock Group.  Woodring negotiated with Arif, Satter, Bayrock Group, Merrimac, Ocean Club and Camelback a separation agreement (the "2005 Woodring Agreement").

196.     In order to entice Woodring to enter into the 2005 Woodring Agreement, Arif, Satter, Schwarz, Merrimac, Ocean Club and Camelback included the following provisions: (1) a provision granting Woodring a *fully-vested* non-dilutable 10% non-voting membership interest in Camelback; (2) a provision purporting to amend and modify Camelback's Operating Agreement "to incorporate the provisions" granting Woodring his membership interests in Camelback; and (3) a provision by which Arif as "the direct and/or indirect majority member of" Camelback acknowledged and confirmed his agreement to terms (1) and (2).  In exchange for the terms of the 2005 Woodring Agreement, including the fully-vested membership interest in Camelback, Woodring agreed to relinquish his membership interests in Merrimac and Ocean Club, which had *partially* vested by that time.

197.     While conducting negotiations with Woodring over the 2005 Woodring Agreement, Defendants Arif, Satter, Schwarz and Camelback *concealed Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments and the*

*fact that Arif and Satter never intended to honor their promises of equity compensation.*  Had Arif or Satter informed Woodring of these facts, Woodring would have demanded cash to relinquish his partially-vested membership interests in Merrimac and Ocean Club.

198.    Woodring executed the 2005 Woodring Agreement believing that Arif, Satter, Bayrock Group, and Camelback intended to honor the terms of that Agreement.

199.    Each of Defendants Schwarz, Salomon, Weinreich, Salomon & Co. and Dogan had knowledge of terms included in the 2005 Woodring Agreement and knew that the Agreement had granted Woodring a fully-vested 10% membership interest in Camelback.  Each also knew that these membership interests entitled him to distributions when Camelback proceeds were "available for distribution."

X.    **The Details: Culmination of the Finance Professional Frauds and the Related Theft and/or Unlawful Conversion of Plaintiffs' Membership Interests and Distributions**

A.    *The FL Group Seeks to Invest $50 Million in Bayrock Group Investments In Return for a Major Share of Projected Profits Exceeding $200 Million*

200.    Sometime in the Autumn of 2006, Bayrock Group entered into discussions with FL Group, an Icelandic investment company that, as of the end of first quarter 2007, had total assets of approximately €3.4 billion, and a market capitalization of €2.7 billion.

201.    In January 2007, Bayrock Group made a presentation to FL Group focusing on four of its investments: (1) Trump SoHo, for which Defendant Spring Street had been formed; (2) the Trump Phoenix project, for which Defendant Camelback had been formed; (3) the Trump International Hotel & Tower Fort Lauderdale, for which Defendant Merrimac had been formed; and (4) a condominium complex located in Whitestone, Queens, New York, for which Defendant Whitestone had been formed.  At

that presentation, Bayrock Group touted that these four investments were projected to generate profits to Bayrock Group of approximately $227.5 million, broken down as follows: (1) approximately $69 million in profit by Trump SoHo; (2) approximately $89 million by Trump Phoenix; (3) approximately $31 million by Trump Fort Lauderdale; and (4) approximately $38 million by the Whitestone project.

202.    On a date in early 2007, FL Group began offering to purchase equity interests in Spring Street, Merrimac, Whitestone and Camelback that would entitle it to approximately 62% of the profits from the four projects discussed in January 2007 for approximately $50 million.

203.    Defendants Arif, Satter, Schwarz, Lauria, Spring Street, Ocean Club, Whitestone and Camelback were greatly interested in the FL Group offer.  This was an opportunity for them to obtain roughly one-quarter of the approximately $227.5 million in profit they projected the four Bayrock Group investments to generate *within months rather than years*.  Of course, FL Group expected to benefit from the transaction and thus sought a 62% participation in the projected profits, which, using Bayrock Group's profit projections, might ultimately amount to $141 million.

   B.    *The Finance Professionals' Membership Interests/Profit Participation Rights Pose an Obstacle to the FL Group Investment*

204.    This offer by FL Group posed a considerable problem.  Due to the numerous equity compensation agreements entered into by Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street, Bayrock Group itself no longer owned sufficient membership interests in these entities entitling Bayrock Group to 62% of the profit from the projects.

205.    Without an accounting of Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street, Plaintiffs are unable to allege the precise date upon which the membership interests transferred by the equity compensation agreements entered into by Bayrock Group, Spring Street, Ocean Club, Merrimac, Whitestone and Camelback became ***fully-vested***.  That date, however, occurred no later than the date upon which Arif and Bayrock Group first received proceeds from the FL Group Investment.  They are likely to have received such proceeds on the day the FL Group Investment closed, or shortly thereafter.  Plaintiffs have demanded access to the books of Whitestone and Spring Street, which Defendants have refused.[18]  Plaintiffs have no reason to believe that Defendants' response would be different to a demand to access the books of Bayrock Group, Ocean Club, Merrimac or Camelback.

206.    During negotiations with FL Group over the terms of the FL Group Investment during 2006 and 2007, the parties – including FL Group – were aware of the terms of the equity compensation agreements of Kriss, Ejekam and Woodring. Nevertheless, the parties based the FL Group Investment on an assumption that Bayrock Group owned a 100% membership interest in each of Merrimac, Camelback, Whitestone and Spring Street.  No Defendant ever sought to purchase any membership interests in these entities from Plaintiffs or from any other financial professional owning such interests.

207.    No third-party consents from Plaintiffs or any of the other finance professionals granted membership interests in Bayrock Group, Merrimac, Camelback,

---

[18] The 2005 Kriss Agreement contains a provision guaranteeing Kriss "the right, no more than once per year, to audit the books and records of the Company Entities."  Kriss has never secured an audit of the books and records of any of the "Company Entities".

Whitestone and Spring Street in their equity compensation agreements were requested or obtained in connection with the FL Group Investment.

### C.    The Role Played by Defendants in the FL Group Investment

208.    Defendants Arif, Satter and Schwarz played active roles in the planning and execution of the FL Group Investment.  Arif and Schwarz executed documents effecting the FL Group Investment.  Satter conducted negotiations with FL Group officers overseas.  Schwarz, reviewed, drafted and/or edited the documents used in the transaction with FL Group.

209.    Arif, Satter and Schwarz each knew: (a) that Plaintiffs and Woodring owned membership interests in Merrimac, Camelback, Whitestone and/or Spring Street; (b) the vesting schedule for – and the vesting status of – those interests; (c) the terms of the equity compensation agreements; and (d) that the membership interests, to the extent they had vested, entitled Plaintiffs and Woodring to distributions from the four entities. Arif, Satter and Schwarz proceeded with the FL Group Investment knowing that the transaction treated those membership interests as if they were all owned by Bayrock Group.

210.    Defendants Salomon, Weinreich and Salomon & Co. prepared accounting and other documents required to plan and execute the FL Group Investment that concealed vested membership interests owned by Plaintiffs and Woodring in Merrimac, Camelback, Whitestone and/or Spring Street and that treated such interests as if they were all owned by Bayrock Group.  At the time they did so, Salomon, Weinreich and Salomon & Co. knew (a) that Plaintiffs and Woodring owned membership interests in Merrimac, Camelback, Whitestone and/or Spring Street; (b) the vesting schedule for –

and the vesting status of – those interests; (c) the terms of the equity compensation agreements; and (d) that the membership interests, to the extent they had vested, entitled Plaintiffs and Woodring to distributions from the four entities.

211.    Each of Defendants Dogan, Pisem and Roberts & Holland played a critical role in planning and executing the FL Group Investment, providing legal advice, communicating with counsel representing FL Group and negotiating and drafting the documents that embodied the transaction.  Each of these Defendants drafted documents and/or deal terms that concealed or disavowed the membership interests of Plaintiffs and Woodring, and provided legal advice with respect to such documents and terms.  At the time they did so, Dogan, Pisem and Roberts & Holland knew (a) that Plaintiffs and Woodring owned membership interests in Merrimac, Camelback, Whitestone and/or Spring Street; (b) the vesting schedule for – and the vesting status of – those interests; (c) the terms of the equity compensation agreements; and (d) that the membership interests, to the extent they had vested, entitled Plaintiffs and Woodring to distributions from the four entities.  None of these attorney Defendants demanded any pre-transaction transfer of membership interests from Plaintiffs and/or Woodring to Bayrock Group.  None of them attempted to obtain consents from Plaintiffs and/or Woodring to the FL Group Investment.  Each of Dogan, Pisem or Roberts & Holland failed to advise Arif, Satter, Schwarz, Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street that transferring rights associated with the membership interests owned by Plaintiffs and Woodring to FL Group was wrongful, illegal and/or criminal.

D.      *The FL Group Investment Closes*

70

212.    On a date in 2007, FL Group agreed in principal to invest approximately
$50 million in the four projects that Bayrock had presented to it in January 2007.  In a
press release providing "Interim Results for Q4 and Full Financial Year 2007," FL Group
announced:

> In 2007 FL Group established a strategic partnership with
> the US property developer Bayrock Group.  Investment in
> four property development projects with Bayrock: Trump
> SoHo…; Trump Lauderdale… ; Whitestone, New York
> (development of 13 acres of land located along the East
> River in Whitestone, Queens …) … and Camelback.

213.    FL Group announced its entrance into the FL Group Investment on the
Icelandic stock exchange (ICEX) on May 22, 2007.

214.    The FL Group Investment closed on a date in late May 2007.  The
transaction documents for the FL Group Investment included a paper-only transfer of the
$50 million from FL Group to Merrimac, Camelback, Whitestone and Spring Street in
equal $12.5 million portions followed by an immediate transfer of all four portions to
Bayrock Group.

215.    Some of the FL Group Investment transaction documents referred to the
transfer of $50 million as a "loan."  However, other aspects of the transaction, including
but not limited to the extensive term of the loan and the repayment provisions, reveal that
for all intents and purposes, the FL Group Investment effected a sale of membership
profit interests in Merrimac, Camelback, Whitestone and Spring Street – a sale that
purported to entitle FL Group to the first approximately $120 million in profits generated
for Bayrock Group by those four projects.[19]

---

[19] Plaintiffs intend to seek discovery that will provide a more precise measurement of the
membership profit interests transferred by the FL Group Investment.

216.    Upon the closing of the FL Group Investment, FL Group transferred $50 million to a U.S. bank account in the name of Bayrock Group.

217.    Once the $50 million in proceeds were deposited in Bayrock Group's New York bank account, Defendants Arif, Satter, Schwarz and Lauria caused portions of these funds to be distributed, transferred and paid to themselves, and to Defendants Salomon, Weinreich, Salomon & Co., Dogan, Pisem and Roberts & Holland.  Upon information and belief, Arif, Satter and Schwarz jointly received tens of millions of dollars in such distributions, transfers and payments, either directly or indirectly through third parties designated by Arif, Satter and/or Schwarz.  At least $1.5 million of the $50 million was used to pay personal expenses purportedly incurred by Arif and Satter.

218.    Defendants Arif, Satter, Schwarz and Lauria used $1.5 million of the proceeds from the $50 million transaction to pay Defendant Lauria a purported professional "fee".  Lauria, who had worked alongside Satter on the 1998 White Rock/State Street securities fraud and money laundering racket, had no significant professional finance or real estate background prior to receiving this "fee."  As of May 2007, Lauria had never arranged any real estate finance or investment transaction of a magnitude even close to that of the FL Group Investment.  ***Initially, Satter had requested that Lauria be paid a fee of $2.5 million***, but Schwarz objected and the fee amount was reduced by $1 million.

219.    Salomon, Weinreich and Salomon & Co. each received substantial compensation for their work on the FL Group Investment, including compensation from from Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street.  At least

some of this compensation included funds received from FL Group in the FL Group Investment.

220.     Dogan, Pisem and Roberts & Holland each received substantial compensation for their work on the FL Group Investment, including compensation from Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street.  At least some of this compensation included funds received from FL Group in the FL Group Investment.

   E.     *Kriss Seeks Distributions Owed Him under the 2005 Kriss Agreement;*
          *Satter Threatens Kriss with Serious Bodily Harm*

221.     On a date after the FL Group Investment closed, but before September 2007, Kriss made inquiries about the payment of any distributions to which he was entitled under the 2005 Kriss Agreement.  In response, Satter informed Kriss that Kriss would be receiving a bonus, and asked Kriss to propose an appropriate amount.  Kriss then consulted an attorney, who suggested that Kriss first seek a payment that would not be disputed and – once he received such a payment – demand the entirety of the distributions to which Kriss was entitled.  Following this advice, Kriss sought and received a $500,000 bonus.

222.     On a later date, but before September 2007, Kriss approached Satter to discuss the distributions to which Kriss was entitled under the 2005 Kriss Agreement. Defendants refused to pay Kriss such distributions.

223.     Thereafter, in mid-September 2007, Kriss informed Bayrock Group that he intended to resign and cease performing services for the company.  Arif offered Kriss a salary increase and a promotion to the position of President if he were to remain at the company.  Kriss rejected this offer.

224.    Kriss has not performed any services on Bayrock Group's behalf since mid-September 2007.

225.    In May or June 2008, Kriss approached Satter and again requested that Bayrock Group pay him the distributions Kriss was owed under the 2005 Kriss Agreement.

226.    In response to the May/June 2008 request, Satter threatened Kriss' safety at the time.  Satter presented Kriss with a "choice": Kriss could either drop his demand for distributions, or he could accept the risk that a contact of Satter's from the Russian mob might inflict serious bodily harm or death on Kriss.

227.    To date, Kriss has not received any distribution from Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone or Spring Street.

228.    To date, Ejekam has not received any distribution from either Whitestone or Spring Street.

229.    To date, Woodring has not received any distribution from Camelback.

230.    In 2008, the FL Group filed for bankruptcy.

F.    *The FL Group Investment and Subsequent Money Transfers Constitute NSPA Violations, RICO Predicate Acts*

231.    At the time the FL Group Investment was executed, and at the time that Arif, Satter, Schwarz and Lauria caused portions of the $50 million from FL Group to be distributed, transferred and/or paid out from Bayrock Group's bank account as alleged *supra*:

      a.    Kriss owned a 10% fully-vested membership interest in Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street.  Under the terms of the 2005 Kriss Agreement, and the terms of the operating agreements of

Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street, as modified and amended by the 2005 Kriss Agreement, Kriss was entitled to distributions from Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street in the millions of dollars;

b. Ejekam owned a 2% fully-vested membership interest in Whitestone and Spring Street.  Under the terms of the 2006 Ejekam Agreements and the terms of the operating agreements of Whitestone and Spring Street as modified and amended by the 2006 Ejekam Agreements, Ejekam was entitled to distributions from Whitestone and Spring Street in the millions of dollars; and

c. Woodring owned a 10% fully-vested membership interest in Camelback.  Under the terms of the 2005 Woodring Agreement and the terms of Bayrock Camelback's Operating Agreement, as modified and amended by the 2005 Woodring Agreement, Woodring was entitled to distributions from Camelback in the millions of dollars.

232.    Executing the FL Group Investments, Defendants stole or unlawfully converted the membership interests of Plaintiffs and Woodring, and some or all of the distribution rights attaching to those interests, and then sold those interests and rights to FL Group.  At the time of the FL Group Investment, Defendants knew that these membership interests and rights were owned by Plaintiffs and Woodring.

233.    The FL Group Investment transferred the stolen or unlawfully converted membership interests of Plaintiffs and Woodring, and some or all of the distribution rights attaching to those interests, to FL Group, *an Icelandic corporation* or to an affiliate

or subsidiary of FL Group formed in *Delaware*.  Under federal law, those membership interests and rights in Merrimac, Camelback, Whitestone and Spring Street – which entities, in turn, owned interests in investments *located in Florida, Arizona and New York* – are "securities" and were stolen.  They were stolen either (a) in those states by those entities, or (b) by those entities, Arif and Schwarz in New York when the two men executed transaction documents stating that Bayrock Group owned 100% of the membership interests in the four entities.  By entering into the FL Group Investment, Arif, Satter, Schwarz, Merrimac, Camelback, Whitestone and Spring Street sold the stolen securities across a U.S. state or national boundary to FL Group, an Icelandic entity or to a designated Delaware-formed affiliate or subsidiary thereof.  The sale violated 18 U.S.C. § 2315.

234.   When Defendants Arif, Satter, Schwarz and Lauria caused portions of the $50 million from FL Group to be distributed, transferred and/or paid out from Bayrock Group's bank account as alleged *supra*, they stole, converted or took by fraud distributions to which Plaintiffs and Woodring were entitled by virtue of their membership interests in Merrimac, Camelback, Whitestone and Spring Street.  At the time they caused such distributions, transfers and payments to be made, Arif, Satter, Schwarz and Lauria knew that Plaintiffs and Woodring were entitled to distributions from the $50 million received from FL Group.

235.   Defendants Arif, Satter, Schwarz and Lauria caused portions of the $50 million from FL Group, which included the distributions so stolen, converted and/or taken by fraud, to be distributed, transferred and/or paid from Bayrock Group's New

York bank account into interstate and foreign commerce.  These distributions, transfers and/or payments include (but are not limited to):

    a.    Approximately $700,000 to an entity in the U.K. as a "broker fee" in connection with the FL Investment Group;

    b.    Approximately $1.6 million to a person or entity in France to purchase Hotel Ambassadeur in Juan les Pins, France, or an interest therein;[20]

    c.    Approximately $2.1 million to a person or entity in Switzerland to purchase the Hotel du Parc in Montreaux, Switzerland;[21] and

    d.    Approximately $145,000 to a partner of Defendant Arif's in the Rixos hotel chain in Turkey.[22]

236.    The transfers of portions of the $50 million in proceeds from Bayrock Group's New York bank account alleged *supra* violated 18 U.S.C. § 2314.

## XI.    Arif and Satter's Continued Involvement in Criminal and Fraudulent Acts

237.    In early October 2010, Arif was arrested in a helicopter raid onto one of the world's largest yachts for allegedly having organized and paid for a large, extended party involving underage prostitutes onboard.  In connection with the raid, nine Russian and Ukrainian women were detained and then deported from Turkey.  Arif was charged with encouraging and facilitating prostitution.  The charges were dropped months later.

238.    In 2013, Satter was sued by an Ohio real estate development joint venture in which he was a partner (***Tri-County Mall Investors, LLC v. Sater et al.***, Supreme

---

[20] *See* Bayrock Slide Presentation at 10, *supra,* at 15, n. 8.

[21] *See id.*

[22] *See id.* at 11-15.

Court of the State of New York, County of New York, Commercial Div., Index No.
2013-654361).  The action was brought in the name of the joint venture and filed by the
Nicholas Bourg, another partner in the joint venture who is the President and sole
member of it.  The lawsuit alleges that the joint venture purchased the rights and
obligations of Wells Fargo under a loan secured by several parcels of land in Hamilton
County, Ohio, which were about to be foreclosed upon.  After the foreclosure sale was
made, approximately $43 million in proceeds were wired into a bank account in the joint
venture's name that had been set up by Satter and to which Satter had access.  The
developer's action alleges that Satter, together with a colleague, transferred the entire $43
million to a bank account under the exclusive control of Satter and his colleague without
obtaining approval from Bourg.  In an Order to Show Cause, Bourg asserts that he had
repeatedly asked Satter to provide the joint venture with all financial records and an
accounting concerning the sales proceeds, but that Satter had refused to do so.

### COUNT ONE
**(RICO, 18 U.S.C. §1962(c) Plaintiff Kriss Against All Defendants Except
Bayrock Group LLC)**

239.     The contents of the paragraphs set forth above are incorporated as if fully
set forth herein.

240.     **RICO Persons Alleged.**   Each Defendant other than Defendant Bayrock
Group is a "person" within the meaning of 18 U.S.C. §1961(3) and separate from
Bayrock Group.

241.     **RICO Enterprise Alleged.**   As alleged *supra*, Bayrock Group constituted
an "enterprise" within the meaning of 18 U.S.C. §1961(4) that (a) was engaged in, and
whose activities affected, both interstate and foreign commerce; (b) has, at least, a five

year duration; (c) has a discernable structure; and (d) is distinct from the predicate acts – namely the Investor Frauds, the Loan Frauds, the Finance Professional Frauds, the related NSPA violations and the two acts/threats of murder and/or extortion – set forth in this Complaint. As herein alleged: (a) Defendants Arif and Satter jointly managed the Bayrock Group enterprise, which engaged in real estate finance and development in at least three different U.S. states, and in foreign nations; (b) the Bayrock Group enterprise commenced operation in 2003 and, upon information and belief, has not ceased to operate; (c) Defendants Lauria, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., and Roberts & Holland were employees of Bayrock Group, or accountants and attorneys hired by Bayrock Group, who (or that) received generous compensation for following and implementing the orders of Arif and Satter in connection with the Investor Frauds, the Loan Frauds and the Professional Frauds. As alleged *supra*, Defendants Bayrock Ocean Club, Bayrock Merrimac, Bayrock Camelback, Bayrock Whitestone and Bayrock Spring Street were formed at the direction of Arif and Satter and were used by them to conduct the Investor Frauds, the Loan Frauds, the Finance Professionals Frauds and the related NSPA violations.

242.    The Bayrock Group is distinct from the frauds, the NSPA violations and the acts/threats of murder and extortion alleged herein. It has engaged in real estate investments that are not at issue in Plaintiffs' claims, including, for example, Bayrock Group's residential and hotel developments in Europe and Turkey. In addition, the Bayrock Group as an enterprise has engaged in numerous accounting and tax practices that violate federal and state law, and IRS regulations, and which are not a focus of Plaintiffs' RICO claims. These additional illegal activities were conducted by each of the

Defendants.  Defendants Salomon, Weinreich and Salomon & Co., *inter alia*, performed

the accounting in connection with the Illegally-Structured Satter Payments, which were

designed to evade federal and state taxes, knowing that those Payments violated federal

and state law, and IRS regulations.  Defendants Salomon, Weinreich, Dogan, Pisem,

Roberts & Holland and Salomon & Co., *inter alia*, devised the structure of the FL Group

Investment, conducted the negotiations and drafted transaction documents for the FL

Group Investment and/or drafted other documents facilitating the FL Group Investment.

Each of these Defendants was aware that the FL Group Investment violated federal and

state law, and IRS regulations at the time of the transaction.

243.  **Pattern of Racketeering Activity Alleged.**  The Defendants conducted

and/or, either directly or indirectly, participated in the conducting of, the 21 predicate acts

identified in the table below.  Each such predicate act constitutes either (a) a mail fraud in

violation of 18 U.S.C. § 1341 and/or a wire fraud in violation of 18 U.S.C. § 1343; (b) a

violation of 18 U.S.C. § 2314, which proscribes the transfer of money stolen, converted

or taken by fraud in interstate and foreign commerce; (c) a violation of 18 U.S.C. § 2315,

which proscribes the sale of securities stolen or unlawfully converted that have crossed a

U.S. state or national boundary; or (d) an act or threat involving murder and/or extortion

within the meaning of 18 U.S.C. § 1961(1)(A).

| Dates | Predicate Act/Complaint ¶¶ | Defendants |
|---|---|---|
| 2003-2007 | The Initial Trump Transactions Fraud, ¶¶ 80-87 | Arif, Satter, Salomon, Weinreich, Ocean Club, Merrimac, Camelback, Salomon & Co. |
| 2003-2006 | The Thieriot Fraud, ¶¶ 88-102 | Arif, Satter, Salomon, Weinreich, Ocean Club, Merrimac, Salomon & Co. |
| 2005 | The Thieriot NSPA Violation, ¶¶ 88-103 | Arif, Satter, Ocean Club |
| 2003-2006 | The Camelback Plaza | Arif, Satter, Schwarz, Salomon, |

| | Development Fraud, ¶¶ 104-119 | Weinreich, Camelback, Salomon & Co. |
|---|---|---|
| 2006-2007 | The Camelback Plaza Development NSPA Violation, ¶¶ 104-120 | Arif, Satter, Schwarz |
| 2005-2008 | The Trump SoHo Fraud, ¶¶ 121-129 | Arif, Satter, Salomon, Weinreich, Spring Street, Salomon & Co. |
| 2005-2008 | The Trump SoHo NSPA Violation, ¶¶ 121-130 | Arif, Satter, Schwarz, Spring Street |
| 2005-2008 | The iStar Financial Lender Fraud, ¶¶ 131-138 | Arif, Satter, Salomon, Weinreich, Spring Street, Salomon & Co. |
| 2006 | Act/Threat of Murder/Extortion Against Ernest R. Mennes, ¶ 114 | Arif, Satter |
| 2006-2008 | The Capmark Finance/GMAC Mortg. Corp./Camelback Fraud, ¶¶ 131-138 | Arif, Satter, Schwarz, Salomon, Weinreich, Camelback, Salomon & Co. |
| 2006-2008 | The Capmark Finance/Whitestone Fraud, ¶¶ 131-138 | Arif, Satter, Schwarz, Salomon, Weinreich, Whitestone, Salomon & Co. |
| 2003-2008 | The Fraud Against Kriss, ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Kriss (18 U.S.C. § 2315), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Kriss (18 U.S.C. § 2314), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria |
| 2003-2008 | The Fraud Against Ejekam, ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Ejekam (18 U.S.C. § 2315), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Ejekam (18 U.S.C. § 2314), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria |
| 2003-2008 | The Fraud Against Woodring, ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, |

| | | Camelback |
|---|---|---|
| 2007-2008 | The NSPA Violation Against Woodring (18 U.S.C. § 2315), ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Camelback |
| 2007-2008 | The NSPA Violation Against Woodring (18 U.S.C. § 2314), ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria |
| 2008 | Act of Extortion Against Kriss, ¶ 226 | Arif, Satter |

244.    The predicate acts listed in the chart contained in paragraph 243 *supra*

form a "pattern of racketeering" for purposes of RICO.  These acts were perpetrated in

furtherance of a common goal, to enrich Defendants Arif, Satter, Lauria and Schwarz and

the attorneys and accountants that aided them.  The frauds and the related NSPA

violations had nearly the same participants, and the victims were all third parties with

something of value that the Bayrock Group needed to further enrich the Defendants.

Moreover, in perpetrating the Bayrock Group frauds and the related NSPA violations,

Defendants used the same methods over and over again, *inter alia*: (a) concealing the

Material Information and the Bad Faith Practices; (b) making false promises regarding

compensation or investment gains with the use of membership interests in investment

limited liability companies that they never intended to keep; (c) converting the fraud

victims' interests – including their membership interests in Bayrock Group, Bayrock

Ocean Club, Bayrock Merrimac, Bayrock Camelback, Bayrock Spring Street and

Bayrock Whitestone; and (d) refusing to provide accounting and other financial

information to their victims that would provide evidence of their misdeeds.

245.    **Participation by Defendants Alleged.**  By their conduct alleged *supra*,

each of the Defendants **conducted** one or more of the Investor Frauds, the Loan Frauds,

the Professional Frauds, the NSPA violations and/or the acts/threats of murder and/or

extortion **and/or, either directly or indirectly, participated in the conducting of** one of these acts carried out in the name of the Bayrock Group enterprise.

246.    Defendants Arif and Satter, controlling and employing Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street: (a) devised the Frauds; (b) induced the victims to enter into investment and equity compensation agreements; (c) made false promises to the victims; (d) converted the victims' interests in Bayrock Group investments (through, *inter alia*, making the Illegally-Structured Satter Payments and entering into the FL Group Investment); and (e) refused to pay victims investment returns or compensation the victims were owed.  Additionally, Arif and Satter, controlling and employing Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street: (a) knowing that one or more of Arif, Schwarz, Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street had stolen or wrongfully converted the membership interests in Merrimac, Camelback, Whitestone and/or Spring Street owned by Plaintiffs and Woodring, sold those interests and the distribution rights attaching to them to FL Group or an affiliate or subsidiary of FL Group; and (b) knowing that that one or more of Arif, Schwarz, Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street had stolen, converted or *taken* distributions to which Plaintiffs Kriss and Ejekam, and non-party Woodring were entitled upon the receipt by these entities of proceeds from the FL Group Investment *by fraud*,[23] caused some or all of those distributions to be

---

[23] Defendants Arif and Satter each knew that these distributions were stolen, converted and/or taken by fraud because they knew that (1) the membership interests of Plaintiffs and Woodring entitled Plaintiffs and Woodring to distributions from Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street upon these entities' receipt of the proceeds of the FL Group Investment, and (2) that Bayrock Group, Merrimac, Camelback, Whitestone and/or Spring Street had not made – and would never make – any distributions of the FL Group Investment proceeds to Plaintiffs and Woodring.

transferred from Bayrock Group's New York bank account into interstate and/or international commerce.

247.    Satter also conducted the two act/threats of murder and/or extortion alleged *supra*.  Arif approved these acts/threats and/or at the very least granted Satter the authority to conduct such activity in the Bayrock Group name.

248.    The remaining Defendants conducted one or more of the Investor Frauds, the Loan Frauds and the Professional Frauds and/or, either directly or indirectly, participated in the conducting of one or more of those Frauds by the Bayrock Group enterprise as set forth below:

| Predicate Act/Complaint ¶¶ | Defendants' Participation |
|---|---|
| The Initial Trump Transactions Fraud, ¶¶ 80-87 | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Initial Trump Transactions concealing Satter's ownership interest and managerial role in Bayrock Group and Defendants Ocean Club, Merrimac and Camelback; and (b) caused those documents to be sent through the interstate mails or interstate wires. |
| The Thieriot Fraud, ¶¶ 88-102 | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents concealing Satter's ownership interest and managerial role in Bayrock Group and Defendant Ocean Club; and (b) caused those documents to be sent through the interstate mails or interstate wires. <br><br> **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) participated in (1) the sale of Ocean Club's interests in 500 Seabreeze, and (2) the refusal to provide Thieriot with a full and fair accounting of Ocean Club ███████████████████ ███████████████ and (b) caused documents effecting or relating to these acts to be sent through the interstate mails or interstate wires (such documents including, but not limited to, federal tax filings made on behalf of Bayrock Group, Ocean Club or 550 Seabreeze and sent to the IRS |

| | and/or Elizabeth Thieriot). |
|---|---|
| The Camelback Plaza Development Fraud, ¶¶ 104-119 | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Bayrock Investment in CDP concealing Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback; and (b) caused those documents to be sent through the interstate mails or interstate wires (documents including, but not limited to, federal tax filings made on behalf of CDP and Defendant Camelback and documents sent to Camelback Plaza Development LLC).<br><br>***Schwarz*, Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other paperwork for the additional $5.1 million in financing obtained from Capmark Finance by CDP, knowing that the financing violated CDP's Operating Agreement and improperly converted Camelback Plaza's membership interest in CDP; and (b) caused such documents to be sent through the interstate mails or interstate wires. |
| **The Camelback Plaza Development NSPA Violation, ¶¶ 104-119** | **Schwarz** requested, approved and/or otherwise caused transfers of funds from an Arizona bank account in the name of CDP in interstate or foreign commerce, knowing that those funds were converted or taken by fraud, in that the funds were the proceeds of $5.1 million in financing that violated CDP's Operating Agreement and violated an express promise made by Defendant Bayrock Camelback in an agreement with Camelback Plaza.<br><br>**Schwarz** executed the loan documentation for the additional $5.1 million in financing obtained from Capmark Finance by CDP. |
| The Trump SoHo Fraud, ¶¶ 121-129 | **Salomon, Weinreich and Salomon & Co.** (a) created, edited and/or executed accounting and other documents for the Trump SoHo investment concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Spring Street, and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. |
| The Trump SoHo NSPA Violation, ¶¶ 121-130 | **Schwarz** requested, approved and/or otherwise caused transfers of funds, received from the Sapir |

| | Group as a result of the Trump SoHo Fraud, from an account in New York for Bayrock Group, Spring Street, or an affiliate or subsidiary of Bayrock Group, in interstate or foreign commerce.  At the time of such actions, Schwarz knew that those funds were converted or taken by fraud, in that the Sapir Organization transferred the funds to Bayrock Group, Spring Street, or an affiliate or subsidiary of Bayrock Group as the result of Defendants' omission of the Material Information, the Bad Faith Practices, the Illegally-Structured Satter Payments, and the intention of Arif and Satter not to honor their contractual commitments regarding the Trump SoHo. |
|---|---|
| The iStar Financial Lender Fraud, ¶¶ 131-138 | **Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other paperwork for the financing obtained from iStar Financial in connection with the Trump SoHo project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. |
| The Capmark Finance/GMAC Mortg. Corp./Camelback Fraud, ¶¶ 131-138 | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other paperwork for the 2006 $5.1 million financing obtained from Capmark Finance Inc./GMAC Mortgage Corporation in connection with the Trump Phoenix project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Camelback and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. |
| The Capmark Finance/Whitestone Fraud, ¶¶ 131-138 | **Schwarz, Salomon, Weinreich and Salomon & Co.** (a) prepared, approved and/or executed the agreements, applications and other for the financing obtained from Capmark Finance Inc. in connection with the Bayrock Whitestone project concealing (1) Satter's ownership interest and managerial role in Bayrock Group and Defendant Whitestone and (2) the Illegally-Structured Satter Payments; and (b) caused those documents to be sent through the interstate mails or interstate wires. |
| The Fraud Against Kriss, ¶¶ 139- | **Schwarz** (a) concealed the Illegally-Structured |

| | |
|---|---|
| 178; 200-235; The Fraud Against Ejekam, ¶¶ 139-155; 179-190; 200-235; The Fraud Against Woodring, ¶¶ 139-155; 191-235 | Satter Payments; (b) used company proceeds that should have been distributed to Plaintiffs and Woodring pursuant to their equity compensation agreements with Merrimac, Camelback, Whitestone and/or Spring Street to make wrongful payments to Defendants Salomon, Weinreich, Salomon & Co. and Lauria, or wrongful payments to third parties for the benefit of Arif and Satter; and (c) caused documents relating to these acts to be sent through the interstate mails and interstate wires.

**Schwarz, Salomon, Weinreich and Salomon & Co.** (a) approved some or all of the Illegally-Structured Satter Payments and/or created documentation to conceal the nature of such Payments, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities, and (2) the Payments and their concealment would harm such interests; and (b) caused documents in connection with such approval and/or documentation to be sent through the interstate mails and interstate wires.

**Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland** (a) approved, drafted and/or executed transaction documents in connection with the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities, and (2) the FL Group Investment would harm those interests; and (b) caused such transaction documents to be sent through the interstate mails and interstate wires.

**Dogan, Pisem and Roberts & Holland** devised the structure for the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities, and (2) said structure would harm those interests; and (b) caused documents relating to the structure for the FL Group Investment to be sent through the interstate mails and interstate wires. |
| The NSPA Violation Against Kriss (18 U.S.C. § 2314), ¶¶ 139-178; 200-235; the NSPA Violation Against Ejekam (18 U.S.C. § 2314), ¶¶ 139-155; 179-190; 200-235; the NSPA | **Schwarz and Lauria** caused the transfer of proceeds of the FL Group Investment into interstate and foreign commerce knowing that the FL Group Investment stole, converted or took by fraud the membership interests to which Plaintiffs and Woodring were entitled under their equity |

| | |
|---|---|
| Violation Against Woodring (18 U.S.C. § 2314), ¶¶ 139-155; 191-235 | compensation agreements and/or the distributions to which Plaintiffs and Woodring were entitled by virtue of owning such membership interests. |
| The NSPA Violation Against Kriss (18 U.S.C. § 2315), ¶¶ 139-178; 200-235; the NSPA Violation Against Ejekam (18 U.S.C. § 2315), ¶¶ 139-155; 179-190; 200-235; the NSPA Violation Against Woodring (18 U.S.C. § 2315), ¶¶ 139-155; 191-235 | **Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland** (a) approved, drafted and/or executed transaction documents in connection with the FL Group Investment, knowing (1) Plaintiffs and Woodring had membership interests in Bayrock entities; (2) by executing the transaction documents Arif and Schwarz, Bayrock Group and the Bayrock entities were stealing or wrongfully converting those membership interests and the distribution rights attaching to them; and (3) the FL Group Investment for all intents and purposes sold those membership interests and rights from Bayrock Group or the Bayrock entities to FL Group, or an affiliate or subsidiary of FL Group. |

249.   **RICO Injury Alleged.** Plaintiff Kriss was injured by at least four predicate acts alleged herein: (1) the Fraud Against Kriss; (2) the NSPA Violation Against Kriss (18 U.S.C. § 2315); (3) the NSPA Violation Against Kriss (18 U.S.C. § 2314); and (4) the Act of Extortion Against Kriss.  As a result of these predicate acts, Kriss has been deprived of: (a) his membership interests in Defendants Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street that entitled him to at least $8 million in distributions; (b) such distributions; (c) millions of dollars in annual salary from Bayrock Group from 2003 through 2007 that he would have bargained for instead of equity compensation; and/or (d) millions of dollars he would have earned had he pursued other opportunities to obtain equity compensation in similar real estate development projects and investments.

## COUNT TWO
### (RICO, 18 U.S.C. §1962(c) Plaintiff Ejekam Against All Defendants Except Bayrock Group, Ocean Club, Merrimac & Camelback)

250.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

251.    **RICO Injury Alleged.**  Plaintiff Ejekam was injured by at least three predicate acts alleged herein: (1) the Fraud Against Ejekam; (2) the NSPA Violation Against Ejekam (18 U.S.C. § 2315); and (3) the NSPA Violation Against Ejekam (18 U.S.C. § 2314).  As a result of these predicate acts, Ejekam has been deprived of: (a) his membership interests in Defendants Whitestone and Spring Street that entitled him to at least $2 million in distributions; (b) such distributions; (c) hundreds of thousands or millions of dollars in fixed fee payments from Bayrock Group from 2003 through 2006 that he would have bargained for instead of equity compensation; and/or (d) millions of dollars he would have earned had he pursued other opportunities to obtain equity compensation in similar real estate development projects and investments.

## COUNT THREE
### (RICO CONSPIRACY, 18 U.S.C. §1962(d), Plaintiff Kriss Against All Defendants Except Bayrock Group)

252.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

253.    **Agreement by Defendants to Commit RICO Violations Alleged.**  Each Defendant (other than Bayrock Group) had knowledge of, and agreed to engage in, the activities alleged in the paragraphs listed in the chart below, and in so doing perpetrated, or attempted to perpetrate, the frauds and NSPA violations listed in the chart below.

| Dates | Predicate Act/Complaint ¶¶ | Defendants |
|---|---|---|
| 2003-2007 | The Initial Trump Transactions Fraud, ¶¶ 80-87 | Arif, Satter, Salomon, Weinreich, Ocean Club, Merrimac, Camelback, Salomon & Co. |
| 2003-2006 | The Thieriot Fraud, ¶¶ 88-102 | Arif, Satter, Salomon, Weinreich, Ocean Club, Salomon & Co. |
| 2005 | The Thieriot NSPA Violation, ¶¶ 88-103 | Arif, Satter, Ocean Club |
| 2003-2006 | The Camelback Plaza Development Fraud, ¶¶ 104-119 | Arif, Satter, Schwarz, Salomon, Weinreich, Camelback, Salomon & Co. |
| 2006 | Act/Threat of Murder/Extortion Against Ernest R. Mennes, ¶ 114 | Arif, Satter |
| 2006-2007 | The Camelback Plaza Development NSPA Violation, ¶¶ 104-120 | Arif, Satter, Schwarz |
| 2005-2008 | The Trump SoHo Fraud, ¶¶ 121-129 | Arif, Satter, Salomon, Weinreich, Spring Street, Salomon & Co. |
| 2005-2008 | The Trump SoHo NSPA Violation, ¶¶ 121-130 | Arif, Satter, Schwarz, Spring Street |
| 2005-2008 | The iStar Financial Lender Fraud, ¶¶ 131-138 | Arif, Satter, Salomon, Weinreich, Spring Street, Salomon & Co. |
| 2006-2008 | The Capmark Finance/GMAC Mortg. Corp./Camelback Fraud, ¶¶ 131-138 | Arif, Satter, Schwarz, Salomon, Weinreich, Camelback, Salomon & Co. |
| 2006-2008 | The Capmark Finance/Whitestone Fraud, ¶¶ 131-138 | Arif, Satter, Schwarz, Salomon, Weinreich, Whitestone, Salomon & Co. |
| 2003-2008 | The Fraud Against Kriss, ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Kriss (18 U.S.C. § 2315), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| 2007-2008 | The NSPA Violation Against Kriss (18 U.S.C. § 2314), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria |
| 2003-2008 | The Fraud Against Ejekam, ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |

| 2007-2008 | The NSPA Violation Against Ejekam (18 U.S.C. § 2315), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |
| --- | --- | --- |
| 2007-2008 | The NSPA Violation Against Ejekam (18 U.S.C. § 2314), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria |
| 2003-2008 | The Fraud Against Woodring, ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Camelback |
| 2007-2008 | The NSPA Violation Against Woodring (18 U.S.C. § 2315), ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Camelback |
| 2007-2008 | The NSPA Violation Against Woodring (18 U.S.C. § 2314), ¶¶ 139-155; 191-235 | Arif, Satter, Schwarz, Lauria |
| 2007 | Act of Extortion Against Kriss, ¶ 226 | Arif, Satter |

254. **Knowing Participation of Defendants Alleged.**  As alleged *supra*, each Defendant knowingly participated in at least three of the Bayrock Group frauds identified in this Complaint.

255. **Conduct Furthering the Schemes To Defraud Investors, Lenders and Finance Professionals Alleged.**  As alleged *supra*, each Defendant acted in furtherance of the agreement to commit the Investor Frauds, the Loan Frauds and the Professional Frauds.

### COUNT FOUR
**(RICO CONSPIRACY, 18 U.S.C. §1962(d), Plaintiff Ejekam Against All Defendants Except Bayrock Group, Ocean Club, Merrimac and Camelback)**

256. The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

## COUNT FIVE
**(Fraudulent Inducement, Plaintiff Kriss Against Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone & Spring Street)**

257.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

258.    Plaintiff Kriss reasonably relied upon the representations and omissions relating to the Material Information, the Bad Faith Practices, and the Illegally-Structured Satter Payments made by Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street when Kriss entered into the 2004 Kriss Agreement and the 2005 Kriss Agreement.  Moreover, Kriss reasonably relied upon the omission made by Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street of the fact that Arif and Satter never intended to fulfill any contractual promise to pay him any equity-based compensation when Kriss entered into the 2004 Kriss Agreement and the 2005 Kriss Agreement.  Such representations and omissions were of *material* fact.

259.    Had Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street not made the representations and omissions of material fact alleged *supra*, Kriss would either have pursued other professional opportunities that would have earned him millions of dollars, or demanded a high six-figure, or low seven-figure, annual salary for each year he provided valuable services to Defendants.

## COUNT SIX
**(Fraudulent Inducement, Plaintiff Ejekam Against Defendants Bayrock Group, Arif, Satter, Whitestone & Spring Street)**

260.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

261.    Plaintiff Ejekam reasonably relied upon the representations and omissions relating to the Material Information, the Bad Faith Practices, and the Illegally-Structured Satter Payments made by Defendants Bayrock Group, Arif, Satter, Whitestone and Spring Street when Ejekam entered into the 2005 Ejekam Whitestone and 2005 Ejekam Spring Street Agreements (collectively, the "2005 Ejekam Agreements"), and the 2006 Ejekam Agreements.  Moreover, Ejekam reasonably relied upon the omission made by Bayrock Group, Arif, Satter, Whitestone and Spring Street of the fact that Defendants Arif and Satter never intended to fulfill any contractual promise to pay Ejekam any equity-based compensation when Ejekam entered into the 2005 Ejekam Agreements and the 2006 Ejekam Agreements.  Such representations and omissions were of ***material*** fact.

262.    Had Bayrock Group, Arif, Satter, Whitestone and Spring Street not made the representations and omissions of material fact alleged *supra*, Ejekam would either have pursued other professional opportunities that would have earned him millions, or demanded high six-figure, or low seven-figure, fixed payments in connection with the two projects for which he provided valuable services to Defendants, the Trump SoHo and the Whitestone condominium development.

## COUNT SEVEN
**(Breach of Contract, Plaintiff Kriss Against Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone & Spring Street)**

263.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

264.    Plaintiff Kriss fully performed each and every obligation he had under the 2004 Kriss Agreement and the 2005 Kriss Agreement.

265.     The failure of Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street to pay Kriss at least $8 million in distributions as the owner of a 10% membership interest in Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street constitutes a material breach of the 2004 Kriss Agreement and 2005 Kriss Agreement.

266.     Kriss was injured by the material breaches of the 2004 Kriss Agreement and the 2005 Kriss Agreement by Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street in an amount exceeding $8 million.

## COUNT EIGHT
### (Breach of Contract, Plaintiff Ejekam Against
### Defendants Bayrock Group, Arif, Satter, Whitestone & Spring Street)

267.     The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

268.     Plaintiff Ejekam fully performed each and every obligation he had under the 2005 Ejekam Agreements and the 2006 Ejekam Agreements.

269.     The failure of Defendants Bayrock Group, Arif, Satter, Whitestone and Spring Street to pay Plaintiff Ejekam at least $2 million in distributions as the owner of a 2% membership interest in Whitestone and Spring Street constitutes a material breach of the 2005 Ejekam Agreements and the 2006 Ejekam Agreements.

270.     Ejekam was injured by the material breaches of the 2005 Ejekam Agreements and the 2006 Ejekam Agreements by Defendants Bayrock Group, Arif, Satter, Whitestone and Spring Street in an amount exceeding $2 million.

**COUNT NINE**

**(Tortious Interference with Contract, Plaintiff Kriss Against Defendants
Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co.
and Roberts & Holland)**

271.    The contents of the paragraphs set forth above are incorporated as if fully

set forth herein.

272.    As alleged *supra*, Defendants Arif, Satter, Schwarz, Salomon, Weinreich,

Dogan, Pisem, Salomon & Co. and Roberts & Holland approved, drafted and/or executed

transaction documents in connection with the FL Group Investment.  At the time they did

so, these Defendants knew the 2005 Kriss Agreement existed and was valid, and knew

that the terms of the 2005 Kriss Agreement granted Plaintiff Kriss membership interests

in Defendants Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street

which entitled Kriss to distributions from these five entities.

273.    As alleged *supra*, Dogan, Pisem and Roberts & Holland devised the

structure for the FL Group Investment.  At the time they did so, these Defendants knew

the 2005 Kriss Agreement existed and was valid, and knew that the terms of the 2005

Kriss Agreement granted Kriss membership interests in Defendants Bayrock Group,

Merrimac, Camelback, Whitestone and Spring Street which entitled Kriss to distributions

from these five entities.

274.    The FL Group Investment breached the 2005 Kriss Agreement by

effecting the transfer of the membership interests in Bayrock Group, Merrimac,

Camelback, Whitestone and Spring Street granted to Kriss under said Agreement, and/or

the transfer of the distribution rights flowing from those membership interests.

275.    As alleged *supra*, Arif, Satter, Schwarz and Lauria caused the transfer of

proceeds of the FL Group Investment that included the distributions to which Kriss was

entitled under the 2005 Kriss Agreement.  At the time they did so, these Defendants knew the 2005 Kriss Agreement existed and was valid, and knew that the terms of the 2005 Kriss Agreement granted Kriss membership interests in Bayrock Group, Merrimac, Camelback, Whitestone and Spring Street which entitled Kriss to distributions from these entities.

276.    The transfer of proceeds of the FL Group Investment alleged *supra* constitutes a breach of the 2005 Kriss Agreement.

277.    Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland **intended** to breach the 2005 Kriss Agreement in that each of them **intentionally** participated in the FL Group Investment and in the transfer of proceeds of the FL Group Investment as alleged *supra*, **knowing that the result of these actions would be to deprive Kriss of his membership interests and/or the distributions to which he was entitled under said Agreement.**

278.    But for the actions of Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland, no breach of the 2005 Kriss Agreement would have occurred.

279.    Kriss has been injured by these breaches of the 2005 Kriss Agreement as alleged *supra*.

### COUNT TEN
**(Tortious Interference with Contract, Plaintiff Ejekam Against Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland)**

280.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

281.     As alleged *supra*, Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland approved, drafted and/or executed transaction documents in connection with the FL Group Investment.  At the time they did so, these Defendants knew the 2006 Ejekam Agreements existed and were valid, and knew that the terms of the 2006 Ejekam Agreements granted Plaintiff Ejekam membership interests in Defendants Whitestone and Spring Street which entitled Ejekam to distributions from these entities.

282.     As alleged *supra*, Dogan, Pisem and Roberts & Holland devised the structure for the FL Group Investment.  At the time they did so, these Defendants knew the 2006 Ejekam Agreements existed and were valid, and knew that the terms of the 2006 Ejekam Agreements granted Ejekam membership interests in Whitestone and Spring Street which entitled Ejekam to distributions from these entities.

283.     The FL Group Investment breached the 2006 Ejekam Agreements by effecting the transfer of the membership interests in Whitestone and Spring Street granted to Ejekam under said Agreements, and/or the transfer of the distribution rights flowing from those membership interests.

284.     As alleged *supra*, Arif, Satter, Schwarz and Lauria caused the transfer of proceeds of the FL Group Investment that included the distributions to which Ejekam was entitled under the 2006 Ejekam Agreements.  At the time they did so, these Defendants knew the 2006 Ejekam Agreements existed and were valid, and knew that the terms of the 2006 Ejekam Agreements granted Ejekam membership interests in Whitestone and Spring Street which entitled Ejekam to distributions from these entities.

285.    The transfer of proceeds of the FL Group Investment alleged *supra* constitutes a breach of the 2006 Ejekam Agreements.

286.    Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland **intended** to breach the 2006 Ejekam Agreements in that each of them **intentionally** participated in the FL Group Investment and in the transfer of proceeds of the FL Group Investment as alleged *supra*, **knowing that the result of these actions would be to deprive Ejekam of his membership interests and/or the distributions to which he was entitled under said Agreements.**

287.    But for the actions of Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland, no breach of the 2005 Kriss Agreement would have occurred.

288.    Ejekam has been injured by these breaches of the 2006 Ejekam Agreements as alleged *supra*.

**COUNT ELEVEN**
**(Conversion Against All DEFENDANTS)**

289.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

290.    Defendants exercised unauthorized dominion over personal property to which Plaintiffs had legal title that denied and/or was inconsistent with Plaintiffs' rights to such personal property by making, authorizing, executing, planning, structuring, documenting and/or participating in *inter alia*, one or more of the following: (a) the Illegally-Structured Satter Payments; (b) the FL Group Investment, including but not limited to the distribution of all funds received from FL Group by Defendants Merrimac, Camelback, Whitestone and Spring Street to Bayrock Group; and (c) transfers of the

proceeds of the $50 million from FL Group Investment including but not limited to each of such payments alleged *supra* (collectively, the "Acts of Conversion").

291.    Plaintiffs were injured by the Acts of Conversion.

## COUNT TWELVE
### (Aiding & Abetting Conversion against Defendants Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland)

292.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

293.    Defendants Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland knew that Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street made, authorized, executed and/or participated in one or more Acts of Conversion.

294.    As alleged *supra*, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland provided substantial assistance in one or more Act(s) of Conversion.

295.    Plaintiffs were injured as alleged *supra*.

## COUNT THIRTEEN
### (Breach of Fiduciary Duties Against Defendants Arif, Satter, Schwarz, Bayrock Group)

296.    The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

297.    Defendants Arif, Satter, Schwarz and Bayrock Group are, and were at all times relevant to the allegations of this Complaint, members of Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.

298.     Defendant Bayrock Group is, and was at all times relevant to the allegations of this Complaint, the Manager or Managing Member of Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.

299.     Arif, Satter, Schwarz and Bayrock Group owed fiduciary duties, including but not limited to the duty of loyalty, to Plaintiff Kriss as a member of Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.

300.     Arif, Satter, Schwarz and Bayrock Group owed fiduciary duties, including but not limited to the duty of loyalty, to Plaintiff Ejekam as a member of Whitestone and Spring Street.

301.     The actions of Arif, Satter, Schwarz and Bayrock Group alleged *supra*, including but not limited to their participation in (a) the Illegally-Structured Satter Payments, (b) the FL Group Investment and (c) the distribution of proceeds from the FL Group Investment breached the fiduciary duties they owed to Kriss and Ejekam.

302.     Kriss and Ejekam were injured by the breaches of fiduciary duty as alleged *supra*.

### <u>COUNT FOURTEEN</u>
**(Aiding & Abetting Breach of Fiduciary Duties Against Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland)**

303.     Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland knowingly and intentionally induced or participated in the breaches of fiduciary duties alleged *supra*.

304.     Kriss and Ejekam were injured by the breaches of fiduciary duty as alleged *supra*.

**COUNT FIFTEEN**
**(Alter Ego/Corporate Veil Piercing**
**Against Defendants Arif, Satter & Schwarz)**

305.     Arif, Satter and Schwarz own and/or control Defendants Bayrock Group, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street (collectively, the "Corporate Defendants"), and are the alter-egos thereof.

306.     Arif, Satter and Schwarz have dominated and controlled the Corporate Defendants, and continue to do so.

307.     Arif, Satter and Schwarz have disregarded, and continue to disregard, the corporate form of the Corporate Defendants.

308.     Arif, Satter and Schwarz have intermingled their personal assets with the assets of one or more of the Corporate Defendants, and have caused the intermingling of the assets of the Corporate Defendants.

309.     The Corporate Defendants have not observed proper corporate formalities, regularly held meetings, or timely approved minutes of meetings.  They continue to fail to do so.

310.     The observance of the corporate form of the Corporate Defendants would sanction a fraud and/or promote injustice.

**COUNT SIXTEEN**
**(Unjust Enrichment against All DEFENDANTS)**

311.     The contents of the paragraphs set forth above are incorporated as if fully set forth herein.

312.     Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs by their participation in the following conduct alleged *supra* and set forth

in the chart below.  When participating in such conduct, Defendants acted with conscious

disregard for the personal property and rights of Plaintiffs.

| | |
|---|---|
| The Fraud Against Kriss, ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| The NSPA Violation Against Kriss (18 U.S.C. § 2315), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Ocean Club, Merrimac, Camelback, Spring Street, Whitestone |
| The NSPA Violation Against Kriss (18 U.S.C. § 2314), ¶¶ 139-178; 200-235 | Arif, Satter, Schwarz, Lauria |
| The Fraud Against Ejekam, ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |
| The NSPA Violation Against Ejekam (18 U.S.C. § 2315), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria, Salomon, Weinreich, Dogan, Pisem, Salomon & Co., Roberts & Holland, Spring Street, Whitestone |
| The NSPA Violation Against Ejekam (18 U.S.C. § 2314), ¶¶ 139-155; 179-190; 200-235 | Arif, Satter, Schwarz, Lauria |

313.    As a result of Defendants' wrongful conduct as alleged herein, they have

been unjustly enriched at the expense of, and to the detriment, of Plaintiffs.

314.    Defendants' unjust enrichment is traceable to, and resulted directly and

proximately from, the conduct alleged herein.

315.    Under the common law of unjust enrichment, it is inequitable for

Defendants to be permitted to retain the benefits *(including profit earned in connection*

*with the FL Group Investment)* they received, and are still receiving without

justification.

316.    The financial benefits derived by Defendants rightfully belong to

Plaintiffs.

317.     As a consequence, Defendants must be compelled to disgorge the amount of their unjust enrichment, ***including any professional fees they earned as attorneys and/or accountants*** in connection with their participation in the Illegally-Structured Satter Payments, the FL Group Investment, the Frauds Against Kriss and Ejekam, and the NSPA Violations Against Kriss and Ejekam.

## **JURY DEMAND**

318.     Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs demand judgment against Defendants on each Count aforesaid:

  a.   awarding compensatory, punitive and/or treble damages to Plaintiffs in such amount as may be determined after discovery and trial;

  b.   awarding Plaintiffs equitable relief, including but not limited to disgorgement of profits and professional fees;

  c.   awarding Plaintiffs the cost of this action, including reasonable attorneys' fees and expense, experts' fees and other disbursements; and

  d.   for such further and other relief as may be just and proper.

Dated:  New York, New York
        November 19, 2015

                              SIMON & PARTNERS, LLP


                              ___/s/_____
                              Bradley D. Simon (BS 3406)
                              J. Evan Shapiro (JS 9903)
                              Simon & Partners, LLP
                              551 Fifth Avenue, 31st Floor
                              New York, NY 10176
                              (212)332-8900

                              *Attorney for Plaintiffs*

104