UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

J. KRISS, et al.,

        Plaintiffs,

    -against-

BAYROCK GROUP, LLC, et al.,

        Defendants.

------------------------------------------------------------------------X

SDNY Docket No.

10-cv-3959 (LGS) (FM)

**Affidavit of Jody Kriss**

I, Jody Kriss, being duly sworn this 19th day of November 2013, state under penalty of perjury, pursuant to 28 U.S.C. 1746, as follows:

1.      From 2003 to 2008 I was a service provider to Bayrock, a real estate developer structured as a hierarchical set of limited liability companies (though there were on occasion other business forms used) which I understand is often referred to as a tiered partnership

2.      The topmost company is Bayrock Group LLC, a New York limited liability company. Bayrock Group LLC is typically referred to in relevant documents from those years as "the Company."

3.      Lower in the tier are various, typically non-wholly owned subsidiary companies Bayrock formed as holding companies to hold its interests in its various projects.

4.      The followng five non-wholly owned subsidiary companies, or "Subs, are most relevant to this action: (1) Bayrock Camelback LLC, an Arizona limited liability company; (2) Bayrock Merrimac, a Florida limited liability; (3) Bayrock Ocean Club, also a Florida limited liability company; (4) Bayrock Spring Street, a Delaware limited liability company; and (5) Bayrock Whitestone, also a Delaware limited liability company.

5.      From the outset, the terms and conditions of my agreement to provide services were understood and agreed to by the firm and myself, the firm, at least in 2003, consisting of Tevfik Arif,

who I was told was the "owner"; Felix Sater, who I was told had an "undefined" role; and a few low-level clerical workers, including Maria Simonchyk, who was, and at all times remained, a bookkeeper.

6.      That is, I agreed to provide services to Bayrock Group LLC solely in return for "sweat equity" in various projects it would undertake, which was always given me by having whatever Sub (subsidiary company) was associated with that project issue me membership interests and so admit me as a member. In other words, in a corporate analogy, in return for performing services for the parent corporation, I was issued compensatory stock in subsidiary corporations, each serving as a holding company for Bayrock's financial interests in a different project. But I stress that all these Subs, certainly for purposes of this case, like Bayrock Group itself, were limited liability companies, so I became a member, not a stockholder.

7.      In June 2004, I negotiated a new deal, whereby in addition to sweat equity I would also receive a salary from parent Bayrock Group.

8.      Attached as pages 14 through 20 hereto is a true and correct copy of my employment agreement from June 2004. One can see it states on page 14 [Emphasis added]:

> WHEREAS, the Company [Bayrock Group LLC] desires to employ Employee to furnish his services as Director of Finance, and Employee desires to be so employed in connection with the real estate investment business;
>
> WHEREAS, the Employee is also an unsalaried **member** of certain affiliated limited liability companies to wit: a) Bayrock Ocean Club LLC (10% membership), b) Bayrock Merrimac LLC (10% membership; and c) Bayrock Camelback LLC (5% membership) **in which entities the Employer is also a member**.

9.      This correctly reflected the companies in which I had by then become a member and also the salary and other terms and conditions of my employment.

10.     In 2005 in connection with the hiring of Julius Schwarz as Bayrock's General Counsel and Executive Vice President – and to be clear, to my personal knowledge Mr. Schwarz at all times wore two hats, as a general executive and as a lawyer, and often complained to me or in my presence that he wanted to be more, if not exclusively, on the business side and not the legal side and by 2007

would often brag, to me or in my presence, that he was personally making most of the business decisions and was far more than just a lawyer – I, Mr. Schwarz, and Mr. Sater renegotiated our agreements pursuant to a series of meetings and communications with tax lawyers and accountants.

11.     This also would include giving all of us, if we didn't already have it (I did not at the time, but apparently Mr. Sater did), membership in Bayrock Group LLC itself.

12.     Basically, as I know from personally witnessing this and participating in it, Mr. Arif, or at least his lawyer, was concerned that giving us membership in the parent company itself could lead to problems, for example that we would be owed fiduciary duties, which he didn't want.

13.     He said he would prefer if we were given "contract rights" to share in the profits, rather than outright membership in the Company.

14.     However, all the tax lawyers and accountants we spoke to said that would be a tax disaster because we and the Company would be subject to horrifically expensive tax withholding and they all said, every one of them, that the only way to avoid that withholding would be if we were made members of the companies and immediately and thereafter treated as members (I understand the technical term is "tax partner" to describe the tax aspects of membership) even before we were vested.

15.     Although I am not a tax attorney or accountant, I am a graduate of the Wharton School with a degree in finance and I understand this meant in general terms that giving us such "rights" as mere promises to pay would be taxed the moment they vested, as if we had actually been given cash, even when we hadn't. I further understand that this could bankrupt all of us and the firm along with us, if for example we were given interests worth millions and then had to pay withholding tax at 35% on that value without any cash with which to do so. Which is exactly what happened; that is, we did soon thereafter accrete that much wealth during the 2007-2008 boom, when the membership interests we had in the subsidiary Company Entities, which were vesting incrementally each month, became worth as much as $120,000,000 altogether, vesting at $3,600,000 per month, and we would have been ruined if we had had to pay $1,000,000 per month in withholding. So it was a good thing we weren't

exposed to that because, again, we were made members exactly to avoid that, because again, as had been explained to me, tax law treated vesting *membership* interests differently from anything else, at least as long as they followed certain other rules (for example, so long as this wasn't all a sham).

16.     I remember distinctly that it took almost the entire year for this to be resolved, and it was finally resolved when Mr. Arif relented and our contracts, in my case my new contract, were all written that way, in other words that our "sweat equity" would be conveyed to us (as in my case it always had been) by giving us membership interests, making us members not only of various subsidiaries but (new for me) also in **Bayrock Group LLC itself**.

17.     Attached as pages 21 through 38 hereto is a true and correct copy of my agreement from November 2005. One can see that Section 4 says that I am receiving a 10% membership interest in the Company and in various Company Entities and that the operating agreements of the Company and the Company Entities are deemed modified to incorporate that Section 4. See pgs. 21, 22, 23.

18.     And you can see Section 4 itself refers to (all of us) as members where, for example, it says in 4(K)(c) that all the members will receive special tax distributions when necessary. Pg. 24

19.     Relatedly, attached as pages 48 through 75 hereto is a true and correct copy of the Bayrock Group LLC Operating Agreement as of the day I became a member in 2005. You can see that quite appropriately it defines a "membership interest" exactly the same way, as that bundle of rights, both financial and governance, held by a **member** of the firm. Pg. 52.

20.     I understand that to mean that the purpose of this agreement was to obligate Bayrock to give me membershps in those companies in return for my promise to provide services, but that once I had those membership interests my rights as a member would of course be governed by the limited liability company agreements, which is why Section 4 was incorporated into them so that rights to distributions and special tax distributions and the like would be governed by and indeed could be adjudicated by reference to the operating agreements and not to this agreement.

21.     In other words, I understand this to mean that this agreement is a subscription agreement, that says if I perform these services, or promise to, I get these memberships, in the same way an investor might sign an agreement obligating him to pay money in return for shares in a company, but that once he got the shares, his rights as a shareholder would be determined by corporate law and the bylaws, just as my rights as a member would be determined by limited liability law and the limited liability company agreements.

22.     Therefore, I note that while the agreement itself has an arbitration clause at Section 15, that was **not** deemed incorporated into the limited liability company agreements, so that as a member, my rights running from those limited liability company agreements would not be deemed to run from this agreement, and disputes not arbitrable, because, for example, you wouldn't need to reference this agreement at all to determine my right to a distribution or to consent on admitting a new member. Instead, all that would be in the operating agreement of the Company or its subsidiaries.

23.     I also call attention to the fact that I gave up my $120,000 salary at Bayrock Group. As you can see, Section 4(b) says instead I will from then on receive up to a $10,000 month advance against my distributive share, which I have learned is typical in partnerships like law firms, and called a "partnership draw," where partners are allowed to draw against eventual distributions. Pg. 24.

24.     Now Mr. Schwarz and Mr. Sater also signed substantially similar agreements.

25.     Attached as pages 39 through 42 hereto are true and correct excerpts from the version that Mr. Schwarz signed. I include them so one can see that the membership interests he was being given were only 1.5%, compared with my 10%. See pg. 41. But otherwise his Section 5 and my Section 4 are identical, as was also the case with the equivalent section in Mr. Sater's contract.

**26.**     And attached as pages 43 through 47 hereto are true and correct excerpts from the version Mr. Sater signed, and you can see his Section 4 is the same again, except for the size of his membership interests in the Company and all the Company Entities, which is almost 50%, again in the Company and in each Company Entity, which means if you do the math that as Mr. Sater owned

almost 50% of all the subsidiaries and 50% of the parent **then obviously he owned more than 50% of the entire entity structure of Bayrock.** Pg. 45.

27.     **Also note that Mr. Sater's membership interests carry with them the rights to vote by converting his interest into voting interests, while my interests and Mr. Schwarz's do not, Section 4(e), pg. 46, but pursuant to the Bayrock Group LLC operating agreement each of us, not just Mr. Sater, has the right to consent or withhold consent, ART VI, pg. 57, and that means any of us could thereafter block anything for which unanimous consent was needed, such as amending this agreement or, frankly, much else. See pgs. 57, 58.**

28.     I say all this because there came a time when I sued Bayrock companies and members and others in Delaware Chancery court in November 2008 and in May 2009 they (defendants) filed a Motion to Dismiss. I am told their law firm was one of the biggest and most respected in Delaware. Pages 76 through 106 are exactly that Motion as filed in behalf of Schwarz and Bayrock Group LLC and other Company Enttities and you can see right on page 85 it describes Julius Schwarz as:

> Plaintiff has also named the following persons and entities as defendants to this action: Julius Schwarz, Bayrock Group's Executive Vice President and former General Counsel and a member of Bayrock Group and certain Company Entities

29.     I understand that's what lawyers call a judicial admission, though I don't propose to make legal argument; still I remember seeing that when it was served on us four years ago and thinking it was very significant and learning about judicial admissions because not long thereafter, in September 2009, I made a demand as a member of Bayrock Spring Street and Bayrock Whitestone for their books and records and had to sue in Chancery Court because I was refused.

30.     And ever since then Bayrock has refused to acknowledge my membership status. But be clear: they don't deny it either. They stonewall. They refuse every demand I made for access to the books and records of various companies in which I am a member without explanation, and most recently just a few months ago this year my lawyer Mr. Oberlander made such a demand on Mr.

Saurack, counsel for the Bayrock Defendants, and he wrote back and said, "Bayrock will answer this in due course," but they never have.

31.     In my opinion, knowing the reputation of these people at Bayrock, I believe there is no other explanation possible but that they tried to have it both ways, basically to make us members so that they didn't have to pay tens of millions in withholding tax for us but then deny all our rights as members so we would have no knowledge of the crimes they were committing.

32.     And not just me. For some reason Mr. Schwarz developed amnesia and confusion, because even though he was paid $720,000 per year at Bayrock and is a graduate of the University of Pennsylvania Law School and spent years at Wachtell Lipton before becoming a partner at Akerman Senterfitt, all of which I know or believe to be true from his CV and resume representations and what he told me before he was brought into Bayrock, I have seen page 25 of a deposition transcript of Julius Schwarz taken March 5, 2009 in Bernstein's suit against him, included elsewhere in these papers, and it says:

> Q:  Are you a member of Bayrock Group LLC?
>
> A:  That is an issue that is debatable and in contest from what I understand –
>
> Q:  That is not an answer.
>
> A:  There are different points of view in a proceeding action with Jody Kriss and I am not comfortable answering the question.

33.     That's a deposition five years after he wrote and signed those agreements for himself and us in 2005, and a year after his own lawyers submitted papers into Delaware Chancery court admitting that he's a member, but now it's "debatable." Really?

34.     And Schwarz stated on the May 27, 2008 recording, a transcription of which has been provided to the court – it is Bayrock's position that I was a member *and* also an employee, which I now understand to be illegal, and to constitute tax fraud if it was willful.

35.     Quite simply, I have not been provided K-1's, even though I have been a member (as have others with me, like co-plaintiff Ejekam, to my knowledge because I was his superior at the firm

and made the deal with him that made him a member of Bayrock Spring Street and Bayrock Whitestone, and non-party Beau Woodring, who was a member of Bayrock Camelback and other companies as well and so far as I know still is at least as to Camelback). Mr. Ejekam tells me he has never received any K-1's ever. Between just the two of us that's about 200 missing K-1's over just the last five years. In my personal opinion this is impossible to explain if I'm a member (as of course I am) other than as tax fraud.

36.     But if I was a mere employee, as Bayrock's counsel Walter Saurack calls me in his papers, then I should have been provided W-2's reflecting the value of all my membership interests as deferred compensation. For example, by mid-2007 my 10% to 20% interests in Camelback, Merrimac, Spring Street, and Whitestone were worth between $10,000,000 and $30,000,000 based on Bayrock's own internal estimates which were prepared by my subordinates at the firm in 2007, and as at least the Spring Street and Whitestone interests were incrementally vesting each month, I should have been issued W-2's with millions and millions of dollars of compensation, but I was not.

37.     And Bayrock should have withheld 35% of all that, using its own funds to remit if it couldn't get them from me, but it did not.

38.     Thus, at least from my perspective as a layman, Bayrock has to be committing tax fraud one way or the other, either by failing to report me properly as a member or as failing to report and withhold millions of dollars as an employee with non-qualified deferred compensation.

39.     Since 2010, I (through counsel) have done everything in my power to bring this tax fraud (and other Bayrock frauds) to the attention of the courts, only to be subjected to gag orders and sealing orders.

40.     I first became concerned that Bayrock was engaging in fraudulent activities ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

8

41.     I consulted with many attorneys and their *Kovel* experts in money laundering and tax evasion, and after concluding that there was a tax fraud, and many other frauds, and that I was a victim thereof, I considered making a proffer to the U.S. Attorney, to the New York Attorney General, and the New York County District Attorney's office. Be very clear, I had met with preeminent criminal defense attorneys who had backgrounds prosecuting this kind of tax fraud, tax attorneys, and commercial and RICO attorneys.

42.     Of course, I cannot divulge, without waiving, the attorney-client communications; however, it is no waiver for me to say that I made the decision to disclose all the frauds, including those committed upon others, by preparing the initial civil RICO complaint herein, which was filed by my counsel on May 10, 2010 in the Southern District of New York.

43.     I now beseech this court to refer the tax evasion and frauds alleged in the complaint for criminal investigation. My counsel will submit formal motion papers requesting the Court invite the Criminal Investigation Division of the Internal Revenue Service and the White Collar Crime unit(s) of the Southern District of New York to intervene.

44.     Further, this affidavit is my personal attestation under oath that, if Mr. Saurack is telling the truth in his declaration and all the allegations or most of them in the FAC are related to information in the hard drives he says he has from Bernstein, then not only do I swear that is reason to believe that that drive is holding evidence of massive criminal fraud and may so be seized on this assurance or on any other form of assurance I am asked to make, I further state:

45.     I am a member of Bayrock Group LLC.

46.     Bayrock Group LLC is the managing member of many other companies including the four subsidiaries relevant here.

47.     I have the right to access all information of Bayrock Group LLC pursuant to New York law, for any proper purpose.

48.     Accordingly by the accepted standards of appellate decisions, as I have the right to access the books and records of Bayrock and through it its subsidiaries, as well as by my membership rights in those subsidiaries themselves and anyone with a common right of access may do this:

**49.     I hereby grant full, unconditional permission to any branch of the United States Department of Justice and any branch of the United States Department of the Treasury to seize and/or search all the books and records of the firm to which I have such common rights of access, whether located at Bayrock or at Satterlee.**

**50.     And as I was, as memorialized by their own engagement letter of 2007, a joint client of Roberts & Holland LLP along with Bayrock Group LLC itself and Mr. Schwarz, Mr. Arif, and Mr. Sater with respect to that certain transaction whereby in the FAC I claim** ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████**, I hereby waive all privilege of every kind, including attorney-client and work product, with respect to Roberts & Holland insofar as I am now adverse in that matter to them and all their other joint clients. I grant full, unconditional common-law rights of access and demand for turnover to the same Department of Justice.**

51.     I simply want the fraud to stop.

\* \* \*

52.     I have reviewed the two affidavits of Joshua Bernstein submitted with the declaration of Walter Saurack. With respect to the second affidavit of August 9, 2010 (see Exhibit 3 to Saurack declaration, last 3 pages thereof [1]), while I cannot dispute Bernstein's claim that others at Bayrock were aware that Felix Sater had a secret EDNY racketeering conviction, I hereby, without any reservation whatsoever, and as adamantly as I can, avow that I was unaware of Felix Sater's secret prosecution and guilty plea until about March 2010, when Bernstein gave to my counsel Frederick Oberlander the documents showing same and he told me of what they said.

53.     With respect to the statement in Bernstein's affidavit that I promised him a "piece" of this case if he were to provide documents, I deny that anything improper was done, and that, rather, I only told him that I viewed us as being in common interest and that we should consider joining together to prosecute the cases together and perhaps that he should join this case and that if he did and we cooperated together to the extent it was legal we could pool recoveries. Nothing more came of it. I certainly never requested that he provide false testimony, and he does not allege such in his affidavit. Rather, the affidavit seems to be crafted as innuendo, to suggest that there was something wrongful done, without stating that anything wrongful was done.

* * *

54.     I have reviewed the papers submitted by my counsel in support of the motion to disqualify the Satterlee Stephens firm, and incorporate by reference herein the allegations set forth in the First Amended Complaint, and avow that they are true. As they are allegations, they are made upon both personal information as well as belief predicated upon other information known to me.

* * *

---

[1] While Mr. Saurack did not include the signed version of the August 9, 2010 Bernstein affidavit, he presumably is aware it was signed, as Mr. Bernstein states in his affidavit of September 11, 2011 that he complied with the request of Mr. Oberlander and Mr. Lerner in providing the August 9, 2010 declaration, and that he assisted in its preparation. I understand that the executed version of the August 9, 2010 declaration will be submitted to the court by my counsel.

55.     With regard to the affidavit of Ms. Maria Simonchyk, who identifies herself as an employee and "authorized representative" of various Bayrock entities, please note that I know Ms. Simonchyk to have been a mere bookkeeper and sometimes translator at Bayrock. Her role was entirely clerical or administrative. For example, she wrote the checks that would be signed by others and processed payroll. She had no decision-making authority about the management of the Bayrock companies. She had no decision-making authority with respect to any of the business deals of any of the Bayrock companies. She never once came to a meeting with a bank or an investor or a lawyer insofar as any such meeting was even vaguely substantive.

56.     Indeed, by no means could Ms. Simonchyk be said to be amongst the control group of Bayrock, and it is my understanding (albeit a layman's understanding) that providing allegedly privileged documents (including the First Amended Complaint itself) to a low-echelon employee to review constitutes a waiver of any claimed privilege unless there was a defensible purpose.

57.     I do not believe, and Ms. Simonchyk does not identify any relevant background to suggest, that she has the qualifications to determine what constitutes a privileged communication, attorney work-product, or a trade secret. Thus, it is especially odd (but no surprise) that Julius Schwarz, who has held himself out as Bayrock's general counsel, did not provide the affidavit in support of Bayrock's instant motion. That he is distancing himself from the matter speaks volumes but what it can't speak in any language is that it's any kind of good reason to try to use the unfounded declaration of a clerical worker as to privilege and confidentiality and trade secret instead of Mr. Schwarz.

58.     I also note that Ms. Simonchyk indicates that there is information contained in the First Amended Complaint that constitutes Bayrock's proprietary information, presumably meaning that such information constitutes trade secrets. Ms. Simonchyk, however, fails to indicate why such information constitutes a trade secret or proprietary information. That is, her affidavit does not set forth the value of such information, why it has intrinsic value, how it has been produced and at what cost. It does not say, for example, how the ownership structure of Bayrock could be confidential and

proprietary. Nor does it describe by what metrics of valuation she came to her conclusions of the risk of disclosure and concomitant harm.

59.     This may be because to the best of my knowledge Bayrock is seriously insolvent and being kept alive only to avoid a tax disaster by its bankruptcy filing and concomitant recognition of cancellation of debt income. If so, then there is no possible risk as Bayrock has no net worth to protect nor any operating business to protect.

60.     Additionally, Ms. Simonchyk states that Mr. Bernstein was not authorized to keep the Bayrock documents when he left the company in September 2008. Ms. Simonchyk does not identify what particular employment agreement or policy manual (or otherwise) provides the basis for such belief. But more importantly, Ms. Simonchyk has acknowledged that Mr. Bernstein lawfully came into possession of the documents lawfully. Thus, Bayrock's allegations that Mr. Bernstein "stole" them are belied by Ms. Simonchyk's affidavit, for it is my understanding (as a layman) that one cannot "steal" what one has lawfully come into possession of.

I declare under penalty of perjury and pursuant to 28 U.S.C. 1746 that the foregoing statements are true and correct.

Dated: New York, New York
      November 19, 2013

_____
Jody Kriss

13

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("Agreement") made as of the 29th day of June, 2004 by and between BAYROCK GROUP LLC., with offices at 725 Fifth Avenue, Suite 2400, New York, New York 10022, (the "Company"), and JODY L. KRISS, an individual residing at 6723 SW 138 Street, Miami, FL 33158 ("Employee").

### W I T N E S S E T H:

WHEREAS, the Company desires to employ Employee to furnish his services as Director of Finance, and Employee desires to be so employed in connection with the real estate investment business.

WHEREAS, the Employee is also an unsalaried member of certain affiliated limited liability companies to wit: a) Bayrock Ocean Club LLC (10% membership) b) Bayrock Merrimac LLC (10% membership) c) Bayrock Camelback LLC (5% membership) in which entities the Employer is also a member.

WHEREAS, the Company and Employee desire to set forth the terms and conditions of Employee's employment by the Company.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### 1.0  Term and Employment.

1.1    The term of this agreement shall be three (3) years. Notwithstanding the foregoing, the Employer may terminate this agreement pursuant to paragraph "6.1" on ten (10) days notice and Employee may terminate this agreement on thirty (30) days notice. Upon such termination, Employer shall be released from any obligation to compensate Employee further pursuant to Paragraph "3.1", however, paragraph "3.2" shall remain in effect with respect to Employee's participation in certain real estate project.

1.2    For the purpose of calculating the amount of gross monthly salary earned by Employee pursuant to paragraph "3.1" and the duration of employment for vesting pursuant to paragraph "3.2", the Company acknowledges and agrees that Employee actually began employment as of February 1, 2003 and that salary shall be paid and vesting shall be calculated retroactive to that date.

1

2.0 Employment.

2.1 Title; Duties. The Company hereby employs Employee on a full-time basis and engages his exclusive services as Director of Finance. Employee hereby accepts such employment, all on the terms and conditions set forth below. Employee shall use his best efforts in the performance of such duties as are prescribed by the Company and/or a manager designated by the Company, and as are customarily associated with his position in the Company. Employee shall render his services in New York City and/or Miami/Ft Lauderdale and/or such other place(s) to be mutually agreed upon by the parties.

3.0 Compensation.

3.1 Compensation. Employee shall receive a gross monthly salary of $10,000 less all applicable payroll taxes and other gross lawful deductions, and shall be paid in accordance with the regular payroll practices of the Company. Employee shall receive, with a deduction of the gross salary hereinabove, the additional amount set forth in paragraph "3.2".

3.2 Participation In Certain Real Estate Projects. In addition to the compensation set forth in paragraph "3.1" hereinafter, the Employee shall receive additional compensation as will be set forth in the operating agreements of the following affiliated entities: Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC. Notwithstanding the foregoing, Employee shall not receive any additional compensation until Mr. Tevfik Arif and/or Bayrock Group LLC receives one hundred (100%) percent of the cumulative capital advanced in each of the foregoing projects as set forth in the respective accounting of the books and records of each Company. Only after Mr. Arif and/or Bayrock Group LLC are fully reimbursed for the capital contribution made therein will the Employee receive distributions in the aforesaid limited liability companies in the proportions set forth in said operating agreements. In the event of termination of employment pursuant to paragraph "1", the Employee's right to receive any further compensation as a member of the aforesaid limited liability companies shall be limited as follows: a) in the event employee is terminated by the Company, Employee shall be deemed fully vested b) in the event the Employee leaves voluntarily during the term hereof, he shall only be vested on a prorated basis for the time served under this agreement and c) in the event Employee commits gross acts of negligence or unlawful malfeasance, then Employee shall be vested pro-rata only through the date of such act.

2

4.0    Benefits.

4.1    Medical Benefits. Employee shall have the right to participate in all medical benefit plans of the Company, whether now existing or hereafter established (collectively, the "Benefit Plan"). Nothing herein shall obligate the Company to create or maintain any particular Benefit Plan or prevent it from modifying the terms of, or eliminating, any Benefit Plan it may at any time maintain.

4.2    Reimbursement of Business Expenses. Upon the presentation of receipts and a Company prescribed expense report, the Company shall reimburse reasonable business expenses incurred by Employee in accordance with the Company's policies provided that such business expenses have been approved in advance by the Company.

5.0    Protection of Confidential Information; Non-Solicitation and Non-Competition.

5.1    Employee acknowledges that in the course of his employment by the Company that the Company will bring Employee into close contact with the "Confidential Information" of the Company, including, without limitation: costs, profits, marketing strategies, sales information, products, operational methods and solicitation strategies, plans for future development, client identification and specifications, project specifications and agreements, and any other business information which is not available to the public and provided to the Employee solely in connection with his duties hereunder (defined herein as the "Confidential Information"), and that the foregoing Confidential Information is of a special, unique, proprietary nature. Employee further acknowledges that the Company's business is international in scope, that the Company will compete with other real estate development companies that could be located anywhere in the world and the nature of Employee's services to the Company including Employee's expertise are such that Employee may compete from any location in the world. In recognition of the foregoing, Employee agrees:

5.1.1 That Employee will not use the Confidential Information for his own benefit or for the benefit of any party other than the Company, or intentionally disclose the Confidential Information to any person or entity outside of the Company either during or after the Initial Term or any subsequent Term, except if such disclosure is in furtherance of the interests of the Company or if Employee obtains the Company's express prior written consent, provided, however, that (i) Employee shall have no such obligation to the extent such matters are or become publicly known other than as a result of Employee's breach of

3

his obligations hereunder; (ii) Employee, after giving prior notice to the Company to the extent practicable under the circumstances, may disclose such matters to the extent required by applicable laws or governmental regulation or judicial or regulatory process; or reasonably deemed necessary by Employee in the course of regular business operation or (iii) Employee may disclose the terms of this Agreement to his attorney, accountant and/or financial advisor; and

5.1.2 That Employee will deliver promptly to the Company (and erase from memory on his/her computer or any other electronic memory device) upon termination of employment or at any other time the Company may so request, all names, addresses, phone numbers, memoranda, notes, records, reports, policy information and other documents (and all copies thereof) in any form whatsoever (including information contained in computer memory or on any computer disks) relating to the Company's business, including without limitation the Confidential Information, which Employee obtained while employed by, or otherwise serving or acting on behalf of, the Company and which Employee may then possess or have under his/her control;

5.1.3 That for a period of two (2) years after Employee's termination of employment, for any reason, Employee shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity, employ or solicit the employment of, or assist or encourage any entity of which Employee is an affiliate, to employ or solicit the employment of any person who was an employee of the Company or any of its affiliated companies;

5.1.4 That for a period of two (2) years after Employee's termination of employment, for any reason, Employee shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity: solicit, entice or attempt to solicit or entice, any business association or relationship (not preexisting with Employee) during the term of this agreement of the Company to cease doing business with the Company; and

5.1.5 That Employee agrees that so long as he is employed by the Company, he will conduct the real estate development business only on behalf of the Company except for Employee's family – oriented businesses and that he will not, in any capacity, render services to any other entity including but not limited to his own enterprise, unless he obtains prior written approval from the Company.

4

5.2     Specific Remedy. In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Employee commits a breach of any of the provisions of Section 6.1, the Company shall have the right and remedy to have such provisions specifically enforced by any court having jurisdiction, including without limitation both a temporary and permanent injunction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages may not provide an adequate remedy.

6.0     Representations.   Employee represents and warrants that he/she is not a party to any agreements or understandings which would prevent the fulfillment by Employee of the terms of this Agreement or which would be violated by entering into this Agreement and performing Employee's obligations hereunder.

6.1     Termination for cause. Employee may be terminated "for cause" including willful misconduct and/or his failure to perform the duties set forth hereunder in the reasonable discretion of the employer.

7.0     Notices.   All   notices,   requests,   consents   and   other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by express mail, overnight delivery, or three days after being mailed first-class, postage prepaid, by registered or certified mail, return receipt required, as follows (or to such other or additional address as either party shall designate by notice in writing to the other in accordance herewith):

If to the Company:

> BAYROCK GROUP, LLC.
> 725 Fifth Avenue, Suite 2400
> New York, New York 10022
> Attn:  Mr. Tevfik Arif

If to the Employee: (at the address written above).

8.0     Agreement to Cooperate in Investigations. Employee agrees to willingly and fully cooperate in any investigation by the Company relating to embezzlement or theft of the Company's assets and/or property.

9.0     General.

5

9.1     Governing Law and Jurisdiction. This Agreement shall be governed by and construed and enforced in accordance with the laws of the state of New York applicable to agreements made and to be wholly performed therein.

9.2     Captions. The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

9.3     Entire Agreement: No Other Representations. The parties expressly acknowledge, represent and agree that this Agreement is fully integrated and contains and constitutes the complete and entire agreement and understanding of the parties with respect to the subject matters hereof and supersedes any and all agreements, understandings and discussions, whether written or oral, between the parties with respect to the subject matters hereof except to the extent applicable, any subject matter hereof. The parties further acknowledge, represent, and agree that neither has made any representations, promises or statements to induce the other party to enter into this Agreement, and each party specifically disclaims reliance, and represents that there has been no reliance, on any such representations, promises or statements.

9.4     Assignability. This Agreement and Employee's rights and obligations hereunder may not be assigned by Employee. The Company may assign this Agreement and/or its rights, together with its obligations hereunder, in connection with any sale, transfer or other disposition of the business and/or assets of the Company, and such rights and obligations shall inure to, and be binding upon, any successor to the business or substantially all of the assets of the Company, whether by merger, purchase of stock or assets or otherwise, and such successor shall expressly assume such obligations. Notwithstanding the foregoing, Employee may assign his interests as a member of the limited liability companies described hereinafter, provided he gives the right of first refusal to Bayrock Group LLC, and in the event Bayrock declines the purchase, the Employee may assign such interest to a third party which Bayrock consents to which Consent shall not be unreasonably withheld and if such consent is withheld then the, Employee may pledge only the economic interests of his membership in the aforesaid companies to such third party.

9.5     Amendments: Waivers, Partial Invalidity. This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and covenants hereof may be waived, only by written instruments executed by both of the parties hereto, or in the case of a waiver, by the party waiving compliance. The failure of either party at any time or times to require performance of any provisions hereof shall in no manner affect such party's right at a later time to enforce the same.

6

No waiver either party of the breach of any term or covenant contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such    breach, or a waiver of the breach of any other term or covenant contained in this Agreement.

If any provision hereof shall be for any reason illegal or unenforceable, the same shall not affect the validity or enforceability of the remaining provisions hereof, and the offending provision shall be construed as if it had been deleted or modified to the minimum extent necessary to retain its validity and/or enforceability.

9.6    Construction.    No presumption will be made or inference drawn because the attorneys for one of the parties drafted this Agreement or because of its drafting history.

9.7    Arbitration.    Any dispute hereunder shall be referred to the American Arbitration Association in New York City to be held before a single arbitrator on an expedited basis in accordance with the rules thereof.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.

Witnesseth:

Name: Woodring

BAYROCK GROUP, LLC., Employer

By:
Managing Member

JODY L. KRISS

7

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") dated ~~September~~ November 10th __, 2005 but effective as of February 1, 2003 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 4 hereof, and Jody Kriss ("Executive").

## Recitals

The Company desires to retain the services of Executive, and Executive desires to be retained by the Company, on the terms and conditions set forth in this Agreement.

## Agreement

For and in consideration of the foregoing and the mutual covenants of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    ENGAGEMENT.  The Company hereby engages Executive to serve in the capacities described herein, and Executive hereby accepts such engagement and agrees to perform the services described herein upon the terms and conditions hereinafter set forth (collectively, the "Services").

2.    TERM.  The term of Executive's Services pursuant to this Agreement shall commence on the Effective Date and shall terminate at the close of business on December 31, 2008, subject to earlier termination in accordance with the other terms and conditions set forth herein.

3.    DUTIES; LOYALTY.  Executive shall be Director of Finance of the Company, and shall accordingly be responsible for supervising all transactions on behalf of and as required by the Company.  Executive agrees to devote his full working time, skill and attention and use his best efforts to advance the business and welfare of the Company.  During the term of employment, Executive shall not engage in any other employment activities for any direct or indirect remuneration, including, without limitation, serving as a member of any board of directors of any other entity, provided that, Executive shall not be precluded from investing personal and/or family assets so long as such other activities do not impair Executive's devotion of substantially all his full business time to the affairs of the Company, and do not compete against any Company Investments (as defined in Paragraph 5).

4.    MEMBERSHIP INTEREST.  For purposes of this Section and the remainder of this Agreement, the following capitalized terms shall have the following respective meanings:

A.    "Assumed Tax Rate" means the sum of the maximum federal and state tax rates applicable to each class of income earned during the period in question without giving effect to deductions for state taxes which may be available at the federal level. The federal tax rates shall be determined by rates applicable to individuals who are residents of the United States applied to the particular class of income to which the federal tax rate is being applied.  The maximum state tax rate shall be determined by reference to the tax rates of the State of New York with respect to

the particular class of income to which the Assumed Tax Rate is being applied; accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

B.    "Capital Proceeds" means proceeds received by the Company or any Company Entity by reason of the occurrence of any of the following-described events, less in each instance the total of all expenses incurred in connection with the receipt or collection of such proceeds and less all amounts applied to the reduction of the Company Entities' indebtedness (other than indebtedness from a Company Member) and/or toward repayment of Principal Capital: (i) any sale of Company or any Company Entity property; (ii) any refinancing of any permanent loan with respect to Company or any Company Entity property; (iii) any insurance payment or damage recovery with respect to Company or any Company Entity property to the extent that such proceeds are not required to repair or restore such property; and (iv) any condemnation, or sale in lieu of condemnation, of any Company or any Company Entity property.

C.    "Company Entities" means the Company and/or the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name.

D.    "Company Members" means the members, officers, directors, employees and/or representatives and/or agents of the Company, and/or their respective affiliates, related entities, successors and/or assigns.

E.    "Company Proceeds" shall mean, at any relevant time, the cash, securities, cash equivalents and other proceeds of the Company and all Company Entities, collectively, including Capital Proceeds, reduced by (i) payment of the Company Entities' debts and obligations as they become due, exclusive of loans made to the Company or any Company Entity by the Principal or any other Company Member, (ii) the Total Principal Company Contribution, (iii) without duplication of amounts reduced under clauses (i) and/or (ii) above, amounts disbursed in payment of incurred out-of-pocket operating expenses of the Company and/or the Company Entities, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member, but specifically including the non-equity salaries and benefits paid to Company administrative personnel and professionals, and (iv) amounts reasonably designated by the Principal as cash reserves to pay for Company overhead for a period not to exceed six (6) months.

F.    "Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows: (i) first, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated income (but not loss) of the Company allocated to the Members for federal income tax purposes, including ordinary income, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of income earned during said period; (ii) second, for all fiscal years and other periods of the Company which have ended (including fractional periods), the

total amount of each different class of separately stated loss or expense (but not income) of the Company allocated to the Members for federal income tax purposes, including ordinary losses, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of loss or expense incurred during said period assuming that such item were an item of gain or income instead of loss or expense; and (iii) third, the Cumulative Tax Amount is equal to the remainder of the sum of the products described in clause (i) above minus the sum of the products described in clause (ii) above. The Cumulative Tax Amount shall be recalculated and determined as of every date on which distributions are made, immediately prior to the making of such distributions.

G.    "Executive's Membership Interest" means a non-dilutable 10% non-voting membership interest in the Company and each of the Company Entities, pursuant to which, following Principal having first received a 10% return of his Total Principal Company Contribution, and subject to the provisions of this Section 4 and Section 5, Executive shall be entitled to 10% of all Company Proceeds, reduced, however, by the Executive Advance Amount (as hereinafter defined) previously paid to Executive as of such time, and subject, further, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid to Executive as and when Company Proceeds are available for distribution to the Members.    Executive shall under no circumstances be responsible for the debt or obligations of the Company as a result of Executive's Membership Interest, nor shall Executive ever be required to contribute capital to the Company.

H.    "Members" means the members of the Company and the members of each Company Entity.

I.    "Principal" means Tevfik Arif, an individual.

J.    "Principal Capital" means the principal (but not interest) of any loans to the Company and/or the Company Entities made by the Principal to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities.

K.    "Total Principal Company Contribution" means the total capital contributions made to the Company and/or the Company Entities by the Principal, together with Principal Capital, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member.

(a)    Subject to the provisions of this Section 4 and Section 5, the Company and the Company Entities agree that, in consideration for Executive's Services, Executive shall receive Executive's Membership Interest.  Executive shall have the right, no more than once per year, to audit the books and records of the Company Entities.  Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment.  Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence

of Company Proceeds in excess of $5,000 to which Executive was entitled pursuant to the provisions of this Section, but which failed to be distributed to Executive.

(b)     The Company shall advance to Executive from time to time up to an amount not to exceed $10,000 per month, funds reasonably required to pay for the personal living expenses of Executive and his immediate family members (the "Executive Advance Amount"). The Executive Advance Amount shall be deducted from Executive's portion of Company Proceeds to which Executive is entitled under the provisions of Section 4(a).

(c)     Notwithstanding anything in the Company's and the Company Entities' Operating Agreements (collectively, the "Operating Agreements") to the contrary, the Company's and the Company Entities' Managing Members shall make a distribution (a "Special Tax Distribution") to the Members, Pro Rata in accordance with the relative amount by which the positive Cumulative Tax Amount of each Member exceeds the cumulative distributions which have been made to such Member pursuant to the Operating Agreements as modified by this Agreement, until the cumulative amount distributed to the Members equals the positive Cumulative Tax Amounts of the Members. Without limiting other provisions of this Agreement, Special Tax Distributions (i) shall be distributed to the Members regardless of a Member's individual tax situation and regardless of when a Member became a Member of the Company, (ii) shall be considered to be in anticipation of, and shall be offset against and reduce as quickly as possible, all amounts otherwise distributable to such Member, other than amounts which represent the repayment of loans or interest thereon, and (iii) shall be debited against the Capital Accounts of the Members to the same extent as the distributions against which the Special Tax Distributions are offset. The Company's and the Company Entities' Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

(d)     The Operating Agreements are hereby deemed amended and modified to incorporate the provisions of this Section. Tevfik Arif, the direct and/or indirect majority member of the Company and each Company Entity, hereby executes this Agreement in order to acknowledge and to confirm his agreement to the foregoing. By signing this Agreement individually, Tevfik Arif shall sign solely in his capacity as managing member and/or majority member of the Company and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution, provided, however, that the foregoing limitation of liability shall apply only so long as Tevfik Arif retains direct or indirect control and majority ownership of the Company and each Company Entity.

5.     <u>VESTING SCHEDULE</u>. Notwithstanding the provisions of Section 4 above to the contrary, until such time as the Principal has received a return of 100% of his Total Principal Company Contribution plus a 10% return thereon (at which time Executive shall be deemed fully vested with respect to such Company Investments), with respect to any particular Company Investment (as hereinafter defined), Executive's Membership Interest will vest on the basis of the earlier of (i) one-thirty-sixth (1/36th) per month from and after the later of (y) the Company Investment Date (as hereinafter defined) or (z) the Effective Date, or (ii) the date upon which the Principal receives Company Proceeds from a Company Investment (as hereinafter defined). For purposes of this Agreement, (y) "Company Investments" means investments by the Company or any Company Entity, including, without limitation, the Company investments listed on Annex B

hereto; it being understood that in the event the Company and/or any Company Entity participate in a Company Investment, such Company Investment shall be treated as a single Company Investment for all purposes of this Agreement; and (z) "Company Investment Date" means the date on which either an agreement has been executed or an investment has been made by a Company Entity with respect to a Company Investment.

6.    FRINGE BENEFITS.

(a)    Generally.  Executive shall be eligible for fringe benefits pursuant to any pension, retirement, profit sharing or other employee fringe benefit plan that the Company makes available to employees of the Company and/or its subsidiaries and for which Executive will qualify according to his eligibility under the provisions thereof.

(b)    Insurance.  The Company shall pay for the cost of the health, dental, life, and disability insurance plans maintained by the Company for its professional/senior staff for Executive.   The Company shall maintain directors and officers insurance for its executives.

(c)    Vacation, Holidays and Illness.   During the term of this Agreement, Executive shall be entitled to days off for vacation (not less than (and no greater than without Company approval) four (4) weeks per year), holidays, illness or other appropriate purposes, which vacation shall be scheduled at times reasonably convenient to the Company.

(d)    Company Cars and Residences.   During the term of this Agreement, Executive shall be entitled to use for himself and his immediate family members Company automobiles, Company apartment and condominium units and Company homes, in each case solely to the extent retained and maintained by the Company for the nonexclusive use of one or more of the Company Members, excluding, however, property and assets retained by Principal for his own personal use.

7.    EXPENSES.   Executive shall be promptly reimbursed for all reasonable expenses incurred on behalf of the Company.

8.    TERMINATION.   The term of Executive's engagement under this Agreement may be terminated by the Company prior to expiration of the term provided in Section 2 hereof only in accordance with the following sections.

(a)    For Cause.   This Agreement may be immediately terminated by the Company for Cause (as herein defined).  For purposes of this Agreement, the term "Cause" shall mean the existence or occurrence of one or more of the following conditions or events:

(i)    a willful and continual breach by Executive of any provision of this Agreement, provided that if such act is capable of cure, Executive shall be given written notice and such act shall not be deemed a basis for Cause if cured within 5 business days after such written notice is received by Executive specifying the alleged failure in reasonable detail (in the event of any disagreement between Executive and the Company as to whether Executive has, in fact, willfully and continually breached a provision of this Agreement, such disagreement shall be resolved by arbitration under the provisions of Section 15 hereof);

(ii)    performance by Executive of any act of fraud or material misrepresentation or a material act of misappropriation, or a felony conviction resulting from any such act; or

(iii)    the entry of a judgment or order enjoining or preventing Executive from such activities as are material or essential for Executive to perform the Services as required by this Agreement.

(b)    <u>Mutual</u>.    Executive's engagement under this Agreement may be terminated upon mutual written agreement of the Company and Executive.

(c)    <u>Death</u>.    In the event of the death of Executive, this Agreement shall terminate immediately.

(d)    <u>Disability</u>.    If, during Executive's engagement under this Agreement, Executive shall become permanently disabled and unable to perform his duties as required herein ("Disability") for a total of sixty (60) consecutive days in any twelve (12) month period then the Company may, upon thirty (30) days written notice to Executive, terminate Executive's engagement under this Agreement.

9.    <u>DEATH AND DISABILITY</u>.  In the event of the termination of Executive's engagement under this Agreement by reason of Executive's death or Disability, (i) the Company shall pay Executive (or his heirs and/or personal representatives) all compensation and benefits for a period of one (1) year after the date of death or one (1) year after the date of termination for Disability as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.

10.    <u>SEVERANCE</u>.  In the event of the termination of Executive's engagement under this Agreement for any reason other than Executive's death or Disability, the Company shall provide the payments and benefits to Executive as indicated below:

(a)    <u>With Cause or Voluntary Termination by Executive</u>.  If Executive is terminated for Cause, or if Executive voluntarily terminates his engagement with the Company (other than by reason of a Change of Control, as hereinafter defined, or the relocation of the Company outside of New York City), (i) the Company shall be obligated only to reimburse Executive for any expenses to which Executive is due reimbursement by the Company under Sections 6 and 7; and (ii) Executive's Membership Interest shall be limited to the amount by which it has vested as of the date of said termination in accordance with the provisions of Section 5, and Executive shall further not be entitled to any Company Proceeds attributable to any Company Investments for which the respective Company Investment Date occurs subsequent to the date of said termination. In addition, Company shall pay vested benefits, if any, owed to Executive under any plan provided for Executive under Section 6 hereof in accordance with the terms of such plan as in effect on the date of termination of engagement under this Section.

(b)    <u>Without Cause</u>.  In the event that the Company shall terminate Executive without Cause or Executive voluntarily terminates his engagement with the Company as a result of a Change of Control or the relocation of the Company outside of New York City, (i) the

Company shall be obligated to pay all compensation and benefits to Executive for a period of nine (9) months after the date of termination as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.  For purposes hereof, a "Change of Control shall be deemed to have occurred if any person or group of persons (within the meaning of Section 13 or 14 of the Securities Exchange Act of 1934, as amended), other than the Principal or any person directly or indirectly controlled by the Principal, obtains the ability to control, directly or indirectly, the policies or management of the Company.

11.   PROTECTION OF CONFIDENTIAL INFORMATION; NON-SOLICITATION AND NON-COMPETITION.

(a)   Executive acknowledges that in the course of his employment by the Company that the Company will bring Executive into close contact with the "Confidential Information" of the Company, including, without limitation: costs, profits, marketing strategies, sales information, products, operational methods and solicitation strategies, plans for future development, client identification and specifications, project specifications and agreements, and any other business information which is not available to the public and provided to the Executive solely in connection with his duties hereunder (defined herein as the "Confidential Information"), and that the foregoing Confidential Information is of a special, unique, proprietary nature.  Executive further acknowledges that the Company's business is international in scope, that the Company will compete with other real estate development companies that could be located anywhere in the world and the nature of Executive's services to the Company including Executive's expertise are such that Executive may compete from any location in the world.  In recognition of the foregoing, Executive agrees:

(i)   That Executive will not use the Confidential Information for his own benefit or for the benefit of any party other than the Company, or intentionally disclose the Confidential Information to any person or entity outside of the Company either during or after the term of this Agreement or any subsequent term, except if such disclosure is in furtherance of the interests of the Company or if Executive obtains the Company's express prior written consent; provided, however, that (i) Executive shall have no such obligation to the extent such matters are or become publicly known other than as a result of Executive's breach of his obligations hereunder; (ii) Executive, after giving prior notice to the Company to the extent practicable under the circumstances, may disclose such matters to the extent required by applicable laws or governmental regulation or judicial or regulatory process; or reasonably deemed necessary by Executive in the course of regular business operation or (iii) Executive may disclose the terms of this Agreement to his attorney, accountant and/or financial advisor; and

(ii)   Executive will deliver promptly to the Company (and erase from memory on his/her computer or any other electronic memory device) upon termination of employment or at any other time the Company may so request, all names, addresses, phone numbers, memoranda, notes, records, reports, policy information and other documents (and all copies thereof) in any form whatsoever (including information contained in computer memory or on any computer disks) relating to the Company's business, including without limitation the Confidential Information, which Executive obtained while employed by, or otherwise serving or

acting on behalf of, the Company and which Executive may then possess or have under his/her control;

(iii)     That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity, employ or solicit the employment of, or assist or encourage any entity of which Executive is an affiliate, to employ or solicit the employment of any person who was an employee of the Company or any of its affiliated companies;

(iv)     That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity:  solicit, entice or attempt to solicit or entice, any business association or relationship (not preexisting with Executive) during the term of this agreement of the Company to cease doing business with the Company; and

(v)     That Executive agrees that so long as he is employed by the Company, he will conduct the real estate development business only on behalf of the Company except for Executive's family – oriented businesses and that he will not, in any capacity, render services to any other entity including but not limited to his own enterprise, unless he obtains prior written approval from the Company.

(b)     In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Executive commits a breach of any of the provisions of this Section, the Company shall have the right and remedy to have such provisions specifically enforced by any court having jurisdiction, including without limitation both a temporary and permanent injunction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages may not provide an adequate remedy.

12.     <u>NOTICES</u>.  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail, personally or by overnight delivery service to the addresses below or to such other address as either party shall designate by written notice to the other:

If to Executive:  To the address set forth below his signature on the signature page hereof.

If to the Company:

725 Fifth Avenue, 24th Floor
New York, New York  10022
Attention: Tevfik Arif

13.     <u>INDEMNIFICATION</u>.  The parties agree to the indemnification provisions set forth in <u>Annex A</u> attached hereto and made a part hereof.

14.   <u>REPRESENTATIONS AND WARRANTIES</u>. Each party represents and warrants to the other that (a) this Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, and (b) the execution, delivery and performance by such party of this Agreement do not and will not require any consent, approval or filing or violate or conflict with any provision of the charter documents, certificate of organization, operating agreement, by-laws or similar documents of such party and do not and will not violate any law, rule or regulation, or any order, judgment or decree of any court or other governmental or regulatory authority, nor violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan or other agreement or instrument to which such party is a party or by which it or any of its assets are subject nor will result in the creation or imposition of any lien, charge or encumbrance of any kind whatsoever. The foregoing representations and warranties contained in this Section shall survive the cancellation and/or termination of this Agreement.

15.   <u>ARBITRATION</u>. All claims and disputes (a "Dispute") between the parties arising out of or relating to this Agreement or the breach thereof, shall be resolved using the following procedures:

(a)   A meeting shall be held promptly, and in any event, not later than five (5) business days after a party requests such a meeting, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the Dispute.

(b)   If the parties cannot negotiate a resolution of the Dispute within seven (7) calendar days after the meeting (the "Negotiation Period"), the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ("AAA") currently in effect, unless the parties mutually agree otherwise.   The following procedures shall apply:

(i)   Demand for arbitration shall be filed in writing with the other parties and with the AAA.  A demand for arbitration shall be made within a reasonable time.  In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(ii)   No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the parties and any other person or entity sought to be joined.  Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein.  The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented by the parties to this Agreement shall be specifically enforceable in accordance with applicable law and any court having jurisdiction thereof.

(iii)    The award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(iv)    All filing fees and AAA costs associated with the arbitration itself shall be paid for by the prevailing party.  The prevailing party also shall recover from the non-prevailing party all attorneys' fees and costs, including fees and costs for legal assistants and expert witnesses, and including all fees and costs incurred relative to any challenge or appeal of the arbitration award or confirmation by a court of law.  For purposes of this Agreement, the "prevailing party" shall be deemed to be that party who obtains substantially the result sought, whether by settlement, mediation or otherwise, or judgment.  For purposes of this Agreement, the term "attorneys' fees" shall include, without limitation, the actual attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal, or any other legal proceeding, including mediation and arbitration.

(v)    The parties to the arbitration shall mutually designate an arbitrator who shall be the sole arbitrator from and after said appointment or, if the parties fail to agree on a mutually acceptable arbitrator within five (5) calendar days following the expiration of the Negotiation Period, each party to the arbitration shall appoint one arbitrator within such five (5) calendar day period, and the two arbitrators so appointed shall appoint a third arbitrator within five (5) calendar days of the last of their appointments, and such third arbitrator shall be the sole arbitrator from and after said appointment.  In the event either party fails to appoint its respective arbitrator within the five (5) calendar day period provided above, the arbitrator appointed by the other party within such period shall be the sole arbitrator for purposes of this Section 15, and in the event the two arbitrators fail to appoint a third arbitrator within the five (5) calendar day period provided above, either part may request an arbitrator be appointed by the AAA, in which event said arbitrator shall be the sole arbitrator for purposes of this Section 15.  Once the sole arbitrator is designated pursuant to the provisions of this clause (v), arbitration shall be done on an expedited basis and shall be decided within thirty (30) days of the designation of the sole arbitrator.

(vi)    Time shall be of the essence with respect to the provisions of this Section 15.

16.    ENTIRE AGREEMENT; MODIFICATION.

(a)    This Agreement contains the entire agreement of the Company, the Principal and Executive, and the Company, the Principal and Executive hereby acknowledge and agree that this Agreement supersedes any prior statements, writings, promises, understandings or commitments between the parties hereof.

(b)    No future oral statements, promises or commitments with respect to the subject matter hereof, or other purported modification hereof, shall be binding upon the parties hereto unless the same is reduced to writing and signed by each party hereto.

17.    ASSIGNMENT.  The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the

parties. Notwithstanding anything contained herein to the contrary, neither party may assign his or its rights or obligations under this Agreement without the prior written consent of the other party; provided, however, that Executive shall be allowed to assign Executive's Membership Interest rights in connection with his estate planning to one or more of his immediate family members and/or to a trust, the beneficiaries of which include one or more of his immediate family members.

18.    GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

19.    MISCELLANEOUS.

(a)    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or the interpretation of this Agreement.

(b)    The failure of any party to enforce any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision.

(c)    All written notices required in this Agreement shall be sent postage prepaid by certified or registered mail, return receipt requested or by overnight delivery service against receipt or by overnight delivery service against receipt.

(d)    In the event any one or more of the provisions of this Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable valid, and enforceable provision which comes closest to the intent of the parties.

(e)    In any action or proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party to the action or proceeding.

(f)    This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

(g)    The Company and Tevfik Arif individually hereby acknowledge and confirm that they have been represented by counsel, Mel Dogan, in connection with the negotiation and execution of this Agreement, and that said counsel has explained and translated in Turkish for the Company and Mr. Arif individually the provisions hereof.

(h)    This Agreement supercedes the terms and provisions of that certain Employment agreement entered into between Executive and the Company dated June 29, 2004.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Engagement Agreement as of the day and year first above written.

BAYROCK GROUP, LLC

WITNESSES:

By: _____
Tevfit Arif, its sole Member

Print Name: DANIEL RIDLOFF

Print Name: MAITA SZREBRODOLSKI.

JODY KRISS

Print Name: DANIEL RIDLOFF

Print Name: MAITA SZREBRODOLSKI

7 E 75 ST, #4C
New York, NY 10021

TEVFIK ARIF HEREBY EXECUTES
THIS AGREEMENT TO ACKNOWLEDGE
AND TO CONFIRM HIS AGREEMENT
TO THE PROVISIONS OF SECTION 4
HEREOF:

Tevfik Arif

Print Name: DANIEL RIDLOFF

Print Name: MAITA SZREBRODOLSKI.

STATE OF _New York_ )
                                        ) ss.
COUNTY OF _New York_ )

On the _10th_ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Tevfik Arif_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Notary Seal]                         My commission expires:

MELIH DOGAN
Notary Public, State of New York
No. 02-4693196
Qualified in New York County
Commission Expires June 30, 1989   _12/20/05_

STATE OF _New York_ )
                                        ) ss.
COUNTY OF _New York_ )

On the _10th_ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Tevfik Arif_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Notary Seal]                         My commission expires:

MELIH DOGAN
Notary Public, State of New York
No. 02-4693196
Qualified in New York County
Commission Expires June 30, 1989   _12/20/05_

{M2248368;3}                         14

STATE OF _New York_ )
                           ) ss.
COUNTY OF _New York_ )

On the _10th_ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Jody Kriss_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

JULIUS RANDOLPH SCHWARZ
Notary Public, State of New York
No. 02SC6127581
Qualified in New York County
Commission Expires May 23, 2009

[Notary Seal]          My commission expires: _____

## ANNEX A

The Company agrees to indemnify and hold harmless Executive and his affiliates, employees, independent contractors, advisors, partners, members, managers and each of their respective successors and/or assigns (all of the foregoing are referred to as an "Indemnified Party"), from any and all losses, claims, damages or liabilities, joint or several, as they are incurred (including, without limitation, any legal or any other expenses incurred by any Indemnified Party in connection with the investigation of any claim or the preparation for or defense of any action, claim or proceeding, whether or not resulting in any liability, or otherwise incurred at trial and/or any appellate levels) to which such Indemnified Party may become subject under any statute, common law or otherwise, relating to or arising out of this Agreement, or any transactions referred to herein or any transactions arising out of the transactions contemplated herein; provided, however, that the Company shall not be liable to an Indemnified Party in any such case to the extent that any such loss, claim, damage or liability is found, in a final judgment by a court of competent jurisdiction, to have resulted from said Indemnified Party's willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of the commencement of any action or proceeding in respect of which indemnity may be sought against the Company, such Indemnified Party will notify the Company in writing of the receipt of commencement thereof, and the Company shall assume the defense of such action or proceeding (including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and expenses of such counsel). After assumption of the defense of any action by the Company, the Company shall not be liable for any further costs of defense by counsel for the Indemnified Party. Notwithstanding the preceding sentence, the Indemnified Party will be entitled to employ its own counsel in such action if the Indemnified Party reasonably determines that a conflict of interest exists which makes representation by counsel chosen by the Company inappropriate. In such event, the fees and disbursements of such separate counsel will be paid by the Company.

If for any reason the foregoing indemnity, hold harmless and reimbursement provisions, rights, remedies and protections are unavailable to any Indemnified Party, or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company on the one hand and the Indemnified Party on the other hand, and also the relative fault of the Company on the one hand and the Indemnified Party on the other hand, as well as any relevant equitable considerations. It is hereby further agreed that the relative fault of the Company on the one hand and an Indemnified Party on the other hand with respect to the transactions shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or incorrect opinion or conclusion or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or by the Indemnified Party on the other hand, as well as the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement, opinion, conclusion or omission. No Indemnified Party shall have any liability to the Company or any other person in connection with this Agreement except for any liability for losses, claims, damages or liabilities finally judicially determined to have resulted

solely from actions taken or omitted to be taken as a direct result of such Indemnified Party's gross negligence or willful misconduct.

The indemnity, contribution and expense reimbursement obligations set forth herein shall be in addition to any other rights, remedies or indemnification which any Indemnified Party may be entitled to at common law or otherwise, and shall remain in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party. In no event shall the Company have any liability for any settlement affected without the written consent of the Company (which consent shall not be unreasonably withheld); provided that, the Company will not agree to any settlement requiring anything other than the payment of money damages without the consent of Executive, which consent may be withheld in his sole and absolute discretion.

**ANNEX B**

## Existing Company Investments

Midtown Miami

Banyan Bay

Trump Ft Lauderdale Beach Club

Trump Ft Lauderdale Hotel & Tower

Trump Camelback in Phoenix

Sixth Street in Whitestone, Queens

246 Spring Street, New York New York

1770 Sherman Street, Denver, Colorado

Arizona Center, Phoenix Arizona

Woodmont Country Club, Tamarac, Florida

2308 and 2300 N. Ocean Drive, Hollywood, Florida

<u>**EMPLOYMENT AGREEMENT**</u>

THIS EMPLOYMENT AGREEMENT ("Agreement") dated as of April 21, 2005 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 5 hereof, and Julius Schwarz ("Executive").

<u>Recitals</u>

The Company desires to retain the services of Executive, and Executive desires to be retained by the Company, on the terms and conditions set forth in this Agreement.

<u>Agreement</u>

For and in consideration of the foregoing and the mutual covenants of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      <u>ENGAGEMENT</u>.  The Company hereby engages Executive to serve in the capacities described herein, and Executive hereby accepts such engagement and agrees to perform the services described herein upon the terms and conditions hereinafter set forth (collectively, the "Services").

2.      <u>TERM</u>.  The term of Executive's Services pursuant to this Agreement shall commence on May 1, 2005 and shall terminate at the close of business on April 30, 2008, subject to earlier termination in accordance with the other terms and conditions set forth herein.

3.      <u>DUTIES; LOYALTY</u>.  Executive shall serve as and have the title of General Counsel and Executive Vice President, and shall be responsible for supervising all legal and legal corporate services on behalf of and as required by the Company.  Executive agrees to devote no less than forty (40) hours per week on average to such Services while so engaged.  Except as provided below with respect to charitable and community affairs, Executive shall not engage in legal matters unrelated to the Company without the Company's consent.  Nothing in this Agreement shall preclude Executive from engaging in charitable and community affairs, from managing any passive investment made by him, from serving as a member of the board of directors or as a trustee of any other corporation, association or entity, or from investing personal and/or family assets, <u>provided</u> that such other activities do not impair Executive's devotion of substantially all his full business time to the affairs of the Company, and do not compete against any Company Investments (as defined in Paragraph 6).  Executive shall owe a duty of loyalty to the Company.

4.      <u>COMPENSATION</u>.   The Company shall pay Executive, and Executive agrees to accept, base compensation at the rate of $360,000.00 per year, payable in equal installments no less frequently than monthly, through the term of this Agreement (the "Base Compensation").  The Base Compensation specified in this Section 4 may be increased (but not decreased) annually during the term of this Agreement in the sole discretion of the Company.

5.      <u>MEMBERSHIP INTEREST</u>.  For purposes of this Section and the remainder of this Agreement, the following capitalized terms shall have the following respective meanings:

A. "Assumed Tax Rate" means the sum of the maximum federal and state tax rates applicable to each class of income earned during the period in question without giving effect to deductions for state taxes which may be available at the federal level. The federal tax rates shall be determined by rates applicable to individuals who are residents of the United States applied to the particular class of income to which the federal tax rate is being applied.  The maximum state tax rate shall be determined by reference to the tax rates of the State of New York with respect to the particular class of income to which the Assumed Tax Rate is being applied; accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

B. "Capital Proceeds" means proceeds received by the Company or any Company Entity by reason of the occurrence of any of the following-described events, less in each instance the total of all expenses incurred in connection with the receipt or collection of such proceeds and less all amounts applied to the reduction of the Company Entities' indebtedness (other than indebtedness from a Company Member) and/or toward repayment of Principal Capital:  (i) any sale of Company or any Company Entity property; (ii) any refinancing of any permanent loan with respect to Company or any Company Entity property; (iii) any insurance payment or damage recovery with respect to Company or any Company Entity property to the extent that such proceeds are not required to repair or restore such property; and (iv) any condemnation, or sale in lieu of condemnation, of any Company or any Company Entity property.

C. "Company Entities" means the Company and/or the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name.

D. "Company Members" means the members, officers, directors, employees and/or representatives and/or agents of the Company, and/or their respective affiliates, related entities, successors and/or assigns.

E. "Company Proceeds" shall mean, at any relevant time, the cash, securities, cash equivalents and other proceeds of the Company and all Company Entities, collectively, including Capital Proceeds, reduced by (i) payment of the Company Entities' debts and obligations as they become due, exclusive of loans made to the Company or any Company Entity by the Principals or any other Company Member, (ii) repayment of capital contributions made to the Company and/or the Company Entities by the Principals, together with Principal Capital, (iii) without duplication of amounts reduced under clauses (i) and/or (ii) above, amounts disbursed in payment of incurred out-of-pocket operating expenses of the Company and/or the Company Entities, exclusive of any fees, salaries or other remunerative amounts paid to the Principals or any other Company Member, but specifically including Executive's Base Compensation and the non-equity salaries and benefits paid to Company administrative personnel and professionals, (iv) amounts reasonably designated by the Principals as cash reserves to pay for Company

overhead for a period not to exceed six (6) months, and (v) the Existing Incremental Value.

F.    "Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows: (i) first, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated income (but not loss) of the Company allocated to the Members for federal income tax purposes, including ordinary income, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of income earned during said period; (ii) second, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated loss or expense (but not income) of the Company allocated to the Members for federal income tax purposes, including ordinary losses, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of loss or expense incurred during said period assuming that such item were an item of gain or income instead of loss or expense; and (iii) third, the Cumulative Tax Amount is equal to the remainder of the sum of the products described in clause (i) above minus the sum of the products described in clause (ii) above. The Cumulative Tax Amount shall be recalculated and determined as of every date on which distributions are made, immediately prior to the making of such distributions.

G.    "Existing Company Incremental Value" is the net value of the Company and the other Company Entities as of the Effective Date.  For purposes of this Agreement, the Existing Company Incremental Value shall be deemed to be $3,000,000.

H.    "Executive's Membership Interest" means a non-dilutable 1.5% non-voting membership interest in the Company and each of the Company Entities, purusuant to which Executive shall be entitled to 1.5% of all Company Proceeds, subject, however, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid to Executive as and when Company Proceeds are available for distribution to the Members.  Executive shall under no circumstances be responsible for the debt or obligations of the Company as a result of Executive's Membership Interest, nor shall Executive ever be required to contribute capital to the Company.

I.    "Members" means the members of the Company and the members of each Company Entity.

J.    "Principal Capital" means the principal (but not interest) of any loans to the Company and/or the Company Entities made by the Principals to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities.

    (a)    The Company and the Company Entities additionally agree that Executive shall receive Executive's Membership Interest.  Executive shall have the right, no more than

once per year, to audit the books and records of the Company Entities.  Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment.  Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence of Company Proceeds in excess of $5,000 to which Executive was entitled pursuant to the provisions of this Section, but which failed to be distributed to Executive.

(b)     Notwithstanding anything in the Company's and the Company Entities' Operating Agreements (collectively, the "Operating Agreements") to the contrary, the Company's and the Company Entities' Managing Members shall make a distribution (a "Special Tax Distribution") to the Members, Pro Rata in accordance with the relative amount by which the positive Cumulative Tax Amount of each Member exceeds the cumulative distributions which have been made to such Member pursuant to the Operating Agreements as modified by this Agreement, until the cumulative amount distributed to the Members equals the positive Cumulative Tax Amounts of the Members. Without limiting other provisions of this Agreement, Special Tax Distributions (i) shall be distributed to the Members regardless of a Member's individual tax situation and regardless of when a Member became a Member of the Company, (ii) shall be considered to be in anticipation of, and shall be offset against and reduce as quickly as possible, all amounts otherwise distributable to such Member, other than amounts which represent the repayment of loans or interest thereon, and (iii) shall be debited against the Capital Accounts of the Members to the same extent as the distributions against which the Special Tax Distributions are offset.  The Company's and the Company Entities' Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

(c)     The Operating Agreements are hereby deemed amended and modified to incorporate the provisions of this Section.  Tevfik Arif, the direct and/or indirect majority member of the Company and each Company Entity, hereby executes this Agreement in order to acknowledge and to confirm his agreement to the foregoing.

6.     VESTING SCHEDULE.  Notwithstanding the provisions of Section 5 above to the contrary, until such time as the Principal has received a return of 100% of his Total Principal Company Contribution plus a 10% return thereon (at which time Executive shall be deemed fully vested with respect to such Company Investments), Executive's Membership Interest will vest on the basis of the earlier of (i) one-thirty-sixth (1/36th) per month from and after the later of (y) the Company Investment Date (as hereinafter defined) or (z) the Effective Date (i.e., with respect to existing Company Investments), or (ii) the date upon which the Principals receive Company Proceeds from a Company Investment (as hereinafter defined).  For purposes of this Agreement, (y) "Company Investments" means investments by the Company or any Company Entity, including, without limitation, the Company investments listed on Annex B hereto; it being understood that in the event the Company and/or any Company Entity participate in a Company Investment, such Company Investment shall be treated as a single Company Investment for all purposes of this Agreement; and (z) "Company Investment Date" means the date on which either an agreement has been executed or an investment has been made by the Company with respect to a Company Investment.

7.     FRINGE BENEFITS.

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") dated ~~September~~ *November 10th,* ___, 2005 but effective as of January 1, 2003 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 4 hereof, and Felix Sater ("Executive").

### Recitals

The Company desires to retain the services of Executive, and Executive desires to be retained by the Company, on the terms and conditions set forth in this Agreement.

### Agreement

For and in consideration of the foregoing and the mutual covenants of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    ENGAGEMENT.  The Company hereby engages Executive to serve in the capacities described herein, and Executive hereby accepts such engagement and agrees to perform the services described herein upon the terms and conditions hereinafter set forth (collectively, the "Services").

2.    TERM.  The term of Executive's Services pursuant to this Agreement shall commence on the Effective Date and shall terminate at the close of business on December 31, 2008, subject to earlier termination in accordance with the other terms and conditions set forth herein.

3.    DUTIES; LOYALTY.  Executive shall be responsible for supervising all transactions on behalf of and as required by the Company.  Executive agrees to devote his full working time, skill and attention and use his best efforts to advance the business and welfare of the Company. During the term of employment, Executive shall not engage in any other employment activities for any direct or indirect remuneration, including, without limitation, serving as a member of any board of directors of any other entity, provided that, Executive shall not be precluded from investing personal and/or family assets so long as such other activities do not impair Executive's devotion of substantially all his full business time to the affairs of the Company, and do not compete against any Company Investments (as defined in Paragraph 5).

4.    MEMBERSHIP INTEREST.  For purposes of this Section and the remainder of this Agreement, the following capitalized terms shall have the following respective meanings:

      A.    "Assumed Tax Rate" means the sum of the maximum federal and state tax rates applicable to each class of income earned during the period in question without giving effect to deductions for state taxes which may be available at the federal level. The federal tax rates shall be determined by rates applicable to individuals who are residents of the United States applied to the particular class of income to which the federal tax rate is being applied.  The maximum state tax rate shall be determined by reference to the tax rates of the State of New York with respect to the particular class of income to which the Assumed Tax Rate is being applied;

accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

B. "Capital Proceeds" means proceeds received by the Company or any Company Entity by reason of the occurrence of any of the following-described events, less in each instance the total of all expenses incurred in connection with the receipt or collection of such proceeds and less all amounts applied to the reduction of the Company Entities' indebtedness (other than indebtedness from a Company Member) and/or toward repayment of Principal Capital: (i) any sale of Company or any Company Entity property; (ii) any refinancing of any permanent loan with respect to Company or any Company Entity property; (iii) any insurance payment or damage recovery with respect to Company or any Company Entity property to the extent that such proceeds are not required to repair or restore such property; and (iv) any condemnation, or sale in lieu of condemnation, of any Company or any Company Entity property.

C. "Company Entities" means the Company and/or the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name.

D. "Company Members" means the members, officers, directors, employees and/or representatives and/or agents of the Company, and/or their respective affiliates, related entities, successors and/or assigns.

E. "Company Proceeds" shall mean, at any relevant time, the cash, securities, cash equivalents and other proceeds of the Company and all Company Entities, collectively, including Capital Proceeds, reduced by (i) payment of the Company Entities' debts and obligations as they become due, exclusive of loans made to the Company or any Company Entity by the Principal or any other Company Member, (ii) the Total Principal Company Contribution, (iii) without duplication of amounts reduced under clauses (i) and/or (ii) above, amounts disbursed in payment of incurred out-of-pocket operating expenses of the Company and/or the Company Entities, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member, but specifically including the non-equity salaries and benefits paid to Company administrative personnel and professionals, and (iv) amounts reasonably designated by the Principal as cash reserves to pay for Company overhead for a period not to exceed six (6) months.

F. "Company Team Equity Payments" means any and all payments from equity participations and/or interests in the Company and/or the Company Entities to Jody Kriss, Beau Woodring and Julius Schwarz.

G. "Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows: (i) first, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated income (but not loss) of the Company allocated to the Members for federal income tax purposes, including ordinary




income, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of income earned during said period; (ii) second, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated loss or expense (but not income) of the Company allocated to the Members for federal income tax purposes, including ordinary losses, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of loss or expense incurred during said period assuming that such item were an item of gain or income instead of loss or expense; and (iii) third, the Cumulative Tax Amount is equal to the remainder of the sum of the products described in clause (i) above minus the sum of the products described in clause (ii) above. The Cumulative Tax Amount shall be recalculated and determined as of every date on which distributions are made, immediately prior to the making of such distributions.

H.   "Executive's Membership Interest" means Executive's Non-Voting Membership Interest or Executive's Voting Membership Interest, as applicable.

I.   "Executive's Non-Voting Membership Interest" means a non-dilutable 50% non-voting membership interest in the Company and each of the Company Entities, purusuant to which, following Principal having first received a 10% return of his Total Principal Company Contribution, and subject to the provisions of this Section 4 and Section 5, Executive shall be entitled to 50% of all Company Proceeds, reduced, however, by the Executive Advance Amount (as hereinafter defined) previously paid to Executive as of such time, and subject, further, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid to Executive as and when Company Proceeds are available for distribution to the Members.   Executive shall under no circumstances be responsible for the debt or obligations of the Company as a result of Executive's Membership Interest, nor shall Executive ever be required to contribute capital to the Company.

J.   "Executive's Voting Membership Interest" means a 50% voting membership interest in the Company and each of the Company Entities, subject to the same economic terms as Executive's Non-Voting Membership Interest.

K.   "Members" means the members of the Company and the members of each Company Entity.

L.   "Principal" means Tevfik Arif, an individual.

M.   "Principal Capital" means the principal (but not interest) of any loans to the Company and/or the Company Entities made by the Principal to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities.

N.   "Total Principal Company Contribution" means the total capital contributions made to the Company and/or the Company Entities by the Principal, together with




Principal Capital, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member.

(a)     Subject to the provisions of this Section 4 and Section 5, the Company and the Company Entities agree that, in consideration for Executive's Services, Executive shall receive Executive's Non-Voting Membership Interest. Executive shall have the right, no more than once per year, to audit the books and records of the Company Entities. Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment. Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence of Company Proceeds in excess of $5,000 to which Executive was entitled pursuant to the provisions of this Section, but which failed to be distributed to Executive.

(b)     The Company shall advance to Executive from time to time with Company prior approval funds reasonably required to pay for the personal living expenses of Executive and his immediate family members (the "Executive Advance Amount"). The Executive Advance Amount shall be deducted from Executive's portion of Company Proceeds to which Executive is entitled under the provisions of Section 4(a).

(c)     Notwithstanding anything in this Agreement to the contrary, the Company Proceeds to which Executive is entitled under Section 4(a) shall be further reduced by 100% of all Company Team Equity Payments made by the Company as of such date.

(d)     Notwithstanding anything in the Company's and the Company Entities' Operating Agreements (collectively, the "Operating Agreements") to the contrary, the Company's and the Company Entities' Managing Members shall make a distribution (a "Special Tax Distribution") to the Members, Pro Rata in accordance with the relative amount by which the positive Cumulative Tax Amount of each Member exceeds the cumulative distributions which have been made to such Member pursuant to the Operating Agreements as modified by this Agreement, until the cumulative amount distributed to the Members equals the positive Cumulative Tax Amounts of the Members. Without limiting other provisions of this Agreement, Special Tax Distributions (i) shall be distributed to the Members regardless of a Member's individual tax situation and regardless of when a Member became a Member of the Company, (ii) shall be considered to be in anticipation of, and shall be offset against and reduce as quickly as possible, all amounts otherwise distributable to such Member, other than amounts which represent the repayment of loans or interest thereon, and (iii) shall be debited against the Capital Accounts of the Members to the same extent as the distributions against which the Special Tax Distributions are offset. The Company's and the Company Entities' Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

(e)     At any time following the five (5) year anniversary of this Agreement, Executive shall have the right, subject to the express prior written consent of the Company, to convert Executive's Non-Voting Membership Interest to Executive's Voting Membership Interest. In the event Executive provides the Company with notice of such election at any time following such five (5) year anniversary, Executive's Non-Voting Membership Interest shall be automatically converted to Executive's Voting Membership Interest.

 

(f)     The Operating Agreements are hereby deemed amended and modified to incorporate the provisions of this Section.  Tevfik Arif, the direct and/or indirect majority member of the Company and each Company Entity, hereby executes this Agreement in order to acknowledge and to confirm his agreement to the foregoing.  By signing this Agreement individually, Tevfik Arif shall sign solely in his capacity as managing member and/or majority member of the Company and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution, provided, however, that the foregoing limitation of liability shall apply only so long as Tevfik Arif retains direct or indirect control and majority ownership of the Company and each Company Entity.

5.     VESTING SCHEDULE.  Notwithstanding the provisions of Section 4 above to the contrary, with respect to any particular Company Investment (as hereinafter defined), until such time as the Principal has received a return of 100% of his Total Principal Company Contribution plus a 10% return thereon (at which time Executive shall be deemed fully vested with respect to such Company Investments), Executive's Membership Interest will vest on the basis of the earlier of (i) one-thirty-sixth (1/36th) per month from and after the later of (y) the Company Investment Date (as hereinafter defined) or (z) the Effective Date, or (ii) the date upon which the Principal receives Company Proceeds from a Company Investment (as hereinafter defined).  For purposes of this Agreement, (y) "Company Investments" means investments by the Company or any Company Entity, including, without limitation, the Company investments listed on Annex "B" hereto; it being understood that in the event the Company and/or any Company Entity participate in a Company Investment, such Company Investment shall be treated as a single Company Investment for all purposes of this Agreement; and (z) "Company Investment Date" means the date on which either an agreement has been executed or an investment has been made by a Company Entity with respect to a Company Investment.

6.     FRINGE BENEFITS.

(a)     Generally.  Executive shall be eligible for fringe benefits pursuant to any pension, retirement, profit sharing or other employee fringe benefit plan that the Company makes available to employees of the Company and/or its subsidiaries and for which Executive will qualify according to his eligibility under the provisions thereof.

(b)     Insurance.  The Company shall pay for the cost of the health, dental, life, and disability insurance plans maintained by the Company for its professional/senior staff for Executive.   The Company shall maintain directors and officers insurance for its executives.

(c)     Vacation, Holidays and Illness.  During the term of this Agreement, Executive shall be entitled to days off for vacation (not less than (and no greater than without Company approval) four (4) weeks per year), holidays, illness or other appropriate purposes, which vacation shall be scheduled at times reasonably convenient to the Company.

(d)     Company Cars and Residences.  During the term of this Agreement, Executive shall be entitled to use for himself and his immediate family members Company automobiles, Company apartment and condominium units and Company homes, in each case solely to the extent retained and maintained by the Company for the nonexclusive use of one or



# Operating Agreement

## OF

### BAYROCK  GROUP  LLC

#### A LIMITED LIABILITY COMPANY

#### ORGANIZED UNDER THE LAWS OF

#### THE STATE OF

#### NEW YORK

2.3     Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5
2.4     Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
2.5     Registered Agent and Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
2.6     Principal Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
2.7     Publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

## ARTICLE III
## PURPOSE; NATURE OF BUSINESS

## ARTICLE IV
## ACCOUNTING AND RECORDS

4.1     Records to be Maintained . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
4.2     Reports to Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
4.3     Tax Returns and Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

## ARTICLE V
## NAMES AND ADDRESSES OF MEMBERS

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS

6.1     Management Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7
6.2     Liability of Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
6.3     Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
6.4     Representations and Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
6.5     Conflicts of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
6.6     Member's Standard of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

## ARTICLE VII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

7.1     Initial Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
7.2     Additional Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
7.3     Enforcement of Commitments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
7.4     Capital Account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
7.5     No Obligation to Restore Deficit Balance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
7.6     Withdrawal; Successors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
7.7     Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
7.8     Investment of Capital Contributions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
7.9     No Personal Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

## ARTICLE VIII
## ALLOCATIONS AND DISTRIBUTIONS

8.1     Profits and Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
8.2     Profits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
8.3     Losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
8.4     Special Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
8.5     Curative Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

8.6     Other Allocation Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
8.7     Distribution of Net Cash Flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARTICLE IX
TAXES
9.1     Tax Matters Partner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
9.2     Mandatory Section 754 Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

ARTICLE X
TRANSFER OF MEMBERSHIP INTEREST
10.1    Compliance with Securities Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10.2    Transfer of Economic Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10.3    Transfer of Membership Interest and Admission of Substitute Member . . . . . . . . . . 16
10.4    Status of Transferee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
10.5    Death, Dissolution, Bankruptcy or Incompetency of a Member . . . . . . . . . . . . . . . . . 17
10.6    Dispositions not in Compliance with this Article Void . . . . . . . . . . . . . . . . . . . . . . . . 17

ARTICLE XI
DISSOCIATION OF A MEMBER
11.1    Dissociation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
11.2    Rights of Dissociating Member . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARTICLE XII
DISSOLUTION AND WINDING UP
12.1    Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12.2    Effect of Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.3    Distribution of Assets on Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
12.4    Winding Up and Filing Articles of Dissolution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE XIII
MISCELLANEOUS
13.1    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.2    Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.3    Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.4    Binding Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.5    Saving Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.6    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.7    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.8    No Membership Intended for Nontax Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
13.9    No Rights of Creditors and Third Parties under Agreement . . . . . . . . . . . . . . . . . . . . 21
13.10   General Interpretive Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Limited Liability Company Operating Agreement**

**of**

**Bayrock Group. LLC**

This Limited Liability Company Operating Agreement of the above, a limited liability company organized pursuant to the New York Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

1.1 **Act.** The New York Limited Liability Company Law and all amendments to the Act.

1.2 **Additional Contribution.** An additional Capital Contribution payable by the Members to the Company pursuant to Article VII.

1.3 **Additional Contribution Share.** A Member's proportionate share of an Additional Contribution, (i) equal to the product of (A) such Member's Initial Sharing Ratio (set forth in Schedule A to this Agreement) and (B) such Additional Contribution or (ii) as otherwise agreed by the Members under Section 7.2.

1.4 **Agreement.** This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

1.5 **Articles.** The Articles of Organization of the Company, as amended from time to time, and filed with the Department of State of New York.

1.6 **Assignee.** A transferee of a Membership Interest who has not been admitted as a Substitute Member.

1.7 **Bankrupt Person.** A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

1.8 **Business Day.** Any day other than Saturday, Sunday or any legal holiday observed in the State of New York.

1.9 **Capital Account.** The account maintained for a Member or Assignee determined in accordance with Article VII.

1

**1.10    Capital Contribution.**  Any contribution of Property or services made by or on behalf of a Member or Assignee.

**1.11    Commitment.**  The Capital Contributions that a Member is obligated to make, including a Member's Initial Capital Contribution and any Additional Contribution Share of a Member.

**1.12    Company.**  The company named at beginning of this Operating Agreement, a limited liability company formed under the laws of New York, and any successor limited liability company.

**1.13    Default Interest Rate.**  The prime rate published by the Wall Street Journal for the last Business Day on which a Commitment is payable.

**1.14    Delinquent Member.**  A Member who has failed to meet the Commitment of that Member.

**1.15    Disposition (Dispose).**  Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

**1.16    Dissociation.**  Any action which causes a Person to cease to be a Member as described in Article XI hereof.

**1.17    Dissolution Event.**  An event, the occurrence of which will result in the dissolution of the Company under Article XII.

**1.18    Distribution.**  A transfer of Property to a Member on account of a Membership Interest as described in Article VIII.

**1.19    Effective Date.**  The date of filing of the Articles of Organization or such other date as set forth in the Articles of Organization.

**1.20    Fiscal Year.**  The calendar year.

**1.21    Initial Capital Contribution.**  The Capital Contribution agreed to be made by the Members as described in Article VII.

**1.22    Initial Membership Interest.**  The Initial Membership Interest set forth in Schedule A.

**1.23    Initial Sharing Ratio.**  The Initial Sharing Ratio set forth in Schedule A.

**1.24    Management Right.**  The right of a Member to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

**1.25    Member.**  A Person executing the Agreement as a Member, and a Substitute Member.

**1.26    Membership Interest.**  The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

2

**1.27    Net Cash Flow.** With respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Members may determine, (d) repayment of principal on any financing and (e) taxes.

**1.28    Organization.** A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

**1.29    Person.** An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of New York.

**1.30    Principal Office.** The Principal Office of the Company set forth in Section 2.6.

**1.31    Proceeding.** Any administrative, judicial, or other adversary proceeding, including without limitation litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

**1.32    Property.** Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

**1.33    Schedule A.** Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, Initial Membership Interest and Initial Sharing Ratio of each Member, and the Member designated as the Tax Matters Partner.

**1.34    Sharing Ratio.** With respect to any Member, as of any date, the ratio (expressed as a percentage) of (i) such Member's Capital Contribution to (ii) the aggregate Capital Contributions of all Members, or such other ratio as shall be agreed by all Members from time to time. The Initial Membership Interest and Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members. In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

**1.35    Substitute Member.** An Assignee who has been admitted to all of the rights of membership pursuant to Section 10.3 of the Agreement.

**1.36    Tax Characterization and Additional Tax Terms.** It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes. For such purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Section 7.4 and the provisions of Article VIII) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively. In addition, the following terms shall have the following meanings:

(a)    Adjusted Capital Account Deficit shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations; and

(ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)    Code shall mean the Internal Revenue Code of 1986.

(c)    Nonrecourse Deductions has the meaning set forth in Section 1.704-2(b)(1) of the Tax Regulations.

(d)    Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Tax Regulations.

(e)    Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulations.

(f)    Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Tax Regulations.

(g)    Partner Nonrecourse Deductions has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)    Partnership Minimum Gain has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Tax Regulations.

(i)    Profits and Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i) shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section

4

1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i), shall be subtracted from such taxable income or loss;

(iii)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 8.4 or 8.5 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 8.4 or 8.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)    Tax Regulations shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time. All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

1.37    **Unit.** One of the  100 units of Membership Interest that are authorized to be issued under this Agreement. Each Unit represents a Membership Interest with an Initial Sharing Ratio of   one percent   percent (  1   %), subject to adjustment as provided herein. A Unit is divisible into fractional parts. References to Units herein shall be solely for the purpose of certificating the Membership Interests authorized hereunder. Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement without reference to the number of Units held by Members.

## ARTICLE II
## FORMATION

2.1    **Organization.** The Members hereby organize the Company as a New York limited liability company pursuant to the provisions of the Act.

2.2    **Agreement.** For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members executing the Agreement hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended. It is the express intention of the Members that the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule. To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act. In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

2.3    **Name.** The name of the Company is the name set forth at the beginning of this Operating Agreement, and all business of the Company shall be conducted under that name.

2.4     **Term.** The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement on   as set forth in article unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.

2.5     **Registered Agent and Office.** The registered agent for the service of process and the registered office shall be that Person and location reflected in the Articles. The Members, may, from time to time, change the registered agent or office through appropriate filings with the Department of State of New York. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

2.6     **Principal Office.** The Principal Office of the Company shall be located at

                725 Fifth Avenue, New York, New York 10022

2.7     **Publication.** Within 120 days after the Effective Date, the Members shall cause a notice containing the substance of the Articles, in the form required by the Act, to be published once in each week for six successive weeks in two newspapers of the county in which the Principal Office is located.

## ARTICLE III
## PURPOSE; NATURE OF BUSINESS

The business purpose of the Company is to engage in any and all business activities permitted under the laws of the State of New York.

The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III. The Company exists only for the purpose specified in this Article III, and may not conduct any other business without the unanimous consent of the Members. The authority granted to the Members hereunder to bind the Company shall be limited to actions necessary or convenient to this business.

## ARTICLE IV
## ACCOUNTING AND RECORDS

4.1     **Records to be Maintained.** The Company shall maintain the following records at the Principal Office:

        (a)     a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with the information set forth on Schedule A relating to each Member's Initial Capital Contribution, number of Units, Membership Interest and Sharing Ratio;

(b)      a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendment has been executed;

(c)      a copy of the Company's federal, state and local income or information tax returns and reports for the three most recent Fiscal Years;

(d)      a copy of this Agreement including all amendments thereto; and

(e)      the Company's books and records, including financial statements of the Company, which shall be open to inspections by the Members or their agents at reasonable times.

4.2      **Reports to Members.**  The Company shall provide reports, including a balance sheet, statement of profit and loss and changes in Members' accounts, and a statement of cash flows, at least annually to the Members at such time and in such manner as the Members may determine reasonable.

4.3      **Tax Returns and Reports.**  The Members, at Company expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and the Company shall prepare and deliver to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information returns and reports required by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns.

## ARTICLE V
## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as stated on Schedule A.

## ARTICLE VI
## RIGHTS AND DUTIES OF MEMBERS

6.1      **Management Rights.**  Management of the Company shall be vested in all of its Members, who shall manage the Company solely in their capacity as Members of the Company.  Each Member shall have authority to bind the Company.  Any matter that requires the vote or consent of the Members shall be decided by the Members holding at least a majority of the Membership Interests, except that (a) the assignment of a Membership Interest and the admission of a Substitute Member shall require the approvals set forth in Sections 10.2 and 10.3, and (b) the following actions shall require the consent of all of the Members:

(a)      any amendment to the Agreement or to the Articles;

(b)      the sale of Company Property other than in the ordinary course of business;

(c)      the merger or consolidation of the Company with any other Person;

(d)      the continuation of the Company after a Dissolution Event;

(e)     the borrowing of funds or the pledging, mortgaging or otherwise encumbering of any Company Property, except in the ordinary course of business.

(f)     the admission of a new Member; and

(g)     the requirement that Additional Contributions be made.

6.2     **Liability of Members.**  No Member shall be liable as such for the liabilities of the Company.

6.3     **Indemnification.**  A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

6.4     **Representations and Warranties.**  Each Member, and in the case of a trust or other entity, the person(s) executing the Agreement on behalf of the entity, hereby represents and warrants to the Company and each other Member that: (a) if that Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest.  The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

6.5     **Conflicts of Interest.**

(a)     A Member shall be entitled to enter into transactions that may be considered to be competitive with the Company, it being expressly understood that Members may enter into transactions that are similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members shall account to the Company and hold as trustee for it any Property, profit, or benefit derived by the Member, without the consent of all of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)     A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest.  A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

6.6     **Member's Standard of Care.**  Each Member shall discharge the Member's duties to the Company and the other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances.  In discharging its duties, a Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid.  The Company shall indemnify and hold harmless each Member against any loss,



damage or expense (including attorneys' fees) incurred by the Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Member of liability for failure to perform his or her duties in accordance with the standards set forth herein. The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

## ARTICLE VII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

7.1 **Initial Contributions.** Each Member shall make the Initial Capital Contribution described for that Member on Schedule A at the time and on the terms specified in Schedule A and shall perform that Member's Commitment, and shall receive the number of Units of Membership Interest and Sharing Ratio described for that Member on Schedule A. The Company shall issue certificates representing the Units subscribed for by the Members. No Member shall have the right to withdraw or be repaid any Capital Contribution except as provided in the Agreement.

7.2 **Additional Contributions.** In addition to the Initial Capital Contributions, the Members shall make such Additional Contributions (in accordance with their respective Additional Contribution Shares) as shall be determined with the consent of all the Members. Upon the unanimous agreement of the Members, the Members shall make such Additional Contributions in accordance with such agreement.

7.3 **Enforcement of Commitments.** In the event any Member (a Delinquent Member) fails to perform the Delinquent Member's Commitment, the other Members shall give the Delinquent Member a notice of such failure. If the Delinquent Member fails to perform the Commitment (including the payment of any costs associated with the failure and interest at the Default Interest Rate) within ten Business Days of the giving of such notice, the other Members may take such action as they deem appropriate, including but not limited to enforcing the Commitment in the court of appropriate jurisdiction in the state in which the Principal Office is located or the state of the Delinquent Member's address as reflected in the Agreement. Each Member expressly agrees to the jurisdiction of such courts but only for purposes of such enforcement.

7.4 **Capital Account.** A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704—1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a) To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b) To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member assumed by the Company as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations)

other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c) The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d) In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XII hereof upon the dissolution of the Company. The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

7.5 **No Obligation to Restore Deficit Balance.** Except as required by law, no Member shall be required to restore any deficit balance in its Capital Account.

7.6 **Withdrawal; Successors.** A Member shall not be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than the Commitments. Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company under Section 708 of the Code by reason of such interest transfer.

7.7 **Interest.** No Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

7.8 **Investment of Capital Contributions.** The Capital Contributions of the Members shall be invested in demand, money market or time deposits, obligations, securities, investments or other instruments constituting cash equivalents, until such time as such funds shall be used for Company purposes. Such investments shall be made for the benefit of the Company.

7.9 **No Personal Liability.** No Member shall have any personal liability for the repayment of any Capital Contributions of any Member.

ARTICLE VIII
ALLOCATIONS AND DISTRIBUTIONS

8.1   **Profits and Losses.** Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article VIII.

8.2   **Profits.** After giving effect to the special allocations set forth in Sections 8.4 and 8.5, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a)   First, to the Members, if any, who received any allocation of Losses under Section 8.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 8.3(c) for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Members pursuant to this Section 8.2(a) for all prior Fiscal Years;

(b)   Second, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 8.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 8.2(b) for all prior Fiscal Years;

(c)   Third, to the Members, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 8.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 8.2(c) for all prior Fiscal Years;

(d)   Fourth, the balance of the Profits remaining, if any, among the Members, *pro rata*, in proportion to their respective Sharing Ratios.

8.3   **Losses.** After giving effect to the special allocations set forth in Sections 8.4 and 8.5, Losses shall be allocated as set forth in Section 8.3(a), subject to the limitation in Section 8.3(b) below, and, if applicable, as provided in Section 8.3(c).

(a)   Losses for any Fiscal Year shall be allocated in the following order of priority:

(i)   first, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits allocated to each such Partner pursuant to Section 8.2(d) hereof for all prior Fiscal Years, over (B) the cumulative Losses allocated to such Partner pursuant to this Section 8.3(a)(i) for all prior Fiscal Years; and

(ii)   the balance, if any, among the Members in proportion to their respective Sharing Ratios.

(b)   The Losses allocated pursuant to Section 8.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 8.3(a) hereof, the limitation set forth in this Section 8.3(b) shall

be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c) In the event that there are any remaining Losses in excess of the limitations set forth in Section 8.3(b), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

8.4 **Special Allocations**. The following special allocations shall be made in the following order:

(a) <u>Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(f) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations. This Section 8.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b) <u>Partner Minimum Gain Chargeback</u>. Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Tax Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations. This Section 8.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(c) <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 8.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VIII have been tentatively made as if this Section 8.4(c) were not in this Agreement.

(d) <u>Gross Income Allocation</u>. In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5)

of the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 8.4(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VIII have been made as if Section 8.4(c) and this Section 8.4(d) were not in this Agreement.

(e)   Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(f)   Partner Nonrecourse Deductions.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Tax Regulations.

(g)   Mandatory Allocations Under Section 704(c) of the Code.  Notwithstanding the foregoing provisions of this Section 8.4, in the event Section 704(c) of the Code or Section 704(c) of the Code principles applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of Profits or Losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members.  Any item of Company income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-1(b)(2)(iv) of the Tax Regulations) and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; provided, however, that curative allocations consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such property; further provided, however, that any other method allowable under applicable Tax Regulations may be used for any contribution of property as to which there is agreement between the contributing Member and the other Members.

8.5   **Curative Allocations.**  The allocations set forth in Sections 8.4 (a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.5.  Therefore, notwithstanding any other provision of this Article VIII (other than the Regulatory Allocations), the Members shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 8.2 and 8.3.  The Members (i) shall take into account future Regulatory Allocations under Sections 8.4(a) and 8.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 8.4(e) and 8.4(f) and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years.  This Section 8.5 shall control notwithstanding any

reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

### 8.6   Other Allocation Rules.

(a)   For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

(b)   The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(c)   Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(d)   To the extent permitted by Section 1.704-2(h)(3) of the Tax Regulations, the Members shall endeavor to treat distributions of Net Cash Flow as having been made from the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

(e)   Except as otherwise provided in this Article VIII, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(f)   For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article VIII, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members. This section 8.6(f) shall not alter the amount of allocations among the Members pursuant to this Article VIII, but merely the character of income so allocated.

(g)   Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liability unless such arrangement has been approved by all Members. To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's *pro rata* share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

8.7   **Distribution of Net Cash Flow.**   (a)   _Amounts and Timing_.   Net Cash Flow shall be distributed to the Members in proportion to their respective shares of Profits allocated to each of them for such period (and prior periods) under Section 8.2, to the extent that such amounts have not been distributed previously under this Section 8.7. Such distributions, shall be made within 90 days of the end

of each Fiscal Year to those persons recognized on the books of the Company as Members or as Assignees on the last day of such Fiscal Year.

(b)    _Amounts Withheld_. All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 8.7 for all purposes under this Agreement. The Members are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provisions of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(c)    _Draws for Payment of Estimated Taxes_. The Company may pay to each Member a quarterly draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article VIII, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 8.7(c) by the lesser of (a) the entire amount otherwise distributable to the Member receiving such draw and (b) the entire amount of any unrepaid draws pursuant to this Section 8.7(c). All draws hereunder shall be made to the Members pro rata based on their estimated respective shares of Profits allocated to each of them for such Fiscal Year under this Article VIII. Any draw by any Member made pursuant to this Section 8.7(c) shall not result in any decrease in the Sharing Percentage of such Member.

## ARTICLE IX
## TAXES

9.1    **Tax Matters Partner.** The Member designated as such on Schedule A shall be the Tax Matters Partner of the Company pursuant to Section 6231(a)(7) of the Code. Such Member shall not resign as the Tax Matters Member unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Member and such Member has given its consent in writing to its appointment as Tax Matters Member. The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company. The Tax Matters Member is authorized to employ such accountants, attorneys and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties. In addition, such Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

9.2    **Mandatory Section 754 Election.** Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Members, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be. The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

15

## ARTICLE X
### TRANSFER OF MEMBERSHIP INTEREST

10.1 **Compliance with Securities Laws.** No Unit of Membership Interest has been registered under the Securities Act of 1933, as amended, or under any applicable state securities laws. A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Units of Membership Interest, except upon compliance with the applicable federal and state securities laws. The Members shall have no obligation to register any Member's Units of Membership Interest under the Securities Act of 1933, as amended, or under any applicable state securities laws, or to make any exemption therefrom available to any Member.

10.2 **Transfer of Economic Interest.** The right to receive allocations of Profits and Losses and to receive Distributions may not be transferred in whole or in part unless the following terms and conditions have been satisfied:

The transferor shall have:

(a) assumed all costs incurred by the Company in connection with the transfer;

(b) furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code, cause the Company to be treated as an association taxable as a corporation for income tax purposes or otherwise adversely affect the Company or the Members; and

(c) complied with such other conditions as the Members may reasonably require from time to time.

Transfers will be recognized by the Company as effective only upon the close of business on the last day of the calendar month following satisfaction of the above conditions. Any transfer in contravention of this Article X and any transfer which if made would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void *ab initio* and ineffectual and shall not bind the Company or the other Members.

10.3 **Transfer of Membership Interest and Admission of Substitute Member.** Except for the right to receive allocations of Profits and Losses and to receive Distributions, a Membership Interest of any Member may not be transferred in whole or in part, and a transferee shall not have a right to become a Member unless the following terms and conditions have been satisfied:

(a) All of the other Members shall have consented in writing to the transfer and substitution, which consent may be arbitrarily withheld by any such Member;

(b) The transferee shall have assumed the obligations, if any, of the transferor to the Company, including the obligation to fulfill the *pro rata* portion of the transferor's then existing or subsequently arising Commitment allocable to the transferred Unit of Membership Interest or portion thereof; and

(c)     The transferor and the transferee shall have complied with such other requirements as the non-transferring Members may reasonably impose, including the conditions that the transferee:

(i)     adopt and approve in writing all the terms and provisions of the Agreement then in effect; and

(ii)     pay such fees as may be reasonable to pay the costs of the Company in effecting such substitution.

**10.4     Status of Transferee.**   A transferee of a Unit of Membership Interest who is not a Substitute Member shall be entitled only to receive that share of Profits, Losses and Distributions, and the return of Capital Contribution, to which the transferor would otherwise be entitled with respect to the interest transferred, and shall not have the rights of a Member of the Company under the Act or this Agreement including without limitation the right to obtain any information on account of the Company's transactions, to inspect the Company's books or to vote with the Members on, or to grant or withhold consents or approvals of, any matter. The Company shall, however, if a transferee and transferor jointly advise the Company in writing of a transfer of the Unit of Membership Interest, furnish the transferee with pertinent tax information at the end of each Fiscal Year.

**10.5     Death, Dissolution, Bankruptcy or Incompetency of a Member.**   Upon the death, dissolution, adjudication of bankruptcy or adjudication of incompetency of a Member, such Member's successors, executors, administrators or legal representatives shall have all the rights of a Member (except as provided by the last sentence of this Section 10.5) for the purpose of settling or managing such Member's estate, including such power as such Member possessed to substitute a successor as a transferee of such Member's interest in the Company and to join with such transferee in making the application to substitute such transferee as a Member. However, such successors, executors, administrators or legal representatives will not have the right to become a Substitute Member in the place of their predecessor in interest unless all of the other Members shall so consent as provided in Section 10.3(a) hereof.

**10.6     Dispositions not in Compliance with this Article Void.**   Any attempted Disposition of a Unit of Membership Interest, or any part thereof, not in compliance with this Article shall be void *ab initio* and ineffectual and shall not bind the Company.

## ARTICLE XI
## DISSOCIATION OF A MEMBER

**11.1     Dissociation.**   A Person shall cease to be a Member upon the happening of any of the following events:

(a)     the withdrawal, retirement or expulsion of a Member;
(b)     the bankruptcy of a Member;

(c)     in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

(d)     in the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e)     in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(f)     in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g)     in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

11.2    **Rights of Dissociating Member.**  In the event any Member dissociates prior to the expiration of the term of this Agreement:

(a)     if the Dissociation causes a dissolution and winding up of the Company under Article XII, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that, if such Dissociation results from a withdrawal of a Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members;

(b)     if the Dissociation does not cause a dissolution and winding up of the Company under Article XII, the Company shall pay to the Member, within *six* months of such Dissociation, an amount equal to the value of the Member's Membership Interest in the Company, to be paid over a period not to exceed          five years together with interest at the minimum rate necessary to avoid the imputation of interest under the Code.  The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Agreement and the fair market value of the Member's Membership Interest as of the date of Dissociation as determined by

reduced by any damages sustained by the Company as a result of the Member's Dissociation.

## ARTICLE XII
## DISSOLUTION AND WINDING UP

12.1    **Dissolution.**  The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)     the expiration of the term of the Agreement, unless the Company is continued with the consent of all of the Members;

(b)      the unanimous written consent of all of the Members;

(c)      the Dissociation of any Member, unless at the time of such Dissociation there are at least two remaining Members and the Company is continued with the consent of all of the remaining Members within 180 days after such Dissociation;

(d)      when there is but one Member.

12.2     **Effect of Dissolution.**  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New York.

12.3     **Distribution of Assets on Dissolution.**  Upon the winding up of the Company, the Members acting together or such Person(s) designated by the Members representing at least a majority of the Members' Sharing Ratios) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Members determine that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)      first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)      second, to the setting up of any reserves which the Members may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Members to an escrow agent or trustee selected by the Members to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Members shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)      then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Members.

If at the time of liquidation the Members shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Members may, in order to avoid such loss, defer liquidation.

12.4  **Winding Up and Filing Articles of Dissolution.** Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New York for filing. The articles of dissolution shall set forth the information required by the Act. The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.

## ARTICLE XIII
## MISCELLANEOUS

13.1  **Notices.** Notices to the Company shall be sent to the Principal Office of the Company. Notices to the Members shall be sent to their addresses set forth on Schedule A. Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 13.1. Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given with receipt confirmed if and when delivered personally, given by prepaid telegram or mailed first class, postage prepaid, delivered by courier, or sent by facsimile, to such Members at such address.

13.2  **Headings.** All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

13.3  **Entire Agreement.** This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

13.4  **Binding Agreement.** The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

13.5  **Saving Clause.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby. If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

13.6  **Counterparts.** The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart. Any counterpart of either the Agreement shall for all purposes be deemed a fully executed instrument.

13.7  **Governing Law.** The Agreement shall be governed by and construed in accordance with the laws of the State of New York.

13.8  **No Membership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the New York Partnership Law. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making

such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

13.9    **No Rights of Creditors and Third Parties under Agreement**.   The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.  The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person.  Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

13.10    **General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)    references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)    a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

(e)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean without limitation by reason of enumeration.

21

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.

_____          X _____
Name                                              Name     Tevfik Arif

                                                  Rif International Group, Inc.

_____          By: X _____
Name                                              Name     Tevfik Arif


_____Bayrock Group_____ L.L.C.

By: X _____
        Member

22

## SCHEDULE A

| Name and Address of Member | Description and Value of Initial Capital Contribution | No. of Units, Initial Membership Interest and Sharing Ratio |
|---|---|---|

**SCHEDULE A**

| Name and Address of Member | Description and Value of Initial Capital Contribution | No. of Units, Initial Membership Interest and Sharing Ratio |
|---|---|---|
| Tevfik Arif | | 99 |
| Rif International Group, Inc | | 1 |
| Total Units | | 100 |

CONSENT OF MEMBERS

OF

BAYROCK GROUP LLC

The undersigned, being all the members of the above Limited Liability Company (the "Company"), hereby consent to the following action in lieu of an annual meeting:

RESOLVED, that the following persons are hereby elected to be the Managers of the Company, each to serve until such person's successor is duly elected and has qualified or until such person's earlier resignation or removal:

Tevfik Arif

_____

_____

_____

Dated as of June 1, 2002

MEMBERS:

_____
(Name)     Tevfik Arif

_____
(Name)

_____
(Name)

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JODY KRISS, for himself and derivatively on behalf of the Delaware limited liability companies Bayrock Spring Street, LLC, and Bayrock Whitestone LLC, the Arizona limited liability company Bayrock Camelback LLC, the Florida limited liability companies Bayrock Merrimac LLC, and Bayrock Ocean Club LLC, and the New York limited liability company Bayrock Group, LLC, | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| BAYROCK GROUP LLC; RIF INTERNATIONAL GROUP, INC.; TEVFIK ARIF; JULIUS SCHWARZ; MEL DOGAN; DOGAN & ASSOCIATES; 2027 EMMONS AVE LLC; FELIX SATTER (aka FELIX SATER); VICTORIA SATER; ALEX SALOMON; ALEX SALMON & CO., PC; JOSEPH BENCIVENGA; BUENA VISTA ALARGA LLC; BAYROCK SPRING STREET LLC; BAYROCK WHITESTONE LLC; BAYROCK HOLDINGS LLC; BAYROCK NATURAL STONE LLC; BAYROCK SAPIR ORGANIZATION LLC; 246 SPRING STREET HOLDINGS II LLC; BAYROCK/SAPIR ORGANIZATION HOLDINGS LLC; BAYROCK/SAPIR ORGANIZATION REALTY LLC; 151-45 SIXTH ROAD WHITESTONE PARTNERS LLC; CAMELBACK DEVELOPMENT PARTNERS LLC; STILLMAN BAYROCK MERRIMAC LLC; SB HOTEL ASSOCIATES LLC, 550 SEABREEZE DEVELOPMENT LLC, | ) ) ) ) ) ) ) ) ) C.A. No.: ) 4154-VCS ) ) ) ) ) ) ) ) |
| True Defendants, | ) ) |
| And | ) ) |
| BAYROCK GROUP LLC; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK, LLC; BAYROCK MERRIMAC LLC; BAYROCK OCEAN CLUB, LLC; BAYROCK SPRING STREET LLC, | ) ) ) ) |
| Nominal Defendants. | ) ) |

**OPENING BRIEF IN SUPPORT OF THE BAYROCK DEFENDANTS' MOTION TO DISMISS**

Barry M. Willoughby (No. 1016)
Kathaleen St. J. McCormick (No. 4579)
**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Dated: May 13, 2009                    *Attorneys for the Bayrock Defendants*

## <u>Table of Contents</u>

**Page**

<u>PRELIMINARY STATEMENT</u> ............................................................................ 2

<u>STATEMENT OF FACTS</u> ................................................................................. 3

<u>ARGUMENT</u> ................................................................................................. 9

    I.      PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION ........................................................................ 9

          A.     The Arbitration Clause Delegates the Question of Substantive <u>Arbitrability to the Arbitrator</u> ..................................... 10

          B.     All Claims Brought Against the Company Entities Are Subject <u>to Arbitration</u> ............................................. 14

          C.     All Claims Brought Against Non-Signatories to the November <u>10 Contract Are Also Subject to Arbitration</u> ................... 15

          D.     Plaintiff's Claims Fall Within the Scope of the Arbitration <u>Provision of the November 10 Contract</u> ....................... 17

    II.     PLAINTIFF'S CLAIMS AGAINST THE NON-RESIDENT DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ................................................ 19

    III.    PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PROPERLY JOIN INDISPENSABLE PARTIES ................................. 21

<u>**Table of Authorities**</u>

**Cases**

*Apollo Computer, Inc. v. Berg,*
   886 F.2d 469 (1st Cir. 1989) ...................................................... 12

*Bapu Corp. v. Choice Hotels Int'l, Inc.,*
   2008 U.S. Dist. LEXIS 71252 (D.N.J. Sept. 8, 2008) ............................. 12

*Baypo Ltd. P'ship, v. Tech. JV, LP,*
   940 A.2d 20 (Del. Ch. 2007) ................................................ 12, 13

*Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys. Inc.,*
   2009 U.S. Dist. LEXIS 3725 (E.D. La. Jan. 12, 2009) ........................... 12

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.,*
   203 F.R.D. 677 (S.D. Fla. 2001)
   *aff'd on other grounds*, 312 F.3d 1349 (11th Cir. 2002) ....................... 12

*Canaday v. Superior Court in and for New Castle County,*
   119 A.2d 347 (Del. 1955) ..................................................... 22

*Carder v. Carl M. Freeman Communities, LLC,*
   2009 Del. Ch. LEXIS 2 (Del. Ch. Jan. 5, 2009) ........................... passim

*Choctaw Generation L.P. v. Am. Home Assur. Co.,*
   271 F.3d 403 (2d Cir. 2001) .................................................. 15

*Citigfinancial, Inc. v. Newton,*
   359 F. Supp. 2d 525 (S.D. Miss. 2005) ........................................ 12

*Collins & Aikman Prods. Co. v. Building Sys.,*
   58 F.3d 16 (2d. Cir. 1995) ............................................... 14, 17

*Contec Corp. v. Remote Solution Co. Ltd.,*
   398 F.3d 205 (2d Cir. 2005) .............................................. 12, 16

*Denney v. BDO Seidman, L.L.P.,*
   412 F.3d 58 (2d Cir. 2005) ................................................... 16

*Dresser Indus. v. Global Indus. Techs.,*
   1999 Del. Ch. LEXIS 118 (Del. Ch. June 9, 1999) ............................... 9

*Elster v. American Airlines, Inc.,*
   106 A.2d 202 (Del. Ch. 1954) ................................................. 22

*First Options of Chicago, Inc. v. Kaplan*,
　514 U.S. 938 (1995) ................................................................................ 10

*Fisk Ventures, LLC v. Segal*,
　2008 Del. Ch. LEXIS 158 (Del. Ch. May 7, 2008) .................................. 19

*FSC Securities Corp. v. Freel*,
　14 F.3d 1310 (8th Cir. 1994) ................................................................. 12

*Global Detection and Reporting, Inc., v. Securetec Detektions-Systeme AG*, 2008 U.S.
　Dist. LEXIS 95038 (S.D.N.Y. 2008) ...................................................... 22

*Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*,
　960 F. Supp. 701 (S.D.N.Y. 1997) .......................................................... 22

*Graham v. State Farm Mutual Automobile Ins. Co.*,
　565 A.2d 908, 910 (Del. 1989) .................................................................. 9

*Grigson v. Creative Artists Agency, L.L.C.*,
　210 F.3d 524 (5th Cir. 2000) .................................................................. 16

*HDS Inv. Holding, Inc. v. Home Depot, Inc.*,
　2008 Del. Ch. LEXIS 154 (Del. Ch. Oct. 17, 2008) ............................ 9, 11

*Hoffman v. Finger Lakes Instrumentation, LLC*,
　789 N.Y.S.2d 410 (N.Y. Sup. Ct. 2005) ............................................ 12, 15

*Hovensa, L.L.C. v. Technip Italy S.p.A.*,
　2009 U.S. Dist. LEXIS 21191 (S.D.N.Y. Mar. 16, 2009) ...................... 22

*Hughes Tool Co. v. Fawcett Publ's, Inc.*,
　350 A.2d 341 (Del. 1975) ........................................................................ 21

*Imo Indus. v. Sierra Int'l, Inc.*,
　2001 Del. Ch. LEXIS 120 (Del. Ch. Oct. 1, 2001) .................................. 9

*In re Arrow Inv. Advisors, LLC* ..................................................................... 18

*In re Wheelabrator Techs., Inc. S'holders Litig.*,
　1992 Del. Ch. LEXIS 196 (Del. Ch. Sept. 1, 1992) .................................. 7

*IOTEX Communs., Inc. v. Defries*,
　1998 Del. Ch. LEXIS 236 (Del. Ch. Dec. 21, 1988) .............................. 18

*James & Jackson, LLC v. Willie Gary, LLC*,
　906 A.2d 76 (Del. 2006) ............................................................ 10, 12, 13

*Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*,
　456 F. Supp. 831 (D. Del. 1978) .............................................................. 22

*Kennett v. The Carlyle Johnson Machine Co.*,
   2002 Del. Ch. LEXIS 73 (Del. Ch. June 17, 2002) .................................................. 18

*Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*,
   2008 N.Y. Misc. LEXIS 6032 (N.Y. Sup. Ct., Mar. 30, 2008) ......................................... 10, 12

*McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, Inc.,
   741 F.2d 342 (11th Cir.1984) .................................................. 18

*McLaughlin v. McCann*,
   942 A.2d 616 (Del. Ch. 2008) ......................................................... passim

*McMahon v. New Castle Assocs.*,
   532 A.2d 601 (Del. Ch. 1987) .................................................. 9

*McPadden v. Sidhu*,
   2008 Del. Ch. LEXIS 123 (Del. Ch. Aug. 29, 2008).................................................. 7

*NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*,
   922 A.2d 417 (Del. Ch. 2007) .................................................. 23

*Orner v. Country Grove Inv. Group, LLC*,
   2007 Del. Ch. LEXIS 144 (Del. Ch. Oct. 12, 2007).................................................. 11

*Palmer v. Moffat*,
   2001 Del. Super. LEXIS 386 (Del. Super. Ct. Oct. 10, 2001).................................................. 12, 21

*R&R Capital LLC v. Buck & Doe Run Valley Farms, LLC*,
   2008 Del. Ch. LEXIS 115 (Del. Ch. Aug. 19, 2008).................................................. 7

*Ross v. Am. Express Co.*,
   547 F.3d 137 (2d Cir. 2008) .................................................. 16

*Ryan v. Volpone Stamp Co., Inc.*,
   107 F. Supp. 2d 369 (S.D.N.Y. 2000) .................................................. 22

*SBC Interactive, Inc. v. Corporate Media Partners*,
   714 A.2d 758 (Del. 1998) .................................................. 9

*Schuss v. Penfield Partners, L.P.*,
   2008 Del. Ch. LEXIS 73 (Del. Ch. June 13, 2008) .................................................. 7

*Smith Barney, Harris Upham & Co. v. Luckie*,
   647 N.E.2d 1308 (N.Y. 1995).................................................. 9

*Sprint Nextel Corp. v. iPCS, Inc.*,
   2008 Del. Ch. LEXIS 90 (Del. Ch. July 14, 2008).................................................. 20

*Terminix Int'l Co., L.P. v. Palmer Ranch L.P.*,
  432 F.2d 1327 (11th Cir. 2005) ......................................................... 12

*Travelers Indem. Co. v. Household Int'l, Inc.*,
  775 F. Supp. 518 (D.Conn. 1991) ...................................................... 22

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960) ........................................................................... 9

*Worthy v. Payne*,
  1998 Del. Ch. LEXIS 13 (Del. Ch. Feb. 12, 1998) ............................. 9

**Statutes**

10 *Del. C.* § 3104 ................................................................................. 20

**Rules**

American Arbitration Association Employment Mediation Rule 7(a) ................................. 11, 15

Ct. Ch. Rule 12(b)(1) .......................................................................... 3

Ct. Ch. Rule 12(b)(2) .............................................................. 3, 19, 20

Ct. Ch. Rule 12(b)(7) ................................................................... 3, 22

Ct. Ch. Rule 19(a) ....................................................................... 22, 23

Ct. Ch. Rule 19(b) ................................................................. 22, 23, 24

Ct. Ch.. Rule 19 ............................................................................ 22, 24

## <u>NATURE AND STAGE OF THE PROCEEDINGS</u>

Plaintiff commenced this action by filing a Verified Complaint in this Court on November 4, 2008.  Plaintiff took no action to serve the Complaint for approximately four (4) months.

On March 24, this Court granted the parties' stipulated order for defendants to answer or otherwise move on or before April 30, 2009.  A second extension until May 15, 2009, for filing an answer or otherwise pleading was approved by the Court.

On May 12, 2009, defendants moved to dismiss plaintiff's Complaint in its entirety.

This is the Opening Brief in Support of Defendants' Motion to Dismiss.

## PRELIMINARY STATEMENT

This case arises from an employment contract executed on November 10, 2005 (the "November 10 Contract"), between plaintiff, Jody Kriss and a real estate company, Bayrock Group LLC ("Bayrock Group"), its founder, Tevfik Arif, and its subsidiaries.  The November 10 Contract provided that Mr. Kriss would receive profit interests in certain subsidiaries in consideration for serving as Director of Finance of Bayrock Group.  Notably, Mr. Kriss does not include any allegation in his complaint that he has not been paid monies owed to him under the November 10 Contract.  Instead, he appears to be seeking declaratory relief for alleged inchoate rights under the November 10 Contract.

This case should be dismissed for three reasons:

First, the November 10 Contract contains a binding arbitration clause that should be enforced.

Second, this Court does not have personal jurisdiction over 20 of the 29 defendants in this action.

Third, and finally, this Court does not have personal jurisdiction over indispensable parties to this action.

For all of these reasons, as set forth more fully below, this case should be dismissed.

# STATEMENT OF FACTS[1]

**The Parties**

*Bayrock Group LLC and Tevfik Arif*

Defendant Bayrock Group LLC ("Bayrock Group") is a New York limited liability

engaged in real estate development.  Compl. ¶ 2.  Mr. Arif is the managing member of Bayrock

Group.  The Affidavit of Tevfik Arif  ("Arif Aff.") ¶ 1.   Mr. Arif is a Turkish citizen and resides

in New York.  Compl. ¶ 4.1; Arif Aff. ¶ 1.  Aside from the formation of certain Delaware

entities, neither Bayrock Group LLC nor Mr. Arif have any contacts with Delaware, and the

formation of these Delaware entities is not at issue in this lawsuit.  Arif Aff. ¶ 3.

*Plaintiff*

Plaintiff, Jody Kriss, was hired by Bayrock Group as its Director of Finance through an

Employment Agreement executed on November 10, 2005 (the "November 10 Contract" or "Nov.

10 Contract," attached to the Arif Affidavit as Exhibit A).

*The Company Entities*

In consideration for his employment with Bayrock Group, the November 10 Contract

gave Mr. Kriss a right to profit interests in certain "affiliates, subsidiaries and related entities of

[Bayrock Group LLC] and/or Tevfik Arik doing business under the 'Bayrock' name."  Nov. 10

Contract ¶ 4.C.  The business entities in which Mr. Kriss was given profit interests are defined as

the "Company Entities" in the November 10 Contract.   Aside from Bayrock Group, all of the

entities named as defendants to this lawsuit (except for Dogan & Associates, Alex Salmon &

---

[1]     The "Facts" recited herein are drawn from plaintiff's Complaint (cited herein as "Compl. at ¶
__") and from documents referenced in the Complaint and other documents that settled precedent
permit the Court to consider in connection with a motion to dismiss pursuant to Rules 12(b)(1),
(2), and (7).  Defendants do not concede, and largely dispute, the accuracy of the facts alleged in
the Complaint for any purpose beyond the resolution of defendants' motion to dismiss.

Co., PC, and RIF International Group, Inc.) have been so named by virtue of plaintiff's claim that these defendants are Company Entities under November 10 Contract.  Of the eighteen purported Company Entities identified by plaintiff, nine were incorporated in Delaware (the "Delaware entities") and nine were incorporated in other states (the "non-Delaware entities").  Compl. ¶¶ 2-3.  The parent entity – Bayrock Group – is not incorporated in Delaware.  Compl. ¶ 3.1.  Neither Bayrock Group nor any of the Company Entities are head-quartered in Delaware. *Id*.  Bayrock Group is not engaged in one real estate development project in Delaware.  Arif Aff. ¶ 3.  Neither Bayrock Group nor its subsidiaries engage in business with any Delaware-based developers.  *Id*.  In short, none of the non-Delaware entities have any contact with Delaware.  *Id*.

### *Other Named Defendants*

Plaintiff has also named the following persons and entities as defendants to this action: Julius Schwarz, Bayrock Group's Executive Vice President and former General Counsel and a member of Bayrock Group and certain Company Entities (Arif Aff. ¶ 4)**;** Felix Satter, a former employee of Bayrock Group (*id.*);  Mr. Satter's wife, Victoria Sater, whose only connection with the defendants is that she's married to one of its former employees (*id.*); Alex Salomon, Bayrock Group's accountant (*id.*);  Mr. Salomon's accounting firm, Alex Salomon & Co., PC, and a former employee of Mr. Salomon, Joseph Bencivenga (*id.*).  All of these persons have purportedly aided in the various conspiracies alleged by plaintiff, though the Complaint offers no specifics with respect to the purported wrongful acts any of these individuals.

Mr. Mel Dogan, Mr. Arif's personal counsel, has also been named as an individual defendant to this action, as has his sole proprietorship, Dogan & Associates.  As set forth more fully in his affidavit filed herewith, Mr. Dogan has no personal or business contacts with Delaware.  *See, generally,* The Affidavit of Mel Dogan ("Dogan Aff.").  Mr. Dogan does not

have an office in Delaware, nor does he conduct business in the State of Delaware. Dogan Aff. ¶ 6. He does not advertise his services in the State of Delaware or intentionally direct his services to a Delaware market. *Id.* None of his clients are Delaware residents. *Id.* He typically renders his services to Mr. Arif in New York City, and has never rendered any services to Mr. Arif when he has been in Delaware or when Mr. Arif has been in Delaware. *Id.* All advice rendered by Mr. Dogan in connection with the November 10 Contract was rendered in New York City. *Id.* And Mr. Dogan was not involved in the formation of any of the Delaware Company Entities. Dogan Aff. ¶ 5.

A New York corporation, RIF International Group, Inc. ("RIF"), was also named as a defendant, though plaintiff does not claim that RIF committed any wrongs. In fact, plaintiff acknowledge that he does not know exactly what RIF does. *See* Compl. ¶ 4.4 (noting that RIF is of "unknown purpose").

**The Terms of the November 10 Contract**

The November 10 Contract was entered into by and between Bayrock Group, Mr. Arif, the Company Entities, and Jody Kriss. Compl. ¶ 35; Nov. 10 Contract p. 1. It was effective as of February 1, 2003 (though executed on November 10, 2005) through December 31, 2008, and could be terminated by Bayrock Group for cause (Nov. 10 Contract § 8(a)) or by agreement of the parties (*id.* § 10(b)). The negotiations of this contract took place entirely in New York City. Dogan Aff. ¶ 4.

Section 4 of the November 10 Contract governed the terms of Mr. Kriss's profit interests in Bayrock Group and the Company Entities. Specifically, Section 4 of the Contract gave Mr. Kriss an "Executive Membership Interest," defined as a 10% non-voting profit interests in Bayrock Group and the Company Entities. *Id.* § 4.G. The November 10 Contract gave Mr.

Kriss the immediate right to seek advancements, in an amount not to exceed $10,000 per month, against any future distributions Mr. Kriss might receive as a result of his profit interests.  *Id.* § 4(g).  It also gave Mr. Kriss an immediate right to "audit the books and records of the Company Entities."

Unlike the right to seek advancements and inspect the books and records, Mr. Kriss's rights to future distributions from his profit interests were subject to certain conditions.  First, Mr. Kriss's profit interests did not immediately vest; rather, they were subject to a staggered vesting schedule:  Until Mr. Arif received in distributions an amount equal to his total capital contributions to Bayrock Group and the Company Entities, Mr. Kriss's interest would vest only periodically and only in a partial amounts (which varied under certain circumstances).  *Id.* § 5. Even after the interests fully vested, the amount of money advanced to Mr. Kriss per the November 10 Contract was to be deducted from any amount he was due in distributions. Further, Mr. Kriss was only permitted distributions if and *after* Mr. Arif received distributions in the amount of 10% of the total principal company contribution made by Mr. Arif to Bayrock Group and/or the Company Entities.  *Id.* §§ 4.G and 4.K.

To effectuate the portion of the November 10 Contract giving Mr. Kriss various rights to profit interests, the November 10 Contract "amended and modified" the operating agreements of the various Company Entities.  The contract stipulates that Mr. Arif was a signatory to the contract for this purpose.  In Section 4, it is made clear that "individually, Tevfik Arif shall sign solely in his capacity as a managing member and/or majority member of [Bayrock Group] and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution . . . ."  *Id.* § 4(d).  This language is consistent with the operating agreements of Bayrock Group and the Company Entities, which exculpate Mr. Arif from personal liability for

actions taken on behalf of the Bayrock Group or the Company Entities. *See, e.g.,* Operating Agreement of Bayrock Group LLC § 6.2, Arif Aff. Exh. B.[2]

Importantly, the November 10 Contract contains an arbitration provision that sets forth binding procedure for resolving "[a]ll claims and disputes (a "Dispute") between the parties arising out of or relating to [the November 10 Contract]." The arbitration clause provides that "the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ('AAA') currently in effect, unless the parties mutually agree otherwise." Nov. 10 Contract at 9. The rules of the American Arbitration Association currently in effect state with respect to jurisdiction that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[3]

Also notable, the November 10 Contract contains a choice of law provision, requiring that the contract "be governed and construed in accordance with the domestic laws of the State of New York." *Id.* § 18.

**The Claims**

Plaintiff Kriss does not contend that he has been denied any specific rights under the November 10 Contract. No where does he contend that he has not received any monies that he was due under the contract. Instead, he seeks, in the first instance, a declaration that the

---

[2]     Operating Agreements and exculpatory provisions are appropriate for this Court's consideration on motion to dismiss. *See., e.g., Schuss v. Penfield Partners, L.P.,* 2008 Del. Ch. LEXIS 73, at *10-11 (Del. Ch. June 13, 2008) (taking judicial notice of content of a limited partnership agreement on motion to dismiss); *R&R Capital LLC v. Buck & Doe Run Valley Farms, LLC,* 2008 Del. Ch. LEXIS 115, at *5-6 (Del. Ch. Aug. 19, 2008) (same); *McPadden v. Sidhu,* 2008 Del. Ch. LEXIS 123, at *33 n.28 (Del. Ch. Aug. 29, 2008) (taking judicial notice of documents containing exculpatory provisions); *In re Wheelabrator Techs., Inc. S'holders Litig.,* 1992 Del. Ch. LEXIS 196, at *38 (Del. Ch. Sept. 1, 1992).

[3]     American Arbitration Association Mediation Rule 7(a) is included at Tab 1 in the compendium of Unreported Authorities filed herewith.

November 10 Contract did not create profit interests for him in the Company Entities.  Compl. ¶¶ 37-39.  He also brings two putative counts for breach of the covenant of good faith (Compl. ¶¶ 40-53), four putative counts of fraud ("common law fraud," and then securities fraud under Delaware, Florida and Arizona law) (Compl. ¶¶ 54-101), two putative counts for aiding and abetting in the alleged frauds (Compl. ¶¶ 102-105), one putative count for breach of fiduciary duties (Compl. ¶¶ 106-136), and one putative count for aiding and abetting in the breach of fiduciary duties (Compl. ¶¶ 137-138).

As set forth more fully herein, plaintiff's claims should be dismissed because they are subject to a binding arbitration provision in the November 10 Contract, and because this Court does not have personal jurisdiction over indispensible parties.

## ARGUMENT

**I.    PLAINTIFF'S CLAIMS ARE SUBJECT TO ARBITRATION AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

On a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), this Court assesses the "nature of the wrong alleged and the remedy available in order to determine whether a legal, as opposed to an equitable remedy, is available and fully adequate."[4]  Delaware Courts dismiss claims for lack of subject matter jurisdiction where such claims are contractually subject to arbitration because "arbitration is an adequate legal remedy."[5]  Delaware policy favors arbitration.[6]  Thus, "unless 'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,'" a presumption will arise in favor of arbitration.[7]

The November 10 Contract contains a provision requiring the arbitration of "[a]ll claims and disputes . . . arising out of or relating to this Agreement or the breach thereof."[8]  The claims in plaintiff's Complaint arise out of and relate to the November 10 Contract.  The arbitration

---

[4]    *Imo Indus. v. Sierra Int'l, Inc.*, 2001 Del. Ch. LEXIS 120, at *4-5 (Del. Ch. Oct. 1, 2001) (citing *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987) ("if a realistic evaluation leads to the conclusion that an adequate legal remedy is available," this court will not exercise jurisdiction)).

[5]    *Dresser Indus. v. Global Indus. Techs.*, 1999 Del. Ch. LEXIS 118, at *12 (Del. Ch. June 9, 1999).

[6]    *See Graham v. State Farm Mutual Automobile Ins. Co.*, 565 A.2d 908, 910 (Del. 1989).  *See also*, *HDS Inv. Holding, Inc. v. Home Depot, Inc.*, 2008 Del. Ch. LEXIS 154, at *14-15 (Del. Ch. Oct. 17, 2008) ("Delaware's policy of enforcing arbitration agreements is substantially similar to the policies under the FAA and New York law." (citing *Smith Barney, Harris Upham & Co. v. Luckie,* 647 N.E.2d 1308, 1315 (N.Y. 1995)).

[7]    *Worthy v. Payne*, 1998 Del. Ch. LEXIS 13, at *2 (Del. Ch. Feb. 12, 1998) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)); *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del. 1998) ("[a]ny doubt as to arbitrability is to be resolved in favor of arbitration").

[8]    Nov. 10 Contract ¶ 15.

clause therein, therefore, deprives this Court of subject matter jurisdiction over this action, insofar as it provides an adequate legal remedy for the resolution of this dispute.  When the issue of arbitration is raised in litigation, this Court has noted that two threshold questions arise:  (a) whether the dispute "should be resolved in arbitration (the issue of arbitrability)" and (b) "whether the issue of arbitrability should be decided by the court or the arbitrator (the issue of substantive arbitrability)."[9]  The Court need not reach the issue of arbitrability in the case at hand, because, as set forth more fully below, the issue of substantive arbitrability resolves in favor of arbitration.  This is true with respect to claims brought against all alleged parties to the November 10 Contract, including the Company Entities.  In addition, because the claims brought against the non-signatories to the November 10 Contract are sufficiently intertwined with the claims brought against the parties to the November 10 Contract, the non-signatories to the contract may also force plaintiff to arbitrate the issue of arbitrability with respect to those claims brought against them.  In any event, the issue of arbitrability also resolves in favor of arbitration, as plaintiff's claims fall with the scope of the arbitration clause at issue.

> **A.     The Arbitration Clause Delegates the Question of Substantive Arbitrability to the Arbitrator**

Generally, a court will presume that the "parties intended courts to decide issues of substantive arbitrability."[10]  Such a presumption will not be applied, however, where the arbitration clause at issue contains "clear and unmistakable" language to the contrary effect.[11]

---

[9]     *McLaughlin v. McCann*, 942 A.2d 616, 621 (Del. Ch. 2008) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).

[10]    *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006). *Accord Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 2008 N.Y. Misc. LEXIS 6032, at *6 (N.Y. Sup. Ct., Mar. 30, 2008); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[11]    *See, e.g.,Willie Gary,* 906 A.2d at 79.

Here, the arbitration clause contains "clear and unmistakable" language that the parties intended to submit the question of substantive arbitrability to the arbitrator.

The arbitration clause of the November 10 Contract provides that "the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ('AAA') currently in effect, unless the parties mutually agree otherwise." Nov. 10 Contract at 9. Rule 7 of the AAA Commercial Arbitration Rules ("AAA Rule 7") states with respect to jurisdiction that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[12] Thus, AAA Rule 7 operates to delegate the question or substantive arbitrability to the arbitrator.

When interpreting an arbitration clause in a contract that contains a choice of law selection provision, this Court will enforce the arbitration clause applying the parties' chosen law.[13] Because the November 10 Contract contains a New York choice of law provision, this Court must apply New York law when enforcing the arbitration clause at issue.

New York state courts, applying the majority view of Federal courts, have held that where, as here, the parties have invoked the rules of the AAA in the context of an arbitration clause, the parties have evinced the requisite "clear and unmistakable" intent to delegate the

---

[12]     AAA Rule 7(a).

[13]     *See, e.g., HDS Inv. Holding, Inc. v. Home Depot, Inc.*, 2008 Del. Ch. LEXIS 154, at *12 (Del. Ch., Oct. 17, 2008) ("Because the Agreement contains a choice of law provision selecting New York law, this Court must apply New York law to determine which disputes the parties agreed to arbitrate." (citations omitted)); *Orner v. Country Grove Inv. Group, LLC*, 2007 Del. Ch. LEXIS 144, at *18-20 & n.14 (Del. Ch. Oct. 12, 2007) (noting that a Maryland choice of law provision in a Subscription Agreement arguably required application of Maryland law in the interpreting of the arbitration clause in the Subscription Agreement); *see also*, *First Options*, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

issue of substantive arbitrability to be the arbitrator (the "majority view").[14]  The majority view

has the "primary advantage" of judicial efficiency.[15]  That is, "once it has been determined that

an arbitration clause references the rules of an arbitral body that authorize the arbitrator to decide

the issue of arbitrability, the trial court is not required to delve into the scope of the arbitration

clause and the details of the contract pending lawsuit – that is the job of the arbitrator."[16]

Because the parties referenced the AAA Rules, under New York law, the analysis stops

here: The majority view should be applied and the substantive arbitrability of this dispute should

be determined by the arbitrator.

To the extent plaintiff argues that the law of the forum applies, the same conclusion is

reached under Delaware law, though Delaware courts apply a slightly different analysis.

Delaware courts have also adopted the majority view.[17]  Delaware courts, however, will not

necessarily apply the majority view where the arbitration clause in question carves-out certain

---

[14]        *See, e.g., Life Receivables Trust,* 2008 N.Y. Misc. LEXIS 6032, at *6; *Contec Corp. v. Remote Solution Co. Ltd.*, 398 F.3d 205, 208 n.1 (2d Cir. 2005) (applying majority view, interpreting and agreement governed by New York law); *Bollinger Shipyards Lockport LLC v. Northrop Grumman Ship Sys. Inc.*, 2009 U.S. Dist. LEXIS 3725, at *14 (E.D. La. Jan. 12, 2009) (articulating the majority view, noting that all Federal courts that have considered this issue have adopted the majority view); *Apollo Computer, Inc. v. Berg,* 886 F.2d 469 (1st Cir. 1989) (applying majority view); *FSC Securities Corp. v. Freel*, 14 F.3d 1310 (8th Cir. 1994) (applying majority view); *Terminix Int'l Co., L.P. v. Palmer Ranch L.P.*, 432 F.2d 1327 (11th Cir. 2005) (same); *Bapu Corp. v. Choice Hotels Int'l, Inc.*, 2008 U.S. Dist. LEXIS 71252, at *9-11 (D.N.J. Sept. 8, 2008) (same); *Citigfinancial, Inc. v. Newton*, 359 F. Supp. 2d 525 (S.D. Miss. 2005) (same); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 685 (S.D. Fla. 2001) (same), *aff'd on other grounds*, 312 F.3d 1349 (11th Cir. 2002). *See also*, *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Sup. Ct. 2005) (interpreting New York state law consistent with Federal case law on the basis of the New York Court of Appeals' well-established policy of promoting "nationwide uniformity" in federal and state arbitration laws).

[15]        *McLaughlin*, 942 A.2d at 623.

[16]        *Id.*

[17]        *Willie Gary, LLC*, 906 A.2d at, 80; *accord*, *Carder v. Carl M. Freeman Communities, LLC,* 2009 Del. Ch. LEXIS 2, at *12-14 (Del. Ch. Jan. 5, 2009); *McLaughlin*, 942 A.2d 616; *Baypo Ltd. P'ship*, *v. Tech. JV, LP*, 940 A.2d 20 (Del. Ch. 2007).

aspects of the dispute to be arbitrated.[18]  For example, in *Willie v. Gary*, the case which

established Delaware's rule on this issue, the Delaware Supreme Court did not interpret a

reference to the AAA Rules as evincing a "clear and unmistakable" intent to arbitrate the issue of

arbitrability, because the clause at issue also reserved a litigant's ability to obtain injunctive

relief and specific performance in the courts.[19]

The *Willie Gary* decision made clear, however, that where the language at issue contains

no carve-outs (like those present in *Willie Gary*), and instead the arbitration clause in question

"generally provides for arbitration of all disputes" in addition to invoking the AAA rules,

Delaware courts will apply the majority view and defer the question of substantive arbitrability

to the arbitrator.[20]

Furthermore, this Court, applying the rule of *Willie Gary,* has held that where AAA Rules

are present in the language at issue, Delaware courts will apply a presumption in favor of

arbitrating the issue of substantive arbitrability.[21]  The purpose of the majority view – increased

judicial efficiency – motivates this presumption.[22]

The arbitration clause at issue here provides this Court with no reason to depart from the

majority rule.  Unlike *Willie Gary*, the November 10 Contract contains no carve-outs to the

arbitration clause.  Not only are there no carve-outs in the arbitration clause at issue, but the

arbitration clause is expansive in scope.  The language used here compares favorably with the

---

[18]     *Willie Gary*, 906 A.2d at 80.

[19]     *Id.* at 81.

[20]     *See, e.g., Carder*, 2009 Del. Ch. LEXIS 2, at *12-14 (applying majority view where the arbitration clause invoking the AAA rules contained no carve-outs); *McLaughlin* 942 A.2d at 626 (same); *Baypo*, 940 A.2d at 25 (same).

[21]     *McLaughlin*, 942 A.2d at 625

[22]     *Id.*

language interpreted in *Carder* and *McLaughlin*, in each case the Court ruled that the issue of substantive arbitrability is for the arbitrator.  The pertinent language in *Carder* and *McLaughlin*, respectively, committed to arbitration "all disputes arising in any way under the Agreement," and disputes "aris[ing] under th[e] agreement."[23]  Here, the parties chose a "broader locution" of the relevant language, surrendering to arbitration "*[a]ll* claims and disputes . . . between the parties *arising out of or relating to* [the November 10 Contract]."[24]  If the plaintiffs in *Carder* and *McLaughlin* could not avoid arbitrating the issue of arbitrability under their comparatively narrow arbitration clauses, then certainly plaintiff cannot do so here.

### B.  All Claims Brought Against the Company Entities Are Subject to Arbitration

A review of the Complaint shows that plaintiff affirmatively alleges that the Company Entities are ***parties*** to the November 10 Contract, along with Bayrock Group.  Compl. ¶ 35.  That paragraph specifically alleges that: "The November 10 contract was executed by the parties (i) Arif; (ii) [Bayrock Group]; ***each Company Entity***; and (iv) Kriss."  Likewise, plaintiff asserts in Paragraph 134, that all of the Company Entities are under the control of Bayrock Group.  Accordingly, based on the allegations of the Complaint, this dispute "arises out of or relates to" the November 10 Contract as provided in the arbitration provision because plaintiff has affirmatively alleged that the Company Entities are ***parties*** to the November 10 Contract.  An arbitrator appointed pursuant to Section 15 of the contract should therefore adjudicate whether the other Company Entities are parties as plaintiff alleges.  At a minimum, based on the

---

[23]     *Carder*, 2009 Del. Ch. LEXIS 2, at *13; *McLaughlin*, 942 A.2d at 618.

[24]     Nov. 10 Contract ¶ 14 (emphasis added); *Carder*, 2009 Del. Ch. LEXIS 2, at *17 (describing "arising out of or relating to" as a "broader locution" than the language at issue in *Carder*); *see also*, *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16, 20 (2d. Cir. 1995) (interpreting an arbitration clause, describing "relating to" as the paradigm of a broad clause).

allegations of plaintiff's Complaint, the arbitrator can effectively adjudicate the case because of the control the Bayrock Group allegedly wields over the other entities.

### C. All Claims Brought Against Non-Signatories to the November 10 Contract Are Also Subject to Arbitration

All claims brought against non-signatories to the November 10 Contract are also subject to arbitration.[25]  Under the doctrine of estoppel, courts will prohibit "a signatory from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estoped party has signed."[26]  The reason for this is that "although arbitration is a matter of contract and cannot, in general, be required for a matter involving an arbitration agreement non-signatory, a signatory to that agreement cannot . . . have it both ways, that is, he cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains the arbitration provision, but, on the other hand, deny the arbitration clause's applicability because the defendant is a non-signatory."[27]

In evaluating whether the claims against a non-party are intertwined so as to implicate the arbitration clause, courts consider whether there is a "sufficient relationship [1] to [the

---

[25]     To the extent the issue of who constitutes signatories or parties to the November 10 Contract is disputed, this Court need not address it:  Who constitutes a party to the November 10 Contract is a question of substantive arbitrability to be determined by the arbitrator, insofar as it is a question regarding the "existence, scope or validity" of the agreement and is within the jurisdiction of the arbitrator pursuant to AAA Rule 7.  *Cf. Contec*, 398 F.3d at 210 (deeming the question of whether the right to compel arbitration was validly assigned to a non-signatory an issue within scope of the arbitrator's jurisdiction under AAA Rule 7).

[26]     *Choctaw Generation L.P. v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001); *see also Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (N.Y. Supr. 2005) (citing cases).

[27]     *Hoffman*, 789 N.Y.S.2d at 415 (quotations omitted) (citations omitted).

signatories] and [2] to the rights created under the agreement."[28]   Both of these considerations

weigh in favor of arbitration here.

First, with respect to the relationship to the signatories, having alleged that all non-

signatories acted in concert with the signatories to defraud plaintiff or aided and abetted in such

conduct, plaintiff would be hard-pressed to deny that the non-signatories are sufficiently related

for the purpose of arbitration.[29]   But other factors compel this conclusion as well.  In determining

whether non-signatories are sufficiently related for the purpose of compelling arbitration, courts

have considered, for example, whether the parties are "subsidiaries, affiliates, agents, and other

related business entities,"[30] and/or whether, though not parties to the contract, the non-signatories

were "explicitly named [in the contract] as having certain tasks to perform under that contract."[31]

Both of these factors weigh against plaintiff here.  To the extent plaintiff argues that the

Company Entities are not signatories to the November 10 Contract as a grounds for evading

arbitration, plaintiff must concede that, by the definition given to the term in the November 10

Contract, the Company Entities are "affiliates, subsidiaries and related entities of [Bayrock

Group, LLC] and/or Tevfik Arif . . . ."[32]   Furthermore, the non-signatories who are not Company

Entities were named as defendants specifically because of their purported agency relationship

with the other defendants.  The non-signatories therefore bear a relationship sufficiently

---

[28]     *Contec Corp.*, 398 F.3d at 209.

[29]     *See, e.g., Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) ("Application of equitable estoppel is warranted when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.").

[30]     *Ross v. Am. Express Co.*, 547 F.3d 137, 144 (2d Cir. 2008) (citing cases).

[31]     *Ross*, 547 F.3d at 144 (citing cases).

[32]     Nov. 10 Contract § 4.C.

connected to the contracting parties to warrant estopping plaintiff from avoiding arbitration of claims brought with respect to the non-signatories.

Second, with respect to the relationship among the claims, all claims are intertwined in that they arise from a common nucleus of facts, namely, the execution of the November 10 Contract, the intent behind executing that contract and the contention that the parties' performance under that contract (or, allegedly, non-performance or inability to perform under that contract).

As a final matter, this Court has held that where, as here, the question of substantive arbitrability should be deferred to the arbitrator, unless plaintiff can show that the non-signatories' contention that the claims against them are subject to arbitration is "wholly groundless," the question of the scope of the arbitration remedy with respect to non-signatories must be deferred to the arbitrator.[33]

### D. Plaintiff's Claims Fall Within the Scope of the Arbitration Provision of the November 10 Contract

Even aside from the issue of substantive arbitrability, plaintiff's claims fall within the scope of the arbitration provision of the November 10 Contract. The parties to the November 10 Contract chose the broadest locution of arbitration clauses possible, catching in its scope "[a]ll claims and disputes (a "Dispute") . . . arising out of or relating to [the November 10 Contract]."[34] And this Court has held that in the context of arbitration clauses, the phrase "'related to' . . .

---

[33]    *McLaughlin*, 942 A.2d at 626-627 ("[A]bsent a clear showing that the party desiring arbitration has essential no non-frivolous argument about substantive arbitrability to make before the arbitrator, the court should require the signatory to address its arguments against arbitrability to the arbitrator. Otherwise, the efficiency gains contemplated by *Willie Gary* will be greatly undermined.").

[34]    Nov. 10 Contract § 14 (emphasis added); *Carder*, 2009 Del. Ch. LEXIS 2, at *17 (describing "arising out of or relating to" as a "broader locution" than the language at issue in *Carder*); *see*

explicitly extends beyond the four corners of the contract."[35]  Certainly, declarations relating to the validity of the contract relate to the contract.[36]  Claims for breach of a contract's implied covenant arise from and relate to the contract.  Claims of breach of fiduciary duties in connection with alternative entities have been found to be within the scope of an arbitration provision in contracts creating that fiduciary relationship.[37]  Claims of fraud in connection with the November 10 Contract also fall within its broad scope,[38] – just as this Court will not permit plaintiffs to bootstrap a fraud claim into a breach of contract merely by adding the words "fraudulently induced,"[39] it is also "well established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract."[40]

*      *      *

For the reasons set forth above, this Court should therefore dismiss this case based on the binding arbitration clause in the November 10 Contract.

---

*also*, *Collins & Aikman Prods. Co. v. Building Sys.,* 58 F.3d 16 (2d. Cir. 1995) (interpreting an arbitration clause, describing "relating to" as the paradigm of a broad clause).

[35]   *Carder*, 2009 Del. Ch. LEXIS 2, at *17.

[36]   *C.f. Kennett v. The Carlyle Johnson Machine Co.*, 2002 Del. Ch. LEXIS 73, at *8-9 (Del. Ch. June 17, 2002) ("[Plaintiff] sought to amend his Complaint by abandoning the request that the transfer of the membership interests be rescinded and by asking, instead, that the Court declare that [certain defendants] could not transfer the interests. . . . [R]egardless of how one tries to define the relief sought, the question, in substance, nonetheless remains . . . .").

[37]   *See, e.g., In re Arrow Inv. Advisors, LLC*, 2009 Del. Ch. LEXIS 66, at *23 (Del. Ch. Apr. 23, 2009).

[38]   *See, e.g., Carder*, 2009 Del. Ch. LEXIS 2, at *15-16 (holding that claims of fraud brought in connection with an agreement fell within the scope of a similarly broadly worded arbitration clause).

[39]   *IOTEX Communs., Inc. v. Defries,* 1998 Del. Ch. LEXIS 236, at *17 (Del. Ch. Dec. 21, 1988).

[40]   *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, Inc., 741 F.2d 342, 344 (11th Cir.1984) (citing cases).

## II.   PLAINTIFF'S CLAIMS AGAINST THE NON-RESIDENT DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

"Once a defendant moves to dismiss under Rule 12(b)(2), the burden rests on the plaintiff to demonstrate the two bedrock requirements for personal jurisdiction: (1) a statutory basis for service of process; and (2) the requisite 'minimum contacts' with the forum to satisfy constitutional due process."[41]   As the party invoking this Court's jurisdiction, "the plaintiff has the burden to show a basis for the Court's jurisdiction over the nonresident defendant."[42]   When assessing whether there is a statutory basis for service of process, Delaware courts have been careful not to "break[] the necessary connection between statutory words and common usage of the English language."[43]   On a motion to dismiss pursuant to Rule 12(b)(2), "[t]he court may consider the pleadings, affidavits, and any discovery of record."[44]

This Court does not have personal jurisdiction over Bayrock Group or Mr. Arif.  This Court does not have jurisdiction over the non-Delaware entities named as defendants herein.  Nor does this Court have jurisdiction over defendants Dogan & Associates, Messrs. Schwarz, Dogan, or the Saters (collectively, with Bayrock Group, Mr. Arif, and the non-Delaware entities, the "non-resident defendants").  No allegations supporting any conclusion to the contrary have been made.

Plaintiff has attempted service of process on all non-Delaware defendants pursuant to Delaware's Long-Arm Statute, codified at 10 *Del. C.* § 3104.  Under Section 3104, a non-resident person or entity is deemed to submit to the jurisdiction of the Delaware courts by

---

[41]   *Fisk Ventures, LLC v. Segal*, 2008 Del. Ch. LEXIS 158, at *18-19 (Del. Ch. May 7, 2008).

[42]   *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 Del. Ch. LEXIS 90, at *17 (Del. Ch. July 14, 2008) (citing cases).

[43]   *Fisk Ventures*, 2008 Del. Ch. LEXIS 158, at *18 (citation omitted).

committing any one of several acts.  10 *Del. C.* § 3104(b).  These acts are: (1) transacting any business or performing any character of work within the state; (2) contracting to supply services or things in Delaware; (3) causing tortious injury in Delaware through an act committed in Delaware; (4) causing tortious injury in Delaware through an act committed outside Delaware if the person solicits business in Delaware, engages in regular conduct in Delaware or derives substantial revenue from Delaware contacts; (5) having an interest in, using, or possessing real property in Delaware; or (6) contracting to act as a surety for a contract or other such obligation located, executed, or to be performed within Delaware at the time the contract is made.  *Id.* § 3104(c)(1)-(6).

With respect to the non-resident defendants, plaintiff's complaint does not allege a single act that would fall within any of these six categories.  Indeed, the only apparent Delaware connection to this action is the fact that nine of the 29 defendants are Delaware entities, and the contract plaintiff seeks to enforce purportedly conveys to plaintiff profit interests in these Delaware entities.  The November 10 Contract was not negotiated in Delaware.  It was not negotiated by Delaware residents or with the advice of Delaware counsel.  Nothing needed to be filed in Delaware in order for its terms to be effectuated.  The agreement did not require any action to occur in or be directed to Delaware.  Plaintiff has thus offered no grounds for bringing any of the non-resident defendants within the ambits of the long-arm statute, and it appears that there are none.[45]

Exercising personal jurisdiction over the non-resident defendants would also offend due process.  "The constitutional standard for determining whether a state may exercise judicial

---

[44]     *Sprint Nextel Corp.*, 2008 Del. Ch. LEXIS 90, at *17.

[45]     *See* The Affidavits of Messrs. Arif and Dogan, filed contemporaneously herewith, attesting to the lack of any contact the non-resident defendants have with Delaware.

power over a person is fairness and substantial justice. The critical question in making this determination is whether a reasonable person would have anticipated that his actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions."[46]  Given the dearth of any relevant Delaware contacts, no reasonable person would have anticipated being hailed into a Delaware court regarding a dispute arising from the November 10 Contract.  The non-Delaware Company Entities could not have expected that they would be required to defend a dispute under the November 10 Contract in Delaware.  As such, exercising personal jurisdiction with respect to the non-resident defendants would offend due process.

## III.   PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PROPERLY JOIN INDISPENSABLE PARTIES

This Court may dismiss claims under Court of Chancery Rule 12(b)(7) where the non-movant has failed to join a necessary and indispensable party.  Rule 19 "categorizes those persons whose joinder should be required to accord complete adjudication of claims at issue."[47] Rule 19 outlines a two-part analysis for determining whether an action must be dismissed for failure to join a necessary and indispensable party.  First, Rule 19(a) identifies what parties are "necessary" for adjudication, and, second, 19(b) sets forth the analysis to be applied when joinder of those parties is not feasible.

Under Rule 19(a), it is "necessary" for a party to be joined when:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede that person's ability to protect

---

[46]   *Palmer v. Moffat*, 2001 Del. Super. LEXIS 386, at *11 (Del. Super. Ct. Oct. 10, 2001).

[47]   *Hughes Tool Co. v. Fawcett Publ's, Inc.*, 350 A.2d 341, 344 (Del. 1975).

that interest or (ii) leave any of the persons already parties subject
to a substantial risk of incurring double, multiple, or otherwise
inconsistent obligations by reason of the claimed interest.[48]

Under Rule 19(b), when joinder of a "necessary" party is not feasible, the Court will determine

whether "in equity and good conscience" the party is "indispensable" and the action should be

dismissed.[49]  In determining whether the party is indispensable under Rule 19(b), the Court

considers the following four factors:

> First, to what extent a judgment rendered in the person's absence
> might be prejudicial to the person or those already parties; second,
> the extent to which, by protective provisions in the judgment, by
> the shaping of relief, or other measures, the prejudice can be
> lessened or avoided; third, whether a judgment rendered in the
> person's absence will be adequate; fourth, whether the plaintiff
> will have an adequate remedy is the action is dismissed for
> nonjoinder.[50]

As a general rule, "a contracting party is the paradigm of an indispensable party."[51]  The

reasons for this are manifest:  A contract implicates an interest for the purpose of Rule 19(a),

---

[48]  Ct. Ch. R. 19(a).

[49]  Ct. Ch. R. 19(b).

[50]  *Id.*

[51]  *Hovensa, L.L.C. v. Technip Italy S.P.A.*, 2009 U.S. Dist. LEXIS 21191, at *6 (S.D.N.Y. Mar. 16, 2009) (quoting *Travelers Indem. Co. v. Household Int'l, Inc.*, 775 F. Supp. 518, 527 (D. Conn. 1991)); *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 387 (S.D.N.Y. 2000) ("It is well established that a party to a contract which is the subject of the litigation is considered a necessary party."); *Global Detection and Reporting, Inc, v. Securetec Detektions-Systeme AG*, 2008 U.S. Dist. LEXIS 95038, at *3-4 (S.D.N.Y. 2008) (same) (citing cases*); Global Discount Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 707-08 (S.D.N.Y. 1997) ("As a direct party to the contract which is under dispute, Karabu is a necessary party to this litigation . . . ."); *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 836 n.7 (D. Del. 1978) ("In general, where rights sued upon arise from a contract, all parties to the contract must be joined."); *Cf. Elster v. American Airlines, Inc.,* 106 A.2d 202, 204 (Del. Ch. 1954) ("All parties to a contract sought to be cancelled are indispensable parties to the suit for cancellation unless it is obvious that one not joined has no interest whatever in the subject matter of the suit."). S*ee also*, *Canaday v. Superior Court in and for New Castle County*, 119 A.2d 347, 352 (Del. 1955) ("Decisions interpreting the Federal Rules of Civil Procedure are accorded great weight in interpreting parallel State Court rules.").  *Accord NAMA Holdings, LLC v. Related*

namely, the consideration, and it is inequitable for the purpose of Rule 19(b) to adjudicate the rights and obligations with respect to that consideration absent the parties having rights or potential obligations or liabilities with respect to that interest.

According to plaintiff, the parties to the November 10 Contract are: "(i) Arif; (ii) [Bayrock Group]; (iii) each Company Entity; and (iv) Kriss."  Compl. ¶ 34 (emphasis added). Mr. Arif, Bayrock Group and each Company Entity therefore are indispensable parties to the litigation in this Court.  Because this Court does not have personal jurisdiction over the majority of these contracting parties (Mr. Arif, Bayrock Group, or nine of the eighteen Company Entities), and because they cannot be joined for the purpose of Rule 19, plaintiff's complaint must be dismissed.

The non-Delaware defendants are also indispensable parties for reasons extrinsic to their function as contracting parties.  For example, Bayrock Group and the Company Entities have an interest in the distribution of their profit interests and the identity of their members, or any liability arising therefrom.[52]  Mr. Arif, on the other hand, has an interest in assuring that the exculpatory language of the November 10 Contract,[53] as well as the exculpatory language of the operating agreements that the November 10 Contract amends,[54] is enforced.  Furthermore, the

---

*World Mkt. Ctr., LLC*, 922 A.2d 417, 436 (Del. Ch. 2007) (deeming the parties to the disputed contract indispensable under Rule 19).

[52]    *See, e.g., Kennett v. The Carlyle Johnson Machine Co.*, 2002 Del. Ch. LEXIS 73, at *9-10 (Del. Ch. June 17, 2002) (parties contracting with respect to membership interests in limited liability companies are indispensable parties with respect to such a contract).

[53]    *See* Nov.  10 Contract § 4(d) ("[I]ndividually, Tevfik Arif shall sign solely in his capacity as a managing member and/or majority member of [Bayrock Group] and each Company Entity, and shall incur no personal liability under this Agreement as a result of said execution . . . .").

[54]    *See, e.g.,* Arif Aff. Exh. B § 6.2.

possibility of future litigation to enforce the November 10 Contract against the non-resident defendants gives rise to the real potential of inconsistent and multiple obligations.

One final Rule 19(b) factor weighs in favor of dismissal here – were this Court to dismiss this case, plaintiff would have an adequate remedy through arbitration.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that this Court enter an order dismissing plaintiff's complaint with prejudice.

Respectfully submitted,

**YOUNG CONAWAY STARGATT**
**  & TAYLOR, LLP**

*/s/ Barry M. Willoughby*
Barry M. Willoughby (No. 1016)
Kathaleen St. J. McCormick (No. 4579)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600

Dated: May 13, 2009

*Attorneys for the Bayrock Defendants*