```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  JODY KRISS and
    MICHAEL CHU'DI EJEKAM,
 4
                    Plaintiffs,
 5
                 v.                        10 Civ. 3959 (LGS)
 6
    BAYROCK GROUP LLC, et al.,
 7                                         Decision
                    Defendants.
 8
    ------------------------------x
 9
                                           New York, N.Y.
10                                         May 31, 2016
                                           11:50 a.m.
11
    Before:
12
            HON. LORNA G. SCHOFIELD
13
                                           District Judge
14

15

16          APPEARANCES

17
    SATTERLEE STEPHENS BURKE & BURKE LLP
18       Attorneys for BayRock defendants
    BY:  CHARLES KEELEY
19       MARK A. FOWLER
         WALTER A. SAURACK
20

21  MOSES & SINGER LLP
         Attorneys for Defendant Satter
22  BY:  ROBERT S. WOLF
         ROBERT B. MCFARLANE
23

24  BEYS LISTON MOBARGHA & BERLAND
         Attorneys for Defendant Satter
25  BY:  MICHAEL P. BEYS
```

```
 1                    APPEARANCES

 2

 3   LANDMAN CORSI BALLAINE & FORD P.C.
          Attorneys for Defendants Salomon, Weinreich, and
          Salomon & Co.
 4   BY:  RONALD E. JOSEPH

 5

 6   STORCH AMINI & MUNVES P.C.
          Attorneys for Defendants Roberts & Holland and Pisem
     BY:  JOHN W. BREWER
 7

 8   BLANK ROME LLP
          Attorneys for Movant Oberlander
 9   BY:  SIMON J.K. MILLER (tel.)

10

11   LEVINE SULLIVAN KOCH & SCHULZ LLP
          Attorneys for Associated Press and Telegraph Media Group
     BY:  KATHERINE M. BOLGER
12

13   Also Present:

14        FREDERICE OBERLANDER

15

16

17

18

19

20

21

22

23

24

25
```

1              (Case called)

2         THE COURT:  Good morning.

3         MR. OBERLANDER:  Your Honor, my name is Frederick

4    Oberlander on behalf of clients for whom I have a motion just

5    briefly sub judice, who I wish to be for now identified as Jane

6    Does 1, 2, and 3.

7         THE COURT:  Good morning.  You may be seated.  We are

8    here for a conference on two issues.  One is the issue

9    resulting from an order to show cause why Mr. Oberlander and

10   Mr. Lerner should not be sanctioned in connection with their

11   conduct in the three cases before me.  The other issue regards

12   the unsealing of the original complaint in this action.

13        I don't want to hear oral argument.  I have read all

14   of your papers.  They were heavy over the Memorial Day weekend

15   but gave me something interesting to read, so thank you very

16   much.

17        I do have a few questions though.  Let me ask my

18   questions before I rule.  The first question is for BayRock's

19   counsel.  Somebody from the Satterlee Stephens firm will be

20   speaking.

21        MR. SAURACK:  Your Honor, there are two things I would

22   note.  One is Mr. Vodicka I believe told me he would appear by

23   telephone.  I don't know if that access is in place right now.

24        THE COURT:  It is possible for him to call, but I

25   haven't received word that he did call in.

1          MR. SAURACK:  It's okay, your Honor.

2          MR. OBERLANDER:  Your Honor, I'm sorry.  I don't mean

3    to interrupt.  I am not a party or counsel any longer in the

4    underlying action.

5          THE COURT:  I'm having a little trouble hearing you.

6          MR. OBERLANDER:  I am not a party or counsel in the

7    underlying plenary action.  As to the sanctions motion, I'm

8    obviously a participant and a respondent, but I'm represented

9    in that.

10         If you will forgive me, there is nothing on the docket

11   that I saw that indicates that we are being brought up to date.

12   Moreover, it would mean that Blank Rome, if you forgive the

13   phrase, badly screwed the pooch by not showing up today and

14   missing a calendar call on this.

15         I'm asking the Court:  Is there some possibility that

16   the Court simply failed to docket this?  This is news to me.  I

17   was speaking with them over the weekend on related matters.  I

18   can't believe they simply wouldn't show up.  They are

19   representing me.

20         If you are going to do anything on that motion, I'm

21   going to request that you stay it until we can straighten out

22   exactly how -- what am I going to say?  I have no business

23   representing myself, and there is nothing on any docket that

24   says that is being brought up.

25         THE COURT:  I'm not sure if that is true.  I wonder if

1    we can get somebody from Blank Rome on the phone.

2         MR. OBERLANDER:  If you will forgive me, the Court

3    will note that nobody filed any notices to withdraw or

4    substitute, so they are representing me.

5         THE COURT:  I understand, and I have read their

6    papers.

7         MR. OBERLANDER:  It's not that.  All I saw was a

8    series of four postponement dates on the proceeding based on

9    requests to wait for Judge Kogan.  There is nothing that there

10   says that is being brought up.  I have no reason to dissemble.

11   I think you understand.

12        THE COURT:  I understand what you are saying.  I'm

13   trying to approach this practically.  I'm not going to hear

14   argument.  I don't think anybody will be prejudiced.  I under-

15   stand why you would like to have them here.  If we can get them

16   on the phone to avoid everyone having to collect again, that

17   would be the easiest thing to do.

18        MR. OBERLANDER:  The issue is, to be clear, I don't

19   want to accidentally waive anything by failing to object, and

20   it is not my business to be doing that.

21        THE COURT:  I understand.  You can sit down.  I

22   promise you won't be prejudiced by the fact that Blank Rome is

23   not here.  Let's give this a minute to see if we can resolve

24   that.

25        MR. OBERLANDER:  I can give you the direct phone

 1    numbers, if that is going to help.

 2            THE CLERK:  I am going to call him now from the

 3    courtroom phone.

 4            THE COURT:  Who is the he?

 5            THE CLERK:  Mr. Miller.

 6            (Pause)

 7            THE CLERK:  We are going to continue the conference

 8    now.

 9            THE COURT:  Good morning, Mr. Miller.  Sorry to get

10    you on the phone like this, apparently unexpectedly.  Mr.

11    Oberlander pointed out that he was not aware that the sanctions

12    issue was on the calendar for today.  If that is the case, my

13    apologies.  It is not my intention to hear oral argument, so I

14    don't intend to put you on the spot.  I have reviewed your

15    papers as well as everyone else's papers on that issue, and I

16    have also of course reviewed the papers on the other issue we

17    are considering today, which is the unsealing issue.

18            I was about to ask counsel for BayRock, Mr. Saurack, a

19    question, and that is:  What is the current status of the

20    BayRock entities?  Are any of them still doing business?

21            MR. SAURACK:  They are not doing business.

22            THE COURT:  Given that, what kind of privacy interest

23    do they have in the so-called BayRock documents that are not

24    privileged and don't relate to the criminal action but that we

25    might call proprietary?

C5urkaid_Corrected

7

 1          MR. SAURACK:  I think it is not just BayRock.  The

 2   company is still operative; it is still not just developing

 3   properties.

 4          THE COURT:  Pick the mic up and talk into it.

 5          MR. SAURACK:  The company is not operating now, but it

 6   could develop further properties in the future.  There are some

 7   proprietary aspects of those documents insofar as how they

 8   structure a deal and insofar as who their business partners

 9   were and those types of items.  In essence, what we are care

10   about most are the privileged documents, your Honor, and also

11   the documents taken from the company relating to Mr. Satter.

12          THE COURT:  I understand.  The next question I had was

13   in the BayRock's papers I got a description of the inadvertent

14   filing of the original complaint in Israel.  If I could ask you

15   to tell me what you know about that.  Then I will ask counsel

16   for Mr. Satter, although I suspect that the relevant counsel

17   for Mr. Satter is in Israel but not here.

18          MR. SAURACK:  My understanding of the filing was that

19   it was inadvertently filed in Israel in Israel and that Mr.

20   Satter tried to have it resealed.  My understanding also is you

21   can't just walk into the court and get a copy of the complaint.

22   There are some strictures.  You have to go into court and

23   potentially get the complaint.  I also understand eventually it

24   went up on the Internet, and eventually it wound up in the

25   hands of AP, I don't know how.

1      I do know Mr. Oberlander is counsel for the party on

2 the other side over in Israel.  I leave it to counsel for

3 Satter to give you details concerning that.  We are very

4 concerned about how it went from the clerk's office, where you

5 can't just walk in and take it and copy it, to the Internet, to

6 the AP.  That is the concern we have.

7      THE COURT:  Let me hear from Mr. Satter's counsel, Mr.

8 Wolf.

9      MR. WOLF:  Yes, your Honor.  Last year, last November,

10 Mr. Satter's counsel in Israel filed papers in court indicating

11 that the --

12      THE COURT:  This was a propos of an action against?

13      MR. SAURACK:  This was an action that Mr. Satter

14 commenced against Irvin Tausky, who was one of the Gottdiener

15 plaintiffs that this Court dismissed the complaint and the

16 Second Circuit affirmed this Court's dismissal of that

17 complaint.  Mr. Satter then brought an action in Israel against

18 Irvin Tausky, who resides there.

19      THE COURT:  A complaint?

20      MR. WOLF:  Yes.  Mr. Satter's counsel in that action

21 inadvertently filed a redacted copy of what is the original

22 complaint in this action.

23      THE COURT:  The complaint that is under seal?

24      MR. WOLF:  Correct, except that the one that he

25 actually filed in Israel contained additional redactions, not

1    the one that is under seal in this matter, which has no

2    redactions and exhibits.  What was filed there without the

3    exhibits that are attached in this one was a copy of that

4    original complaint with redactions on it.  It was erroneously

5    filed, filed without the knowledge of Mr. Satter.

6             THE COURT:  Let me stop you for a second just so I

7    understand.  The original complaint is completely under seal

8    here; there is none of it that is public here.

9             MR. WOLF:  Correct.

10            THE COURT:  The original complaint was filed with

11   redactions in the Israel action, and you're saying that none of

12   the attachments were filed.

13            MR. WOLF:  Correct.

14            THE COURT:  I'm not sure that is true.

15            MR. WOLF:  When I say none of the attachments, meaning

16   the pre-sentence report and other sealed documents by order of

17   the Eastern District were not attached to that.  That document

18   was labeled Exhibit Q in the Israeli filing.

19            THE COURT:  Do you know how the Israeli counsel for

20   Mr. Satter got the sealed document?

21            MR. WOLF:  They were provided in a file to him by Mr.

22   Satter.

23            THE COURT:  By Mr. Satter himself?

24            MR. WOLF:  Yes.

25            THE COURT:  Or someone on his behalf?

G5ynkrid4 Cooperated

```
1          MR. WOLF:  Or someone on his behalf, for him to review
2    and have a full set of file documents in drafting a complaint.
3          THE COURT:  Did someone caution Mr. Satter's counsel
4    about the fact that the document was under seal and not to be
5    disseminated?
6          MR. WOLF:  Your Honor, there was a back-and-forth that
7    all documents that would be filed should be cleared through
8    counsel to make sure they weren't under seal.  He did not
9    follow up on that, and he subsequently filed.  I have an
10   English translation copy of it.  We could file it on ECF with
11   the Court, Hebrew and English.  He filed in November, when it
12   was brought to his attention, and we only learned about it
13   because The Associated Press contacted us and said, we have a
14   copy of what was filed in Israel and we intend on publishing
15   it.
16          We immediately contacted Israeli counsel, who then
17   immediately filed an urgent ex parte motion to the Israeli
18   court -- this is November 13th of last year -- informing the
19   court, and I'm quoting, "Applicant's counsel," applicant being
20   Felix Satter, "Applicant's counsel, unknown to the applicant
21   himself, inadvertently attached confidential and sealed
22   documents to the statement of claim and now requests the court
23   to issue an order sealing the file from public inspection."
24   That was filed last November, before there was any
25   dissemination of the redacted original complaint in this
```

1    action.  That application was ultimately denied by the Israeli

2    court.

3            I point that out, one, in response to your Honor's

4    question.  Two, there is no question that the only way that

5    redacted complaint made its way to the Associated Press was

6    through Tausky's counsel, Frederick Oberlander

7            THE COURT:  First of all, we don't point fingers in

8    this courtroom.  Second, there is also no question that the

9    complaint made its way to Israeli counsel from Mr. Satter and

10   Mr. Satter's counsel.

11           MR. WOLF:  No question.

12           THE COURT:  The facts are what the facts are.  Let's

13   continue with the facts.  What happened as far as the

14   publication of the complaint by The Associated Press?  When did

15   that happen?

16           MR. WOLF:  That happened in December of last year.

17   Before The Associated Press published that, they were notified,

18   by first myself and then counsel for BayRock before they did

19   it, that that complaint, even in redacted form, was subject to

20   a sealing order in this case, and that sealing order goes back

21   to Judge Buchwald.

22           THE COURT:  Had the Israeli court already denied the

23   application to seal at that point?

24           MR. WOLF:  I believe it had, your Honor, yes.  It is

25   still on appeal now to the Israeli supreme court.  But yes.

G5ynkr1d1-Corrected

 1          THE COURT:  The Associated Press, as I understand it,

 2   published it, published a link to the complaint with an online

 3   article.  Is that right?

 4          MR. WOLF:  Yes, a link to the complaint with the

 5   redactions in it.  I say that to emphasize that --

 6          THE COURT:  There is redacted material in it, I

 7   understand.

 8          MR. WOLF:  Yes.  The reference in the papers here that

 9   the original complaint should be unsealed, and that's already

10   public, that's not true.

11          THE COURT:  I think I have seen a copy of it.  There

12   are redactions, but the vast majority of the complaint is not

13   redacted.

14          MR. WOLF:  Your Honor, correct, and there were no

15   attachments that were filed, nor do I believe there were any

16   attachments in the Associated Press article or link.  The only

17   link is the original complaint with those redactions.

18          THE COURT:  How long was that link live, do you know?

19          MR. WOLF:  I don't know, your Honor.

20          MR. OBERLANDER:  It still is.

21          MR. WOLF:  I believe it is still live.

22          MR. OBERLANDER:  I don't mean to interrupt.

23          THE COURT:  I asked a question.  If anybody knows the

24   answer, I'm happy to hear it.

25          MR. OBERLANDER:  I'm sorry if this sounds stupid.  We

1    are having a hearing and discussing it, obviously.

2              THE COURT:  You may sit and get closer to the mic.

3              MR. OBERLANDER:  If I might just correct the record a

4    bit.  The facts are the facts, and I actually have nothing to

5    do with this one.  I'm trying to help the Court.

6              THE COURT:  I appreciate it.

7              MR. OBERLANDER:  I represent and continue to represent

8    certain interests of the Gottdiener family, of which the sole

9    survivor of that generation is Rabbi Tausky in Israel.  I

10   currently represent him in a matter sub judice in the United

11   States federal court of claims here.  I do not represent him in

12   Israel, nor obviously could I, because I'm not admitted to

13   practice there.  He has independent counsel there at a very

14   prominent law firm.

15             What happened -- I'll make this rapid.  We are dealing

16   with very serious issues, and I have been accused of doing

17   something that wouldn't be illegal anyway.  Nevertheless, if

18   you give me the opportunity to give you a full background.

19             On approximately the 5th of May or the 1st of May,

20   somewhere around the beginning of May, I notified Judge Maas,

21   who asked me --

22             THE COURT:  May of what year?

23             MR. OBERLANDER:  I beg your pardon.  2015.  I notified

24   Judge Maas, who had asked me to state what my clients intended

25   to do about Chris 2, meaning the Gottdiener clients, that I

14

G5ynkrdd Corrected

1    certainly did represent them.  I have a multipage engagement

2    letter.  But they had recently received in Israel a letter from

3    counsel threatening that if they did not drop all the actions

4    here, a lawsuit would be brought and this is what the lawsuit

5    would say.

6           The Israeli complaint, which is in Hebrew, basically

7    said that Rabbi Tausky criminally masterminded a plot to have

8    Satter killed, to extort law firms, and caused a sham complaint

9    to be filed and refers to the complaint.  In any event, I

10   notified Judge Maas, attached all of that, including trans-

11   lations of it.  The next thing I knew, the following Monday I

12   got a notice from Israel that the rabbi had been served.

13          What do you know: he is served with a package which

14   includes the redacted complaint.  If I may correct my colleague

15   here, there are attachments to it, none anybody cares about.

16   There are attachments that I had in the original complaint that

17   are secular.  They are insurance policies and crap like that,

18   if you will forgive me, let me speak freely, but the Satter

19   documents are not there.

20          Nevertheless, and I promise this will move quickly, I

21   asked Israeli counsel, I said, is there a protective order or

22   something?  He said no.  And I said, did they file that

23   complaint?  He said yes.  I said, is it public?  He said yes.

24   I said, how does somebody get access?

25          THE COURT:  Can you fast-forward?

1              MR. OBERLANDER:  Okay.  The point is that it is

2     publicly available to any member of the Israeli press.  The way

3     it works is the press get a card like you have for the press

4     box in the room, and the press can walk in, put the card in the

5     terminal, and read it.  I have no idea how anybody else can get

6     access to it.

7              THE COURT:  Here is my question.  How long was it live

8     on the AP website?

9              MR. OBERLANDER:  It went up live on Friday, December

10    4th, at about 9:00 in the morning, and as far as I know, as of

11    an hour ago it still is.

12             THE COURT:  Ms. Bolger, you may not, but do you know

13    if that link is live?

14             MS. BOLGER:  I believe it is live, your Honor.

15             MR. OBERLANDER:  I will be done in a minute, but just

16    to follow up on what happened.  When the AP contacted us for a

17    comment, they apparently contacted them.  But you should know,

18    and I'm telling you -- it's not testimony, I just want to make

19    certain -- I'm telling you they were the eighth press operation

20    to contact us that got it.  ABC News got a copy of it.  They

21    all have it.  So it's not going to accomplish anything.

22             The end of the story is --

23             THE COURT:  I think I have heard enough in answer to

24    my question.  It looks like Ms. Bolger may have an addition.

25             MS. BOLGER:  I have a quick follow-up.  The AP link is

1  still live.  In addition, very recently the Telegraph

2  correspondent walked into the courthouse and was able to get a

3  copy of the complaint.  So not only is the AP link live, but

4  also the Israeli court is still open and you are still able to

5  get a copy of the complaint.

6          MR. WOLF:  Your Honor, may I finished my record?

7          THE COURT:  Please finish.

8          MR. WOLF:  In court in November, Satter's counsel

9  filed with the court the application and statement that

10  unbeknownst to Satter, he erroneously filed this sealed

11  complaint.  That got to The Associated Press, quite obviously,

12  through Mr. Oberlander.

13          I point out, your Honor, the law firm that represents

14  The Associated Press represents Mr. Oberlander.  So everybody

15  knows what we are dealing with here.  Ms. Bolger's law firm,

16  Levine Sullivan Koch & Schulz, was Mr. Oberlander's counsel in

17  the Second Circuit proceedings that resulted in one of the

18  injunctions that Judge Kogan is tasked by the Second Circuit to

19  enforce.  So they are not just here as an objective counsel or

20  party to the public at large; they are married to Mr.

21  **Oberlander.**

22          But let point out one other thing.  Before it was ever

23  published by The Associated Press -- that's why I point to Ms.

24  Bolger's letter she feigns ignorance that no one is even

25  claiming that it was filed erroneously -- they were put on

G5ynkrld Corrected

 1    notice that it was filed erroneously.  Indeed, Tausky, Mr.

 2    Oberlander's client, here, not in Israel, opposed the

 3    unsealing.  He knew when the papers were filed that it was

 4    erroneously done by counsel.

 5         It is what it is today.  But to suggest today that Mr.

 6    Satter filed with his blessing so that the whole world could

 7    have it is not only false, but making those representations to

 8    the Court is deliberately deceptive.  For The Associated Press,

 9    Oberlander's counsel, to be submitting a letter to the court

10    claiming that --

11         THE COURT:  I understand your point.  Is that all?

12         MR. WOLF:  That's all.

13         THE COURT:  Thank you.

14         MR. OBERLANDER:  Your Honor --

15         THE COURT:  I'm going to rule.  Let me make clear on

16    the record what the background is.

17         A gentleman named Brian Vodicka had moved to intervene

18    for the purpose of requesting to unseal the original complaint.

19    My understanding is that Mr. Vodicka is not present.  However,

20    he makes a serious request under the circumstances.  There were

21    similar requests from the Miami Herald and from The Associated

22    Press, and there was opposition to the unsealing by the BayRock

23    defendants and defendant Felix Satter.  I am prepared to rule

24    on the application now.

25         The Court of Appeals for the Second Circuit has set

G5xnkrld4  Corrected

1    forth a three-part analysis to determine whether a document

2    relating to a lawsuit should be available to the public.  That

3    was in Lugosch v. Pyramid Company, 435 F.3d 110, 119-20 (2d

4    Cir. 2006).

5            First, the court is required to determine whether the

6    documents are indeed judicial documents, to which the public

7    has a presumptive right of access, and the documents must be

8    "relevant to the performance of the judicial function and

9    useful in the judicial process."

10           Second, if the court determines the materials a party

11   seeks to have sealed are judicial documents, then the court

12   must determine the weight of the presumption of access.  The

13   weight to be given the presumption of access must be governed

14   by the role of the material at issue in the exercise of Article

15   III judicial power and the resultant value of such information

16   to those monitoring the federal courts.

17           Finally, the court must "balance competing

18   considerations against it," citing Lugosch at page 120.  "Such

19   countervailing factors include but are not limited to the

20   danger of impairing law enforcement or judicial efficiency and

21   the privacy interests of those resisting disclosure."

22           Basically, to me it seems as though there is a

23   balancing test.  On the one hand you balance the importance of

24   judicial documents to the judicial proceeding, and on the other

25   hand you balance the countervailing privacy or other interests.

G5ynkrj4v4Corrected

1    Applying that test here, there is no question that the

2    complaint in a civil action is a judicial document.  However,

3    the weight of the presumption of access is weak here because

4    the complaint was never served on some of the defendants, it

5    was never the subject of an answer or motion to dismiss, it was

6    not the subject of discovery, and it was not otherwise the

7    subject of litigation on the merits.

8    Second, regarding the privacy interests of those

9    resisting disclosure, there are no such privacy interests in

10   the portions of the original complaint and its attachments that

11   have already been disclosed.  I'm not getting into any finger-

12   pointing here regardless of who was responsible for putting the

13   documents in the hands of the media or even in the hands of Mr.

14   Satter's counsel.  The documents have been disclosed.

15   So, in balancing the public's interest to disclosure

16   against the relevant privacy interests, there are no privacy

17   interests for what has been disclosed.  I am referring to

18   Gambale v. Deutsche Bank A.G., 377 F.3d 133, 144 (2d Cir.

19   2004), and also In re Application to Unseal, 98 Cr. 1101, 891

20   F.Supp.2d 296, 300 (E.D.N.Y. 2012).

21   What that means is that I'm ordering disclosure and

22   unsealing of the original complaint and its attachments to the

23   extent that they have already been disclosed.  I'll get to the

24   rest of it in a moment.  Counsel for BayRock and Satter shall

25   confer and shall provide the documents to the Court for filing.

G5ynkrld Corrected

1           Regarding the portions of the complaint that were not

2     disclosed, that were redacted, it seems to me that there are

3     from this long history three categories of information that

4     potentially merit sealing.

5           The first is information relating to Mr. Satter and

6     the criminal action in the Eastern District of New York to the

7     extent that information is still under seal.  I know Judge

8     Kogan has recently unsealed additional information.  The second

9     category is information reflecting privileged communications.

10    And the third is, if there is still an interest in it,

11    information reflecting trade secret or proprietary business

12    information.

13          I am also ordering the Satter and BayRock defendants

14    to prepare an in camera submission of the original complaint.

15    Instead of redactions, I want highlighting, and I want it

16    highlighted with an accompanying letter.  The letter will not

17    be under seal, so draft it accordingly.

18          Identify those redactions, any you don't care about

19    that can be unsealed.  There may be some of those, I don't

20    know.  Then, if there is anything else that you want to remain

21    sealed, mark it as being in one of those three categories and

22    include a chart or a letter, again publicly filed, explaining

23    the request for the redaction.

24          In other words, as to the criminal action, you can say

25    redaction in paragraph 4, we want this to remain under seal

1    because it is information that is still contained in docket

2    number X in the criminal action, which remains under seal.  As

3    to privileged communications, you can say this reflects a

4    communication between X and Y requesting legal advice about Z.

5          As to business information, you should explain the

6    continuing privacy interest.  The reason I asked the question

7    at the beginning is to the extent BayRock is in business, not

8    doing this business at the moment or anymore, it seems that the

9    privacy interest is quite weak.

10         Is that all clear?  I'll put it in a written order,

11   but want to make sure it is all clear.

12         MR. OBERLANDER:  I'm sorry.  I just need to clarify

13   something.  You're saying that if we would have visualized

14   this, that of the 168 pages --

15         THE COURT:  I can't hear you.

16         MR. OBERLANDER:  Of the 168 pages, if we visualized it

17   with a bunch of black Magic Markers that he put there, what's

18   not black is going public, what is black they get to submit?

19         THE COURT:  They get to submit, and I'll rule whether

20   or not that information should be made public.

21         MR. OBERLANDER:  If you would allow me, I'll clock it

22   60 seconds, I could save is a motion to reconsider.

23         THE COURT:  That would be great.

24         MR. OBERLANDER:  I promise you.  With all respect,

25   what you read, and I don't have Lugosch memorized -- I really

G5ynkr4d-Corrected

 1    don't memorize everything in Lexis, just most of it -- but

 2    Lugosch has been as to that extent superseded by Bernstein

 3    Litowitz, which dates to February.  What Bernstein Litowitz

 4    says is any civil pleading, especially a complaint, attaches

 5    immediately upon filing a First Amendment qualified right of

 6    accession.

 7          Obviously, it doesn't matter to the extent that you

 8    are unsealing.  But to the extent of the test as to what else

 9    should be under sealed -- I have 30 seconds left -- number one,

10    counsel for Mr. Satter should note his former counsel accepted

11    service under rule 4(b), is it, for waiver of service.  That

12    was recorded and every single BayRock defendant did the same

13    thing, and there was a letter that went in.  They were served.

14          THE COURT:  Not everyone was served.

15          MR. OBERLANDER:  No, but they were.  Those are the

16    people that are claiming was an inoperable complaint.  It

17    certainly was but not as it goes to them.  And it doesn't

18    matter whether they were served.  All I'm saying, my last 15

19    seconds, is that the test to be applied, the prongs are under

20    the First Amendment, that the presumption of access is there,

21    and the burden is to show (a) there is a compelling interest

22    which (b) is cognizable to the extent that it would override

23    the public right of access and (c) that there are no least

24    restrictive means.  I only say that because what you read was

25    the test under the common law, which doesn't apply anymore to

G5ynkrld Corrected

 1    complaints.

 2           My final point is on Friday, and you may not know

 3    about it, with all respect, your colleague in San Diego hearing

 4    the Trump cases unsealed certain documents based on an

 5    application by The Washington Post.  He made the comment that

 6    while he was doing it under the common law privilege and

 7    clearly would have reached the same result that was following

 8    constitutional avoidance, and you may have, nevertheless, under

 9    the test for in public interest, it isn't the same in every

10    case.  There is a floor.  The First Amendment sets a floor.

11    The more important the case is, the higher it goes.

12           He pointed out that anything implicating Donald Trump

13    and fraud has a damn high interest in unsealing.  I just wanted

14    to get that on the record.  I don't mean to be disputatious.

15           THE COURT:  If it will save me a motion to reconsider,

16    I very much appreciate it.  And I heard you promise.

17           MR. OBERLANDER:  Yes.  Thank you.

18           THE COURT:  I understand your point.  There is both a

19    common law test and a First Amendment test, and they are

20    different.  I will evaluate what I receive from the BayRock

21    defendants and from Mr. Satter regarding the redactions.

22           MR. WOLF:  Your Honor, if I may.  Our biggest concern,

23    and I pointed out that factual history because Judge Kogan took

24    great pains, and I know your Honor has read the transcript --

25           THE COURT:  I have.

G5ynkrld v Cgpronotcd

1           MR. WOLF:  -- is to point out the illegal boot-

2    strapping of Mr. Oberlander and Lerner.  I submit The

3    Associated Press part of it was just an extension of it: let's

4    get it out there in public while we can and then argue it is

5    futile.

6           THE COURT:  I have already ruled.  I understand your

7    point and your frustration, and I'm sure you must have been

8    dismayed when you discovered that your client's counsel had

9    done this.  But the facts are the facts.  It is not a very

10   sympathetic position to be in.  You know my ruling, and I will

11   consider your arguments concerning the redactions.

12          MR. WOLF:  Thank you very much.

13          THE COURT:  Let's turn to the other issue, which is

14   the sanction issue.  I'm prepared to rule on that as well, and

15   I don't need to hear any argument.

16          First, let me begin with some observations.  I was

17   assigned these cases as I think the third judge in March of

18   2013, which I believe was my first month on the bench.  I have

19   had them ever since, although Judge Maas has largely overseen

20   them and Judge Maas has a longer history with them.

21          Based on my having observed the proceedings and

22   participated in them in the last three years, three things seem

23   clear to me:  First, that respondents obtained the BayRock

24   documents improperly and used them improperly.  When I say

25   respondents, I'm referring to Mr. Oberlander and Mr. Lerner;

1   second, that the respondents used the BayRock documents to

2   commence and then protract litigation, which is was vexatious;

3   and third, that the respondents are likely to continue on this

4   path of vexatious litigation.  Let me elaborate.

5        First, that respondents obtained the BayRock documents

6   improperly and used them improperly I think is not news to

7   anyone.  I'm not making a finding.  This is not a new finding.

8   That fact has been found by other courts before me.  The

9   documents included privileged documents, sealed documents from

10  a criminal case, and allegedly proprietary documents.

11       What I care most about as the judge in these

12  proceedings is the improper use of those documents in the

13  filing of the original complaint and the first amended

14  complaint and using or appending some of the so-called BayRock

15  documents to those filings.

16       As to my second complaint, that respondents used the

17  BayRock documents to commence and protract litigation which was

18  vexatious, I don't mean vexatious in the sense that they lack

19  merit.  As we all know, we never got to the merits of anything

20  despite years of litigation.

21       But I do mean vexatious in the sense that counsel's

22  desires seem to be, at least in the three cases before me, to

23  foment litigation with the attendant burden on all litigants

24  and the court without any apparent desire to reach the merits.

25  I know Mr. Oberlander differs with that view, but that is the

G5ynkrdd Conrgsoted

1     view from my perspective.

2             I would note that a complaint without the offending

3     documents was finally filed in this case and finally served on

4     all of the parties five and a half years after the initial

5     filing, and only after plaintiff was represented by new counsel

6     and current counsel had withdrawn.

7             Third, my observation that respondents are likely to

8     continue on the path of vexatious litigation.  First, this is,

9     if nothing else, of interest to me because it seems that there

10    are somehow limitless resources and energy to do so.  My

11    observation is based on counsel's conduct in the last three

12    years in the three separate civil lawsuits that I have seen and

13    over which I have presided since March 2013, and also counsel's

14    repeated defiance of court orders with the effect of prolonging

15    the proceedings, their inevitable motions to reconsider every

16    order except perhaps the last one, efforts to reargue issues

17    already decided, and, most telling, the recent filing, as Mr.

18    Oberlander just mentioned, of a $100 million class action

19    accusing the U.S. government, and specifically prosecutors and

20    the courts, of conspiring to violate their rights.

21            However, having said all that and notwithstanding

22    those observations, I have decided not to impose sanctions

23    against respondents, for two reasons.  My concern and domain

24    are the cases before me and counsel's conduct in those cases.

25    The filing of the original complaint gave rise to most of the

27

1    later collateral litigation that we have been involved in, and

2    that is what has impeded the progress on the merits until very

3    recently.

4              The most significant improprieties related to the

5    disclosure of the information in the complaint, and, as we have

6    just heard and discussed, all of that in some sense is history.

7    The cat is out of the bag, the horse has left the barn, pick

8    whatever metaphor you want, but the information to a large

9    extent in the original complaint is now public.

10             It seems to me that it would be inappropriate to order

11   sanctions relating to my cases in these circumstances.

12             To the extent that respondents' wrongdoing exceeds the

13   bounds of the cases before me, those sanctions should originate

14   elsewhere.  I understand that there has been a referral for

15   criminal prosecution to the U.S. Attorney's office for the

16   Eastern District of New York.  I also understand the matter has

17   been referred to the grievance committee for at least the

18   Eastern District of New York.  Those bodies are certainly

19   empowered to mete out any sanctions that are appropriate.

20             That is my ruling on the sanctions issue.  I will have

21   a very brief written order on the first issue just so it is

22   clear what counsel need to do.  I don't think an order is

23   necessary on the second.

24             Is there anything else we need to discuss?  Thank you.

25   We are adjourned.

G5xnkr1dd Conecoted

```
 1              MR. OBERLANDER:  Could you please, before you gavel

 2   out, make sure Mr. Miller heard all of that?  He isn't saying

 3   anything.  I can't see his head moving up and down.

 4              THE COURT:  Mr. Miller, were you able to hear all of

 5   that?

 6              MR. MILLER:  Yes, your Honor, I was.  Thank you.

 7              THE COURT:  Thank you for participating.

 8              MR. OBERLANDER:  Thank you, your Honor.

 9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```