

The New York Times
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY

December 17, 2007

# Real Estate Executive With Hand in Trump Projects Rose From Tangled Past

By **CHARLES V. BAGLI**

It is a classic tale of reinvention, American style.

Born in the Soviet Union in 1966, Felix H. Sater immigrated with his family to Brighton Beach when he was 8 years old. At 24 he was a successful Wall Street broker, at 27 he was in prison after a bloody bar fight, and at 32 he was accused of conspiring with the Mafia to launder money and defraud investors.

Along the way he became embroiled in a plan to buy antiaircraft missiles on the black market for the Central Intelligence Agency in either Russia or Afghanistan, depending on which of his former associates is telling the story.

But in recent years Mr. Sater has resurfaced with a slightly different name and a new business card identifying him as a real estate executive based on Fifth Avenue. And although he may not be a household name, one of the people he is doing business with is: Donald J. Trump.

Mr. Sater — who now goes by the name Satter — has been jetting to Denver, Phoenix, Fort Lauderdale, Fla., and elsewhere since 2003, promoting potential projects in partnership with Mr. Trump and others. In New York, the company Mr. Sater works for, Bayrock Group, is a partner in the Trump SoHo, a sleek, 46-story glass tower condominium hotel under construction on a newly fashionable section of Spring Street.

But much remains unknown about Mr. Sater, 41, and determining the truth about his past is a bit like unraveling the plot of a spy novel: Almost every character tells a different tale.

A federal complaint brought against him in a 1998 money laundering and stock manipulation case was filed *in secret and remains under seal.* A subsequent indictment *in March 2000 stemming from the same* investigation described Mr. Sater as an "unindicted co-conspirator" and a key figure in a $40 million scheme involving 19 stockbrokers and organized crime figures from four Mafia families.

The indictment asserted that Mr. Sater helped create fraudulent stock brokerages that were used to defraud investors and launder money. Mr. Sater and his lawyer, Judd Burstein, repeatedly refused to discuss in detail his role in the stock scam.

But a onetime friend, Gennady Klotsman, who is known as Gene and who was accused with Mr. Sater as a co-conspirator, contends that they both pleaded guilty in 1998, and that Mr. Sater began cooperating with

the authorities. Prosecutors are unwilling to discuss either the 1998 complaint or the 2000 indictment.

"I'm not proud of some of the things that happened in my 20s," Mr. Sater said in an interview. "I am proud of the things I'm doing now."

Mr. Sater, who has an untitled position at Bayrock, said he started spelling his name as Satter to "distance himself from a past" in an age when anyone can look up a name on Google. But he continues to use the name Sater on the deed to his house on Long Island.

Mr. Burstein added, "He does not hide his past, and difficulties he had, from anybody he does business with."

But Alex Sapir, president of the Sapir Organization, a partner in Trump SoHo, said he was "not happy" to have just learned of Mr. Sater's past on Thursday. "This is all news to me," he said.

Mr. Trump also said he was surprised to learn of Mr. Sater's past. "We never knew that," he said of Mr. Sater. "We do as much of a background check as we can on the principals. I didn't really know him very well."

Mr. Trump said that most of his dealings with Bayrock had been with its founder, Tevfik Arif, and that his son Donald and his daughter Ivanka were playing active roles in managing the project. Neither Bayrock nor Mr. Trump has been accused of wrongdoing.

Mr. Sater has generally kept a low profile on the Trump projects, although he mingled with guests and the owners at the September party introducing Trump SoHo. Mr. Trump and Mr. Sater were also together in Loveland, Colo., in 2005, where they were interviewed by a reporter for The Rocky Mountain News about potential development deals in nearby Denver. Mr. Trump said he did not recall Mr. Sater's being there.

"They seemed to get along just fine," said Justin Henderson, a Denver developer who worked with Mr. Trump and Mr. Sater on an ultimately unsuccessful deal to build the tallest towers in Colorado. "It seemed that Mr. Trump relied heavily on Mr. Sater's opinion on certain markets."

Mr. Sater's latest transformation could prove to be a cautionary tale for Mr. Trump, who has carefully molded his image into an international brand that has extended from real estate to bottled water, men's suits, steaks, vodka, a television show and, in his latest invention, the Trump Hotel Collection.

The hotel collection, a hotel management company, includes two projects with Bayrock: Trump SoHo and Trump International Hotel and Tower in Fort Lauderdale. A third joint project, in Phoenix, is also in the works.

"Trump is a name associated with a certain cachet and bravado, I suppose, that will attract certain kinds of people," said Rita Rodriguez, chief executive of the Brand Union, a corporate branding and identity agency.

"The brand is a strategic and financial asset," she said. "It has to be taken care of very similarly to any other asset you have on your balance sheet. Anything that would detract from that could jeopardize the brand impression the brand makes."

———

Mr. Sater was born in the Soviet Union, the son of Rachel and Mikhail Sater, according to public records, court testimony and the federal indictment. He has said his parents, who are Jewish, moved first to Israel, then to Baltimore and finally to New York in the early 1970s to escape "religious persecution."

Mr. Sater was born Haim Felix Sater, but he once testified in court that he "Americanized" his name to Felix Henry Sater in the early 1990s.

Mr. Sater took classes at Pace University but dropped out at 18 to work at Bear Stearns. Like Mr. Klotsman, he rose quickly, moving from firm to firm selling stock.

Mr. Sater's first brush with the law came in 1991. Mr. Sater and Mr. Klotsman were at El Rio Grande, a Midtown watering hole, celebrating with a friend and eventual co-conspirator, Salvatore Lauria, who had just passed his stockbroker's exam.

Mr. Sater later told a judge that he was in a good mood, having made a quick $3,000 in commissions that day. But he got into an argument with a commodities broker at the bar, and it quickly escalated. According to the trial transcript, Mr. Sater grabbed a large margarita glass, smashed it on the bar and plunged the stem into the right side of the broker's face. The man suffered nerve damage and required 110 stitches to close the laceration on his face.

"I got into a bar fight over a girl neither he nor I knew," Mr. Sater said in an interview. "My life spiraled out of control." Mr. Sater was convicted at trial in 1993, went to prison and was effectively barred from selling securities by the National Association of Securities Dealers.

But according to the 2000 federal indictment in the fraud case, Mr. Sater, Mr. Klotsman, Mr. Lauria and their partners gained control in 1993 of White Rock Partners, which later changed its name to State Street Capital Markets. Although the companies "held themselves out as legitimate brokerage firms," the indictment states, "they were in fact operated for the primary purpose of earning money through fraud involving the manipulation of the prices of securities."

The trio would secretly gain control of large blocks of stock and warrants in four companies through offshore accounts, the indictment said. In an illegal "pump and dump" scheme, they would inflate the value of the shares through under-the-table payoffs to brokers who sold the securities to unsuspecting investors by spreading false information about the companies. Brokers were prohibited from acting on sell orders from investors unless they found another buyer, the indictment said.

The partners would then sell large blocks of stock at a steep profit. Investors suffered substantial losses as share prices plummeted. Despite the prohibition against selling securities, a subsequent complaint by regulators at the N.A.S.D. recounted how Mr. Sater "cursed, yelled and screamed" at the firm's brokers in an attempt to motivate them. He also offered cash rewards to brokers who sold the largest block of house stocks.

At the same time, Mr. Sater, Mr. Lauria and others sought protection and help from members of the Mafia in resolving disputes with "pump and dump" firms operated by other organized crime groups. In 1995, for instance, Edward Garafola, a soldier in the Gambino crime family, sought to extort money from Mr. Sater.

Mr. Sater, in turn, got Ernest Montevecchi, a soldier in the Genovese crime family, to persuade Mr. Garafola to back off, according to the indictment.

The denouement of Mr. Sater's career on Wall Street began in 1998 at a locker at a Manhattan Mini Storage in SoHo, where investigators discovered two pistols, a shotgun and a gym bag stuffed with a trove of documents outlining the money laundering scheme and offshore accounts of Mr. Sater and his partners. According to a law enforcement official, as well as Mr. Klotsman and another defendant in the case, Mr. Sater had rented the locker and then neglected to pay the rent. Mr. Sater denied having anything to do with the locker or the guns.

At the time investigators opened the storage locker, Mr. Sater and Mr. Klotsman had gone to Russia, where their wheeling and dealing continued, they said. Their most interesting stories, however, are hard to assess.

Mr. Sater and Mr. Klotsman tried to cut a deal with the C.I.A., according to a book co-written by Mr. Lauria, "The Scorpion and the Frog: High Times and High Crimes." In exchange for leniency, the book said, they offered to buy a dozen missiles that <u>Osama bin Laden</u> had placed on the black market. The deal later collapsed.

Mr. Lauria has since renounced his book, which also details the false stock brokerage scheme, calling it largely a work of fiction. He even tried unsuccessfully to block publication. However, his co-author, David S. Barry, said he documented all the stories in the book with records and other interviews.

Mr. Klotsman said that Mr. Sater did obtain information for the United States about another set of black-market missiles, and that those efforts "bought Felix his freedom" from prison.

Mr. Sater, Mr. Klotsman and Mr. Lauria eventually returned to New York. Mr. Klotsman and Mr. Lauria agreed to cooperate with the United States attorney's office in Brooklyn and pleaded guilty to racketeering charges in connection with the fraudulent stock brokerages, other defendants and lawyers in Mr. Sater's case said. The information they provided helped prosecutors obtain guilty pleas from all 19 of their former cohorts, including six with ties to the mob.

Mr. Klotsman and his lawyer assert that Mr. Sater also pleaded guilty and cooperated. "Felix was one of the significant participants in the fraud," the lawyer, Alexi M. Schacht, said.

Mr. Klotsman, who grew up with Mr. Sater, now lives in a $600-a-month apartment in Moscow. In an interview, he said he was paying the American government $625 a month in restitution for the $40 million lost by investors. He questioned whether Mr. Sater was paying a dime.

But Mr. Sater and his lawyer, Mr. Burstein, avoided many questions concerning his legal problems involving the Wall Street scam, including whether he pleaded guilty and cooperated. "I challenge you to find any official government document anywhere demonstrating his indictment or conviction for any crime other than the assault," Mr. Burstein said.

Mr. Sater said he joined Bayrock in 2003 at the urging of the company's founder, Mr. Arif. A neighbor of Mr. Sater's in Sands Point, on Long Island, Mr. Arif is a former economist for the Soviet government who built a chain of five luxury hotels in Turkey and Kazakhstan after the collapse of the Soviet Union.

Within a stone's throw of the Manhattan Mini Storage building, the Trump SoHo is rising rapidly at the corner of Spring and Varick Streets, another new glass tower amid the somewhat grubby industrial buildings of what had been the city's printing district. The tower has generated opposition from some local residents and preservationists.

It is, for Mr. Sater, an emblem of his new life. "I'm trying to lead an exemplary existence," he said. "Old, bad luggage is not something anyone wants to remember."

Copyright 2007 The New York Times Company

[REDACTED]

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") dated ~~September~~ November 10th, __, 2005 but effective as of January 1, 2003 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 4 hereof, and Felix Sater ("Executive").

### Recitals

The Company desires to retain the services of Executive, and Executive desires to be retained by the Company, on the terms and conditions set forth in this Agreement.

### Agreement

For and in consideration of the foregoing and the mutual covenants of the parties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **ENGAGEMENT.** The Company hereby engages Executive to serve in the capacities described herein, and Executive hereby accepts such engagement and agrees to perform the services described herein upon the terms and conditions hereinafter set forth (collectively, the "Services").

2.  **TERM.** The term of Executive's Services pursuant to this Agreement shall commence on the Effective Date and shall terminate at the close of business on December 31, 2008, subject to earlier termination in accordance with the other terms and conditions set forth herein.

3.  **DUTIES; LOYALTY.** Executive shall be responsible for supervising all transactions on behalf of and as required by the Company. Executive agrees to devote his full working time, skill and attention and use his best efforts to advance the business and welfare of the Company. During the term of employment, Executive shall not engage in any other employment activities for any direct or indirect remuneration, including, without limitation, serving as a member of any board of directors of any other entity, provided that, Executive shall not be precluded from investing personal and/or family assets so long as such other activities do not impair Executive's devotion of substantially all his full business time to the affairs of the Company, and do not compete against any Company Investments (as defined in Paragraph 5).

4.  **MEMBERSHIP INTEREST.** For purposes of this Section and the remainder of this Agreement, the following capitalized terms shall have the following respective meanings:

    A.  "Assumed Tax Rate" means the sum of the maximum federal and state tax rates applicable to each class of income earned during the period in question without giving effect to deductions for state taxes which may be available at the federal level. The federal tax rates shall be determined by rates applicable to individuals who are residents of the United States applied to the particular class of income to which the federal tax rate is being applied. The maximum state tax rate shall be determined by reference to the tax rates of the State of New York with respect to the particular class of income to which the Assumed Tax Rate is being applied;




accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

B.    "Capital Proceeds" means proceeds received by the Company or any Company Entity by reason of the occurrence of any of the following-described events, less in each instance the total of all expenses incurred in connection with the receipt or collection of such proceeds and less all amounts applied to the reduction of the Company Entities' indebtedness (other than indebtedness from a Company Member) and/or toward repayment of Principal Capital: (i) any sale of Company or any Company Entity property; (ii) any refinancing of any permanent loan with respect to Company or any Company Entity property; (iii) any insurance payment or damage recovery with respect to Company or any Company Entity property to the extent that such proceeds are not required to repair or restore such property; and (iv) any condemnation, or sale in lieu of condemnation, of any Company or any Company Entity property.

C.    "Company Entities" means the Company and/or the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name.

D.    "Company Members" means the members, officers, directors, employees and/or representatives and/or agents of the Company, and/or their respective affiliates, related entities, successors and/or assigns.

E.    "Company Proceeds" shall mean, at any relevant time, the cash, securities, cash equivalents and other proceeds of the Company and all Company Entities, collectively, including Capital Proceeds, reduced by (i) payment of the Company Entities' debts and obligations as they become due, exclusive of loans made to the Company or any Company Entity by the Principal or any other Company Member, (ii) the Total Principal Company Contribution, (iii) without duplication of amounts reduced under clauses (i) and/or (ii) above, amounts disbursed in payment of incurred out-of-pocket operating expenses of the Company and/or the Company Entities, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member, but specifically including the non-equity salaries and benefits paid to Company administrative personnel and professionals, and (iv) amounts reasonably designated by the Principal as cash reserves to pay for Company overhead for a period not to exceed six (6) months.

F.    "Company Team Equity Payments" means any and all payments from equity participations and/or interests in the Company and/or the Company Entities to Jody Kriss, Beau Woodring and Julius Schwarz.

G.    "Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows: (i) first, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated income (but not loss) of the Company allocated to the Members for federal income tax purposes, including ordinary

2

income, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of income earned during said period; (ii) second, for all fiscal years and other periods of the Company which have ended (including fractional periods), the total amount of each different class of separately stated loss or expense (but not income) of the Company allocated to the Members for federal income tax purposes, including ordinary losses, shall be multiplied by the Assumed Tax Rates applicable with respect to such class of loss or expense incurred during said period assuming that such item were an item of gain or income instead of loss or expense; and (iii) third, the Cumulative Tax Amount is equal to the remainder of the sum of the products described in clause (i) above minus the sum of the products described in clause (ii) above. The Cumulative Tax Amount shall be recalculated and determined as of every date on which distributions are made, immediately prior to the making of such distributions.

H.   "Executive's Membership Interest" means Executive's Non-Voting Membership Interest or Executive's Voting Membership Interest, as applicable.

I.   "Executive's Non-Voting Membership Interest" means a non-dilutable 50% non-voting membership interest in the Company and each of the Company Entities, purusuant to which, following Principal having first received a 10% return of his Total Principal Company Contribution, and subject to the provisions of this Section 4 and Section 5, Executive shall be entitled to 50% of all Company Proceeds, reduced, however, by the Executive Advance Amount (as hereinafter defined) previously paid to Executive as of such time, and subject, further, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid to Executive as and when Company Proceeds are available for distribution to the Members.   Executive shall under no circumstances be responsible for the debt or obligations of the Company as a result of Executive's Membership Interest, nor shall Executive ever be required to contribute capital to the Company.

J.   "Executive's Voting Membership Interest" means a 50% voting membership interest in the Company and each of the Company Entities, subject to the same economic terms as Executive's Non-Voting Membership Interest.

K.   "Members" means the members of the Company and the members of each Company Entity.

L.   "Principal" means Tevfik Arif, an individual.

M.   "Principal Capital" means the principal (but not interest) of any loans to the Company and/or the Company Entities made by the Principal to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities.

N.   "Total Principal Company Contribution" means the total capital contributions made to the Company and/or the Company Entities by the Principal, together with

3

 

Principal Capital, exclusive of any fees, salaries or other remunerative amounts paid to the Principal or any other Company Member.

(a)  Subject to the provisions of this Section 4 and Section 5, the Company and the Company Entities agree that, in consideration for Executive's Services, Executive shall receive Executive's Non-Voting Membership Interest. Executive shall have the right, no more than once per year, to audit the books and records of the Company Entities. Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment. Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence of Company Proceeds in excess of $5,000 to which Executive was entitled pursuant to the provisions of this Section, but which failed to be distributed to Executive.

(b)  The Company shall advance to Executive from time to time with Company prior approval funds reasonably required to pay for the personal living expenses of Executive and his immediate family members (the "Executive Advance Amount"). The Executive Advance Amount shall be deducted from Executive's portion of Company Proceeds to which Executive is entitled under the provisions of Section 4(a).

(c)  Notwithstanding anything in this Agreement to the contrary, the Company Proceeds to which Executive is entitled under Section 4(a) shall be further reduced by 100% of all Company Team Equity Payments made by the Company as of such date.

(d)  Notwithstanding anything in the Company's and the Company Entities' Operating Agreements (collectively, the "Operating Agreements") to the contrary, the Company's and the Company Entities' Managing Members shall make a distribution (a "Special Tax Distribution") to the Members, Pro Rata in accordance with the relative amount by which the positive Cumulative Tax Amount of each Member exceeds the cumulative distributions which have been made to such Member pursuant to the Operating Agreements as modified by this Agreement, until the cumulative amount distributed to the Members equals the positive Cumulative Tax Amounts of the Members. Without limiting other provisions of this Agreement, Special Tax Distributions (i) shall be distributed to the Members regardless of a Member's individual tax situation and regardless of when a Member became a Member of the Company, (ii) shall be considered to be in anticipation of, and shall be offset against and reduce as quickly as possible, all amounts otherwise distributable to such Member, other than amounts which represent the repayment of loans or interest thereon, and (iii) shall be debited against the Capital Accounts of the Members to the same extent as the distributions against which the Special Tax Distributions are offset. The Company's and the Company Entities' Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

(e)  At any time following the five (5) year anniversary of this Agreement, Executive shall have the right, subject to the express prior written consent of the Company, to convert Executive's Non-Voting Membership Interest to Executive's Voting Membership Interest. In the event Executive provides the Company with notice of such election at any time following such five (5) year anniversary, Executive's Non-Voting Membership Interest shall be automatically converted to Executive's Voting Membership Interest.

4



(f)    The Operating Agreements are hereby deemed amended and modified to incorporate the provisions of this Section. Tevfik Arif, the direct and/or indirect majority member of the Company and each Company Entity, hereby executes this Agreement in order to acknowledge and to confirm his agreement to the foregoing. By signing this Agreement individually, Tevfik Arif shall sign solely in his capacity as managing member and/or majority member of the Company and each Company Entity, and shall incur no personal liability under *this Agreement as a result of said execution, provided, however, that the foregoing limitation of liability shall apply only so long as Tevfik Arif retains direct or indirect control and majority ownership of the Company and each Company Entity.*

5.    VESTING SCHEDULE.  Notwithstanding the provisions of Section 4 above to the contrary, with respect to any particular Company Investment (as hereinafter defined), until such time as the Principal has received a return of 100% of his Total Principal Company Contribution plus a 10% return thereon (at which time Executive shall be deemed fully vested with respect to such Company Investments), Executive's Membership Interest will vest on the basis of the earlier of (i) one-thirty-sixth ($1/36^{th}$) per month from and after the later of (y) the Company Investment Date (as hereinafter defined) or (z) the Effective Date, or (ii) the date upon which the Principal receives Company Proceeds from a Company Investment (as hereinafter defined). For purposes of this Agreement, (y) "Company Investments" means investments by the Company or any Company Entity, including, without limitation, *the Company investments listed on Annex* "B" hereto; it being understood that in the event the Company and/or any Company Entity participate in a Company Investment, such Company Investment shall be treated as a single Company Investment for all purposes of this Agreement; and (z) "Company Investment Date" means the date on which either an agreement has been executed or an investment has been made by a Company Entity with respect to a Company Investment.

6.    FRINGE BENEFITS.

(a)    Generally.  Executive shall be eligible for fringe benefits pursuant to any pension, retirement, profit sharing or other employee *fringe benefit plan that the Company makes* available to employees of the Company and/or its subsidiaries and for which Executive will qualify according to his eligibility under the provisions thereof.

(b)    Insurance.  The Company shall pay for the cost of the health, dental, life, and disability insurance plans maintained by the Company for its professional/senior staff for Executive.   The Company shall maintain directors and officers insurance for its executives.

(c)    Vacation, Holidays and Illness.  During the term of this Agreement, Executive shall be entitled to days off for vacation (not less than (and no greater than without Company approval) four (4) weeks per year), holidays, *illness or other appropriate purposes,* which vacation shall be scheduled at times reasonably convenient to the Company.

(d)    Company Cars and Residences.  During the term of this Agreement, Executive shall be entitled to use for himself and his immediate family members Company automobiles, Company apartment and condominium units and Company homes, in each case solely to the extent retained and maintained by the Company for the nonexclusive use of one or

5

more of the Company Members, excluding, however, property and assets retained by Principal for his own personal use.

7.    EXPENSES.    Executive shall be promptly reimbursed for all reasonable expenses incurred on behalf of the Company.

8.    TERMINATION.    The term of Executive's engagement under this Agreement may be terminated by the Company prior to expiration of the term provided in Section 2 hereof only in accordance with the following sections.

(a)    For Cause.    This Agreement may be immediately terminated by the Company for Cause (as herein defined). For purposes of this Agreement, the term "Cause" shall mean the existence or occurrence of one or more of the following conditions or events:

(i)    a willful and continual breach by Executive of any provision of this Agreement, provided that if such act is capable of cure, Executive shall be given written notice and such act shall not be deemed a basis for Cause if cured within 5 business days after such written notice is received by Executive specifying the alleged failure in reasonable detail (in the event of any disagreement between Executive and the Company as to whether Executive has, in fact, willfully and continually breached a provision of this Agreement, such disagreement shall be resolved by arbitration under the provisions of Section 15 hereof);

(ii)    performance by Executive of any act of fraud or material misrepresentation or a material act of misappropriation, or a future felony conviction resulting from any such act; or

(iii)    the entry of a judgment or order enjoining or preventing Executive from such activities as are material or essential for Executive to perform the Services as required by this Agreement.

(b)    Mutual.    Executive's engagement under this Agreement may be terminated upon mutual written agreement of the Company and Executive.

(c)    Death.    In the event of the death of Executive, this Agreement shall terminate immediately.

(d)    Disability.    If, during Executive's engagement under this Agreement, Executive shall become permanently disabled and unable to perform his duties as required herein ("Disability") for a total of sixty (60) consecutive days in any twelve (12) month period then the Company may, upon thirty (30) days written notice to Executive, terminate Executive's engagement under this Agreement.

9.    DEATH AND DISABILITY.    In the event of the termination of Executive's engagement under this Agreement by reason of Executive's death or Disability, (i) the Company shall pay Executive (or his heirs and/or personal representatives) all compensation and benefits for a period of one (1) year after the date of death or one (1) year after the date of termination for Disability as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.

6

10.    SEVERANCE.  In the event of the termination of Executive's engagement under this Agreement for any reason other than Executive's death or Disability, the Company shall provide the payments and benefits to Executive as indicated below:

(a)    With Cause or Voluntary Termination by Executive.  If Executive is terminated for Cause, or if Executive voluntarily terminates his engagement with the Company (other than by reason of a Change of Control, as hereinafter defined, or the relocation of the Company outside of New York City), (i) the Company shall be obligated only to reimburse Executive for any expenses to which Executive is due reimbursement by the Company under Sections 6 and 7; and (ii) Executive's Membership Interest shall be limited to the amount by which it has vested as of the date of said termination in accordance with the provisions of Section 5, and Executive shall further not be entitled to any Company Proceeds attributable to any Company Investments for which the respective Company Investment Date occurs subsequent to the date of said termination.  In addition, Company shall pay vested benefits, if any, owed to Executive under any plan provided for Executive under Section 6 hereof in accordance with the terms of such plan as in effect on the date of termination of engagement under this Section.

(b)    Without Cause.  In the event that the Company shall terminate Executive without Cause or Executive voluntarily terminates his engagement with the Company as a result of a Change of Control or the relocation of the Company outside of New York City, (i) the Company shall be obligated to pay all compensation and benefits to Executive for a period of nine (9) months after the date of termination as if Executive had not been so terminated; and (ii) Executive's Membership Interest shall automatically be fully vested and payable as provided under Section 4 hereof.  For purposes hereof, a "Change of Control shall be deemed to have occurred if any person or group of persons (within the meaning of Section 13 or 14 of the Securities Exchange Act of 1934, as amended), other than the Principal or any person directly or indirectly controlled by the Principal, obtains the ability to control, directly or indirectly, the policies or management of the Company.

11.    PROTECTION OF CONFIDENTIAL INFORMATION; NON-SOLICITATION AND NON-COMPETITION.

(a)    Executive acknowledges that in the course of his employment by the Company that the Company will bring Executive into close contact with the "Confidential Information" of the Company, including, without limitation: costs, profits, marketing strategies, sales information, products, operational methods and solicitation strategies, plans for future development, client identification and specifications, project specifications and agreements, and any other business information which is not available to the public and provided to the Executive solely in connection with his duties hereunder (defined herein as the "Confidential Information"), and that the foregoing Confidential Information is of a special, unique, proprietary nature. Executive further acknowledges that the Company's business is international in scope, that the Company will compete with other real estate development companies that could be located anywhere in the world and the nature of Executive's services to the Company including Executive's expertise are such that Executive may compete from any location in the world. In recognition of the foregoing, Executive agrees:

7

(i)    That Executive will not use the Confidential Information for his own benefit or for the benefit of any party other than the Company, or intentionally disclose the Confidential Information to any person or entity outside of the Company either during or after the term of this Agreement or any subsequent term, except if such disclosure is in furtherance of the interests of the Company or if Executive obtains the Company's express prior written consent; provided, however, that (i) Executive shall have no such obligation to the extent such matters are or become publicly known other than as a result of Executive's breach of his obligations hereunder; (ii) Executive, after giving prior notice to the Company to the extent practicable under the circumstances, may disclose such matters to the extent required by applicable laws or governmental regulation or judicial or regulatory process; or reasonably deemed necessary by Executive in the course of regular business operation or (iii) Executive may disclose the terms of this Agreement to his attorney, accountant and/or financial advisor; and

(ii)    Executive will deliver promptly to the Company (and erase from memory on his/her computer or any other electronic memory device) upon termination of employment or at any other time the Company may so request, all names, addresses, phone numbers, memoranda, notes, records, reports, policy information and other documents (and all copies thereof) in any form whatsoever (including information contained in computer memory or on any computer disks) relating to the Company's business, including without limitation the Confidential Information, which Executive obtained while employed by, or otherwise serving or acting on behalf of, the Company and which Executive may then possess or have under his/her control;

(iii)    That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity, employ or solicit the employment of, or assist or encourage any entity of which Executive is an affiliate, to employ or solicit the employment of any person who was an employee of the Company or any of its affiliated companies;

(iv)    That for a period of two (2) years after Executive's termination of employment, for any reason, Executive shall not, without the prior written consent of the Company, directly or indirectly, for his/her own account or for the account of any other person or entity: solicit, entice or attempt to solicit or entice, any business association or relationship (not preexisting with Executive) during the term of this agreement of the Company to cease doing business with the Company; and

(v)    That Executive agrees that so long as he is employed by the Company, he will conduct the real estate development business only on behalf of the Company except for Executive's family – oriented businesses and that he will not, in any capacity, render services to any other entity including but not limited to his own enterprise, unless he obtains prior written approval from the Company.

(b)    In addition to such other rights and remedies as the Company may have at equity or in law with respect to any breach of this Agreement, if Executive commits a breach of any of the provisions of this Section, the Company shall have the right and remedy to have such provisions specifically enforced by any court having jurisdiction, including without limitation

8

both a temporary and permanent injunction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Company and that money damages may not provide an adequate remedy.

12.    NOTICES.  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if sent by registered mail, personally or by overnight delivery service to the addresses below or to such other address as either party shall designate by written notice to the other:

> If to Executive:  To the address set forth below his signature on the signature page hereof.

> If to the Company:

> 725 Fifth Avenue, 24th Floor
> New York, New York 10022
> Attention: Tevfik Arif

13.    INDEMNIFICATION.  The parties agree to the indemnification provisions set forth in Annex A attached hereto and made a part hereof.

14.    REPRESENTATIONS AND WARRANTIES.  Each party represents and warrants to the other that (a) this Agreement has been duly executed and delivered and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, and (b) the execution, delivery and performance by such party of this Agreement do not and will not require any consent, approval or filing or violate or conflict with any provision of the charter documents, certificate of organization, operating agreement, by-laws or similar documents of such party and do not and will not violate any law, rule or regulation, or any order, judgment or decree of any court or other governmental or regulatory authority, nor violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any contract, lease, loan or other agreement or instrument to which such party is a party or by which it or any of its assets are subject nor will result in the creation or imposition of any lien, charge or encumbrance of any kind whatsoever. The foregoing representations and warranties contained in this Section shall survive the cancellation and/or termination of this Agreement.

15.    ARBITRATION.  All claims and disputes (a "Dispute") between the parties arising out of or relating to this Agreement or the breach thereof, shall be resolved using the following procedures:

>         (a)    A meeting shall be held promptly, and in any event, not later than five (5) business days after a party requests such a meeting, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the Dispute.

>         (b)    If the parties cannot negotiate a resolution of the Dispute within seven (7) calendar days after the meeting (the "Negotiation Period"), the Parties shall submit the Dispute to binding arbitration in accordance with the applicable rules of the American Arbitration Association ("AAA") currently in effect, unless the parties mutually agree otherwise.  The following procedures shall apply:

9

(i)    Demand for arbitration shall be filed in writing with the other parties and with the AAA. A demand for arbitration shall be made within a reasonable time. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

(ii)    No arbitration arising out of or relating to this Agreement shall include, by consolidation, joinder or any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement signed by the parties and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented by the parties to this Agreement shall be specifically enforceable in accordance with applicable law and any court having jurisdiction thereof.

(iii)    The award rendered by the arbitrator or arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

(iv)    All filing fees and AAA costs associated with the arbitration itself shall be paid for by the prevailing party. The prevailing party also shall recover from the non-prevailing party all attorneys' fees and costs, including fees and costs for legal assistants and expert witnesses, and including all fees and costs incurred relative to any challenge or appeal of the arbitration award or confirmation by a court of law. For purposes of this Agreement, the "prevailing party" shall be deemed to be that party who obtains substantially the result sought, whether by settlement, mediation or otherwise, or judgment. For purposes of this Agreement, the term "attorneys' fees" shall include, without limitation, the actual attorneys' fees incurred in retaining counsel for advice, negotiations, suit, appeal, or any other legal proceeding, including mediation and arbitration.

(v)    The parties to the arbitration shall mutually designate an arbitrator who shall be the sole arbitrator from and after said appointment or, if the parties fail to agree on a mutually acceptable arbitrator within five (5) calendar days following the expiration of the Negotiation Period, each party to the arbitration shall appoint one arbitrator within such five (5) calendar day period, and the two arbitrators so appointed shall appoint a third arbitrator within five (5) calendar days of the last of their appointments, and such third arbitrator shall be the sole arbitrator from and after said appointment. In the event either party fails to appoint its respective arbitrator within the five (5) calendar day period provided above, the arbitrator appointed by the other party within such period shall be the sole arbitrator for purposes of this Section 15, and in the event the two arbitrators fail to appoint a third arbitrator within the five (5) calendar day period provided above, either part may request an arbitrator be appointed by the AAA, in which event said arbitrator shall be the sole arbitrator for purposes of this Section 15. Once the sole arbitrator is designated pursuant to the provisions of this clause (v), arbitration shall be done on an expedited basis and shall be decided within thirty (30) days of the designation of the sole arbitrator.

10

(vi)    Time shall be of the essence with respect to the provisions of this Section 15.

16.    GUARANTY.  In consideration for Executive's Membership Interest, including, without limitation, the Executive Advance Amount, Executive hereby absolutely, irrevocably and unconditionally guarantees to the Principal and/or the Company thirty-five percent (35%) of any and all unreturned Total Principal Company Contributions made by Principal (the "Guarantied Amount", and the guaranty of Executive made herein, the "Executive Indemnified Obligations"). The liability of the Executive under this Paragraph shall be absolute and unconditional, and shall not be affected, released, terminated, discharged or impaired, in whole or in part, by any or all of the following: (i) any lack of genuineness, regularity, validity, legality or enforceability, or the voidability of, this Agreement; (ii) the failure of the Company and/or Principal to exercise or to exhaust any right or remedy or take any action against any person or any collateral or other security available to it; (iii) any amendment or modification of the terms of this Agreement; (iv) any indemnity now or hereafter executed by the Company and/or Principal or its affiliates or the release of any indemnitor from or failure of any other party to assume liability for the payment in connection with this Letter, whether by operation of law or otherwise; and/or (v) any other circumstance which might constitute a legal or equitable discharge or defense available to an indemnitor or the Executive, whether similar or dissimilar to the foregoing.  Executive's guaranty under this Agreement is a present guaranty of payment and performance and not of collection. The Executive expressly waives the following: (i) notice of acceptance of this Agreement; (ii) any requirement of promptness, diligence, presentment, protest, notice of dishonor, notice of default, notice of acceptance, demand, and all other actions or notices that may otherwise be required on the Company's and/or Principal's part in connection with this Agreement; (iii) the right to interpose all substantive and procedural defenses of the law of indemnification (other than the defense that the Executive has performed in full its obligations hereunder); and (iv) the right to interpose any setoff or counterclaim of any nature or description in any action or proceeding arising hereunder or with respect to this Agreement.   Notwithstanding anything to the contrary contained herein, the Executive's liability shall extend to all amounts and performance of all Executive Indemnified Obligations notwithstanding the fact that this Agreement becomes unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding.  Until such time as the Executive Indemnified Obligations are performed and paid in full, Executive hereby irrevocably waives all rights of subrogation and any other claims that he may now or hereafter acquire against any person or any insider that arise from the existence, payment, performance or enforcement of Executive's obligations under this Agreement.  Executive shall pay on demand all reasonable attorneys' fees, paralegals' fees, and all other costs and expenses incurred by Company and/or Principal through all appellate levels and post judgment proceedings in the enforcement of or preservation of the Company's and/or Principal's rights under this Paragraph.   The provisions of this Paragraph shall survive cancellation or termination of this Agreement.

17.    ENTIRE AGREEMENT; MODIFICATION.

(a)    This Agreement contains the entire agreement of the Company, the Principal and Executive, and the Company, the Principal and Executive hereby acknowledge and agree that this Agreement supersedes any prior statements, writings, promises, understandings or commitments between the parties hereof.

11

(b)     No future oral statements, promises or commitments with respect to the subject matter hereof, or other purported modification hereof, shall be binding upon the parties hereto unless the same is reduced to writing and signed by each party hereto.

18.     ASSIGNMENT.  The rights and obligations of the parties under this Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties. Notwithstanding anything contained herein to the contrary, neither party may assign his or its rights or obligations under this Agreement without the prior written consent of the other party; provided, however, that Executive shall be allowed to assign Executive's Membership Interest rights in connection with his estate planning to one or more of his immediate family members and/or to a trust, the beneficiaries of which include one or more of his immediate family members.

19.     GOVERNING LAW.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York  without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

20.     MISCELLANEOUS.

(a)     The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or the interpretation of this Agreement.

(b)     The failure of any party to enforce any provision of this Agreement shall in no manner affect the right to enforce the same, and the waiver by any party of any breach of any provision of this Agreement shall not be construed to be a waiver by such party of any succeeding breach of such provision or a waiver by such party of any breach of any other provision.

(c)     All written notices required in this Agreement shall be sent postage prepaid by certified or registered mail, return receipt requested or by overnight delivery service against receipt or by overnight delivery service against receipt.

(d)     In the event any one or more of the provisions of this Agreement shall for any reason be held invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable valid, and enforceable provision which comes closest to the intent of the parties.

(e)     In any action or proceeding arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs from the other party to the action or proceeding.

(f)     This Agreement may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument.

12



(g)    The Company and Tevfik Arif individually hereby acknowledge and confirm that they have been represented by counsel, Mel Dogan, in connection with the negotiation and execution of this Agreement, and that said counsel has explained and translated in Turkish for the Company and Mr. Arif individually the provisions hereof.

[Signature page follows]

13



IN WITNESS WHEREOF, the parties have executed this Engagement Agreement as of the day and year first above written.

BAYROCK GROUP, LLC

WITNESSES:                          By: _____
                                         Tevfit Arif, its sole Member

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZWEBRODOLSZIG

FELIX SATER

_____

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZWEBRODOLSZIG

TEVFIK ARIF HEREBY EXECUTES
THIS AGREEMENT TO ACKNOWLEDGE
AND TO CONFIRM HIS AGREEMENT
TO THE PROVISIONS OF SECTION 4
HEREOF:

_____
Tevfik Arif

Print Name: DANIEL RIDLOFF

Print Name: MARTA SZWEBRODOLSZIG

14

STATE OF _new York_ )
                              ) ss.
COUNTY OF _new York_ )

On the ____ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Tevfik Arif_ _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MELIH DOGAN
Notary Public, State of New York
No. 02-4665-3196
Qualified in New York County
My commission expires Commission Expires June 30, 1999   _12/10/05_

[Notary Seal]


STATE OF _New York_ )
                              ) ss.
COUNTY OF _new York_ )

On the ____ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Tevfik Arif_ _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MELIH DOGAN
Notary Public, State of New York
No. 02-4665-3196
Qualified in New York County
My commission expires Commission Expires June 30, 1999   _12/10/05_

[Notary Seal]


15

STATE OF _New York_ )
                           ) ss.
COUNTY OF _New York_ )

    On the _10TH_ day of _November_ in the year 2005 before me, the undersigned, a notary public in and for said state, personally appeared _Feit Safra_ _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

    Notary Public _____

                                **JULIUS RANDOLPH SCHWARZ**
                                Notary Public, State of New York
                                No. 02SC6127581
                                Qualified in New York County
[Notary Seal]        My commission expires: _____  **Commission Expires May 23, 2009**

16

<u>ANNEX A</u>

The Company agrees to indemnify and hold harmless Executive and his affiliates, employees, independent contractors, advisors, partners, members, managers and each of their respective successors and/or assigns (all of the foregoing are referred to as an "Indemnified Party"), from any and all losses, claims, damages or liabilities, joint or several, as they are incurred (including, without limitation, any legal or any other expenses incurred by any Indemnified Party in connection with the investigation of any claim or the preparation for or defense of any action, claim or proceeding, whether or not resulting in any liability, or otherwise incurred at trial and/or any appellate levels) to which such Indemnified Party may become subject under any statute, common law or otherwise, relating to or arising out of this Agreement, or any transactions referred to herein or any transactions arising out of the transactions contemplated herein; provided, however, that the Company shall not be liable to an Indemnified Party in any such case to the extent that any such loss, claim, damage or liability is found, in a final judgment by a court of competent jurisdiction, to have resulted from said Indemnified Party's willful misconduct or gross negligence.

Promptly after receipt by an Indemnified Party of notice of the commencement of any action or proceeding in respect of which indemnity may be sought against the Company, such Indemnified Party will notify the Company in writing of the receipt of commencement thereof, and the Company shall assume the defense of such action or proceeding (including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and expenses of such counsel). After assumption of the defense of any action by the Company, the Company shall not be liable for any further costs of defense by counsel for the Indemnified Party. Notwithstanding the preceding sentence, the Indemnified Party will be entitled to employ its own counsel in such action if the Indemnified Party reasonably determines that a conflict of interest exists which makes representation by counsel chosen by the Company inappropriate. In such event, the fees and disbursements of such separate counsel will be paid by the Company.

If for any reason the foregoing indemnity, hold harmless and reimbursement provisions, rights, remedies and protections are unavailable to any Indemnified Party, or insufficient to hold any Indemnified Party harmless, then the Company shall contribute to the amount paid or payable by such Indemnified Party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company on the one hand and the Indemnified Party on the other hand, and also the relative fault of the Company on the one hand and the Indemnified Party on the other hand, as well as any relevant equitable considerations. It is hereby further agreed that the relative fault of the Company on the one hand and an Indemnified Party on the other hand with respect to the transactions shall be determined by reference to, among other things, whether any untrue or alleged untrue statement of a material fact or incorrect opinion or conclusion or the omission or alleged omission to state a material fact relates to information supplied by the Company on the one hand or by the Indemnified Party on the other hand, as well as the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement, opinion, conclusion or omission. No Indemnified Party shall have any liability to the Company or any other person in connection with this Agreement except for any liability for losses, claims, damages or liabilities finally judicially determined to have resulted

17



solely from actions taken or omitted to be taken as a direct result of such Indemnified Party's gross negligence or willful misconduct.

The indemnity, contribution and expense reimbursement obligations set forth herein shall be in addition to any other rights, remedies or indemnification which any Indemnified Party may be entitled to at common law or otherwise, and shall remain in full force and effect regardless of any investigation made by or on behalf of any Indemnified Party. In no event shall the Company have any liability for any settlement affected without the written consent of the Company (which consent shall not be unreasonably withheld); provided that, the Company will not agree to any settlement requiring anything other than the payment of money damages without the consent of Executive, which consent may be withheld in his sole and absolute discretion.

18



### ANNEX B

#### Existing Company Investments

Midtown Miami

Banyan Bay

Trump Ft Lauderdale Beach Club

Trump Ft Lauderdale Hotel & Tower

Trump Camelback in Phoenix

Sixth Street in Whitestone, Queens

246 Spring Street, New York New York

1770 Sherman Street, Denver, Colorado

Arizona Center, Phoenix Arizona

Woodmont Country Club, Tamarac, Florida

2308 and 2300 N. Ocean Drive, Hollywood, Florida

19

ADDENDUM TO EMPLOYMENT AGREEMENT DATED NOVEMBER
10, 2005 BETWEEN BAYROCK GROUP LLC AND FELIX SATER

1. Notwithstanding anything to the contrary in paragraph "4" of the aforesaid
agreement (the "Agreement"), for the period of five (5) years from the date hereof,
after the repayment of all of the Principal's Total Principal Company Contribution (as
such term and all other capitalized terms used but not defined herein are defined in
the Agreement) together with a 10% return thereon, the Employee agrees that the
lesser of (i) fifty (50%) percent of any and all subsequent after tax distributions to
Employee (excluding the Executive Advance Amount), and (ii) thirty-five percent
(35%) of the capital needs of the Company, shall forthwith be re-invested in any and
all Company Investments and/or be utilized to otherwise fund such capital needs of
the Company, whether the Company Investment Date commenced prior to the date
hereof or arising subsequent to the date of this Addendum and/or the Agreement,
unless the Principal and Employee agree to different capital contribution percentages
in writing.  Principal shall remain obligated to fund sixty-five percent (65%) of the
capital needs of the Company.

2. Employee represents that it has been advised of his right to have independent
counsel review this agreement and has waived such right.

Bayrock Group LLC

By: _____
Managing Member

Principal

Tevfik Arif _____

Employee:

_____
Felix Sater



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

**ForeFront Portfolio**<sup>SM</sup>
**New Business Application**
(for private companies with up to 250 employees)

### BY COMPLETING THIS APPLICATION YOU ARE APPLYING FOR COVERAGE WITH FEDERAL INSURANCE COMPANY OR VIGILANT INSURANCE COMPANY (THE "COMPANY")

**NOTICE: THE LIABILITY COVERAGE SECTIONS OF FOREFRONT PORTFOLIO**<sup>SM</sup> **PROVIDE CLAIMS MADE COVERAGE, WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR ANY APPLICABLE EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED AND MAY BE EXHAUSTED BY "DEFENSE COSTS," AND "DEFENSE COSTS" WILL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT. IN NO EVENT WILL THE COMPANY BE LIABLE FOR "DEFENSE COSTS" OR THE AMOUNT OF ANY JUDGMENT OR SETTLEMENT IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE APPLICATION CAREFULLY BEFORE SIGNING.**

Whenever used in this Application, the term "**Applicant**" shall mean the Parent Corporation and all subsidiaries, unless otherwise stated.

1. Name of Applicant: _Bayrock Group, LLC_

2. Address of Applicant: _725 5th Ave., 24th Floor_
   City: _New York_   State: _New York_ Zip Code: _10022_   Telephone: _212-207-0650_

3. Name and Address (if different than above) of Primary Contact (Executive Officer authorized to receive notices and information regarding the proposed policy):
   Name: _Julius Schwarz_   Title: _Executive Vice President_
   Address _725 5th Ave. 24th Floor_ City: _New York_   State: _NY_   Zip Code: _10022_

4. For Employment Practices Loss Prevention eligibility, indicate the individual responsible for human resources or employment law matters:
   Name: _Julius Schwarz_   Title: _Executive Vice President_
   E-Mail Address: _js@bayrockgroup.com_ Telephone: _212-207-0650_

5. Please indicate below which coverages are being requested.

| Application | Coverage Included | Limit of Liability Requested |
|---|---|---|
| ☒ ForeFront Portfolio Application | ☒ Directors and Officers Liability | $ _TBD_ |
| | ☐ Employment Practices Liability | $ |
| | ☐ Fiduciary Liability | $ |
| | ☐ Crime | $ |
| | ☐ Kidnap/Ransom and Extortion | $ |
| ☐ Supplemental Applications (required if these coverages are selected) | ☐ Workplace Violence Expense | $ |
| | ☐ Miscellaneous Professional Liability | $ |
| | ☐ Internet Liability | $ |

6. State of incorporation: _New York_   Date established: _7/21/2001_

7. Nature of the Applicant's business: _Real Estate Development_

8. Does the **Applicant** have any subsidiaries for which coverage is requested?   ☒ Yes  ☐ No
   If "Yes," please attach a list of these entities and indicate nature of business for each.

14-03-0655NY (Ed. 9/2004)          Page 1 of 5



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

CHUBB

**ForeFront Portfolio**SM
**New Business Application**
(for private companies with up to 250 employees)

9.   Please complete the following information for the current year: *Approx.*
     Total employees: ▲ *10*   Annual revenues: *980,000 for 2006*

10.  In the next 12 months (or during the past 18 months) is the **Applicant** contemplating (or
     has the **Applicant** completed or been in the process of completing):
     (a)   Any reorganization or arrangement with creditors under federal or state law?        ☐Yes ☒No
     (b)   Any branch, location, facility, office, or subsidiary closings, consolidations or layoffs?   ☒Yes ☐No
     If "Yes" to any part of Question 10, please attach an explanation.

11.  Has the **Applicant** given notice of any claim, circumstance or potential claim to any insurer
     under any of the coverages to which this application relates?                              ☐Yes ☒No
     If "Yes," please attach a full explanation of each claim, circumstance or potential claim.

12.  Total assets (for the current year) : *2006 Assets $17,667,579.95*

13.  In the next 12 months (or during the past 18 months) is the **Applicant** contemplating (or has
     the **Applicant** completed or been in the process of completing) any public or private offering
     of securities?                                                                            ☐Yes ☒No
     If "Yes", please attach a full description of the details.

14.  Has the **Applicant** or any person proposed for coverage been the subject of, or been
     involved in, any of the following during the past five years:

     |  | **Organization** | **Persons** |
     |---|---|---|
     | (a) Anti-trust, copyright or patent litigation? | ☐Yes ☒No | ☐Yes ☒No |
     | (b) Civil, criminal or administrative proceeding alleging violation of any federal or state securities laws? | ☐Yes ☒No | ☐Yes ☒No |
     | (c) Any other criminal actions? | ☐Yes ☒No | ☐Yes ☒No |

     If "Yes" to any of the above in Question 14, please attach a full description of the details.

15.  Other than those identified in your response to Question 14, has any claim been brought at
     any time during the last 5 years against (i) any **Applicant** or (ii) any proposed insured
     individual in his or her capacity as a director or officer of any entity?                  ☐Yes ☒No
     If "Yes," please attach a full description of the details.

16.  Please complete the following information:

     | Names of Director or Officer Shareholders | Voting Shares Owned |
     |---|---|
     | *Tevfik Arif* | % *99* |
     | *RIF International Group Inc.* | % *1* |

     | Shareholders (include individual and corp. names) who are both non-directors and non-officers owning 5% or more of voting shares | Voting Shares Owned |
     |---|---|
     |  | % |
     |  | % |

**EMPLOYMENT PRACTICES INFORMATION**

17.  Employee count                                               Current Year   Previous Year
     (a)   Full time employees:                                        *10*            *8*
     (b)   Part time employees (include leased and seasonal):
     (c)   Number of employees located in California



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

CHUBB

**ForeFront Portfolio**SM
**New Business Application**
(for private companies with up to 250 employees)

18. Does the **Applicant**:
   (a)  Have written procedures in place regarding:
      (i)    Equal Opportunity Employment:  ☐Yes ☒No
      (ii)   Anti-discrimination:  ☒Yes ☐No
      (iii)  Anti-sexual harassment:  ☒Yes ☐No
   (b)  If any of the above answers are "No", please attach a full explanation.

19. During the past 3 years, has any **Applicant** or any person proposed for coverage, been
involved in any capacity in any of the following matters?
   (a)  EEOC, NLRB or other similar administrative proceeding?  ☐Yes ☒No
   (b)  Employment-related civil suit?  ☐Yes ☒No
   If "Yes" to either of the above in Question 19, please attach a full description of the details.

20. Please list the names and types of **Applicant's** employee benefits plan(s)

| Plan names (Do not include health & welfare plans) | Plan assets (current year) | Type of plan* | Under funded by more than 25%? (DB only) | Number of plan participants |
|---|---|---|---|---|
|  |  |  | ☐ |  |
|  |  |  | ☐ |  |
|  |  |  | ☐ |  |

\* Defined Contribution (DC), Defined Benefit (DB), Employee Stock Ownership (ESOP), Excess Benefit or Top Hat (EBP)

21. Does the **Applicant** handle any investment decisions in-house?  ☒Yes ☐No
   If "Yes," please describe: _____

22. Are any plans NOT in compliance with plan agreements or ERISA?  ☐Yes ☒No
   If "Yes," please explain: _____

23. Past activities:
   (a)  Has any fiduciary been:
      (i)    accused, found guilty or held liable for a breach of trust?  ☐Yes ☒No
      (ii)   convicted of criminal conduct?  ☐Yes ☒No
   (b)  Has there been any assessment of fees, fines or penalties under any voluntary
      compliance resolution program or similar voluntary settlement program administered
      by the IRS, DOL or other government authority against any plan?  ☐Yes ☒No
   If "Yes" to any of the above in Question 23, please attach a full description of the details.

24. Does the **Applicant** allow the employees who reconcile the monthly bank statements to
also sign checks or handle deposits?  ☒Yes ☐No
   If "Yes," please explain: They are not authorized to sign but are
able to make deposits.

25. Please describe the services the **Applicant** provides for clients (including, but not limited to, accounting,
payroll or purchasing functions): Real Estate Development & Real Estate Management



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

**ForeFront Portfolio**<sup>SM</sup>
**New Business Application**
(for private companies with up to 250 employees)

26. List all employee theft, forgery, computer fraud or other crime losses discovered by the **Applicant** in the last 5 years, itemizing each loss separately. Include date of loss, description and total amount of loss. (Attach additional pages if necessary.)   N/A

27. Please complete the following information regarding the foreign travel of the **Applicant's** employees:

| Countries Visited | Number of annual trips | Average stay | Number of employees |
|---|---|---|---|
| Turkey | 12 | 1 to 2 weeks | 3 |
| Russia | 12 | 1 to 2 weeks | 3 |

28. If the **Applicant** is applying for any Liability Coverage Sections please complete the chart that follows:
☐ Indicate those coverages currently purchased; and
☐ Attach a copy of all applications submitted to the current insurer or any prior insurers.

**IMPORTANT:** The Company will rely upon the declarations and statements contained in any prior application(s) and the **Applicant** understands and agrees that those declarations and statements will be incorporated into any ForeFront Portfolio policy issued by the Company.

| Liability Coverage Sections | The Applicant currently purchases this coverage | | Current limit of liability | Current Insurer |
|---|---|---|---|---|
| | Yes | No | | |
| Directors & Officers Liability | ☐ | ☐ | $ | |
| Corporate (Entity) Liability | ☐ | ☐ | $ | |
| Employment Practices Liability | ☐ | ☐ | $ | |
| Fiduciary Liability | ☐ | ☐ | $ | |

29. The **Applicant** must complete the following prior knowledge statement, if:
- the **Applicant** does not currently purchase any of the Liability Coverages to which this Application relates; or
- the **Applicant** is requesting larger limits than currently purchased, as indicated in Question 5 of the **Specific Information** section of this Application form.

This statement applies to those coverage types for which no coverage is currently maintained; and for any larger limits of liability requested.

No person or entity proposed for coverage is aware of any fact, circumstance, or situation which he or she has reason to suppose might give rise to any claim that would fall within the scope of any of the proposed coverages for which the **Applicant** does not currently maintain insurance, or within any of the larger limits of liability sought by the **Applicant**, except:  None ☒ or

Without prejudice to any other rights and remedies of the Company, the **Applicant** understands and agrees that if any such fact, circumstance, or situation exists, whether or not disclosed in response to this Question 29, any claim or action arising from such fact, circumstance, or situation is excluded from coverage under the proposed policy, if issued by the Company.

14-03-0655NY (Ed. 9/2004)          Page 4 of 5



**Chubb Group of Insurance Companies**
15 Mountain View Road
Warren, New Jersey 07059

**ForeFront Portfolio**SM
**New Business Application**
(for private companies with up to 250 employees)

If there is any material change in the answers to the questions in this Application before the policy inception date, the **Applicant** must immediately notify the Company in writing, and any outstanding quotation may be modified or withdrawn.

The **Applicant's** submission of this Application does not obligate the Company to issue, or the **Applicant** to purchase, a policy. The **Applicant** will be advised if the Application for coverage is accepted. The **Applicant** hereby authorizes the Company to make any inquiry in connection with this Application.

The undersigned authorized agents of the person(s) and entity(ies) proposed for this insurance declare that to the best of their knowledge and belief, after reasonable inquiry, the statements made in this Application and in any attachments or other documents submitted with this Application are true and complete. The undersigned agree that this Application and such attachments and other documents shall be the basis of the insurance policy should a policy providing the requested coverage be issued; that all such materials shall be deemed to be attached to and shall form a part of any such policy; and that the Company will have relied on all such materials in issuing any such policy.

The information requested in this Application is for underwriting purposes only and does not constitute notice to the Company under any policy of a Claim or potential Claim.

**Notice to New York Applicants:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

This Application must be signed by the Chief Executive Officer of the Parent Corporation acting as the authorized representative of all person(s) and entity(ies) proposed for this insurance.

| Date | Signature | Title |
|---|---|---|
| 2/8/2007 | | Chief Executive Officer  *Executive Vice President* |

**PLEASE ATTACH A COPY OF THE FOLLOWING FOR EVERY APPLICANT SEEKING COVERAGE:**
☐ When requesting D&O, EPL, or Fiduciary Liability, the most recent annual financial statements, audited if outside audits are performed.

Produced By: Agent:_____  Agency: _____

Agency Taxpayer ID or SS No.:_____  Agent License No.:_____

Address (Street, City, State, Zip):_____

14-03-0655NY (Ed. 9/2004)          Page 5 of 5