USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ Dec 2, 2016 __

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JODY KRISS, et al.,                                :
                                                   :
                              Plaintiffs,          :
                                                   :
            -against-                              :          10 Civ. 3959 (LGS) (DCF)
                                                   :
BAYROCK GROUP LLC, et al.,                         :          **ORDER AND OPINION**
                                                   :
                              Defendants.          :
-------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Plaintiffs Jody Kriss and Michael Chu'di Ejekam bring this action against Defendants

Tevfik Arif, Felix Satter, Salvatore Lauria, Julius Schwarz, Alex Salomon, Jerry Weinreich, Mel

Dogan, Elliot Pisem, Bayrock Group LLC ("Bayrock Group"), Bayrock Ocean Club LLC

("Ocean Club"), Bayrock Merrimac LLC ("Merrimac"), Bayrock Camelback LLC

("Camelback"), Bayrock Whitestone LLC ("Whitestone"), Bayrock Spring Street LLC ("Spring

Street"), Salomon & Co., P.C., Roberts & Holland LLP and John Does 1–100, asserting

violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968

("RICO"), and various state laws.  Defendants move to dismiss Plaintiffs' claims against them.

For the reasons below, the motion is granted in part and denied in part.

I.      **BACKGROUND**

        A.      **Factual Allegations**

        For purposes of Defendants' motion, the following facts are drawn from the Third

Amended Complaint (the "TAC") and construed in the light most favorable to Plaintiffs.  *See*

*Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

### 1.   Formation of Bayrock Group and the Arif/Satter Agreement

Defendant Bayrock Group is a real estate development and investment firm founded in 2001 by Defendant Tevfik Arif.  Arif had built a real estate development business in Kazakhstan and Turkey and intended to expand that business into the United States through Bayrock Group.

In late 2002 or early 2003, Arif partnered with Defendant Felix Satter, formerly known as Felix Sater, to run Bayrock Group.  Satter had worked in finance but had little experience in real estate.  He also had been convicted of two crimes.  In 1991, he was convicted of assault, sentenced to prison and barred from selling securities.  In 1998, he was charged with and pleaded guilty to one count of racketeering based on alleged stock manipulation and money laundering. The criminal complaint alleged that Satter had engaged in a "pump and dump" scheme using a stock brokerage he operated with a co-defendant and numerous offshore shell corporations and bank accounts.

Under the agreement Arif and Satter allegedly made (the "Arif/Satter Agreement"), Arif would contribute capital to Bayrock Group and its investment activities, and Satter would help manage Bayrock Group's affairs in exchange for 50% of the profits earned through Bayrock Group's investments.  The Arif/Satter Agreement also called for Satter to share some of the profits guaranteed to him with the real estate and finance professionals he was supposed to recruit for Bayrock Group.

The Arif/Satter Agreement set the stage for the present dispute in two ways.  First, the TAC alleges that Arif and Satter agreed to operate Bayrock Group in a way that maximized their profits, even at the expense of other investors, and to conceal both Satter's criminal history and his decision-making authority and ownership interest in Bayrock Group.  Second, the TAC alleges that the Arif/Satter Agreement initiated an "enterprise" within the meaning of RICO, 18

U.S.C. § 1961(c), that operated in the form of Bayrock Group (the "Bayrock Group Enterprise" or "Enterprise").

### 2.  Plaintiffs Join Bayrock Group

Plaintiffs Jody Kriss and Chu'di Ejekam began working for Bayrock Group in 2003. Kriss had worked in real estate finance for several years, including as an analyst at APC Realty Advisors, where he met Satter.  In 2002, Satter proposed that Kriss provide his professional services to Bayrock Group in exchange for 10% of the profits from Bayrock Group's investments.  Kriss accepted the offer and served as Bayrock Group's director of finance from 2003 to 2007.

Ejekam agreed sometime in 2003 to provide consulting services to Bayrock Group in exchange for fixed-fee payments plus profit participation in the Bayrock Group investments on which he worked.  Ejekam provided services to Bayrock Group until 2007 and was primarily involved with identifying co-investors to fund Bayrock Group investments.

### 3.  Bayrock Group Expands

The TAC alleges that the Bayrock Group Enterprise grew in size from 2003, when it consisted of Arif and Satter, to 2007, when it involved all Defendants.  Defendants Ocean Club, Merrimac, Camelback, Whitestone and Spring Street (collectively, the "Bayrock Entities") were formed, and became associated with the Enterprise, between 2003 and 2006.  The Bayrock Entities were formed by Arif and Satter, acting through Bayrock Group, each in connection with a specific real estate development. The TAC alleges that Arif and Satter managed and operated the Bayrock Entities as a means to enrich themselves personally at the expense of third parties.

Defendants Salomon & Co., P.C. ("Salomon & Co."), Alex Salomon ("Salomon") and Jerry Weinreich (collectively, the "Salomon Defendants") served as accountants for Bayrock

Group from 2003 to 2008.  The TAC alleges that the Salomon Defendants also became employed by or associated with the Enterprise no later than 2003 and performed their accounting duties in a manner designed to create the false impression that Bayrock Group and its investments were operating in a routine and above-board manner.

In 2005, Defendant Julius Schwarz started working as Bayrock Group's general counsel and allegedly became employed by or associated with the Enterprise.  As general counsel, Schwarz oversaw salary payments, membership distributions and the accounting work performed by the Salomon Defendants.  He also oversaw, and in some cases prepared and executed, investment and loan agreements involving Bayrock Group or related entities.

Defendant Salvatore Lauria allegedly became employed by or associated with the Enterprise in 2004, when Satter began to use Bayrock Group as a means to enrich Lauria, his long-time associate.

Defendant Mel Dogan served as outside legal counsel to Bayrock Group and allegedly became employed by or associated with the Enterprise in 2005.  Dogan participated in the negotiation and drafting of Plaintiffs' compensation agreements and worked on a 2007 transaction described below that is at the core of Plaintiffs' claims.

Defendants Roberts & Holland LLP ("Roberts & Holland") and Elliot Pisem (collectively, the "R&H Defendants") allegedly became employed by or associated with the Enterprise in 2007.  The R&H Defendants served along with Dogan as outside legal counsel on the 2007 transaction.

### 4.  Frauds Against Outsiders

The TAC identifies three categories of information that Defendants fraudulently concealed from various outside investors and lenders who dealt with Bayrock Group.  The first

category of information, which the TAC calls the "Material Information," includes Satter's 1998 conviction, his "familiarity with converting corporate assets into personal income without triggering detection" and his management and control of Bayrock Group.  The second category, called "Bad Faith Practices," pertains to Arif and Satter's agreement to "simply ignore . . . contract provisions and promises -- along with federal and state law, and IRS regulations -- whenever doing so would increase their take from the Enterprise."  The third category, the "Illegally-Structured Satter Payments," refers to five payments Bayrock Group made to Satter between 2003 and 2007 that totaled several million dollars and that Bayrock Group did not treat as wages or distributions for tax purposes at the time they were made.   The TAC alleges that these payments were designed to avoid tax liability and avoid disclosing -- in financial, corporate and government records that investors or lenders might uncover -- Satter's role in Bayrock Group.

### a.  Investor Frauds

The TAC details Defendants' alleged fraud against three investors in Bayrock Group developments:  Elizabeth Thieriot, Camelback Plaza Development LLC ("Camelback Plaza") and the Trump Organization.

### i.  Elizabeth Thieriot

In the fall of 2003, Elizabeth Thieriot invested $1 million in Defendant Ocean Club. Ocean Club, Arif and Satter allegedly concealed the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments from Thieriot during the negotiations about her investment.  The TAC alleges that Thieriot never would have made the $1 million investment in Ocean Club if she had known these concealed facts.

In connection with her investment, Thieriot wired approximately $1 million from a California bank account to an Ocean Club bank account in either Florida or New York.  In September 2004, Ocean Club sent Thieriot an IRS Form 1065 for calendar year 2003 stating that Thieriot was a 4% owner of Ocean Club and had contributed $1 million in capital during 2003.  Ocean Club later sent Thieriot an IRS Form 1065 for calendar year 2005, which was prepared and approved by Schwarz and the Salomon Defendants, stating that Ocean Club had received $1.5 million in "withdrawals and distributions" in 2005.  Thieriot had not been informed of the $1.5 million payment to Ocean Club.

In April 2006, Thieriot commenced an action in New York state court for an accounting against Ocean Club.  Thieriot alleged that the $1.5 million payment represented the amount paid to Ocean Club to reduce its ownership interest in the underlying real estate investment from 50% to 10%.  Thieriot also alleged that she had not received any proceeds from the $1.5 million payment.

The TAC alleges two RICO predicate acts based on the above.  First, the TAC alleges that Arif, Satter and Ocean Club, together with Schwarz and the Salomon Defendants, who prepared documents in connection with Thieriot's investment, perpetrated a fraud on Thieriot involving communications transmitted through the U.S. interstate and international mail and wires.  Second, the TAC alleges that the transfer of some or all of the $1.5 million transferred by Ocean Club to Bayrock Group, Arif and/or Satter constituted the transfer in interstate commerce of money stolen, converted or taken by fraud, because a portion of the $1.5 million rightfully belonged to Thieriot.

### ii.  Camelback Plaza

In 2003, an entity called Camelback Plaza began negotiations with Arif, Satter and Bayrock Group to develop a property that Camelback Plaza owned.  The parties agreed that Bayrock Group would oversee the development and contribute at least $4.5 million in equity to the project.  As part of the deal, Camelback Plaza conveyed ownership of the parcel to Camelback Development Partners LLC ("CDP"), an investment vehicle formed by the parties and in which Bayrock Group, through its Camelback entity, had a controlling interest.  The TAC alleges that Arif and Satter concealed the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments during the negotiations and that, if Camelback Plaza had known these concealed facts, it would not have agreed to the deal or conveyed the parcel to CDP.

In 2006, CDP's Operating Agreement provided that CDP was not to incur any debt in addition to a $12.2 million loan from Capmark Finance ("Capmark").  Nonetheless, before CDP had fully repaid the $12.2 million loan, it borrowed an additional $5.1 million from Capmark.

In January 2007, Camelback Plaza filed an action in Arizona state court against, among others, Bayrock Group, Camelback, Arif, Satter, Schwarz and Plaintiff Kriss.  Camelback Plaza alleged that the defendants in that action had failed to disclose the criminal histories of Satter and Lauria, and had breached their promises to retain Ernst & Young as accountants and to maintain financial information prepared pursuant to generally accepted accounting principles.  Camelback Plaza also alleged that the defendants in its action had refused to provide financial information about CDP to Camelback, violated CDP's Operating Agreement and misappropriated CDP funds.  Additionally, Camelback Plaza alleged that, on or about February 25, 2006, Satter had called one of Camelback Plaza's managing members and threatened to have him tortured and

killed if he disclosed any of the suspected improprieties and past criminal conduct involving Defendants and CDP.

The TAC alleges three RICO predicate acts based on the above. First, the TAC alleges that Arif, Satter and Camelback, together with Schwarz (who negotiated the terms of the additional $5.1 million loan from Capmark) and the Salomon Defendants (who prepared documents in connection with Bayrock Group's investment in CDP and the additional $5.1 million loan) perpetrated a fraud on Camelback Plaza involving communications transmitted through the U.S. interstate and international mail and wires. Second, the TAC alleges that Arif, Satter, Schwarz and Camelback transferred some portion, in excess of $5000, of the additional $5.1 million loan, knowing that the transferred portion was stolen, converted or taken by fraud. Third, the TAC alleges that the torture and death threat was an act of extortion.

### iii. The Trump Organization

In 2003, Arif and Satter were introduced to Donald Trump, the president of the Trump Organization, by a leasing agent for Trump Tower, where Bayrock Group had its offices. Bayrock Group arranged for the Trump Organization to become involved in the Camelback, Ocean Club and Merrimac developments and to have these developments marketed under the Trump brand. The TAC alleges that Arif and Satter concealed the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments during the negotiations with the Trump Organization. Furthermore, the TAC alleges that Donald Trump testified in a 2007 deposition in an unrelated case that Arif had assured him that Satter was not a partner in Bayrock Group. According to the TAC, the Trump Organization never would have agreed to partner with Bayrock Group on the Camelback, Ocean Club and Merrimac developments if it had known the concealed facts.

In 2005, Bayrock Group partnered with the Trump Organization and the Sapir Organization on another development, the Trump SoHo condo-hotel in New York City. As it alleged about the 2003 negotiations, the TAC alleges that Arif, Satter, Bayrock Group and Spring Street, the holding company for Bayrock Group's ownership interest in Trump SoHo, concealed the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments during the Trump SoHo negotiations. If the Trump Organization and the Sapir Organization had known these concealed facts the TAC alleges, they would not have allowed Bayrock Group or Spring Street to invest in Trump SoHo.

In December 2007, the New York Times published an article about Satter's racketeering conviction and his involvement in Bayrock Group. The TAC alleges that this report was embarrassing and harmful to the Trump Organization and the Sapir Organization. The TAC also alleges that the Sapir Organization and a lender to Trump SoHo developers demanded that Spring Street's finances be audited following the New York Times report.

The TAC alleges two RICO predicate acts based on the above. First, the TAC alleges that Arif, Satter and Spring Street, together with Schwarz and the Salomon Defendants, who prepared documents used in negotiating the Trump SoHo deal, perpetrated a fraud on the Trump Organization and the Sapir Organization involving communications transmitted through the U.S. interstate and international mail and wires. Second, the TAC alleges that Arif, Satter, Schwarz and Spring Street transferred money received from the Sapir Organization to Fendi Casa as payment for furnishings, material and design services for Trump SoHo, knowing that such funds had been taken by fraud.

### b.  Lender Frauds

Bayrock Group required debt financing for its developments.  Among the debt financing Bayrock Group obtained was $275 million from iStar Financial in connection with the Spring Street development, $17.3 million from Capmark in connection with the Camelback development and $27.65 million from Capmark in connection with the Whitestone development. The TAC alleges that Schwarz and the Salomon Defendants prepared the applications for these financings, concealing the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments, and that the lenders would have denied Bayrock Group the financing if they had known the concealed facts.

The TAC alleges a RICO predicate act based on each of the debt financings identified above.  The TAC alleges that Arif, Satter, Schwarz, the Salomon Defendants and several of the Bayrock Entities perpetrated a fraud on the identified lenders involving communications transmitted through the U.S. interstate and international mail and wires.

### 5.  Frauds Against Bayrock Group Financial Professionals

In addition to defrauding outsider investors and lenders, Defendants allegedly defrauded three financial professionals who worked for Bayrock Group -- Plaintiffs Kriss and Ejekam, and non-party Beau Woodring (collectively, the "Financial Professionals").

### a.  Compensation Agreements

According to the TAC, the Financial Professionals each had at least one compensation agreement with Bayrock Group.  Arif and Satter knew that Bayrock Group would need the assistance of highly-skilled finance professionals to generate profits from its investments.  Such professionals can command annual salaries in the high six-figures or low seven-figures from employers such as investment banks.  The TAC alleges that, in order to maximize their personal

gain from Bayrock Group, Arif and Satter paid the Financial Professionals relatively low annual salaries supplemented with the promise of significant future profits.  However, the TAC alleges that Arif and Satter never intended to honor such promises.  The TAC also alleges that Arif, Satter and the Bayrock Entities concealed the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments during the negotiation of the Financial Professionals' compensation agreements.

### i.      Kriss Agreements

The TAC alleges that Kriss entered into three compensation agreements with Bayrock Group.  Under the initial agreement, entered into in spring 2003, Kriss would receive 10% of the profits from Bayrock Group's investments, thereby reducing Satter's share to 40%.  This initial agreement was memorialized in a letter written by Satter on behalf of himself and his wife.  The letter states:

> [W]e have granted you interests in entities formed or to be formed by either or both of us, which in turn hold interests in Bayrock projects.  In the future, you may receive membership interests directly from Bayrock Group or one of its affiliated entities.

Kriss entered into a second compensation agreement on June 29, 2004 (the "2004 Kriss Agreement").  The 2004 Kriss Agreement provides that Bayrock Group would employ Kriss on a full-time basis for a three-year term in his existing role as director of finance.  In return, Kriss would receive $10,000 per month in wages and "additional compensation as will be set forth in the operating agreements of" Ocean Club, Merrimac and Camelback.  The TAC alleges that the operating agreement of each of those entities granted Kriss a 10% membership interest.  Additionally, once Arif and Bayrock Group were fully reimbursed for any capital contributions, Kriss would "receive distributions in the aforesaid limited liability companies in the proportions set forth in said operating agreements."

In 2005, Kriss entered into a third compensation agreement with Bayrock Group (the "2005 Kriss Agreement"). The 2005 Kriss Agreement provides that Kriss would receive "a non-dilutable 10% non-voting membership interest in the Company [Bayrock Group] and each of the Company Entities," defined as "the affiliates, subsidiaries and related entities of the Company and/or Tevfik Arif doing business under the 'Bayrock' name." The 2005 Kriss Agreement also set forth a vesting schedule for Kriss's membership interests and purported to amend and modify the operating agreements for Bayrock Group and the Company Entities "to incorporate the provisions" granting Kriss membership interests.

## ii.    Ejekam Agreements

The TAC alleges that Ejekam entered into several compensation agreements with Bayrock Group. In 2003, Ejekam agreed to provide consulting services to Bayrock Group, Arif and Satter in exchange for fixed fee payments plus profit participation in the Bayrock Group investments on which he worked. In 2005, Ejekam entered into two compensation agreements with Bayrock Group -- one granting him a 2% membership interest in Whitestone and the other granting him a 2% membership interest in Spring Street (collectively, the "2005 Ejekam Agreements"). Ejekam and Bayrock Group memorialized the 2005 Ejekam Agreements in writing in 2006 (collectively, the "2006 Ejekam Agreements"). The 2006 Ejekam Agreements granted Ejekam "a 2% membership profit interest" in Whitestone and Spring Street "following the return to Tevfik Arif and/or Bayrock Group of one hundred percent (100%) of the cumulative capital advanced in the Project plus a ten percent (10%) return thereon." The 2006 Ejekam Agreements also purported to amend and modify the relevant operating agreements to incorporate these provisions.

12

### iii.    Woodring Agreements

The TAC alleges that Woodring entered into two compensation agreements and one separation agreement with Bayrock Group.  In 2003, Woodring agreed to accept future profit participation in some of Bayrock Group's investments in lieu of a guaranteed salary for the professional service he provided to Bayrock Group, Arif and Satter.  In 2004, Woodring entered into a compensation agreement that granted him 5% membership interests in Merrimac and Ocean Club and a 10% membership interest in Camelback.  In 2005, Woodring informed Bayrock Group that he wanted to separate from Bayrock Group and entered into a separation agreement, which granted Woodring a fully-vested, non-dilutable 10% non-voting membership interest in Camelback and divested Woodring's membership interests in Merrimac and Ocean Club.  The separation agreement also purported to amend and modify Camelback's operating agreement to incorporate the provision granting Woodring a membership interest.

### b.  FL Transaction

The TAC alleges that the fraud against the Financial Professionals culminated in the theft or unlawful conversion of their membership interests and distributions when Bayrock Group sold a major share of its projected profits to FL Group.  In January 2007, Bayrock Group made a presentation to FL Group, an Icelandic investment company, focusing on the investments associated with Spring Street, Camelback, Merrimac and Whitestone.  Bayrock Group stated at that presentation that those four investments would generate approximately $227.5 million in profit for Bayrock Group.  Shortly thereafter, FL Group offered $50 million in exchange for equity interests in those four Bayrock Entities that would entitle it to 62% of the total profits (the "FL Group Investment").  The FL Group Investment closed in late May 2007.  Although some of the transaction documents refer to the $50 million as a loan, the TAC alleges that "for all intents

and purposes, the FL Group Investment effected a sale of membership profit interests" in the four Bayrock Entities.

According to the TAC, Bayrock Group did not own sufficient membership interests in the four Bayrock Entities to transfer a 62% membership profit interest to FL Group. The TAC further alleges that Arif, Satter, Schwarz and the four Bayrock Entities, as well as the Salomon Defendants (who prepared accounting documents related to the deal) and Defendants Dogan, Pisem and Roberts & Holland (who provided legal advice and drafted documents related to the deal) knew that the FL Group Investment infringed the membership interests owned by the Financial Professionals. Bayrock Group allegedly distributed portions of the $50 million payment from FL Group to other Defendants, including a $1.5 million "professional fee" to Defendant Lauria.

On two occasions between May and September 2007, Kriss inquired about the payment of any distributions to which he was entitled under the 2005 Kriss Agreement. In response, Satter paid Kriss a $500,000 bonus but refused to pay any distributions. Kriss resigned from Bayrock Group in mid-September 2007. In May or June 2008, Kriss again asked Satter about the distributions. The TAC alleges that Satter responded by presenting Kriss with a choice: drop his demand for distributions, or accept the risk that someone Satter knew might injure or kill Kriss. To date, none of the Financial Professionals has received any distributions from the Bayrock Entities in which their compensation agreements granted them membership interests.

The TAC alleges 10 RICO predicate acts based on the Financial Professionals' allegations, including mail and wire fraud, violations of the National Stolen Property Act ("NSPA"), and extortion.

**B.      Procedural History**

This case has a long and complicated history of which only relevant portions are summarized below.  Plaintiffs initiated this lawsuit on May 10, 2010, by filing the Original Complaint (the "OC").  On May 12, Schwarz received a copy of the OC and emailed it to Satter, Dogan, Salomon and Pisem.  On May 14, the OC was ordered sealed and Plaintiffs were ordered to file a redacted version of the OC within five days because of concern that the OC was based on privileged and confidential information that had been improperly obtained.  Plaintiffs did not file a redacted version, and the Court issued a series of orders extending the time to serve Defendants until April 1, 2013.

On April 2, 2013, the Court received a First Amended Complaint (the "FAC").  The Court deemed the FAC timely submitted on April 1 and ordered Plaintiff to send a copy first to Satter, and then to Bayrock Group and the Bayrock Entities (collectively, "Bayrock Defendants"), but not to file, serve or otherwise distribute the FAC pending further court order. The Bayrock Defendants objected to the filing of the FAC on the ground that it, too, includes information based on privileged or confidential information.  The Court then directed Plaintiffs not to serve the FAC on any defendants other than the Bayrock Defendants but granted Plaintiffs leave to file the FAC under seal, which they did on June 6, 2013.

On July 23, 2013, the Court referred the case to Magistrate Judge Frank Maas for resolution of the issues that are the basis for the Bayrock Defendants' objection to the public filing of the FAC.  On January 14, 2015, Judge Maas issued a Report and Recommendation (the "January Report"), which recommended that the disputed paragraphs be struck from the FAC. The Court adopted the January Report in its entirety on March 23, 2015, and ordered Plaintiffs to file and serve a redacted version of the FAC.

15

Also in March 2015, Plaintiffs discharged their original counsel and retained new counsel to represent them.  Plaintiffs' new counsel requested permission to file a Second Amended Complaint (the "SAC").  On August 13, 2015, after reviewing the proposed SAC, Judge Maas issued another Report and Recommendation (the "August Report"), which recommended that a slightly redacted version of the SAC be filed and served.  On November 9, 2015, the Court adopted the August Report in its entirety and ordered Plaintiffs to file the redacted SAC by November 23 and "promptly" serve the redacted SAC on each of the Defendants.  Plaintiffs timely filed the SAC and either served or obtained waiver of service for each of the Defendants by late December 2015.

On March 17, 2016, Plaintiffs filed an unopposed request for leave to file the TAC, which the Court granted.  The defendants named in the TAC are a subset of the defendants named in the OC, with the exception of Ocean Club, which was not named in the OC.  Defendants filed the instant motion to dismiss on April 15, 2016.

## II.      LEGAL STANDARD

"On a motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor."  *Littlejohn*, 795 F.3d at 306.  "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) (citation omitted); *see also Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

16

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* "[W]hatever documents may properly be considered in

connection with the Rule 12(b)(6) motion, the bottom-line principle is that 'once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the

allegations in the complaint.'" *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (quoting

*Twombly*, 550 U.S. at 563).

Allegations of fraud or mistake must meet the heightened pleading standard imposed by

Federal Rule of Civil Procedure 9(b). "In the RICO context, Rule 9(b) calls for the complaint to

specify the statements it claims were false or misleading, give particulars as to the respect in

which plaintiffs contend the statements were fraudulent, state when and where the statements

were made, and identify those responsible for the statements." *Moore v. PaineWebber, Inc.*, 189

F.3d 165, 173 (2d Cir. 1999). "In addition, the plaintiffs must allege facts that give rise to a

strong inference of fraudulent intent." *Id.* However, Rule 9(b) applies only to allegations of

fraud or mistake; other elements of a RICO claim are "measured under the more liberal pleading

requirements of Rule 8(a)." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n.4 (2d

Cir. 1990).

## III.   DISCUSSION

### A.   Statute of Limitations

Except as to claims against Lauria, the claims asserted in the TAC are timely under the

applicable statute of limitations because the claims relate back to the date the OC was filed.

Because the statute of limitations is an affirmative defense, Defendants carry the burden

of showing that Plaintiffs failed to plead timely claims. *See Staehr v. Hartford Fin. Servs. Grp.*,

*Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("The lapse of a limitations period is an affirmative

defense that a defendant must plead and prove." (citing Fed. R. Civ. P. 8(c)(1))).  Dismissal

based on an affirmative defense at the complaint stage is warranted only if "it is clear from the

face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's

claims are barred as a matter of law."  *Staehr*, 547 F.3d at 425 (emphasis omitted) (quoting

*Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)).

      Plaintiffs' RICO claims have a four-year statute of limitations.  *Agency Holding Corp. v.

Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *Koch v. Christie's Int'l PLC*, 699 F.3d

141, 148 (2d Cir. 2012).  Plaintiffs' state law claims[1] have either a three-year or six-year statute

of limitations.  *See* N.Y. C.P.L.R. §§ 213, 214.[2]  Defendants do not identify precisely when the

statute of limitations began to run on each claim, but aver that it was no later than 2007.

Assuming for purposes of this motion that the limitations period began to run in 2007, even the

six-year limitations period expired well before the TAC was filed in 2016.  However, to the

extent that any claim asserted in the TAC relates back to the filing of the OC on May 10, 2010,

then that claim is timely.

---

[1] For issues or claims governed by state law, this Opinion applies New York law because the parties do.  *See Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

[2] *See also Prichard v. 164 Ludlow Corp.*, 854 N.Y.S.2d 53, 54 (1st Dep't 2008) (applying six-year statute of limitations to fraudulent inducement claim); *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 967 N.E.2d 1187, 1190 (N.Y. 2012) ("Under CPLR 213(2), a claim for breach of contract is governed by a six-year statute of limitations."); *Susman v. Commerzbank Capital Markets Corp.*, 945 N.Y.S.2d 5, 8 (1st Dep't 2012) (applying three-year statute of limitations to tortious interference claim); *Komolov v. Segal*, 947 N.Y.S.2d 14, 15 (1st Dep't 2012) ("three-year statute of limitations applicable to the conversion claims"); *Yatter v. William Morris Agency, Inc.*, 682 N.Y.S.2d 198, 199 (1st Dep't 1998) ("A breach of fiduciary duty claim falls under either a three-year or six-year limitation period, depending on the nature of the relief sought."); *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013) (for unjust enrichment claims under New York law, "[t]he limitations period is six years where plaintiff seeks an equitable remedy, but three years where plaintiff seeks monetary damages.").

Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading."  The Second Circuit has explained that the "central inquiry" under Rule 15 is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading."  *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006), *as amended* (Oct. 3, 2006) (internal quotation marks and citation omitted).  Accordingly, "claims that are based on an 'entirely distinct set' of factual allegations will not relate back," but claims that are a "natural offshoot" of the allegations contained in the original pleading will.  *Id.*

The Second Circuit considered the relation back doctrine in the context of a RICO claim in *Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 36 (2d Cir. 2002), *overruled on other grounds by Slayton*, 406 F.3d at 226–28.  There, the plaintiff amended his complaint to add a RICO claim based on newly discovered evidence that the defendants bribed union officers, and the district court held that the amended complaint related back to the original.  *Id.* at 29.  As a general matter, the Second Circuit explained that:

> If the original complaint referred to general acts of fraud or other predicate acts that might support a RICO claim, then a later amendment adding a RICO claim would "relate back" to the original complaint.  Even if the description of such an act of fraud was not fully developed or specifically described as part of a RICO conspiracy, it would put the defendants on notice that the conduct was at issue.

*Id.* at 36 (citation omitted).  In that particular case, however, the Second Circuit held that the RICO claim did not relate back because the original complaint made no reference to bribery of union officers, and bribery was the only predicate act alleged that could have given rise to a RICO claim.  *Id.*

19

Here, the "general fact situation" alleged in the OC gave all Defendants except Lauria adequate notice that the conduct on which the TAC is based was at issue. *Slayton*, 406 F.3d at 228. The OC is, in Plaintiffs' words, "a sprawling document that portrays virtually every act by each of the Defendants as illegal and injurious to Plaintiffs." The OC alleges at the outset that:

> Bayrock does conduct legitimate real estate business, but for most of its existence it was substantially and covertly mob-owned and operated. Arif, Satter, and Schwarz operated it for years through a pattern of continuous related crimes, including mail, wire, and bank fraud; tax evasion; money laundering; conspiracy; bribery; extortion; and embezzlement.

The following 164 pages of the OC lay out specific allegations of fraudulent or criminal acts by Arif, Satter and Schwarz, various Bayrock entities, and their lawyers and accountants. Although the OC focuses primarily on allegations of tax evasion that have been abandoned in the TAC, the OC contains at least some allegations about each and every claim, as well as all the RICO predicate acts, set forth in the TAC.[3] The OC also contains allegations connecting each

---

[3] The relevant OC allegations include the following examples (from Docket No. 406):
Claims alleged in the TAC:
- RICO:  ¶¶ 9, 14
- RICO conspiracy:  ¶ 14
- Fraudulent inducement:  ¶¶ 147–48
- Breach of contract:  ¶ 685
- Tortious interference:  ¶¶ 519–22
- Conversion:  ¶¶ 519–22
- Aiding & abetting conversion:  ¶¶ 544–47
- Breach of fiduciary duty:  ¶¶ 36–38, 143, 145, 685
- Aiding & abetting breach of fiduciary duty:  ¶¶ 59, 143, 145
- Alter ego/corporate veil piercing:  ¶¶ 105, 108
- Unjust enrichment:  ¶¶ 147–48, 685

RICO predicate acts alleged in the TAC:
- Initial Trump Fraud:  ¶¶ 106, 124
- Thieriot Fraud & NSPA:  ¶¶ 84, 87, 110, 312–24
- Camelback Fraud & NSPA:  ¶¶ 117, 124
- Trump SoHo Fraud & NSPA:  ¶¶ 129, 234, 481, 494–98
- iStar Fraud:  ¶¶ 129, 234, 480–92, 751
- Capmark/Camelback Fraud:  ¶¶ 467–77

Defendant -- with one exception, as explained below -- to conduct relevant to the claims asserted in the TAC.  The OC therefore gave all but one of the Defendants adequate notice that the conduct underlying the claims in the TAC was at issue in this case.  *See Slayton*, 460 F.3d at 228 ("[W]here an initial complaint alleges a basic scheme of defrauding investors by misrepresenting earnings and profitability, an allegation of accounts receivable manipulation in an amended complaint will relate back because it is a natural offshoot of that scheme." (citation and internal quotation marks omitted)).

The claims in the TAC against Lauria do not relate back.  The only allegations made about Lauria in the OC are that he was previously one of Satter's "partners in crime" and received $1.7 million from Satter "on Bayrock's dime" for no other reason than "gratitude for Lauria's serving a prison sentence for racketeering while Satter avoided prison by testifying against 20 Mafia and Russian mob associates."  These allegations, which suggest that Lauria was nothing more than a passive recipient of Satter's allegedly ill-gotten gains, did not provide Lauria notice of the factual basis for any of the TAC's claims against him.  *See Tho Dinh Tran*, 281 F.3d at 36 ("Rather than merely adding a new legal theory based on the same facts as those presented in the original complaint, the plaintiff's amendment introduced a significant new factual allegation that fundamentally changed the nature of the allegations . . . .")  Accordingly, the claims asserted against Lauria in the TAC do not relate back to the OC and therefore are barred by the applicable statute of limitations.

---

- Capmark/Whitestone Fraud:  ¶¶ 163, 478–79
- Kriss Fraud & NSPA:  ¶¶ 66, 91, 102
- Ejekam Fraud & NSPA:  ¶¶ 101, 650–51
- Woodring Fraud & NSPA:  ¶¶ 346, 650–51
- Extortion of Kriss:  ¶ 123

Defendants' reliance on *United States v. Baylor University Medical Center*, 469 F.3d 263 (2d Cir. 2006), *superseded by statute*, 31 U.S.C. § 3731(c), is misplaced.  In *Baylor*, the Second Circuit held that the Government's complaint-in-intervention did not relate back to the original, sealed *qui tam* complaint because the secrecy of *qui tam* actions is incompatible with the notice required for relation back under Rule 15.  *Id.* at 270.  Here, however, the OC was not treated with the secrecy of a *qui tam* complaint.  The OC was initially filed on the public docket.  The Court ordered the OC sealed four days later, but not before it had been disseminated "to certain named defendants and others."  Schwarz indicated in an affidavit filed in a related action that, before the OC was sealed, he emailed an unredacted copy to Satter, Dogan, Salomon and Pisem.  Given that Schwarz is Bayrock Group's general counsel, Salomon is a partner of Salomon & Co., and Pisem is a partner of Roberts & Holland, this email effectively gave all Defendants other than Lauria access to the OC and notice of the allegations contained therein.  *Gold Star, Inc. v. Lloyds of London Ins. Underwriters*, 113 F.3d 1229 (2d Cir. 1997) ("It is elemental that the knowledge of an agent . . . is imputed to the principal." (internal quotation marks and citation omitted)); N.Y. P'ship Law § 20 ("Every partner is an agent of the partnership for the purpose of its business . . . .").

The R&H Defendants also argue unpersuasively that, in order for the TAC's claims against them to relate back to the OC, the additional requirements of Rule 15(c)(1)(C) must be satisfied.  Rule 15(c)(1)(C) applies where the amended pleading "changes the party or the naming of the party against whom a claim is asserted."  Although named as defendants in the OC, the R&H Defendants argue that the TAC "changes the party . . . against whom a claim is asserted" by dropping as a defendant another law firm that the OC alleged played a leading role in the 2007 FL Transaction.  This novel interpretation of Rule 15(c)(1)(C) is rejected.  This

argument would have merit only if the OC alleged that the other law firm performed all the relevant work on the 2007 FL Transaction, thereby giving the R&H Defendants no notice that their work on that transaction was also at issue.  The OC, however, alleged and provided notice of the claim that the R&H Defendants played a significant role in the 2007 FL Transaction.  *See Slayton*, 460 F.3d at 228; *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) ("When a suit is filed in a federal court . . . , the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be." (internal quotation marks and citation omitted)).  Thus, the TAC's claims against the R&H Defendants relate back to the OC and are timely.

### B.      Timeliness of Service

The delay in effecting service of process on Defendants neither requires nor warrants dismissal of this action under Federal Rule of Civil Procedure 4(m), which states:

> If a defendant is not served within 90 days after the complaint is filed, the court --
> on motion or on its own after notice to the plaintiff -- must dismiss the action
> without prejudice against that defendant or order that service be made within a
> specified time.  But if the plaintiff shows good cause for the failure, the court
> must extend the time for service for an appropriate period.[4]

Even in the absence of good cause, a court may in its discretion extend the time for service. *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007); Fed. R. Civ. P. 4(m) Advisory Committee's note to 1993 amendment.

Here, the Court ordered that the OC not be further disseminated after May 14, 2010, and extended the time for service -- "good cause having been shown" -- several times, ultimately through April 1, 2013.  On April 1, 2013, the Court received the FAC and ordered that it be

---

[4] Rule 4(m) was amended as of December 1, 2015, to reduce the presumptive time for serving a defendant from 120 days to 90 days.  *See* Fed. R. Civ. P. 4(m) Advisory Committee's note to 2015 amendment.

distributed to Satter and the Bayrock Defendants only, pending resolution of those defendants' objections to the FAC's reliance on privileged or confidential information.  Those objections took two years to resolve, by which time Plaintiffs had retained new counsel who wished to file the SAC.  Once the Court granted leave, in November 2015, for Plaintiffs to file and serve the SAC, Plaintiffs served or obtained waivers of service from all Defendants within 90 days.  In light of this unusual procedural history, the Court exercises its discretion to extend the time for service *nunc pro tunc* from April 1, 2013, until February 23, 2016, which was 90 days after the SAC was filed.  *See* Fed. R. Civ. P. 4(m); *Zapata*, 502 F.3d at 196.  Timely service was therefore made.

### C.   RICO Claims

The TAC sufficiently pleads a substantive RICO claim under 18 U.S.C. § 1962(c) as to Arif, Satter, Schwarz and the Bayrock Entities, and a RICO conspiracy claim under 18 U.S.C. § 1962(d) involving Arif, Satter, Schwarz and the Salomon Defendants.  To prevail on a civil RICO claim, "a plaintiff must show (1) a violation of the RICO statute, 18 USC § 1962; (2) an injury to business or property; and (3) that the injury was caused by a violation of Section 1962." *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008) (internal quotation marks omitted).  To establish a substantive RICO violation, a plaintiff must show a 'pattern of racketeering activity,'" *id.* (quoting 81 USC § 1962(a)–(c)), "and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation."  *Id.* (citing 18 USC § 1962(d)).

### 1.   RICO Violations Under § 1962

#### a.  Substantive RICO Claims

The TAC states substantive RICO claims under § 1962(c) as to Arif, Satter, Schwarz and

the Bayrock Entities, but fails to plead the conduct element as to the R&H Defendants, Dogan

and the Salomon Defendants.

In order to plead a substantive RICO claim under 18 U.S.C. § 1962(c), a plaintiff must

allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *City of*

*New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 439 (2d Cir. 2008) (quoting *Sedima,*

*S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 (1985)), *rev'd on other grounds sub nom. Hemi Group*

*LLC v. City of New York*, 559 U.S. 1 (2010).  "The requirements of section 1962(c) must be

established as to each individual defendant."  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir.

2001).

#### i.  Racketeering Activity

The TAC sufficiently pleads predicate acts of racketeering as to all Defendants named in

Kriss's and Ejekam's respective substantive RICO claims (collectively, the "RICO

Defendants").[5]

"Racketeering activity" is defined in 18 U.S.C. § 1961(1) to include a variety of offenses

including, as relevant here, mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. §

1343, violations of the NSPA under 18 U.S.C. §§ 2314 and 2315, and "any act or threat

involving . . . extortion . . . which is chargeable under State law and punishable by imprisonment

for more than one year."  For reasons explained below, each Plaintiff must allege that each RICO

---

[5] Count One is Plaintiff Kriss's substantive RICO claim against all Defendants except Bayrock Group, which is alleged to be a RICO enterprise.  Count Two is Plaintiff Ejekam's substantive RICO claim against all Defendants except Bayrock Group, Ocean Club, Merrimac and Camelback.

Defendant committed at least two of these predicate acts, one of which must have caused injury to Plaintiff's business or property.  *See DeFalco*, 244 F.3d at 306.

The TAC adequately alleges at least one predicate act of mail or wire fraud against each Plaintiff and involving all RICO Defendants.  Mail fraud occurs when a person "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do."  18 U.S.C. § 1341.  Similarly, wire fraud occurs when a person "having devised or intending to devise any scheme or artifice to defraud, . . . transmit[s] . . . by means of wire, radio, or television communication . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.  Because these predicate acts sound in fraud, they must be pleaded with particularity pursuant to Rule 9(b), Fed. R. Civ. P.  *See Moore*, 189 F.3d at 172–73.

The TAC alleges that (i) the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments were omitted or concealed (ii) by each Defendant at various, specific times (iii) in the context of negotiations over employment and compensation (iv) resulting in the Bayrock Group Enterprise receiving Plaintiffs' professional services for less than they otherwise would have agreed.  Because the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments, as pleaded, were known to RICO Defendants and essential to the negotiations, they had a duty to disclose them under New York's "special facts doctrine."  *See United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("The [mail and wire] fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."); *United States v. Margiotta*, 688 F.2d 108, 124 (2d Cir. 1982) (noting that state law is one possible source of a duty to disclose for purposes of the federal mail fraud statute); *Connaughton v. Chipotle Mexican Grill, Inc.*, 23 N.Y.S.3d 216, 223 (1st Dep't

2016) ("[T]his Court has recognized the existence of an alternative basis for allowing fraud claims to proceed based on omissions, even in arm's length transactions in the absence of a fiduciary or confidential relationship, 'where one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.'" (quoting *PT Bank Cent. Asia, N.Y. Branch v. ABN AMRO Bank N.V.*, 754 N.Y.S.2d 245, 252 (1st Dep't 2003)).

The TAC also alleges that some of these negotiations and the various documents related to them were conducted remotely, through interstate or international mail or wires.  Together, these allegations plausibly allege a predicate act of mail or wire fraud by each RICO Defendant.

The TAC also sufficiently alleges at least one predicate act under the NSPA involving each Plaintiff and each RICO Defendant.  As relevant here, the elements of a violation of § 2314 of the NSPA are that "(1) the defendant transported property, as defined by the statute, in interstate commerce, (2) the property was worth $5,000 or more, and (3) the defendant knew the property was 'stolen, converted or taken by fraud.'"  *United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991) (quoting *Dowling v. United States*, 473 U.S. 207, 214 (1985)); *see* 18 U.S.C. § 2314.  Pleading a violation of § 2315 of the NSPA requires the same elements, except instead of transport of property there must be a sale or receipt of property.  *See* 18 U.S.C. § 2315; *United States v. Kapelioujnyj*, 547 F.3d 149, 153 (2d Cir. 2008).

The TAC alleges that Schwarz transported and all RICO Defendants sold or received, through interstate commerce, Plaintiffs' membership interests in various Bayrock Entities in connection with their involvement in the 2007 FL Transaction.  Specifically, the TAC alleges that the RICO Defendants knew that the 2007 FL Transaction granted the FL Group a greater share of membership interests in Merrimac, Camelback, Whitestone and Spring Street than Bayrock Group owned at the time, thereby effectively stealing or converting some portion, worth

at least $5000, of Plaintiffs' membership interests in those same Bayrock Entities.  The TAC also

specifies what role each RICO Defendant played in the NSPA violations:  Arif, Satter and

Schwarz negotiated and, on behalf of the Bayrock Defendants, executed the 2007 FL

Transaction; the Salomon Defendants prepared accounting documents for the transaction that

concealed Plaintiffs' membership interests; and Dogan and the R&H Defendants provided legal

advice and drafted documents that embodied the transaction.  While Defendants argue that

Plaintiffs' membership interests had not vested, and thus could not have been stolen from them,

at the time of the 2007 FL Transaction, this argument involves factual determinations that cannot

be made at the motion to dismiss stage, as explained more fully below in relation to Plaintiffs'

breach of contract claim.  Read in a light most favorable to Plaintiffs, the TAC adequately

alleges a predicate act under the NSPA against each Plaintiff and by each RICO Defendant.

Because the TAC satisfies the racketeering element based on the alleged predicate acts of

mail or wire fraud and violations of the NSPA against Plaintiffs, it is not necessary to determine

whether the other predicate acts alleged in the TAC satisfy the pleading standard.  *See*

*Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 405 (S.D.N.Y. 2013).

### ii.  Pattern

The TAC adequately pleads a pattern of racketeering activity.  To satisfy RICO's pattern

element, a plaintiff must establish at least two predicate acts of racketeering activity that are

related and continuous.  *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229,

238 (1989).  Relatedness and continuity "must be stated separately, though in practice their proof

will often overlap."  *H.J. Inc.*, 492 U.S. at 239.

"Predicate acts are 'related' for RICO purposes when they 'have the same or similar

purposes, results, participants, victims, or methods of commission, or otherwise are interrelated

28

by distinguishing characteristics and are not isolated events.'"  *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997) (quoting *H.J. Inc.*, 492 U.S. at 240).  The predicate acts discussed above -- mail or wire fraud and violations of the NSPA -- are clearly related.  Both allegedly were committed (i) by all RICO Defendants (ii) against Plaintiffs (iii) by means of fraudulent documents and transactions (iv) with the purpose and (v) result of enriching Defendants, particularly Arif and Satter.  The relatedness requirement is therefore met.  *See Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 19 (2d Cir. 1989) ("The alleged acts had the same purpose, that is, fleecing the same victims . . . and employ[ed] similar unlawful methods of commission -- namely, the misrepresentation of [defendant's] experience, of construction costs and the padding of billings to plaintiffs.").

　　　"'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *H.J. Inc.*, 492 U.S. at 241.  Either a closed- or open-ended pattern can satisfy the continuity requirement of the pattern element.  *Kalimantano*, 939 F. Supp. 2d at 406.  Plaintiffs argue that the TAC alleges a closed-ended pattern.  As the Second Circuit has explained,

> Closed-ended continuity is demonstrated by predicate acts that "amount to continued criminal activity," by a particular defendant.  To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time.  Predicate acts extending over a few weeks or months . . . do not satisfy this requirement."

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J. Inc.*, 492 U.S. at 242).  Duration is the primary factor courts consider when determining whether closed-ended continuity exists, and "the Second Circuit has never held a period of racketeering activity lasting less than two years to be substantial enough to qualify."  *Kalimantano*, 939 F. Supp. 2d at 412 (citing *DeFalco*, 244 F.3d at 321) (research updated

29

through November 30, 2016).  Other relevant factors include the number and variety of predicate

acts, the number of participants and victims and the presence of separate schemes.  *Id.*

Here, the predicate acts suffice to show closed-ended continuity.  The mail or wire fraud

predicates began in 2003, when Plaintiffs were first induced to work for Bayrock Group, and

continued through 2007, when the FL Transaction was executed and the NSPA predicates

occurred.  This 4-year duration is twice as long as the 2-year guideline, which has been held

sufficient in similar cases.  *See Procter & Gamble*, 879 F.2d at 18 (finding continuity where mail

fraud predicates across five separate schemes spanned two years); *United States v. Cain*, 671

F.3d 271, 288 (2d Cir. 2012) ("The extortions occurred over more than two years, which we have

held is a sufficient period to support a finding of closed-ended continuity."); *City of New York v,

LaserShip, Inc*., 33 F. Supp. 3d 303, 311 (S.D.N.Y. 2014) (finding closed-ended continuity

where predicates spanned 26 months).  Additionally, the number of alleged participants in the

predicate acts (eight individuals, five Bayrock Entities, a law firm and an accounting firm) and

the existence of two separate schemes (one to fraudulently induce Plaintiffs to perform work in

exchange for membership interests, the other to divest them of those membership interests)

support a finding of closed-ended continuity.  *See Kalimantano*, 939 F. Supp. 2d at 412 (citing

*DeFalco*, 244 F.3d at 321).[6]

Because the alleged predicate acts are both related and continuous, the TAC adequately

pleads a pattern of racketeering activity.

---

[6] In addition to the NSPA and mail or wire fraud predicate acts discussed in this Opinion, the
TAC alleges numerous other predicate acts perpetrated against individuals other than Plaintiffs.
These other alleged predicate acts support the conclusion that the TAC describes "a fraudulent
scheme of sufficient breadth or reach to meet the pattern requirement."  *Kalimantano*, 939 F.
Supp. 2d at 414.

### iii.   Enterprise

The TAC adequately alleges the existence of an enterprise of which all RICO Defendants were a part.

RICO defines an "enterprise" to include a "group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "[A]n association-in-fact enterprise must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).  An association-in-fact enterprise "need not have a hierarchical structure, a chain of command, or other business-like attributes," but it "must have an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages."  *United States v. Applins*, 637 F.3d 59, 73 (2d Cir. 2011) (internal quotation omitted) (citing *Boyle*, 556 U.S. at 945–47).

Here, the TAC adequately alleges that the Bayrock Group Enterprise was an association-in-fact enterprise involving all the RICO Defendants.  The TAC alleges that the Enterprise commenced operation in 2003, when Arif and Satter agreed to operate the Bayrock Entities with the purpose "to enrich themselves personally at the expense of third parties."  The TAC further alleges that the Enterprise grew in size between 2003 and 2007, at which point it involved all RICO Defendants -- a collection of Bayrock Group leaders, Bayrock Entities and outside accountants and attorneys.  These allegations provide the purpose, relationships and longevity required of an association-in-fact enterprise, and describe a structure beyond that inherent in the pattern of racketeering activity discussed above.  The enterprise element of Plaintiffs' RICO claim is therefore satisfied.

### iv.  Conduct

The TAC adequately alleges RICO's conduct element as to Arif, Satter, Schwarz and the

Bayrock Entities, but not as to the R&H Defendants, Dogan and the Salomon Defendants.

Section 1962(c) makes it "unlawful for any person employed by or associated with" a

RICO enterprise "to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity."  The Supreme Court has held that

in order to be liable under this provision, "one must participate in the operation or management

of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).  "Simply alleging

that certain entities provide services which are helpful to an enterprise without any allegations

that those entities exert any control over the enterprise does not sufficiently allege a claim under

RICO against those entities."  *Smokes-Spirits.com*, 541 F.3d at 449.  Accordingly, "the provision

of professional services by outsiders, such as accountants, to a racketeering enterprise, is

insufficient to satisfy the participation requirement of RICO."  *Hayden v. Paul, Weiss, Rifkind,

Wharton & Garrison*, 955 F. Supp. 248, 254 (S.D.N.Y. 1997) (citing *Reves*, 507 U.S. at 188).

The TAC adequately alleges that Arif, Satter, Schwarz and the Bayrock Entities -- which

were controlled by Arif, Satter and Schwarz -- participated in the operation or management of

the Bayrock Group Enterprise.  For example, the TAC alleges that Arif and Satter executed

Plaintiffs' compensation agreements and the 2007 FL Transaction, and that Schwarz oversaw

payments -- including the Illegally-Structured Satter Payments -- and the work performed by the

Salomon Defendants and R&H Defendants.  These and similar allegations demonstrate the

"operation or management" necessary to satisfy RICO's conduct element under *Reves* as to these

defendants.  *See* 507 U.S. at 185.

In contrast, the TAC lacks allegations sufficient to satisfy RICO's conduct element as to the R&H Defendants, Dogan and the Salomon Defendants. According to the TAC, the R&H Defendants did not even become associated with the Enterprise until 2007 and worked with the Enterprise only on the 2007 FL Transaction. Dogan allegedly became associated with the Enterprise in 2005 and helped negotiate Schwarz's compensation agreement, but otherwise Dogan's only involvement was with the 2007 FL Transaction. The role that the R&H Defendants and Dogan allegedly played in this transaction is typical of lawyers: "providing legal advice, communicating with counsel representing FL Group and negotiating and drafting the documents that embodied the transaction." Nowhere does the TAC allege that the R&H Defendants or Dogan went beyond the provision of legal services and directed any of the Bayrock Group Enterprise's affairs. The TAC claims that the R&H Defendants and Dogan "played a critical role in planning and executing the FL Group Investment" and "failed to advise" other Defendants "that transferring rights associated with the membership interests owned by Plaintiffs . . . was wrongful, illegal and/or criminal." However, going beyond a professional's customary role or even committing misconduct does not establish "operation or management" of the enterprise. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2d Cir.1994) (provision of legal services in context of fraudulent real estate transaction does not establish conduct element).

The TAC makes more allegations against the Salomon Defendants -- including that they became involved in the Enterprise in 2003 and prepared financial documents in connection with many alleged fraudulent schemes -- but still fails to show that the Salomon Defendants directed the Enterprise in any way. To the contrary, the TAC indicates that Schwarz directed them:

> Schwarz . . . oversaw the accounting work performed by Defendants Salomon, Weinreich and Salomon & Co. on Bayrock Group's behalf.  Schwarz gave Salomon, Weinreich and Salomon & Co. direction and instruction, causing these Defendants to prepare financial statements, tax filings and related documents in a manner designed to conceal improper and/or illegal Bayrock Group transactions, create the impression that Bayrock Group and its investments were being operated in a routine and above-board manner and disguise the extent of Satter's managerial role and ownership interest in Bayrock Group.

The conduct element therefore is not satisfied as to the Salomon Defendants.  *See Hayden*, 955 F. Supp. at 254 (accounting firm's misrepresentations and omissions of material facts in financial statements for the enterprise did not equate to participation in the operation or management of the enterprise); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 469 (S.D.N.Y. 1996) (accounting firm's concealment of an enterprise's fraudulent activities did not amount to operation or management).

In sum, the TAC adequately alleges all the elements of a substantive RICO claim under § 1962(c) as to Arif, Satter, Schwarz and the Bayrock Entities, but fails to allege the conduct element as to the remaining RICO Defendants.  Consequently, the substantive RICO claim is dismissed against the R&H Defendants, Dogan and the Salomon Defendants.

### b.  RICO Conspiracy Claims

The TAC sufficiently pleads the elements of RICO conspiracy claims under § 1962(d) as to Arif, Satter, Schwarz and the Salomon Defendants, but not as to Dogan, the R&H Defendants or the Bayrock Entities.[7]

"[T]he requirements for RICO's conspiracy charges under § 1962(d) are less demanding" than those for substantive RICO claims.  *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003). "A 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the

---

[7] Count Three is Plaintiff Kriss's RICO conspiracy claim against all Defendants except Bayrock Group.  Count Four is Plaintiff Ejekam's RICO conspiracy claim against all Defendants except Bayrock Group, Ocean Club, Merrimac and Camelback.

elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.'"  *Id.* at 376–77 (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  "In the civil context, a plaintiff must allege that the defendant 'knew about and agreed to facilitate the scheme.'"  *Id.* at 377 (quoting *Salinas*, 522 U.S. at 66).

As to Arif, Satter and Schwarz, several allegations in the TAC suggest that they knew about and agreed to facilitate the fraudulent scheme.  First, the Arif/Satter Agreement allegedly called for Bayrock Group to be operated in a way that would create a pattern of racketeering activity.  Second, once the $50 million proceeds from the 2007 FL Transaction were deposited into Bayrock Group's New York bank account, Arif, Satter and Schwarz had portions of these proceeds transferred to their personal accounts, suggesting coordination with each other.  Third, Arif, Satter and Schwarz each allegedly committed multiple predicate acts.  *See City of New York v. Chavez,* No. 11 Civ. 2691, 2012 WL 1022283, at *8 (S.D.N.Y. Mar. 26, 2012) ("When a defendant has personally committed several acts of racketeering in furtherance of the enterprise's affairs, the inference of an agreement [to join the conspiracy] is unmistakable.").  Based on these allegations, the TAC adequately alleges a RICO conspiracy claim against Arif, Satter and Schwarz.

The TAC contains factual allegations sufficient to plead that the Salomon Defendants also knew about and agreed to facilitate the fraudulent scheme.  The Salomon Defendants served as accountants for Bayrock Group from 2003 through 2008 and, in that capacity, knew about and approved the Illegally-Structured Satter Payments and prepared documents related to many of the alleged predicate acts, including the NSPA and mail or wire fraud predicate acts.  This extensive participation in the alleged scheme supports an inference that the Salomon Defendants "adopt[ed] the goal of furthering or facilitating the criminal endeavor."  *Baisch*, 346 F.3d at 376–

77 (quoting *Salinas*, 522 U.S. at 65).  Although the Salomon Defendants' alleged conduct did not satisfy the conduct element of a substantive RICO violation, as explained above, that does not foreclose liability under a RICO conspiracy claim.  *See Salinas*, 522 U.S. at 64 ("A person, moreover, may be liable for conspiracy even though he was incapable of committing the substantive offense.").

As to Dogan and the R&H Defendants, however, the TAC fails to plead facts showing that they knew about and agreed to the fraudulent scheme.  The TAC alleges only that Dogan and the R&H Defendants helped to devise and execute the 2007 FL Transaction, albeit with knowledge of Plaintiffs' allegedly conflicting compensation agreements.  The TAC does not allege that Dogan and the R&H Defendants participated in or even knew about any of the other alleged predicate acts.  Nor does the TAC allege that Dogan and the R&H Defendants entered into any explicit agreement regarding the alleged Enterprise or received any proceeds from the fraudulent scheme other than "substantial compensation for their work on the FL Group Investment."  The RICO conspiracy claims against Dogan and the R&H Defendants are therefore dismissed.

The RICO conspiracy claims also fail as to the Bayrock Entities.  The intracorporate conspiracy doctrine holds that a corporation cannot conspire with its agents.  *See  Turkmen v. Hasty*, 789 F.3d 218, 263 (2d Cir. 2015) ("[D]efendants -- officers and directors of a single corporation, and the corporation itself -- could not legally conspire with one another . . . because the defendants formed a 'single business entity with a managerial policy implemented by the one governing board.'  Thus, the defendants could not satisfy the statutory requirement of a conspiracy between two or more persons." (quoting *Girard v. 94th Street & Fifth Avenue Corp.*, 530 F.2d 66, 70–72 (2d Cir. 1976)), *cert. granted*, 2016 WL 2653797 (U.S. Oct. 11, 2016).

36

Because the Bayrock Entities can act only through their agents Arif, Satter and Schwarz, the Bayrock Entities cannot also participate in a conspiracy with Arif, Satter and Schwarz.  The RICO conspiracy claims against the Bayrock Entities are therefore dismissed.

### 2.  Injury

The TAC adequately alleges injury to Plaintiffs.  To bring a RICO claim in a civil action, a plaintiff must have been "injured in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  "[T]he plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."  *Sedima*, 473 U.S. at 496.  "In this case, proof of injury, or whether plaintiffs have been harmed, is bound up in proof of damages, or by how much plaintiffs have been harmed." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008) *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).  Subject to these requirements and the proximate cause element discussed below, a plaintiff can adequately plead RICO damages by alleging lost contracts or lost wages.  *See, e.g.*, *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 382 (2d Cir. 2001) (finding RICO injury satisfied because, "[i]f plaintiffs can substantiate their claims, the plaintiffs may well show that they lost contracts directly because of the cost savings defendant realized through its scheme to employ illegal workers"); *Apollon Waterproofing & Restoration, Inc. v. Bergassi*, 87 F. App'x 757, 759 (2d Cir. 2004) (summary order) ("Lost contracts that could have been obtained but for racketeering activities are cognizable injuries under RICO.");  *Tho Dinh Tran*, 281 F.3d at 35 (noting without discussion that the alleged RICO injury was lost wages); *Rodonich v. House Wreckers Union, Local 95 of Laborers' Int'l Union of N. Am.*, 627 F. Supp. 176, 180 (S.D.N.Y. 1985) ("[T]o the

extent that plaintiffs' purported injuries consist of lost wages, sufficient proprietary damage is alleged.").

The TAC alleges that Plaintiffs, who are well-credentialed real estate finance professionals, passed up lucrative opportunities at other firms to work for Bayrock Group. The TAC further alleges that but for Defendants' predicate acts involving the fraudulent concealment of the Material Information, Bad Faith Practices and Illegally-Structured Satter Payments, Plaintiffs would have rejected the terms of their compensation agreements and demanded higher pay, either at Bayrock Group or elsewhere. These alleged damages are lost contracts or lost wages and can potentially be recovered in a RICO claim. *See Commercial Cleaning*, 271 F.3d at 382; *Tho Dinh Tran*, 281 F.3d at 35.

### 3. Causation

The TAC sufficiently alleges that the racketeering activity caused Plaintiffs' injury. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a but for cause of his injury, but was the proximate cause as well.'" *Hemi Grp.*, 559 U.S. at 9 (2010) (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992)). Proximate cause for RICO purposes "requires 'some direct relation between the injury asserted and the injurious conduct alleged.' A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id.* (quoting *Holmes*, 503 U.S. at 268, 271).

Plaintiffs' alleged lost earnings flow directly from the pattern of racketeering activity. The Bayrock Defendants obtained Plaintiffs' services at a relatively low rate based on the false pretense that Plaintiffs were receiving valuable equity interests in a sound business. Because of the alleged racketeering activity, however, Plaintiffs received no equity interests, and the business was tainted by illegality. Defendants engaged in a pattern of racketeering activity to

deprive Plaintiffs of fair compensation by means of fraud.  Although there is some question whether Plaintiffs will be able to prove the value of the membership interests they were promised, at the very least they could prove the value of their services, and stand to recover at least any difference between that amount and the lesser amount they were paid.  *See Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d 297, 309 (S.D.N.Y. 2010) (injury and proximate cause adequately alleged where defendants fraudulently purchased journals at individual consumer rate and resold them at institutional rate, thereby "pocketing what should have been Plaintiffs' profits").  The racketeering activity is therefore directly related to Plaintiffs' lost earnings according to the TAC's allegations, and the proximate cause requirement is satisfied.

*     *     *

In sum, the TAC states claims of (1) a substantive RICO violation under 18 U.S.C. § 1962(c) by Arif, Satter, Schwarz and the Bayrock Entities against both Plaintiffs, and (2) a RICO conspiracy under 18 U.S.C. § 1962(d) involving Arif, Satter, Schwarz and the Salomon Defendants against both Plaintiffs.

### D.    State Law Claims

#### a.  Fraudulent Inducement

The TAC states claims for fraudulent inducement against Defendants named in Counts Five and Six.[8]  "To state a legally cognizable claim of fraudulent inducement based on a misrepresentation or omission, the complaint must allege that the defendant intentionally made a material misrepresentation of fact in order to defraud or mislead the plaintiff, and that the plaintiff reasonably relied on the misrepresentation and suffered damages as a result."

---

[8] Count Five is Plaintiff Kriss's fraudulent inducement claim against Defendants Bayrock Group, Arif, Satter, Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.  Count Six is Plaintiff Ejekam's fraudulent inducement claim against Defendants Bayrock Group, Arif, Satter, Whitestone and Spring Street.

*Connaughton*, 23 N.Y.S. 3d at 218; *see also Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d

1104, 1108 (N.Y. 2011).  As discussed above in the context of the RICO claims, the TAC

sufficiently alleges that Defendants knowingly concealed the Material Information, Bad Faith

Practices and Illegally-Structured Satter Payments with the intent to deceive Plaintiffs and induce

them to enter employment and compensation agreements with Bayrock Group, which resulted in

lost earnings for Plaintiffs.

### b.  Breach of Contract

The TAC adequately pleads breach of contract claims against Defendants named in

Counts Seven and Eight.[9]  The elements for a breach of contract claim under New York law are:

"(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3)

breach of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348

(2d Cir. 1996) (applying New York law); *accord Harris v. Seward Park Hous. Corp.*, 913

N.Y.S.2d 161 (1st Dep't 2010).  The TAC alleges, and the parties do not dispute, that Plaintiffs

each had contracts with Bayrock Group, Arif, Satter and various Bayrock Entities.  The TAC

also details how plaintiffs adequately performed under the contracts and alleges that Defendants

breached by failing to pay them millions of dollars in membership distributions to which they

were entitled under the agreements.  The TAC therefore states a claim for breach of contract

against Defendants named in Counts Seven and Eight.

Defendants' contrary arguments fail.  As to Kriss, Defendants contend that he failed to

plead a condition precedent to his receiving distributions under the Kriss 2005 Agreement -- that

Arif had "first received a 10% return of his Total Principal Company Contribution."  This

---

[9] Count Seven is Plaintiff Kriss's contract claim against Defendants Bayrock Group, Arif, Satter,
Ocean Club, Merrimac, Camelback, Whitestone and Spring Street.  Count Eight is Plaintiff
Ejekam's contract claim against Defendants Bayrock Group, Arif, Satter, Whitestone and Spring
Street.

argument ignores the rule under New York law that "[t]he performance or occurrence of a condition precedent in a contract need not be pleaded." N.Y. C.P.L.R. 3015(a). *See also 1199 Hous. Corp. v. Int'l Fid. Ins. Co.*, 788 N.Y.S.2d 88, 89 (1st Dep't 2005) ("In an action on a contract, the obligation to raise the issue of compliance with conditions precedent rests on the party disputing their performance or occurrence.").

 As to both Plaintiffs, Defendants argue that the agreements did not grant membership interests, but rather "profit interests," in various Bayrock Entities. This interpretation defies the plain language of both the Kriss 2005 Agreement and the Ejekam 2006 Agreement. These agreements may be considered on this motion as they are integral to the TAC and were submitted with Defendants' joint motion papers. The Kriss 2005 Agreement states in part that "'Executive's Membership Interest' means a non-dilutable 10% non-voting *membership interest* in the Company and each of the Company Entities," and the Ejekam 2006 Agreements state in part that "Ejekam shall be entitled . . . to a 2% *membership profit interest*" (emphasis added). Because the language of these agreements does not unambiguously support Defendants' argument, Plaintiffs' breach of contract claims survive. *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170–71 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. . . . A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." (internal quotation marks and citations omitted)).

 Similarly premature is Defendants' argument that even if the agreements conveyed membership interests, Plaintiffs were not entitled to distributions of the proceeds from the 2007

FL Transaction because that transaction was structured as a loan, not a sale.  This issue cannot be resolved on the face of the TAC or the Plaintiffs' agreements and therefore cannot be addressed on a motion to dismiss.

### c.  Tortious Interference with Contract

The TAC does not state a claim of tortious interference with contract as to any Defendants named in Counts Nine or Ten.[10]  "A claim of tortious interference requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach, and (4) damages."  *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996).

Here, none of the Defendants named in Counts Nine or Ten can be liable for tortious interference with Plaintiffs' agreements because these Defendants are officers or agents of the Bayrock Defendants.  "[I]t is well settled that an agent cannot be held liable for inducing [its] principal to breach a contract with a third person, at least where [it] is acting on behalf of [its] principal and within the scope of [its] authority."  *Devash LLC v. German Am. Capital Corp.*, 959 N.Y.S.2d 10, 15 (1st Dep't 2013) (quoting *Nu-Life Const. Corp. v. Board of Educ. of City of N.Y.*, 611 N.Y.S.2d 529, 530 (1st Dep't 1994)); *see also Murtha v. Yonkers Child Care Ass'n, Inc.*, 383 N.E.2d 865, 866 (N.Y. 1978) ("A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken." (internal quotation marks omitted)).

---

[10] Counts Nine and Ten are Plaintiffs' respective tortious interference claims against all Defendants except the Bayrock Defendants.

### d. Conversion

The TAC fails to state a claim for conversion or aiding and abetting conversion.  "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). Intangible property, such as ownership interests, generally cannot be converted unless a physical or electronic record of the intangible property, such as a stock certificate, is converted.  *See Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1275–78 (N.Y. 2007).  A conversion claim will lie for "recovery of a particular and definite sum of money," *Thys v. Fortis Sec. LLC*, 903 N.Y.S.2d 368, 369 (1st Dep't 2010), but not for "the mere right to payment."  *Selinger Enters., Inc. v. Cassuto*, 860 N.Y.S.2d 533, 536 (2d Dep't 2008).

The TAC does not allege that Defendants converted any physical or electronic record of Plaintiffs' membership interests, as is necessary for such intangible property to be the subject of a conversion claim.  *See Thyroff*, 864 N.E.2d at 1275–78.  Nor does the TAC allege that Plaintiffs ever possessed the millions of dollars in distributions to which they claim they are entitled.  *See Selinger*, 860 N.Y.S.2d at 536 (holding that unpaid broker's commission could not be the subject of a conversion claim).  Accordingly, Plaintiffs' claims for conversion and aiding and abetting conversion are dismissed.

### e. Breach of Fiduciary Duty

The TAC states claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty against Defendants named in Counts Thirteen and Fourteen.[11]

---

[11] Count Thirteen is Plaintiffs' fiduciary duty claim against Defendants Arif, Satter, Schwarz and Bayrock Group.  Count Fourteen is Plaintiffs' aiding and abetting fiduciary duty claim against

"To state a claim for breach of fiduciary duty, a plaintiff must allege the existence of a fiduciary relationship, misconduct by the other party, and damages directly caused by that party's misconduct." *Castellotti v. Free*, 27 N.Y.S.3d 507, 517 (1st Dep't 2016). "A fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. . . . Ascertaining the existence of a fiduciary relationship inevitably requires a fact-specific inquiry." *Roni LLC v. Arfa*, 963 N.E.2d 123, 124–25 (N.Y. 2011) (internal quotation marks and citations omitted). As explained above, the TAC adequately pleads that Plaintiffs obtained membership interests in various Bayrock Entities. As fellow members of the Bayrock Entities with management authority, the Defendants named in Count Thirteen owed a fiduciary duty to Plaintiffs with respect to matters concerning the Bayrock Entities. *See Pokoik v. Pokoik*, 982 N.Y.S.2d 67, 70 (1st Dep't 2014) ("As the managing member of the LLCs, [defendant] owed plaintiff -- a nonmanaging member -- a fiduciary duty."); *Salm v. Feldstein*, 799 N.Y.S.2d 104, 105 (2d Dep't 2005) ("As the managing member of the [LLC] and as a co-member with the plaintiff, the defendant owed the plaintiff a fiduciary duty to make full disclosure of all material facts."). Also as explained above, the TAC sufficiently alleges that these Defendants defrauded and mistreated Plaintiffs in various ways. Accordingly, Count Thirteen states a claim for breach of fiduciary duty against these Defendants.

"[U]nder New York law, a plaintiff generally states a claim for aiding and abetting upon alleging facts sufficient to support an inference of (1) the existence of an underlying tort; (2) the defendant's knowledge of the underlying tort; and (3) that the defendant provided substantial assistance to advance the underlying tort's commission." *Bigio v. Coca-Cola Co.*, 675 F.3d 163,

---

Defendants Arif, Satter, Schwarz, Salomon, Weinreich, Dogan, Pisem, Salomon & Co. and Roberts & Holland.

172 (2d Cir. 2012) (alterations, internal quotation marks and citation omitted).  According to the

TAC, the Defendants named in Count Fourteen knew about the breach of fiduciary duty just

described and performed services that could be considered substantial assistance -- usually

drafting legal or accounting documents that concealed the Material Information, Bad Faith

Practices and Illegally-Structured Satter Payments from Plaintiffs.  Count Fourteen therefore

states a claim for aiding and abetting breach of fiduciary duty.

### f.  Alter Ego/Corporate Veil Piercing

The TAC's allegations of alter ego or corporate veil piercing against Defendants Arif,

Satter and Schwarz are sufficient to state a claim.[12]  Generally, "piercing the corporate veil

requires a showing that:  (1) the owners exercised complete domination of the corporation in

respect to the transaction attacked; and (2) that such domination was used to commit a fraud or

wrong against the plaintiff which resulted in plaintiff's injury."  *Morris v. N.Y. State Dep't of*

*Taxation & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993).  These elements are satisfied here based

on many of the same allegations supporting the RICO claims, namely that Arif, Satter and

Schwarz dominated the Bayrock Defendants and used that domination to perpetrate various

frauds on Plaintiffs.

---

[12] "Historically, piercing the corporate veil was a remedy used by a successful plaintiff to collect a judgment when the corporate defendant was judgment-proof and the shareholders, officers, or directors had assets. Motions to pierce the corporate veil typically would be filed in connection with efforts to execute on a judgment. In the current environment, however, plaintiffs often assert entitlement to veil piercing at the complaint stage."  Elizabeth S. Fenton, *Trends in Piercing the Corporate Veil*, Bus. Torts & Unfair Competition (Am. Bar Ass'n Section of Litig., Chicago, Ill.), July 31, 2013,
http://apps.americanbar.org/litigation/committees/businesstorts/articles/summer2013-0713-trends-in-jurisprudence-piercing-the-corporate-veil.html.

### g.   Unjust Enrichment

The TAC's unjust enrichment claim is dismissed as duplicative of Plaintiffs' other claims.  To plead a claim of unjust enrichment, "the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal citation omitted).  "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."  *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).  "It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  *Id.*  Here, the TAC alleges that Defendants have breached multiple contracts and committed multiple torts.  "To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects."  *Id.*

## IV.   CONCLUSION

All other arguments in the parties' submissions related to this motion have been considered and determined to lack merit.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED with respect to:

- Defendant Salvatore Lauria;

- Plaintiffs' substantive RICO claims as to Defendants Elliot Pisem, Roberts & Holland LLP, Alex Salomon, Jerry Weinreich, Salomon & Co., P.C. and Mel Dogan;

46

- Plaintiffs' RICO conspiracy claims as to Defendants Elliot Pisem, Roberts & Holland LLP, Mel Dogan, Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC, Bayrock Whitestone LLC, Bayrock Spring Street, LLC;

- Plaintiffs' tortious interference with contract claims;

- Plaintiffs' conversion and aiding and abetting conversion claims; and

- Plaintiffs' unjust enrichment claims.

The motion is DENIED as to all other claims.  For clarity the surviving claims and Defendants are as follows:

- Plaintiffs' substantive RICO claims as to Defendants Tevfik Arif, Felix Satter, Julius Schwarz, Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC, Bayrock Whitestone LLC, Bayrock Spring Street, LLC;

- Plaintiffs' RICO conspiracy claims as to Defendants Tevfik Arif, Felix Satter, Julius Schwarz, Alex Salomon, Jerry Weinreich, Salomon & Co.;

- Plaintiffs' fraudulent inducement claims, which are asserted against Defendants Bayrock Group LLC, Tevfik Arif, Felix Satter, Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC, Bayrock Whitestone LLC, Bayrock Spring Street, LLC;

- Plaintiffs' breach of contract claims, which are asserted against Defendants Bayrock Group LLC, Tevfik Arif, Felix Satter, Bayrock Ocean Club LLC, Bayrock Merrimac LLC, Bayrock Camelback LLC, Bayrock Whitestone LLC, Bayrock Spring Street, LLC;

- Plaintiffs' breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, which are asserted against Defendants Tevfik Arif, Felix Satter, Julius Schwarz, Bayrock Group LLC, Alex Salomon, Jerry Weinreich, Salomon & Co., Mel Dogan, Elliot Pisem, Roberts & Holland LLP; and

- Plaintiffs' alter ego/corporate veil piercing claims, which are asserted against Defendants Tevfik Arif, Felix Satter, Julius Schwarz.

The Clerk of Court is directed to close the motion at Dkt. No. 330.

SO ORDERED.

Dated: December 2, 2016
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**